Stuart Sarnoff
Edward Moss
O'Melveny & Myers LLP
7 Times Square
New York, NY 10036
Telephone: 212-326-2000
Email: ssarnoff@omm.com
        emoss@omm.com

Douglas E. Spelfogel
Alissa M. Nann
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016
Telephone: (212) 682-7474
Facsimile: (212) 687-2329
E-Mail: dspelfogel@foley.com
        anann@foley.com

*Attorneys for Plaintiff Pacific Alliance Asia Opportunity Fund L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------X

| | |
|---|---|
| In re: | Chapter 11 |
| GENEVER HOLDINGS LLC, | Case No. 20-12411-jlg |
| Debtor. | |

-------------------------------------------------X

**PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO MODIFY THE AUTOMATIC STAY TO PROCEED WITH STATE COURT LITIGATION, AND RELATED RELIEF**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

JURISDICTION ...................................................................................................... 3

RELIEF REQUESTED............................................................................................. 4

BACKGROUND ...................................................................................................... 4

    I.    PAX and Kwok Enter Into the 2011 Personal Guarantee..................................... 4

    II.    On The Verge of Default, Kwok Forms The Debtor and Purchases the Sherry-Netherland Residence Through Fraud. ..................................... 5

    III.    The Underlying Litigation Between PAX and Kwok Before Justice Ostrager........................................................................................... 8

        A.    The Attachment Phase and Kwok's Attempts to Shield the Residence. ..................................................................................... 8

        B.    The Merits and Kwok's Perjury......................................................... 12

        C.    The Summary Judgment Decision and Judgment Enforcement. ............. 14

        D.    The Upcoming Trial.......................................................................... 15

    IV.    Bravo Luck and the Purported Trust Agreement. ................................................ 16

    V.    The Debtor's (Kwok's) Sham Bankruptcy Petition............................................. 21

ARGUMENT .......................................................................................................... 24

    I.    The Court Should Modify the Automatic Stay to Allow the State Court Action to Conclude Before Justice Ostrager......................................... 24

        A.    The Court Should Modify the Stay Because the Petition Was Filed in Bad Faith..................................................................................... 24

        B.    Establishing Bad Faith Is Not Necessary to Demonstrate Cause for Stay Relief...................................................................................... 32

    II.    PAX Reserves Its Rights to Seek Further Relief. ................................................ 34

CONCLUSION........................................................................................................ 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 167 W. 133rd St. Hous. Dev. Fund Corp.*,
No. 18-12043 (JLG), 2018 WL 4637460 (Bankr. S.D.N.Y. Sept. 25, 2018) ................... 25, 27

*In re Artisanal 2015, LLC*,
No. 17-12319 (JLG), 2017 WL 5125545 (Bankr. S.D.N.Y. Nov. 3, 2017)............................ 26

*In re Balco Equities Ltd. Inc.*,
312 B.R. 734 (Bankr. S.D.N.Y. 2004) ................................................................................ 25, 27

*In re C-TC 9th Ave. P'ship*,
113 F.3d 1304 (2d Cir. 1997) ............................................................................................... 27, 30

*In re HBA East, Inc.*,
87 B.R. 248 (Bankr. E.D.N.Y. 1988) ................................................................................. 25, 26

*In re Project Orange Assocs., LLC*,
432 B.R. 89 (Bankr. S.D.N.Y. 2010) ........................................................................... 25, 27, 33

*In re Syndicom Corp.*,
268 B.R. 26 (Bankr. S.D.N.Y. 2001) .................................................................... 25, 26, 27, 31

*In re The Bridge to Life, Inc.*,
330 B.R. 351 (Bankr. E.D.N.Y. 2005) .................................................................................. 2, 25

*In re Wally*,
36 B.R. 849 (Bankr. S.D.N.Y. 1984) .......................................................................................... 32

*Marrama* v. *Citizens Bank of Mass.*,
549 U.S. 365 (2007) ...................................................................................................................... 1

*Patterson v. Newspaper & Mail Deliverers' Union of New York & Vicinity*,
138 B.R. 149 (S.D.N.Y. 1992) ................................................................................................... 33

*Schur Management*,
323 B.R. 123 (Bankr. S.D.N.Y. 2005) ...................................................................................... 32

*Sonnax Indus., Inc. v. Tri-Component Prods. Corp.* (*In re Sonnax Indus., Inc.*),
907 F.2d 1280 (2d Cir. 1990)............................................................................................... 32, 33

*State of N.Y. v. N. Storonske Cooperage Co.*,
174 B.R. 366 (N.D.N.Y. 1994) .................................................................................................. 33

*Wilk Auslander LLP* v. *Murray (In re Murray)*,
900 F.3d 53 (2d Cir. 2018)..................................................................................................... 25, 26

**Statutes**

11 U.S.C. § 362(d) ........................................................................................................................ 1, 4

28 U.S.C. § 1334............................................................................................................................... 3

ii

28 U.S.C. § 157 ........................................................................................................ 3, 4

**Other Authorities**

*Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012 ....................................................... 3

Pacific Alliance Asia Opportunity Fund L.P. ("PAX"), by its counsel, O'Melveny & Myers LLP and Foley & Lardner LLP, hereby moves (the "Motion") under 11 U.S.C. § 362(d) for the entry of an order modifying the automatic stay to allow PAX to conclude its New York State Court lawsuit, Docket No. 652077/2017, (the "State Court Action," pending before Justice Barry R. Ostrager) against the Debtor, and to address any attendant claims by any other non-debtor third-parties that may be joined as parties, including but not limited to Bravo Luck Limited ("Bravo Luck") up through entry of final judgment, but excluding enforcement of any such judgment as against the Debtor. In support of the Motion, PAX respectfully states as follows:

## PRELIMINARY STATEMENT[1]

1.        The Debtor's chapter 11 petition (the "Petition") was filed in bad faith. The instant case is nothing but a two-party dispute between PAX and Kwok—the mastermind and controlling member of the Debtor. Kwok orchestrated the bankruptcy filing in an effort to move the veil-piercing trial and related proceedings away from Justice Ostrager, who has presided over the State Court Action for almost four years and has issued a series of rulings adverse to Kwok, including summary judgment in favor of PAX on its breach of contract claim. This bankruptcy filing is a classic example of a party trying to gain an advantage in a two-party litigation involving non-bankruptcy law by filing for bankruptcy under the guise of chapter 11.

2.        Here, there is no "honest but unfortunate debtor."[2] The Debtor is a mere shell formed only to hold and shield a single asset: Kwok's luxury apartment (the "Residence") atop the Sherry-Netherland Hotel (the "Sherry-Netherland"). There is no entity to reorganize; there is

---

[1] Exhibit citations are to the exhibits attached to the December 16, 2020 Declaration of Edward Moss in Support of PAX's Motion for Stay Relief, filed concurrently herewith. The Debtor's Declaration Pursuant to Local Bankruptcy Rule 1007-2, attached to the Voluntary Petition for Non-Individuals Filing for Bankruptcy (ECF No. 1), is referred to as the "Wang Declaration" or "Debtor's Decl." Unless otherwise noted, emphasis is added, and internal quotations and citations are omitted.
[2] *Marrama* v. *Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007).

only Kwok, who wholly owns and dominates the Debtor and its British Virgin Islands incorporated parent, Genever Holdings Corporation ("Genever BVI"), and, thus, the Residence itself. Further, the only legitimate non-insider creditors here are PAX and the Sherry-Netherland (to whom Kwok owes several hundred thousand dollars in delinquent maintenance payments, but which is secured by a security deposit of more than $3 million).

3.    Kwok's bad-faith conduct goes beyond simply filing an action that does not belong in this Court. As detailed below, Kwok has engaged in a wrongful pattern and practice of trying to evade repaying his debt to PAX and obstructing the State Court Action, including routinely committing perjury and misleading Justice Ostrager—who has found that Kwok has misled him and is playing a "shell game" with his assets. Indeed, Kwok caused the Debtor to file its Petition just after Justice Ostrager restrained him from dissipating his assets, including the Residence, and on the eve of having a nine-figure judgment entered against him.

4.    Kwok's gambit here is simple and obvious—he is trying to frustrate PAX's attempts to collect on its forthcoming judgment and foreclose on Kwok's assets, including the Residence, so that it can finally be repaid for a 2011 loan facility that Kwok personally guaranteed and that has long been in default. Kwok also wants to take the case away from Justice Ostrager— who, after four years of litigation, sees Kwok for the fraudster he really is—so that Kwok can try to perpetuate the shell game he has been playing with his assets and block PAX from collecting the forthcoming $120-million-plus judgment. But "[c]hapter 11 was never intended to be used as a fist in a two party bout."[3]

5.    A trial on the veil-piercing issue had been scheduled for January 2021, and the parties expect it will be tried as early in 2021 as COVID-19 will allow. By this Motion, PAX

---

[3] *In re The Bridge to Life, Inc.*, 330 B.R. 351, 357 (Bankr. E.D.N.Y. 2005).

seeks to modify the automatic stay to allow PAX to conclude the State Court Action against the Debtor, and to address any attendant claims by any other non-debtor third-parties that may be joined as parties, including but not limited to Bravo Luck, as discussed below, up through entry of final judgment, but excluding enforcement of any such judgment as against the Debtor.

6.     The State Court Action has been pending in the Commercial Division since 2017, and Justice Ostrager is intimately familiar with the case and has recently stated his strong desire to bring it to closure. Kwok—who entirely controls the Debtor—has filed this bankruptcy Petition in bad faith and with one goal: to perpetuate his improper multi-year effort to try to evade his debt and thwart PAX's ability to collect through its lawsuit. In addition, here, the Debtor asserts that it is not the "true" owner of the Residence (in complete contradiction of the record in the State Court Action), but nevertheless has filed chapter 11 to protect that very asset. The Debtor then goes on to suggest that this Court should adjudicate claims between two non-debtors—PAX and Bravo Luck relating to such asset. The claim that Bravo Luck, not PAX, should receive the proceeds of the Residence is a continuation of Kwok's shell game and further demonstrates that the Debtor has filed this Petition in bad faith. The potential dispute between Bravo Luck and PAX, both non-debtors, is a state-law issue that should be adjudicated not by this Court, but rather by Justice Ostrager, who is intimately familiar with the issues. Accordingly, for the reasons detailed herein, the Motion should be granted, and PAX should be permitted to conclude the State Court Action before Justice Ostrager.

## **JURISDICTION**

7.     This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012. This is a core proceeding pursuant to 28

U.S.C. § 157(b). The statutory bases for the relief requested herein are Bankruptcy Code sections 362 and 1112.

## RELIEF REQUESTED

8.     Bankruptcy Code section 362(d)(1) provides that "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the [automatic] stay . . . by terminating, annulling, modifying, or conditioning such stay for cause . . ." 11 U.S.C. § 362(d). By the Motion, PAX requests that the Court exercise its discretion under section 362(d)(1) to modify the automatic stay to allow PAX to conclude the State Court Action before Justice Ostrager, including conducting the veil-piercing trial and any other relief requested in that case, through judgment but excluding enforcement.

## BACKGROUND

### I.     PAX and Kwok Enter Into the 2011 Personal Guarantee.

9.     This dispute goes back nearly a decade. In March 2011, Kwok and PAX entered into a contract in Asia (the "2011 Personal Guarantee") under which Kwok personally guaranteed a loan facility—approximately $46 million at the time—that PAX had issued to one of Kwok's companies.[4]

10.     Although repayment was due in 2012, neither Kwok nor his company has repaid the debt to PAX; instead, Kwok has effectuated a campaign of fraud and delay.

---

[4] PAX and Kwok began their relationship in early 2008, when PAX lent Kwok and his controlled companies $100 million in two tranches in order to fund the completion of construction of the Pangu Plaza in Beijing, China. Ex. 1. By 2011, Kwok and his companies still had not repaid one of those loans. *See* Ex. 2. On March 16, 2011, a Kwok-controlled entity, Shiny Times, and PAX entered into the "2011 Loan Facility," which superseded the prior agreements and memorialized Shiny Times' debt to PAX as of December 31, 2010 at $46,426,489, with a 15% annual interest rate and a June 30, 2012 repayment date. Ex. 3. The 2011 Loan Facility was conditioned on Kwok's execution of a personal guarantee that secured performance by Shiny Times. *Id.* at 1. As required, Kwok entered into that 2011 Personal Guarantee, also on March 16, 2011. Ex. 4.

## II. On The Verge of Default, Kwok Forms The Debtor and Purchases the Sherry-Netherland Residence Through Fraud.

11. In an attempt to settle the debt, on April 19, 2013, PAX, Shiny Times Holdings Ltd. ("Shiny Times") (Kwok's company/borrower), Kwok, and Beijing Pangu Investment Co. Ltd. ("Beijing Pangu") (the Kwok-affiliated entity that owns real property known as "Pangu Plaza") entered into the "2013 Deed of Settlement," which provided that Shiny Times' debt to PAX would be discharged in return for PAX receiving legal ownership of three residential apartments at Pangu Plaza (the "Apartments").[5] The 2013 Deed of Settlement contained ten conditions precedent to conveying the Apartments to PAX (the "Conditions Precedent") that needed to be satisfied by a July 31, 2013 deadline, or else the settlement would terminate, and the 2011 Loan Facility and 2011 Personal Guarantee would revert to being in full force and effect.[6] The Conditions Precedent were not satisfied by the agreed-upon deadline, or by any of the four deadline extensions thereto,[7] and so the 2011 Loan Facility and 2011 Personal Guarantee reverted to being in full force and effect.

12. In "late January or early February 2015," the People's Republic of China ("PRC") Government charged Kwok with multiple crimes, including corruption, and seized his PRC assets—among them the Pangu Plaza complex, which included the Apartments that were intended to be used in settlement of the obligations to PAX.[8] Kwok never informed PAX of this seizure.

13. On February 10, 2015, Kwok entered into the final extension of the 2013 Deed of Settlement, extending until June 30, 2015, his deadline to satisfy the Conditions Precedent and

---

[5] Ex. 5.
[6] *Id.* at §§ 3.2, 3.4.
[7] Exs. 6–9.
[8] Ex. 10 at ¶ 57; *see also* Ex. 11 at PAX-KWOK-073379, 91 (Beijing land records showing "[j]udicial seizure" of Beijing Pangu properties beginning February 2, 2015).

convey the Apartments to PAX.[9]  In other words, despite the seizure of his PRC assets (including the Apartments), Kwok continued to offer up such assets to PAX to induce a further forbearance. Around the same time, Kwok fled China for New York City,[10] where he worked in secret to strip and hide his other, available assets.

14.     Specifically, once in New York, Kwok formed two shell companies—the Debtor[11] and Genever BVI[12] (collectively, the "Genever Entities")—to continue his shell game.  Kwok is the sole shareholder[13] and sole director of Genever BVI,[14] which in turn is the sole member of the Debtor.[15]  Other than the Residence (apart from Genever BVI's stock in the Debtor and nominal cash), neither the Debtor nor Genever BVI has any assets,[16] employees,[17] phone number,[18] offices,[19] or source of revenue;[20] their exclusive purpose is to hold and shield the Residence for Kwok.

15.     Kwok formed the Genever Entities to purchase the Residence, which occurred on March 6, 2015[21] for $67.5 million in cash.[22]  The purchase price was almost precisely the amount Kwok owed to PAX at that time, including accrued interest.  Thus, Kwok was able to direct virtually the exact amount he knew he owed to PAX into a U.S. asset that he made sure was doubly shielded (by two holding companies) three months before the proposed settlement with PAX

---

[9] Ex. 9 at § 2.1(a).
[10] Ex. 10 at ¶ 23.
[11] Ex. 12 at SN 0156.
[12] *Id.* at SN 0159.
[13] *Id.* at SN 0160–61; Ex. 13 at ¶ 4 & Ex. A.
[14] Ex. 12 at SN 0162–63.
[15] *Id.* at SN 0198, 206.
[16] Ex. 14 at 47:19–22; 100:8–101:19.
[17] *Id.* at 36:17–19; 96:18–20.
[18] *Id.* at 36:20–23; 96:21–23.
[19] *Id.* at 35:4–6; 96:10–14.
[20] *Id.* at 26:4–13, 86:16–87:22, 100:8–25.
[21] Ex. 15 at SN 0351.
[22] Ex. 16 at SN 0084.

would finally fall apart (as he knew it would because at the time he knew the Chinese authorities had already seized his Pangu Plaza and other assets).

16.     During his purchase application process with the Sherry-Netherland, Kwok acted like a man in a hurry to hide his assets.  The Sherry-Netherland's Vice President and Chief Operating Officer testified that he had "never seen"—before or since—an apartment purchased through *two* LLCs.[23]  And Kwok pressured the Sherry-Netherland to approve his application quickly, threatening to walk away unless they approved him within three days.[24]  Indeed, the Sherry-Netherland Vice President and COO later testified that he had never "received this sort of ultimatum from another prospective purchaser."[25]  Kwok also made several fraudulent misrepresentations in his purchase application, including claiming to own companies that he later testified he never did own.[26]

17.     When confronted with Kwok's deposition testimony—*i.e.*, that he never owned the companies he represented as owning in an attempt to demonstrate financial suitability to purchase and maintain a luxury New York apartment—the President of the Sherry-Netherland's Board of Directors testified that "we were defrauded."[27]  Similarly, the Vice President and COO of the

---

[23] Ex. 17 at 68:16–25.
[24] Ex. 16 at SN 0084.
[25] Ex. 17 at 75:6–9; *see also id.* at 39:18–40:2 (describing it as "odd" that Kwok "wanted to close very quickly").
[26] For example, in response to the Sherry-Netherland's request for financial disclosure, Kwok represented that he "owned" and "controlled" Beijing Zenith Holdings Company Ltd. ("Beijing Zenith") and that it had almost $4 billion in assets.  Ex. 18 at SN 0058–72.  But Kwok later testified under oath not only that he never had *any* ownership interest in Beijing Zenith, but also that he *knew* at the time he presented the financials to the Sherry-Netherland to bolster his application that Beijing Zenith's assets had been seized by the PRC government (along with his other assets) a month before (a fact he never disclosed to the Sherry-Netherland).  Ex. 19 at 77:16–78:7, 79:23–80:9.
[27] Ex. 20 at 75:20–76:7.

Sherry-Netherland testified that in his four decades dealing with hundreds of residents, none "made misrepresentations . . . to the extent that Mr. Kwok and his representatives have."[28]

### III. The Underlying Litigation Between PAX and Kwok Before Justice Ostrager.

18. As of early 2015, PAX did not know that Kwok had fled Asia for New York. PAX thus sent Kwok and Shiny Times (the primary obligor) demand letters to Kwok's Hong Kong address[29] and also initiated liquidation proceedings[30] in the British Virgin Islands (Shiny Times' home jurisdiction) seeking to recover the debt. But Kwok never responded, and Shiny Times was found to be insolvent in the liquidation proceeding.[31] So PAX recovered nothing.

19. After PAX learned Kwok had fled to New York, PAX filed suit against Kwok in New York Supreme Court on April 18, 2017, for breach of the 2011 Personal Guarantee.[32] Because the Petition is a transparent attempt by Kwok to evade the judgment in that case—and because that case has spanned nearly four years and has involved more than 650 docket entries, nearly a dozen motions and hearings, and several written decisions—we address that lawsuit's history below.

#### A. The Attachment Phase and Kwok's Attempts to Shield the Residence.

20. By the time PAX filed its lawsuit, it understood full well with whom it was dealing. PAX knew that Kwok would take any step possible to try to shield and secret his assets and frustrate PAX's collection efforts. As a result, before proceeding to the merits of the case, PAX

---

[28] Ex. 17 at 119:19–23.
[29] Exs. 21–22.
[30] Ex. 23 at ¶ 23.
[31] *Id.*
[32] Ex. 24.

sought to protect itself against a subsequent pyrrhic victory by seeking a pre-judgment order of attachment of the only significant asset it knew Kwok held in the United States—the Residence.[33]

21.     Discovery revealed that even after purchasing the Residence through the double-holding-company structure, Kwok took further steps to try to shield it:

(a)     In May 2015, just two months after purchasing the Residence, Kwok pledged it to an entity named Roscalitar 2.[34]  (Kwok terminated that pledge, which had violated his Sherry-Netherland proprietary lease, in March 2017.[35])

(b)     In October 2015—just seven months after purchasing the Residence and while it was still pledged to Roscalitar 2—Kwok listed the Residence for sale.[36]  (He has had it on and off the market ever since, dropping the asking price repeatedly.[37])

(c)     In June 2016 (after Shiny Times was liquidated and found insolvent), Kwok's employee asked the Sherry-Netherland to "***undertake some restructuring in relation to the property so that the ultimate beneficial ownership will pass to his son***" by transferring ownership of the Debtor to "***a trust of which the son is a beneficiary.***"[38]  The Sherry-Netherland denied the request, informing Kwok that his son would need to go through the regular application and approval process.[39]

(d)     In June 2017, two months after PAX filed suit against Kwok, he attempted to change the "contact person" for the Residence to his son.[40]  The Sherry-Netherland Vice President and COO testified that he believed this was an attempt to "circumvent the [Sherry-Netherland's June 2016] decision . . . that he couldn't transfer the apartment to the son."[41]

(e)     In February 2018, Kwok pledged the Residence to a new entity, Blue Capital.[42]  (He terminated that lease-violating pledge after six months, in June 2018.[43])

(f)     In April 2019, Kwok produced—for the first time, and despite it being responsive to earlier discovery requests—a document supposedly dated February 17, 2015, by which the two Genever Entities purported to declare they held their assets

---

[33] Ex. 25.
[34] Ex. 26; *see also* Ex. 13 at ¶ 5.
[35] Ex. 27.
[36] Ex. 28.
[37] Ex. 29 at 3.
[38] Ex. 30 at SN 0018–19.
[39] Ex. 17 at 77:11–78:25.
[40] Ex. 31 at SN 0278.
[41] Ex. 17 at 92:12–93:3.
[42] Ex. 32.
[43] Ex. 33.

(including the Residence) in trust for an entity called Bravo Luck.[44] But that purported trust agreement is nothing more than a forged, sham document that is part of Kwok's continuing shell game. *Not once* during the proceedings before Justice Ostrager did Kwok rely on this document, including when he was attempting to avoid attachment by relying on the other pledges discussed above. But now, as discussed below, Kwok claims that Bravo Luck is wholly owned by his (now) 33-year-old son, and is the rightful owner of the Residence.

22.     Continuing his improper efforts to shield the Residence, Kwok engaged in gamesmanship throughout the attachment phase, including making numerous false representations to Justice Ostrager and committing perjury at his deposition.  To cite just a few examples:

23.     ***False Statements About Ownership of the Residence***.  Kwok listed **himself** as the "Applicant" on his Sherry-Netherland purchase application,[45] he submitted letters that recommended **himself** personally to the Board,[46] and he represented to the Court that **he** had an "ownership interest" in the Residence.[47]  But at his subsequent deposition, Kwok testified that he was not in fact the owner; rather, he testified that the Residence was owned by someone named Zhang Wei, a mysterious alleged associate who had been imprisoned in China since May or June 2015[48]—and whose name does not appear on a single document related to the Residence, or on Kwok's interrogatory responses listing people with knowledge about the Residence.[49]  Similarly, the Debtor does not mention Zhang Wei in its Petition, schedules, or the Debtor's Declaration.

24.     ***False Statements About Ownership and Control of the Debtor***.  Although Kwok represented to the Court that he was the "sole shareholder" of Genever BVI,[50] he testified at his deposition that he did not know whether he was Genever BVI's sole shareholder and that "of

---

[44] Ex. 34.
[45] Ex. 15 at SN 0368–70.
[46] *Id.* at SN 0371–77.
[47] *See, e.g.*, Ex. 13 at ¶ 2.
[48] Ex. 19 at 27:9–16, 114:23–25.
[49] Ex. 35 at 9–10.
[50] Ex. 13 at ¶ 4.

course" he did not control Genever BVI—Zhang Wei did.[51] And despite testifying that he had a written agreement to evidence Zhang Wei's ownership,[52] Kwok (not surprisingly) has never produced it.[53]

25.     ***False Statements About Pledges of the Residence***.  Kwok twice tried to evade an attachment based on the false argument that the Residence already had been pledged to a third-party.  First, Kwok's employee Yan Ping "Yvette" Wang swore in an affidavit filed with the Court that "the assets of Genever BVI, which by virtue of its ownership of [the Debtor] include the [Residence], were pledged to Roscalitar 2."[54]  At her subsequent deposition, however, Wang admitted that she in fact knew absolutely ***nothing*** about any pledges, had "no idea" if the Residence or the Genever Entities had been pledged, and had never spoken to Kwok about any pledges.[55]  PAX also demonstrated that Wang's sworn statement was false through evidence of publicly available filings that the Roscalitar 2 pledge had actually been terminated ***in March 2017***—before PAX even filed its lawsuit.[56]  Of note, the same Ms. Wang is the signatory on the Petition and the declarant in support of this chapter 11 filing.[57]

26.     When confronted by the Sherry-Netherland about the unequivocal statement in Wang's affidavit that the Residence had been pledged to Roscalitar 2, Kwok's lawyers argued, counter-factually, that the affidavit "***made no such representation.***"[58]  Kwok then changed course, submitting (through his since-fired counsel) documents to the Court at oral argument showing that

---

[51] Ex. 19 at 36:20–24.
[52] *Id.* at 119:4–24.
[53] Ex. 36.
[54] Ex. 13 at ¶ 5.
[55] Ex. 37 at 80:2–23.
[56] Ex. 38 at 5; *see also* Ex. 27.
[57] *See* Petition and Debtor's Decl. at ECF No. 1.
[58] Ex. 39 at SN 0437.  Kwok had a motive to deny this, because the pledge violated his lease agreement with the Sherry-Netherland.

the Residence was instead pledged to a different entity called Blue Capital.[59]  Kwok and his

counsel, however, failed to provide the Court with the publicly available filings demonstrating that

this pledge, too, had actually been terminated—*two weeks* before Kwok's counsel touted the

pledge in open court.[60]

27.     On this record (and more), Justice Ostrager found that "the fact pattern here [was]

very problematic" for Kwok,[61] and ultimately entered a notice Order requiring Kwok to "provide

Plaintiff with immediate written notice of any contract" for sale or assignment of the Residence.[62]

### B.     The Merits and Kwok's Perjury.

28.     With the Residence effectively secured by the Court's notice Order, PAX

proceeded to the merits of its breach of contract case.  Kwok relied on no documents he produced,

called no witnesses, and—as it quickly became clear—had no defense.  So, true to form, Kwok

lied again and tried to make one up.

29.     At his deposition, nearly two-and-half years into the case, Kwok raised the

argument *for the first time* that the 2011 Personal Guarantee and several related contracts between

---

[59] Ex. 40.

[60] Ex. 33.  Beyond making misrepresentations to the Court and committing perjury, Kwok has made a mockery of the entire discovery process.  For example, the key question before the Court on PAX's attachment motion was whether Kwok would attempt to frustrate any judgment that might be entered for PAX.  But when PAX's counsel asked Kwok that precise question, Kwok's counsel instructed him not to answer: "Q. . . . If the court finds for our client and orders you to pay a judgment in this lawsuit, money to us, will you pay it?  Mr. Harmon: Don't answer the question.  It's beyond the scope of the attachment proceeding, discovery.  A. Refuse to answer."  Ex. 19 at 125:20–126:5.  Perhaps nothing better illustrates Kwok's disdain for and mockery of the legal process than his answer to the question whether his text messages were searched in response to document requests: "I don't understand what you mean by that.  I never discuss this litigation.  I think this is just a crazy case.  I think this is just scamming.  *I think you guys are a bunch of thugs.  I think you are just mafia.  You're working for the communists . . . I don't need to pay any attention to you at all . . .* You have created a completely nonexisting case and then you're ask [sic] me questions.  I'm completely unable to answer you."  *Id.* at 21:3–22:3.

[61] Ex. 41 at 31:16–17.

[62] Ex. 42 at 1–2.  During the attachment phase, as advised by the Court, PAX added the two Genever Entities as defendants on a veil-piercing claim in order to be able to collect against the Residence.

the parties (*e.g.*, the 2011 Loan Facility and the 2013 Deed of Settlement and its extensions) were actually falsified documents with his signatures forged.[63]

30.     PAX moved for sanctions based on Kwok's blatant lies, and the Court granted PAX's request that it preclude[64] Kwok from arguing either at summary judgment or trial that the contracts were forgeries because he "on more than one occasion, [had] sponsored [those same contracts] to the Court as authentic documents."[65]   Most egregiously, at the outset of the case, Kwok ***himself had sponsored these very agreements by attaching copies of them to an affidavit he submitted to the Court*** to support a dismissal motion.   Kwok submitted the affidavit from Fiona Yu, his "appointed person," who swore to the Court "under penalty of perjury" that she was attaching "true and correct copies of" the agreements.[66]   This is worth repeating:   ***Kwok filed his own copies of several agreements with the Court to support his motion to dismiss, only to falsely testify more than two years later that those exact same agreements were forgeries.***

31.     Kwok also previously had stipulated in a letter to the Court that he "d[id] not dispute the authenticity" of those key contracts.[67]   Similarly, he had admitted in several briefs that the contracts were authentic, including admissions that "*[i]n 2011*, PAX LP and Shiny Times entered into another written agreement superseding prior agreements between the parties about repayment of this loan facility," and that, "***at the same time, Kwok also entered into a separate personal guarantee***."[68]

---

[63] Ex. 43 at 225:6–22, 230:24–231:7, 233:17–19, 234:12–18, 238:18–24.
[64] Ex. 44 at 1.
[65] Ex. 45 at 25:24–26:3.
[66] Ex. 46 at 1.
[67] Ex. 47.
[68] Ex. 48 at 1.

### C. The Summary Judgment Decision and Judgment Enforcement.

32. PAX moved for summary judgment on its breach of contract claim in the summer of 2020, and Kwok managed only one argument on the merits in response—that the Court should reverse its prior preclusion ruling and allow Kwok to continue to offer his (perjured) testimony that the 2011 Personal Guarantee was a forgery.[69] But in a Decision and Order entered on September 15, 2020, the Court granted PAX's motion, rejected Kwok's argument, held him "liable for breach of the 2011 Personal Guarantee," and directed PAX to move "to establish damages . . . so that the Clerk of Court may calculate the total amount due and owing as of the date of entry of judgment."[70]

33. On September 25, 2020, in view of Kwok's long history of misconduct, PAX also moved for relief under CPLR § 5229,[71] which provides that any "party in whose favor a verdict or decision has been rendered" may, with Court approval, enforce the judgment before it is formally entered (and before damages are determined) by (i) taking discovery of the adverse party, and (ii) obtaining an order restraining the adverse party from dissipating assets.[72]

34. Recognizing that Kwok might well try to dissipate his assets before the Court could enter an order under CPLR § 5229, PAX also asked the Court to preserve the status quo until PAX could be heard on its motion.[73] On September 30, 2020, after oral argument, the Court granted PAX's requested TRO, "enjoin[ing] Mr. Kwok from any activity that alters the status quo, except ordinary course expenses" and set a hearing for October 15, 2020, on the CPLR § 5229 motion.[74]

---

[69] Ex. 49 at 8–12.
[70] Ex. 50 at 7–8.
[71] Ex. 51.
[72] CPLR § 5229.
[73] Ex. 51 at 4–5.
[74] Ex. 67 at 7:20–22; *see also* Ex. 52.

35. On October 12, 2020, the Debtor filed its Petition—a clear attempt by Kwok to further delay and frustrate PAX's attempt to collect on its forthcoming nine-figure judgment.

36. On October 15, 2020, the Court held oral argument and granted PAX's requested relief. In addition to allowing PAX to take discovery of Kwok's assets, the Court restrained Kwok

> from making or causing any sale, assignment, transfer, or interference with any property in which he has an interest, whether directly or indirectly, and from paying over or otherwise disposing of any debt now due or thereafter coming due to him subject to the exceptions set forth in CPLR 5222, in accordance with the proceedings on the record of October 15, 2020. ***Specifically, Mr. Kwok and/or the registered owners of (1) the Residence at the Sherry-Netherland Hotel*** and (2) the yacht, "the Lady May" ***are restrained from making or causing any sale, assignment, transfer, or interference with those assets***.[75]

37. During the hearing, the Court made clear that the case had been ongoing for years, had occupied a considerable amount of the Court's time, and that it would no longer tolerate Kwok's gamesmanship and abuse of the litigation process:

> Look, this is a 2017 case. We've had multiple motions relating to Mr. Kwok's assets. ***The Court believes***, as reflected in the September 15, 2020 [Summary Judgment] order ***that Mr. Kwok has attempted to mislead the Court. The Court believes that Mr. Kwok is, as the plaintiff contends, playing a shell game with his assets, and has violated if not the letter of court orders, the spirit of court orders***. . . . So ***we are not going to have any more shell games***. Wherever these assets are held, they are going to remain held where they presently reside, and ***if it's determined that the entities that are presently listed as the owners of the assets are the alter ego of Mr. Kwok or are wholly dominated and controlled by Mr. Kwok, those assets will be made available to satisfy any judgment that the plaintiff recovers***.[76]

**D. The Upcoming Trial.**

38. As noted above, the Court granted summary judgment for PAX on liability on its breach-of-contract claim against Kwok. The Court has scheduled oral argument on December 18,

---

[75] Ex. 53 at 1.
[76] Ex. 54 at 21:10–22:14.

2020, on PAX's motion to establish damages as to Kwok (in an amount expected to be more than $120 million) on its contract claim. The Court also has scheduled a trial (for as early as practicable in 2021 given the pandemic) on the issue of whether the Debtor and Genever BVI are liable for Kwok's debt under a veil-piercing theory.[77] Essentially, the trial will resolve whether PAX has a judgment against the Debtor as Kwok's alter ego, and thus can collect against the Debtor's sole asset, the Residence.

## IV.  Bravo Luck and the Purported Trust Agreement.

39.    In a further distortion of the truth, Kwok (and the Debtor, as discussed below) now claims that Bravo Luck (an entity based in BVI) is actually the beneficial owner of the Residence under a purported trust agreement (the "Trust Agreement")—a document supposedly dated February 17, 2015, by which the two Genever Entities purported to declare that they held their assets (including the Residence) in trust for Bravo Luck. The Trust Agreement, however, is a total fraud, and Bravo Luck is the ultimate bogus insider—it is a shell company controlled by Kwok.

40.    ***The Purported Trust Agreement***. The Trust Agreement has all the indicia of being a bogus, backdated document. For example, the Trust Agreement is dated February 17, 2015, and describes the Debtor as "a limited liability company formed in New York [] at Unit 1801, the Sherry-Netherland Apartments, 781 Fifth Avenue, New York, New York."[78] But the Sherry-Netherland did not approve Kwok's purchase application ***until March 4, 2015***.[79] In fact, Kwok did not even submit his purchase application until February 26, 2015.[80] The Trust Agreement's representation that the Debtor owned the Residence (and used the Residence's address) more than

---

[77] Ex. 50 at 7–8.
[78] Ex. 34.
[79] Ex. 55 at SN 0086–87.
[80] Ex. 15 at SN 0368.

two weeks before the Residence was even acquired reveals the document for what it is: a poorly crafted fraud.

41.     Further, not once did Kwok even try to rely on the purported Trust Agreement in *any* proceedings or papers at any point in the litigation before Justice Ostrager—even though Kwok had argued on multiple occasions that PAX could not attach the Residence because it had been pledged to *other* third-party entities (*e.g.*, Roscalitar 2 and Blue Capital). ***Put another way, if the Genever Entities' assets (including the Residence) were legitimately held in trust for Bravo Luck as of February 2015, then Kwok certainly would (and should) have relied on that fact in opposing PAX's several attachment motions, instead of making false claims about other (extinguished) pledges.***

42.     In fact, Kwok did not produce a copy of the purported Trust Agreement to PAX until April 2019, despite the fact that it was responsive to earlier discovery requests.  In the cover email for production, Kwok's counsel stated that the Trust Agreement had been only "recently obtained" by Kwok,[81]  which is surprising because Kwok was a signatory.

43.     Moreover, if the Genever Entities truly were holding the Residence in trust for Bravo Luck, then surely Kwok would have known something about Bravo Luck —especially in the context of a deposition, the subject matter of which was primarily the Residence.  But, under oath, Kwok actually testified that he knew almost nothing:

Q.  What is Bravo Luck?

A.  . . . I think Bravo Luck is a company that [] has some relation to Mr. Zhang Wei, but I'm not really sure . . .

Q.  Do you have any relation to Bravo Luck?

A.  I really don't know.

---

[81] Ex. 34.

. . .

Q. You have no ownership interest in Bravo Luck Limited?

A. I do not remember having any.[82]

44.     ***Kwok Controls Bravo Luck***.  Kwok has a history of using his children to conceal his wealth.[83]  The Debtor states in the Wang Declaration that Bravo Luck is ***wholly owned by Kwok's now-thirty-something-year-old son, Qiang Guo***.[84]  This belies that Kwok controls, and has a beneficial interest in, Bravo Luck, and is only using his son as a "front" person.  Further, PAX expects that Kwok will argue—based on a document that he has relied on in proceedings pending against Genever BVI and other third-parties in the BVI but never produced in the State Court Action—that his son owns 100% of Bravo Luck because Kwok transferred his 50% interest in that company to his son for $1 in mid-2015.[85]  But this is just more fraud designed to conceal the obvious: just as Kwok owns and controls the Debtor, he also owns and controls Bravo Luck.[86]

45.     If Kwok's son (through Bravo Luck) really were the beneficial owner of the Residence by virtue of the purported Trust Document, then Kwok would never have asked the Sherry-Netherland, as he did in June 2016, to "undertake some restructuring in relation to the property so that the ultimate beneficial ownership will pass to his son" by transferring ownership

---

[82] Ex. 19 at 81:10–82:22.

[83] Ex. 56 at ¶¶ 4–6.

[84] Debtor's Decl. ¶ 4.

[85] PAX filed certain ancillary actions in BVI in 2020 under case No. BVIHCM 2020/0137, against non-debtor third-parties, including, as against (i) Genever BVI, (ii) Bravo Luck, (iii) Kwok, and (iv) Guo (his son) seeking to enforce the NY Judgment, attacking the sham Trust Deed as a fraud, for a declaration that Bravo Luck is in any event Kwok's company, and for damages for conspiracy.  PAX has obtained injunctive relief in support of these proceedings.

[86] On March 5, 2015 (one day before closing on the Residence), Bravo Luck paid $6,300,000 to Kwok's son, Qiang Guo, *see* Ex. 66, who then paid $3,369,000 to the Sherry-Netherland (as part of the purchase price for the Residence). Ex. 61 at ¶ 14. However, it is not clear why Bravo Luck would have needed to transfer the money to Qiang Guo to pay on to the Sherry-Netherland if Bravo Luck was really Qiang Guo's company.  Indeed, this was Kwok's attempt to create a paper trial to suggest that part of the purchase price was funded by Qiang Guo.

to "a trust of which the son is a beneficiary."[87]   The reason Kwok did ask is because he himself has owned and controlled Bravo Luck all along.

46.     In April 2020, PAX obtained an order from the BVI Courts directing the registered agent of Bravo Luck to provide disclosure of certain documents, including ownership information.[88]   That disclosure showed that the sole shareholder of Bravo Luck on incorporation was Qiang Guo, and on January 26, 2015, 50% of Bravo Luck's shares were transferred to Kwok.[89]   Accordingly, as of January 2015—two months prior to purchase of the Residence—Kwok held at least 50% of the equity in Bravo Luck (which he has always controlled and beneficially owned). The corporate documents obtained do not show any transfer by Kwok of his 50% to his son in mid-2015.

47.     Bravo Luck was struck off the register of companies in BVI on April 23, 2019, only to be restored with a new registered agent on October 6, 2020.[90]   During the interim, no change to the identity of the Bravo Luck shareholders was possible under BVI law—meaning Kwok remained the holder of at least 50% of the shares issued by Bravo Luck (putting aside his actual control and beneficial interest).[91]

48.     The registered agent's disclosures also demonstrate Kwok's control of Bravo Luck through his agents and representatives.  For example, the additional disclosures provide as follows:

---

[87] Ex. 30 at SN 0022.
[88] Ex. 57 at 2–3.
[89] Ex. 58.
[90] Ex. 65.
[91] PAX obtained a further disclosure order in BVI on October 30, 2020, which has resulted in significant further disclosures from the new registered agent.  PAX has obtained the BVI Court's permission to disclose that evidence to U.S. courts, but Bravo Luck has gone so far as to apply to the BVI Courts to set aside that permission.  It comes as no surprise to PAX that Bravo Luck (Kwok) is trying to conceal relevant evidence from seeing the light of day in this Court.

- The disclosure from Bravo Luck's former registered agent shows that the "client of record" was Stevenson Wong & Co., Kwok's Hong Kong lawyers.[92]

- That changed on June 19, 2017, when the new client of record became William Je of Kingdom Rich Limited. William Je is Kwok's moneyman and long-term associate, as well as the person who imported Kwok's yacht, the Lady May II, into the United States.[93] The address given for William Je[94] is the same as Kwok's Hong Kong address, as recorded in Bravo Luck's Register of Members.[95]

- An in-house lawyer at ACA Capital Group Ltd. (a group of companies in which Kwok holds interests) certified the due diligence materials supplied to the registered agent.[96]

49. As ever, an important clue to the real ownership of Bravo Luck is to follow the money. The funds used to purchase the Residence were diverted by Kwok through Bravo Luck's Hong Kong Bank account in March 2015,[97] at the time Kwok held at least a 50% equity interest (and 100% beneficial interest, having used his son as a straw man)[98] in Bravo Luck and faced imminent default to PAX. At that time, ***Kwok represented to the Sherry-Netherland that he owned 50% of Bravo Luck*** (while stating that his then-twenty-something-year-old son owned the other half).[99] In fact, Kwok not only told the Sherry-Netherland that he owned 50% of Bravo Luck during the application process,[100] but when asked to provide disclosure of his finances, he showed the Sherry-Netherland a Bravo Luck bank statement showing over $490 million in a UBS Hong Kong bank account,[101] and provided a letter from UBS Hong Kong stating:

> Kwok Ho Wan has been a client of ours through a personal investment company since July 2012 and during this time Mr. Kwok Ho Wan has had a

---

[92] Ex. 62.
[93] *See* Exs. 59–60.
[94] Ex. 62.
[95] Ex. 58.
[96] Ex. 62.
[97] Ex. 66.
[98] Ex. 18 at SN 0073–74.
[99] *Id.*
[100] *Id.*
[101] *Id.* at SN 076–82.

satisfactory banking relationship with us.  As at 18 Feb 2015, the funds involved in this banking relationship is not less than USD400,000,000.[102]

50.     The overwhelming inference is that the "personal investment company" that UBS was referring to was Bravo Luck.  In other words, Kwok held out Bravo Luck as his own ***because it is***, and he is now attempting disingenuously to use Bravo Luck as the instrument to divert his assets and render himself judgment-proof.

## V.     The Debtor's (Kwok's) Sham Bankruptcy Petition.

51.     It is difficult to imagine a more egregious example of a Petition filed in bad faith than this one, which is an obvious attempt by Kwok to (continue to) abuse the judicial process. Kwok bought the Residence through fraud and represented to Justice Ostrager that he had an "ownership interest" in it.  Kwok wired funds to purchase the Residence from a company (Bravo Luck) that he controlled and he represented to the Sherry-Netherland he owned with his then-20-something son.  Kwok took these actions to divert his assets and shield them from PAX in the face of his defaulted personal guarantee.

52.     Now, by the Petition, Kwok is trying to say that he has no "ownership interest" in the Residence or Bravo Luck (despite actually owning and controlling the Debtor and Bravo Luck and living in the Residence).  Rather, Kwok suggests that his son actually owns the Residence because his son purportedly owns all of Bravo Luck (which purportedly owns the Residence via the Trust Agreement), and that Bravo Luck, instead of PAX, should receive the proceeds from any sale of the Residence.  Kwok makes this argument about Bravo Luck—which he ***never*** made in the nearly-four-year-long State Court Action, despite arguing that the Residence had been pledged to other entities—based on fraudulent documents and at the eleventh hour, just on the heels of Justice Ostrager's order temporarily restraining him from dissipating his assets.  Justice Ostrager

---

[102] Ex. 64.

already has found that Kwok has misled him, has engaged in "gamesmanship" and "dissembling," and is playing a "shell game" with his assets that must cease.[103] This Petition is the next move in Kwok's game.

53. In addition, the Debtor's contentions reveal just how abusive this filing is. Here, the Debtor asserts that it is not the "true" owner of the Residence (in complete contradiction of the record in the State Court Action), but nevertheless has filed chapter 11 to protect that asset. The Debtor then goes on to assert that this Court (notwithstanding years of litigation concerning PAX's dispute with Kwok over the Residence) should adjudicate issues between two non-debtors—PAX and Bravo Luck—regarding their alleged competing claims to the Residence. Such a request— for the bankruptcy court to hear a dispute between two non-debtors, regarding issues that at best are collateral to the bankruptcy—is improper, particularly where, as here, the Debtor would not receive any property or benefit irrespective of the outcome of such a litigation.[104]

54. Here, a review of the Petition (filed three days prior to the CPLR § 5229 hearing), supporting documents, and the relevant facts demonstrates this bankruptcy filing is nothing more than Kwok's latest shell game and attempt to shield the Residence from PAX.

55. Although the Debtor names several purported creditors in its schedules, the two named in the Wang Declaration—*filed by the same Yan Ping Wang who filed the demonstrably false affidavit in the State Court Action*—are PAX and Bravo Luck. The Debtor asserts in the Wang Declaration that Bravo Luck is the beneficial owner of the Residence under the purported Trust Agreement and has purported priority over PAX because Bravo Luck supposedly paid for

---

[103] Ex. 54 at 22:7, 24:10.

[104] *See, e.g., Celotex Corp. v. Edwards,* 514 U.S. 300, 398 (1995) ("[B]ankruptcy courts have no jurisdiction over proceedings that have no effect on the estate of the debtor."); *Presidential Gardens Assocs. V. U.S. ex rel. Sec'y of Hous. and Urb. Dev.,* 175 F.3d 132, 142 (2d Cir. 1999) (holding dispute between two third-parties did not fall within the scope of the Bankruptcy Court's jurisdiction).

the Residence and continues to fund the maintenance costs[105] (which are nearly a year overdue—hence the Sherry-Netherland's status as a creditor).  But while the Debtor tries to suggest that Bravo Luck is somehow a *bona fide* third-party creditor and holds ownership rights to the Residence that should take priority/precedence over PAX, as described above, that suggestion is dishonest and untrue.

56.     As an initial matter, such assertions are directly contrary to the Debtor's own schedules of assets and liabilities—signed under penalty of perjury—which list the Debtor as the owner of the Property, and Bravo Luck only as a general unsecured creditor.[106]

57.     In addition, the Debtor claims that Kwok serves only in a "representative capacity" as the Debtor's "manager" and "trustee."[107]  The Wang Declaration goes so far as to claim that "[c]ontrary to published reports, *Mr. Kwok does not have an ownership interest in the [Residence]*."[108]

58.     Putting aside public reports, Wang's Declaration is *directly at odds with her own affidavit submitted to Justice Ostrager*, in which she swore to the very opposite—that Kwok *did* have an ownership interest in the Residence:  "*Mr. Kwok's ownership interest in the Apartment*, through a limited liability company, is not in real property.  Rather, *it consists of an ownership interest* in certain shares of The Sherry Netherland, Inc. . . . and the assignment of a proprietary lease agreement."[109]

59.     Moreover, a review of the Debtor's schedules confirms that Kwok is just trying to use this chapter 11 case to pay himself.  Although the schedules list several purported creditors,

---

[105] Debtor's Decl. ¶¶ 4–5.
[106] *See* ECF No. 4.
[107] Debtor's Decl. ¶ 4.
[108] *Id.* ¶ 12.
[109] Ex. 13 at ¶ 2.  Wang's affidavit before this Court is also inconsistent with Kwok's concession in a November 9, 2020 letter to PAX that Kwok "does have an ownership interest in Genever [BVI]."  Ex. 63.

(i) many are owed $0, and (ii) Kwok's only major creditors besides the Sherry-Netherland (to whom he owes $891,362.06, but which holds a security deposit in excess of $3 million) and PAX (to whom he owes more than $120 million for breach of contract) are ***Kwok himself and his alter egos***. The Debtor claims to owe (i) $67,500,000 to Bravo Luck (*i.e.*, Kwok's shell company in his son's name); (ii) $5,000,000 to Kwok's son, Qiang Guo, in "care of Bravo Luck"; and (iii) $1,800,000 to Golden Spring New York Ltd., yet another company that Kwok controls through family members.[110]

60.     In sum, Kwok—the man behind the Debtor—has filed this Petition to try to forum shop and dupe this Court into determining that Kwok (through ***his*** shell company purportedly now in his son's name) is the priority creditor and should be entitled to the Residence—while PAX is left empty-handed.   These issues are nothing but a continuation of the shell game that Judge Ostrager has condemned, and an attempt to forum shop for a new court unfamiliar with Kwok's years of gamesmanship.   As these issues are inextricably linked and related to the State Court Action, they should be resolved in that forum.

## ARGUMENT

**I.      The Court Should Modify the Automatic Stay to Allow the State Court Action to Conclude Before Justice Ostrager.**

**A.      The Court Should Modify the Stay Because the Petition Was Filed in Bad Faith.**

61.     As demonstrated below, the automatic stay should be modified because the Petition was filed in the utmost bad faith.   "It is well-settled that the filing of a bankruptcy petition in bad faith constitutes cause for dismissal or conversion of a case under the Bankruptcy Code section 1112(b)." *In re 167 W. 133rd St. Hous. Dev. Fund Corp.*, No. 18-12043 (JLG), 2018 WL 4637460,

---

[110] ECF No. 4 at 9.

at *8 (Bankr. S.D.N.Y. Sept. 25, 2018). Because the automatic stay "is a consequential benefit of an otherwise good faith filing," *In re HBA East, Inc.*, 87 B.R. 248, 262 (Bankr. E.D.N.Y. 1988), courts in this jurisdiction have recognized that the same conduct that constitutes bad faith for purposes of dismissing a Chapter 11 case also constitutes cause for relief from the automatic stay. *See, e.g.*, *In re Project Orange Assocs., LLC*, 432 B.R. 89, 112–13 (Bankr. S.D.N.Y. 2010) ("[T]he standards for bad faith as evidence of cause, whether in the context of dismissal or relief from the stay, are not substantively different from each other."*)*; *In re Balco Equities Ltd. Inc.*, 312 B.R. 734, 748–49 (Bankr. S.D.N.Y. 2004) ("Cause, for either dismissal or relief from the stay may be found based on unenumerated factors, including bad faith."). In determining whether bad faith exists, courts "may consider any factors which evidence an intent to abuse the judicial process and the purposes of the reorganization provisions." *In re Syndicom Corp.*, 268 B.R. 26, 49 (Bankr. S.D.N.Y. 2001).

62. To begin, this is not a proper bankruptcy, and "courts that consider bad faith to be cause to dismiss often classify . . . inappropriate use [of the Bankruptcy Code] as evidence of bad faith." *Wilk Auslander LLP* v. *Murray (In re Murray)*, 900 F.3d 53, 60 (2d Cir. 2018). Here, Kwok is blatantly engaged in forum shopping to try to move the upcoming veil-piercing trial away from Justice Ostrager and—in the event PAX prevails on that issue—to have this Court rather than Justice Ostrager decide the (false) issue of whether Bravo Luck's supposed claim to the Residence would have priority over PAX's. This is a classic example of a party improperly trying to gain an advantage in a two-party litigation "involving non-bankruptcy law [by filing a Petition] in the bankruptcy court in the guise of being a reorganization of some sort under Chapter 11." *In re The*

*Bridge to Life*, 330 B.R. at 357 (quoting *In re HBA E., Inc.*, 87 B.R. 248, 260 (Bankr. E.D.N.Y. 1988)).[111]

63.     Moreover, as described above, Kwok's bad-faith conduct here goes beyond simply filing an action that does not belong in this Court.  Kwok has engaged in a wrongful pattern and practice of trying to evade repaying his debt to PAX and obstruct the State Court Action, including routinely committing perjury and misleading Justice Ostrager.  Kwok caused the Debtor to file this Petition just after Justice Ostrager restrained him from dissipating his assets, and on the eve of having a nine-figure judgment entered against him.  He did so solely to create delay and confusion and to position himself in a different forum before a new judge.  This is just the latest iteration of the improper "shell game" that Justice Ostrager already has found Kwok to be playing.

64.     Accordingly, the Debtor is acting in bad faith because it is using the bankruptcy improperly to gain an advantage in a two-party dispute, namely to frustrate PAX's ability to collect on a judgment.  This is an abuse of the integrity of the system.  The factors that Second Circuit courts consider in determining subjective bad faith weigh heavily in favor of the requested relief (here, stay relief to permit the State Court Action to proceed).

65.     Courts consider the eight bad-faith factors laid out in *C-TC*:

> (1) the debtor has only one asset; (2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors; (3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt; (4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure

---

[111] *See, e.g.*, *In re Murray*, 900 F.3d at 60–61 (holding that the filing of a case under the Bankruptcy Code as "a litigation tactic" in a "two-party dispute" is "cause" for dismissal); *In re Syndicom*, 268 B.R. at 31 (granting relief from automatic stay and stating "the Court is also called upon to consider whether bankruptcy courts should be used to facilitate the private agendas of litigants in two-party disputes, particularly where the interests of creditors are not served to any material extent thereby"); *In re Artisanal 2015, LLC*, No. 17-12319 (JLG), 2017 WL 5125545, at *12 (Bankr. S.D.N.Y. Nov. 3, 2017) (granting relief from the stay as alternative relief to dismissal under Bankruptcy Code section 1112 in context of a two-party dispute in respect of a lease).

action; (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights; (6) the debtor has little or no cash flow; (7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and (8) the debtor has no employees.

*In re C-TC 9th Ave. P'ship*, 113 F.3d 1304, 1311 (2d Cir. 1997).

66.     In addition, courts in this Circuit also consider four additional factors that Judge

Gerber set forth in *Syndicom*:

> (1) whether the case was filed as a "tactical" step in connection with the debtor's state court battles; (2) whether there was financial pressure on the debtor on the part of the creditor other than the counterparty to the two-party dispute, or of financial distress as a consequence of other creditors' claims; (3) whether unsecured creditors would not benefit in any material way from the debtor's filing and would not be prejudiced in any material way as a result of relief from the stay; and  (4) whether the case was filed with the purpose and effect of securing benefits for non-debtor individuals in contrast to securing benefits for the debtor.

268 B.R. at 51–52.

67.     Here, ***all*** of the factors are in PAX's favor:[112]

> ***C-TC* Factor 1:**          The Debtor is a single-asset entity,[113] with no revenue source

and no purpose or existence other than to hold the Residence.

> ***C-TC* Factor 2:**          The Debtor has no non-insider creditors other than PAX and

the Sherry-Netherland, and the Petition has nothing to do with protecting legitimate creditors.   In

particular, Bravo Luck and PAX are both listed as unsecured creditors; however, Bravo Luck is an

insider—not a legitimate creditor.   The Sherry-Netherland is the only secured creditor listed in the

---

[112] Several courts have looked only at the subjective factors in considering bad faith.  *In re Project Orange*, 432 B.R at 113 (court only looks to subjective bad faith element (but found cause on other grounds)); *In re Balco Equities*, 312 B.R. at 748–49 (bad-faith lift-stay analysis based upon the *C-TC* subjective factors, but lifting stay on other grounds).   Some courts also consider objective futility, essentially whether the bankruptcy is realistically feasible, in addition to the subjective factors.  *See In re 167 W. 133rd St.*, 2018 WL 4637460, at *8, *10.  In the face of PAX's opposition, as the largest non-insider creditor, to this bad-faith bankruptcy, any plan is undoubtedly objectively futile.
[113] ECF No. 1 at 2.

Petition, and its $891,362.06 claim will easily be satisfied by any sale of the Residence, and could even be satisfied now by the security deposit.[114]

**C-TC Factor 3:** The Residence is not yet in foreclosure proceedings, but it is subject to Justice Ostrager's restraining order, which was intended to preserve the asset for PAX until it has its forthcoming nine-figure judgment in hand.

**C-TC Factor 4:** This case is a classic two-party dispute that was filed in 2017 and will be finally resolved through the trial scheduled for early 2021.

**C-TC Factor 5:** The timing of the bankruptcy filing makes plain that it is an attempt to frustrate PAX's legitimate efforts to enforce its rights as a judgment creditor. The Debtor filed its Petition less than a month after Justice Ostrager ruled on summary judgment against Kwok, and just days after Kwok was temporarily restrained from dissipating his assets, including the Residence. There was no change in the Debtor's financial condition that precipitated the filing. Nor was there was any change in ownership, because the Debtor claims that Bravo Luck has been the beneficial owner of the Residence since early 2015. The only new development was that Kwok lost before Justice Ostrager. As a result, Kwok realized Justice Ostrager would not put up with his antics any longer, and Kwok would have to resort to another strategy to avoid paying the debt he owes to PAX.

**C-TC Factor 6:** The Debtor has never had any cash flows.

**C-TC Factor 7:** The Debtor's only ongoing expenses are its monthly fees to the Sherry-Netherland. It strains credulity to believe that Kwok, a billionaire, does not have

---

[114] Due to Kwok's failure to make any personal financial disclosures to the Sherry-Netherland when applying to purchase the Residence, the Sherry-Netherland required that he post three years' worth of monthly fees, the "large[st] security deposit" the Vice President and COO had ever seen. Ex. 17 at 44:6–11, 48:20–49:6.

sufficient assets to cover that debt. Rather, it appears that he is simply choosing not to pay. And as discussed under *C-TC* Factor 2, Kwok's $3 million security deposit in any event easily covers the debt he owes to the Sherry-Netherland.[115]

> **C-TC Factor 8:** The Debtor has no employees or operations.

**Syndicom Factor 1:** Given the timing (to thwart the adjudication of the veil-piercing claims before Justice Ostrager, after entry of summary judgment and TRO in favor of PAX) and the Petition's stated purpose—to have this Court (instead of Justice Ostrager) determine that Bravo Luck somehow has priority to the Residence instead of PAX—it is an obvious "tactical step" in Kwok's two-party dispute with PAX.

**Syndicom Factor 2:** There was no significant financial pressure on the Debtor from any creditor other than PAX. All claims of the other non-insider creditors are relatively *de minimis*, including the Sherry-Netherland. Kwok has not paid the Sherry-Netherland for nearly a year, yet he only chose to file for bankruptcy just after losing a large lawsuit to PAX and having his assets restrained by Justice Ostrager. And any suggestion that Bravo Luck somehow is putting pressure on the Debtor is nonsense because Kwok controls them both.

**Syndicom Factor 3:** This bankruptcy will not help any legitimate creditors but will materially prejudice the only legitimate creditor with a major claim: PAX, which has been pursuing Kwok for years and is on the cusp of having not only a judgment, but also access to an asset (the Residence) with a value that should satisfy a substantial share of that judgment. Kwok's only purpose in filing the Petition is to gain entry to a new forum in order to stave off a judgment, and to confuse the issues.

---

[115] *Id.* at 69:8–10.

**_Syndicom_ Factor 4:** The only purpose of this filing was to benefit Kwok and not any legitimate creditor. Kwok wants to sidestep Justice Ostrager and keep the proceeds from any sale of the Residence and shield them from PAX.

68. Moreover, it is unclear whether the Debtor could even confirm a plan.[116] As noted above, the Debtor's creditors consist of (i) relatively _de minimis_ creditors whose claims will likely be paid in full and thus will be unimpaired; (ii) insiders like Bravo Luck, who, even if a "creditor," may be "impaired" but whose votes on a plan should not be counted pursuant to Bankruptcy Code section 1129(a)(1); and (iii) PAX. In the face of PAX's opposition to this bad-faith bankruptcy, any plan is undoubtedly objectively futile.[117]

69. This case is just like several cases in which bankruptcy courts have found the filings improper:

70. _In re Syndicom._ This case is on all fours. There, as a result of a court order in an underlying dispute, the debtor's shareholders were about to be evicted from an apartment that the debtor was leasing, but the debtor filed for bankruptcy on the eve of the eviction to drag out the dispute and allow its shareholders to stay in the apartment. The court believed dismissal was warranted based on several factors, all of which are present here: (i) the debtor's only asset was "its interest [] in [an] Apartment . . ."; (ii) the debtor had "only two or three creditors who [were] not either insiders or the Debtor's lawyers [which] represent[ed] less than 8% of the Debtor's stated total claims;" (iii) the bankruptcy case was filed "for the predominant purpose of blocking measures by [the judgment creditor] that had been authorized by the state courts;" (iv) the

---

[116] Debtor's counsel has informed PAX that it intends to sell the apartment under a plan of reorganization to avoid having to pay transfer taxes pursuant to Bankruptcy Code section 1146.

[117] _See In re C-TC_, 113 F.3d at 1311–12 (where debtor's "financial problems involve only a two party dispute with [a single creditor] that can be resolved in [a] pending state court action," the debtor "enjoyed no likelihood of rehabilitation and would be unable to effectuate a plan due to [that single creditor's] opposition").

bankruptcy was in essence a "two party dispute between the Debtor and [a single judgment creditor] which [could] be resolved in the pending litigation in" state court; (v) the timing of the debtor's bankruptcy filing, *i.e.*, "after the issuance" of an unfavorable ruling, "evidence[d] an intent to delay or frustrate the legitimate efforts of [the judgment creditor] to secure possession of the Apartment;" (vi) the debtor "ha[d] no cash flow;" (vii) the debtor had "no cash, and no income" and "no business;" (viii) the debtor had "no employees;" (ix) the case was "filed as a tactical step in connection with the Debtor's state court battles;" (x) there was no showing "of any financial pressure on the Debtor on the part of creditors other than the [state-litigation] counter-party . . . or of financial distress as a consequence of other creditors' claims;" (xi) any "[u]nsecured creditors would not benefit in any material way from the Debtor's filing, and would not be prejudiced in any material way as a result of relief from the stay;" and (xii) the bankruptcy case was "filed with both the purpose and effect of securing benefits for non-debtor individuals [including] continued occupancy of the Apartment . . . in contrast to securing benefits for the Debtor corporation." 268 B.R. at 50–52.

71.     *In re Wally*.  The court there dismissed the bankruptcy because, just like here, (i) the petition was filed around the same time of an adverse ruling in the underlying litigation in an attempt to avoid the consequences of that ruling, and (ii) there was no valid reorganization prospect:

> It is clear that the debtor did not file its petition to reorganize, but rather as a litigating tactic in its dispute with [the creditors].  The petition was filed the same day that judgments on the promissory notes were entered in the state court . . . ***The debtor filed its petition herein to avoid the consequences of adverse state court decisions while it continues litigating.*** . . . The debtor is unable to propose a meaningful plan of reorganization until its litigation with [the creditors] is resolved.  Thus, it is evident that the debtor seeks to use this court not to reorganize, but to

relitigate.  ***This is an impermissible use of Chapter 11 of the Bankruptcy Code.***

36 B.R. 849, 851 (Bankr. S.D.N.Y. 1984).

72.     *Schur Management*.  As in *Schur*, the Debtor here "was formed as a holding company for an apartment" and has "not articulated any need for the protection of the bankruptcy laws" other than an attempt to avoid "a judgment" in a separate lawsuit.  323 B.R. 123, 125, 127 (Bankr. S.D.N.Y. 2005).

**B.     Establishing Bad Faith Is Not Necessary to Demonstrate Cause for Stay Relief.**

73.     Even if there were no evidence of bad faith (and the evidence here is overwhelming), the Court should grant PAX's motion because the vast majority of factors that Second Circuit courts consider in determining whether to lift an automatic stay independent of bad faith weigh heavily in PAX's favor.  *See Sonnax Indus., Inc. v. Tri-Component Prods. Corp.* (*In re Sonnax Indus., Inc.*), 907 F.2d 1280, 1286 (2d Cir. 1990) (listing factors).

74.     The *Sonnax* factors are as follows:

> (1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms.

*See id.*

75.     These factors weigh heavily in PAX's favor.  Specifically:

- Because the veil-piercing trial is the last stage of the litigation before Justice Ostrager, granting PAX's requested relief "would result in a . . . complete resolution of the issues." *Id.*

- Allowing the veil-piercing trial to proceed would in no way "interfere [] with the bankruptcy case." *Id.*  Rather, the veil-piercing trial will decide a threshold issue that needs to be decided should the bankruptcy case continue. *Id.*

- Essentially, "a specialized tribunal with the necessary expertise has been established to hear the cause of action."  Justice Ostrager has experience with veil-piercing issues as New York Commercial Division Justice, and has actively presided over the case for four years, authoring six decisions and conducting approximately a dozen hearings.[118]

- The veil-piercing trial would not "prejudice the interests of other creditors." *In re Sonnax Indus.*, 907 F.2d at 1286.  In fact, there are no legitimate non-insider creditors here other than the Sherry-Netherland (which at present is protected by a $3 million security deposit and, in any event, would be made whole by virtue of the Apartment sale).

- PAX's claim against Genever is not "subject to equitable subordination." *Id.*  Rather, it is Bravo Luck's (bogus) claim that should be subordinated because Bravo Luck is the paradigmatic insider—it is Kwok.

- Allowing the veil-piercing trial to proceed would serve "the interests of judicial economy and the expeditious and economical resolution of litigation." *Id.*  PAX's lawsuit against Kwok and the Genever Entities has been ongoing for nearly four years.  Justice Ostrager is intimately familiar with the case and has expressed a desire to conclude it, and PAX is entitled to resolution on this debt that first came due in 2012.  Further, if one were to believe the Debtor's *ipse dixit* that the Debtor has no "true" ownership in the Residence, then this case is nothing but a dispute between third-parties—PAX and Bravo Luck—which is not properly before this Court.

---

[118] *See also In re Project Orange*, 432 B.R. at 104 (finding it appropriate to lift the stay for the state court to resolve issues of state contract, fraud and landlord-tenant law); *Patterson v. Newspaper & Mail Deliverers' Union of N.Y. & Vicinity*, 138 B.R. 149, 152 (S.D.N.Y. 1992) (concluding that "the issue of whether the automatic stay applies" to a consent decree "is best decided by" the district court with "substantial experience and familiarity with the [underlying] matter"); *State of N.Y. v. N. Storonske Cooperage Co.*, 174 B.R. 366, 372 (N.D.N.Y. 1994) ("[G]iven the rather tortuous and protracted history of this litigation . . . the court is quite familiar with many aspects of this case, and this factor too weighs in favor of this court, rather than the bankruptcy court, deciding the applicability of the automatic stay provision.").

- The "impact of the stay" on PAX would be significant, as it would further delay resolution of its long-pending litigation, and the "balance of harms" weighs heavily in PAX's favor. *Id.* There is no prejudice to the Debtor in adjudicating PAX's claim now, rather than several months from now—especially because PAX likely would be unable to enforce anyway until the Bravo Luck priority issue is resolved. Further, proceeding with such claims in this Court would result in significantly greater costs and delay given that the State Court Action is near its conclusion.

## II.    PAX Reserves Its Rights to Seek Further Relief.

76.    PAX has filed this motion in an effort to ensure that the State Court Action will be fully resolved before Justice Ostrager as soon as possible in 2021, COVID-19 permitting.   For the reasons described above, Kwok's course of conduct of deceit, fraud, and bad faith calls into question whether (i) Kwok (from whom the Debtor takes direction) should be trusted as a steward of this chapter 11 case to sell the Residence, (ii) the sale proceeds could be properly safeguarded under control of the Court, and (iii) this case is properly before a bankruptcy court in the first place.

77.    Nevertheless, PAX is not averse to entering into an agreed-upon process to sell the Residence through this bankruptcy case, provided that any such process includes oversight by an experienced, disinterested third-party, with appropriate safeguards, and oversight by non-insider creditors, including PAX, the U.S. Trustee, and the Court.   PAX has engaged in a dialogue with the Debtor about these issues, but to date, the parties have not reached an agreement.

78.    Given the foregoing, PAX reserves all of its rights and remedies to move to seek further relief before this Court, including, but not limited, to converting this case to chapter 7, dismissing this case under section 1112(b) of the Bankruptcy Code, and/or appointing a Trustee or examiner under Section 1104 of the Bankruptcy Code.

## <u>CONCLUSION</u>

For all of the reasons stated above, and while reserving all other rights and remedies, PAX respectfully requests, that this Court: (i) modify the automatic stay to allow PAX to conclude the State Court Action against the Debtor, and to address any attendant claims by any other non-debtor

third-parties that may be joined as parties, including but not limited to Bravo Luck, up through

entry of final judgment, but excluding enforcement of any such judgment as against the Debtor;

and (ii) grant such other and further relief as the Court may deem just and proper.


DATED: December 16, 2020               Respectfully submitted,
      New York, New York

O'MELVENY & MYERS LLP
By: */s/ Edward Moss*
Stuart Sarnoff (ssarnoff@omm.com)
Edward Moss (emoss@omm.com)
7 Times Square
New York, NY 10036
(212) 326-2000

-and-

FOLEY & LARDNER LLP
By: */s/ Douglas E. Spelfogel*
Douglas E. Spelfogel
(dspelfogel@foley.com)
Alissa Nann (anann@foley.com)
90 Park Avenue
New York, NY 10016
212-338-3566

*Attorneys for Plaintiff Pacific Alliance Asia*
*Opportunity Fund L.P.*