# EXHIBIT 17

*PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. vs.*
*KWOK HO WAN*

---

*MICHAEL ULLMAN*
*September 24, 2018*

---



**ELLEN GRAUER**
COURT REPORTING CO. LLC

126 East 56th Street, Fifth Floor  New York, New York 10022
P:  212-750-6434   F:  212-750-1097
www.ellengrauer.com

*Original File 245613.TXT*
*Min-U-Script® with Word Index*

```
 1   SUPREME COURT OF THE STATE OF NEW YORK

 2   COUNTY OF NEW YORK
     ------------------------------------------------X
 3   PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

 4                         Plaintiff,

 5       - against -

 6   KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN GUI,
     a/k/a GUO WENGUI, a/k/a GUO WEN-GUI, a/k/a WAN
 7   GUE HAOYUN, a/k/a MILES KWOK, a/k/a HAOYUN GUY,

 8                         Defendant.

 9   Index No.: 652077/2017
     ------------------------------------------------X
10

11                         7 Times Square
                           New York, New York
12
                           September 24, 2018
13                         11:25 a.m.

14

15             VIDEOTAPED EXAMINATION BEFORE TRIAL

16   of MICHAEL ULLMAN, before Melissa Gilmore, a

17   Shorthand Reporter and Notary Public of the

18   State of New York.

19

20

21

22

23        ELLEN GRAUER COURT REPORTING CO., LLC
            126 East 56th Street, Fifth Floor
24              New York, New York 10022
                     212-750-6434
25                   REF:  245613
```

```
 1   A P P E A R A N C E S:

 2

 3   O'MELVENY & MYERS LLP

 4   Attorneys for Plaintiff

 5         7 Times Square

 6         New York, New York 10036

 7   BY:  EDWARD MOSS, ESQ.

 8         STUART SARNOFF, ESQ.

 9         SARA N. PAHLAVAN, ESQ.

10         PHONE 212-728-5651

11         E-MAIL emoss@omm.com

12                 ssarnoff@omm.com

13                 spahlavan@omm.com

14

15

16   HODGSON RUSS

17   Attorneys for Defendant

18         605 Third Avenue, Suite 2300

19         New York, New York 10158

20   BY:  JILLIAN MARIE SEARLES, ESQ.

21         PHONE 646-218-7591

22         E-MAIL jsearles@hodgsonruss.com

23

24

25
```

```
1   A P P E A R A N C E S:   (Cont'd)

2

3   STROOCK & STROOCK & LAVAN LLP

4   Attorneys for the Witness

5         180 Maiden Lane

6         New York, New York 10038-4982

7   BY:  EVA TALEL, ESQ.

8         PHONE 212-806-5828

9         E-MAIL etalel@stroock.com

10

11

12   ALSO PRESENT:

13         ADAM VENTURINI, Videographer

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                       ULLMAN
 2    these were also assets that were not in the
 3    United States, correct?
 4        A.    That's correct.
 5        Q.    And these were assets that Mr. Kwok
 6    held not personally but held through a company?
 7        A.    Correct.
 8        Q.    So if you look at the consolidated
 9    balance sheet at SN 0060, there is total assets
10    of 23 billion RMBs, which I think is over about
11    $3 billion.
12              Does that sound right?
13        A.    I think it's divided by six,
14    something like that.  So, yeah, three to
15    $4 billion.
16        Q.    Three to four.  Let's look at the
17    Williams & Connolly letter, SN 0063.  The
18    second page of this, which is the last
19    paragraph, "Both Mr. Kwok," do you see that
20    where I'm reading?
21        A.    Yes.
22        Q.    "Both Mr. Kwok and we very much
23    appreciate your consideration in this matter.
24    Mr. Kwok is eager to become a resident at The
25    Sherry but also feels keenly the need for
```

```
 1                      ULLMAN
 2   confidentiality regarding his business and
 3   financial affairs."
 4            Do you see that?
 5       A.    Yes.
 6       Q.    Do you remember developing -- the
 7   understanding around this time that Mr. Kwok
 8   was very interested in keeping his business and
 9   financial affairs secret?
10       A.    Yes.
11       Q.    And is that typical in your
12   experience with purchasers?
13       A.    No.
14       Q.    Do you recall ever before getting a
15   letter from a law firm explicitly telling you
16   to -- to -- you know, that its client had a
17   very strong desire for confidentiality?
18       A.    No.
19       Q.    Do you recall having any reaction to
20   reviewing this or generally to learning about
21   Mr. Kwok's strong desire for confidentiality?
22       A.    There was -- there was a strong
23   desire -- I believe we were told -- I heard,
24   maybe I was told by the broker, his broker,
25   that because of Feng Shui, or whatever, it had
```

```
 1                          ULLMAN
 2    to close by a certain date, and they were
 3    pushing.  And if memory serves me, it was
 4    around April 6 -- 6 to 8, something like that,
 5    it had to close because of whatever Feng Shui
 6    issues were involved.
 7         Q.    And just for the record, do you have
 8    an understanding as to what Feng Shui is?
 9         A.    Well, I only understand it in the
10    way that it's used in positioning of
11    furnishings and other items in a room and an
12    apartment, you know, in relation to north,
13    east, south, west, whatever.  Yes, that is my
14    understanding of it.
15               It has never been my understanding
16    of my limited knowledge of Feng Shui about
17    dates of a closing.
18         Q.    Do you remember having any reaction
19    to the fact that Mr. Kwok wanted to close very
20    quickly because of Feng Shui reasons?
21         A.    My reactions would be irrelevant to
22    any of this because it was up to the board to
23    decide whether they wanted to do that or not or
24    wanted to accommodate him.
25               Did I personally think it was odd?
```

```
 1                         ULLMAN
 2   Yes.
 3        Q.    So let's go back to Exhibit 1,
 4   please.
 5        A.    Exhibit 1.
 6        Q.    Which is the Susan Hennelly letter
 7   that you signed.
 8        A.    Yes.
 9        Q.    I want to focus your attention,
10   please, on the fourth paragraph, "Due to
11   Mr. Kwok's foreign status and purchasing in an
12   LLC, he will be required to sign an occupancy
13   agreement and personally guarantee the lease.
14   He will also be required to provide a security
15   deposit."
16             Can you explain what you mean in
17   this -- in these two sentences?
18        A.    He wanted to put it -- A, he's
19   foreign.  So without assets -- it was assumed
20   there were no assets in the US that we could
21   attach if there was an issue with getting the
22   maintenance payment.
23             Many people put their units in an
24   LLC, as long as it's a single entity LLC, so
25   that's the only item that could be in the LLC,
```

```
1                         ULLMAN
2    and an occupancy agreement was that he was
3    guaranteeing that he and his -- he and/or his
4    family were going to be the sole occupants of
5    the apartment.
6              And he personally guarantees the
7    lease, which would kind of blend in with the
8    next sentence requiring a security deposit,
9    which the board determined that, after
10   discussion and looking at his finances and
11   seeing that there were no assets in the US that
12   we could use to protect ourselves, they decided
13   that five years of maintenance would be
14   something that would protect us long enough
15   that if he didn't pay, and we had to go through
16   the eviction and sale process, we would have
17   enough backup to carry us from an operating
18   point of view to cover us and make us whole
19   until a sale could be consummated.
20        Q.   And did you understand that, if you
21   had to chase Mr. Kwok for nonpayment, the fact
22   that he was purchasing in an LLC as opposed to
23   his individual capacity might make it harder
24   for you to get to Mr. Kwok's personal assets?
25        A.   I'm sure Stroock advised us on that,
```

```
1                         ULLMAN
2    yes.
3         Q.    One thing I just want to make clear
4    at the deposition is I don't want to invade the
5    attorney/client privilege in any way.  And so I
6    think we should probably strike that answer,
7    and let me just try it again.
8              Did you ever have the view or come
9    to the understanding that the LLC structure of
10   this would make it harder for Mr. Kwok -- would
11   make it harder for The Sherry-Netherland to --
12   strike that.  Let me withdraw that and do it
13   again.
14             Did you ever come to the
15   understanding, just asking you about your
16   understanding, that if you had to chase
17   Mr. Kwok for nonpayment, the fact that he was
18   purchasing in an LLC as opposed to in his
19   individual capacity would make it harder for
20   you to get to Mr. Kwok's personal assets?
21             MS. SEARLES:  Objection, calls for a
22        legal conclusion.
23        Q.    You can answer.
24             MS. TALEL:  You can answer.
25        A.    Yes.
```

ULLMAN

1

2      Q.     So it was the combination of the LLC

3   and the foreign status, meaning the lack of any

4   assets in the US, that had made The

5   Sherry-Netherland want to protect itself?

6      A.     Yes.

7      Q.     How common is it to require a

8   personal guarantee in your experience?

9      A.     It's common when it's a foreign

10  purchaser.  We almost always require a security

11  deposit on a foreign purchaser.  So the answer

12  is it's quite common.

13     Q.     So I was asking about the personal

14  guarantee.

15            Is that -- do you sort of think of

16  the personal guarantee and the security deposit

17  as going together?

18     A.     Yes.

19     Q.     How common is it to have a security

20  deposit in your experience?

21     A.     It's common for foreign purchasers

22  where most of their assets are outside the

23  United States.

24     Q.     And I think you said earlier that

25  the security deposit required ended up being

```
 1                      ULLMAN
 2   $3 million; is that correct?
 3        A.    I believe it was a little bit more
 4   than $3 million.  I want to say it was between
 5   three three and three five, 3.3 to 3.5 million.
 6        Q.    And had there ever been, in your
 7   experience at The Sherry-Netherland, a
 8   requirement for a larger security deposit from
 9   any other customer -- from any other
10   prospective purchaser?
11        A.    No.
12                (Ullman Exhibit 3, Answer by The
13          Sherry-Netherland to the Complaint filed
14          by Genever Holdings, marked for
15          identification.)
16        Q.    Mr. Ullman, you have Exhibit 3,
17   which is the answer by The Sherry-Netherland
18   Hotel to the complaint filed by Genever
19   Holdings and Miles Kwok in the Southern
20   District of New York.
21                Do you see that?
22        A.    Yes.
23        Q.    And is this the answer in the
24   litigation that we touched briefly on earlier?
25        A.    Yes.
```

```
 1                        ULLMAN
 2        Q.    Take a look at paragraph 39, please.
 3   It's on page 9.
 4        A.    Yes.
 5        Q.    And I'm focused on 39(a).  It says,
 6   "Plaintiffs and their representatives fully
 7   understood that the deposit was not standard or
 8   customary and was offered by the Plaintiffs as
 9   an inducement to the corporation's board of
10   directors, the board, to approve the
11   Plaintiffs' purchase transaction without having
12   received and reviewed fully documented
13   information about (i), the size, source and
14   location of Mr. Kwok's financial resources,
15   (ii) the character of Mr. Kwok's business
16   associates, including his relationships with
17   high government officials in China, and (iii),
18   whether the government of the People's Republic
19   of China might have an interest in Mr. Kwok in
20   connection with the government's
21   anti-corruption activities."
22              Do you see that?
23        A.    Yes.
24        Q.    And to the best of your knowledge
25   and as Sherry-Netherland's representative,
```

```
 1                          ULLMAN
 2    that -- that was a true statement when it was
 3    made?
 4         A.    (Document review.)  Yes.
 5         Q.    And is the reason that you, The
 6    Sherry-Netherland, needed the information that
 7    they say was missing because you wanted to be
 8    able to fully assess Mr. Kwok's ability to meet
 9    his financial obligations to the hotel?
10         A.    That's correct.
11         Q.    And those were about half a million
12    dollars per year -- about 600,000?
13         A.    600,000 roughly, yeah.
14         Q.    Can you explain why the size, source
15    and location of Mr. Kwok's financial resources
16    was important to The Sherry Netherland's
17    ability to assess Mr. Kwok's ability to meet
18    his financial obligations?
19         A.    Because of the size of the monthly
20    maintenance charge, it was important to us to
21    make sure that he could meet that obligation.
22         Q.    And the location was important
23    because it would be difficult to get to assets
24    that were located abroad?
25         A.    Absolutely correct.
```

```
1                         ULLMAN
2         Q.    How about number 2, the character of
3    Mr. Kwok's business associates?  Why was that
4    important?
5         A.    Oh, item number 2 in there, I'm
6    sorry, the character.
7         Q.    No problem.
8         A.    Because the board likes to -- likes
9    to make sure that we have residents that are
10   congenial and fit into the overall community of
11   The Sherry and that they are able to meet their
12   obligations.
13               THE VIDEOGRAPHER:  Just to let you
14        know, we have about 15 minutes left on
15        this tape.
16               MR. MOSS:  Okay.  Thank you.
17               THE WITNESS:  I know, but I have 15
18        minutes that I can sit here still before I
19        need to --
20               MR. SARNOFF:  Do you want to take a
21        break?
22               THE WITNESS:  That's -- no, I got 15
23        minutes.
24   BY MR. MOSS:
25        Q.    That's the one, when I went over the
```

```
 1                          ULLMAN
 2   ground rules, the one thing I didn't say.  I
 3   will take a break whenever you want.  Sorry.
 4   So please feel free.
 5        A.   No, I understand.
 6        Q.   How about number 3, "whether the
 7   government of the People's Republic of China
 8   might have an interest in Mr. Kwok in
 9   connection with his government's
10   anti-corruption activities"?  Why was that
11   important?
12        A.   I don't recall that being important,
13   other than he was an upstanding individual
14   that -- that would meet his obligations in the
15   building, and I don't recall any more than
16   that.
17        Q.   You mean the hotel wanted to ensure
18   that he was an upstanding individual?
19        A.   Yeah, correct.
20        Q.   Would you say that the safeguards
21   that The Sherry-Netherland required, the
22   $3 million plus security deposit, the occupancy
23   agreement, the personal guarantee, were those
24   higher safeguards than, in your experience, are
25   typically required?
```

```
 1                          ULLMAN
 2        A.     They were higher.
 3        Q.     Could you ever, in the course of
 4   your 40-year experience, recall a hotel
 5   requiring higher safeguards for a purchase?
 6        A.     No.
 7        Q.     Let's now look, the same document,
 8   Mr. Ullman, paragraph 4(d), please.
 9               Now, this is a paragraph that's
10   quoting a March 2 e-mail.  And do you recall
11   earlier that, when we were looking at your
12   e-mail with the board package, that was a
13   March 3 e-mail?
14        A.     I didn't look at the date, but that
15   sounds correct.
16        Q.     So this references a March 2 e-mail
17   from Michael Horvitz.  He was the co-op board's
18   president; is that correct?
19        A.     Yes.
20        Q.     And you see in 4(d), it says in the
21   third line down, "Horvitz explained in a
22   March 2 e-mail to Shulman that, because
23   Plaintiff's financial assets were all located
24   in China and the documentation provided was
25   unverified, he had 'concern about the financial
```

```
 1                        ULLMAN
 2    information that has been presented'."
 3              Do you see that?
 4         A.    Yes.
 5         Q.    And that's all consistent with your
 6    recollection, right?
 7         A.    A hundred percent.
 8         Q.    And the e-mail continues, "In this
 9    case, you have submitted financial information
10    that you have identified as having been
11    'audited,' but there is no accountant's
12    certification, no statement of the accounting
13    principles used in the preparation of the
14    financials, and no detailed description of the
15    entity to which the financials apply.  The
16    'balance sheet' shows assets only, but not
17    liabilities, and there is no way for us to
18    verify that there are no offsetting liabilities
19    or that [Plaintiff] has immediate access to
20    these assets should he need them."
21              Do you see that?
22         A.    Yes, I do.
23         Q.    And is that also a true statement
24    that's consistent with your recollection?
25         A.    Yes, it is.
```

```
 1                         ULLMAN
 2        Q.    While you have that in front of you,
 3   Mr. Ullman, can you just take a look back at
 4   Exhibit 2?
 5        A.    Which was Exhibit 2?
 6        Q.    It should have a sticker at the
 7   bottom.
 8             MS. TALEL:  This one.  (Handing.)
 9        A.    Okay.
10        Q.    And do you see on the first page of
11   that exhibit it refers to unaudited financial
12   statements, six lines down?
13        A.    (Document review.)  I don't see
14   where it says unaudited.  I must not be reading
15   it.
16        Q.    Do you see four lines down, the
17   sentence that begins with "First"?
18        A.    Yes.
19        Q.    Okay.  So if you read till then,
20   that sentence --
21        A.    Unaudited.  Yes, I do see that.
22        Q.    And in this e-mail -- excuse me.  In
23   the answer, in the quote of the March 2 e-mail,
24   Mr. Horvitz says, "In this case, you have
25   submitted financial information that you
```

```
 1                        ULLMAN
 2             Do you see that?
 3        A.    Yes.
 4        Q.    And is that consistent with your
 5   understanding that the entity through which
 6   Mr. Kwok made his purchase was a New York LLC?
 7        A.    Yes.
 8        Q.    And if you can turn back, please, to
 9   Exhibit 7, and if you look at page 2 -- well,
10   just to level set you, the definitions are
11   probably important.  Why don't you look at the
12   first page, please?
13        A.    Okay.
14        Q.    See Genever Holdings Corporation is
15   defined as the company?
16        A.    (Document review.)  Yes.
17        Q.    And Genever Holdings LLC is defined
18   as Genever.
19             Do you see that?
20        A.    Yes.
21        Q.    And Genever Holdings LLC is the New
22   York LLC that we just talked about in the other
23   exhibit, right?
24        A.    Yes.
25        Q.    So if you see -- now, I think we can
```

```
 1                    ULLMAN
 2   turn to page 2, Bates stamped SN 0150.  I'm
 3   looking at 2(a) under assumptions, "Genever is
 4   validly organized and validly exists under the
 5   laws of the State of New York and is the
 6   wholly-owned subsidiary of the company."
 7           Do see that?
 8       A.   Yes.
 9       Q.   And is that consistent with your
10   recollection that the New York LLC, through
11   which Kwok made his purchase, was wholly owned
12   by a British Virgin Islands LLC?
13       A.   I don't know.
14       Q.   Do you remember anything about
15   Mr. Kwok purchasing through an LLC that was
16   owned by another LLC?
17       A.   No.
18       Q.   During the course of your time at
19   The Sherry-Netherland in the 40 or so purchases
20   in which you have been involved, about how many
21   of those have been purchased through LLCs?
22       A.   Probably half.
23       Q.   And the other half were purchased by
24   individuals?
25       A.   Yes.
```

```
1                         ULLMAN
2          Q.    And of the 20 or so that were
3     purchased by LLCs, how many of those LLCs were
4     New York LLCs?
5          A.    I don't know the answer to that
6     question.
7          Q.    Can you ever remember a foreign LLC
8     purchasing an interest in The
9     Sherry-Netherland?
10         A.    No.
11         Q.    So to the best of your recollection,
12    all of the LLC owners of residences at The
13    Sherry-Netherland are New York LLCs?
14         A.    Yeah, that would -- that would be
15    accurate, yes.
16         Q.    And can you identify any residence
17    at The Sherry-Netherland Hotel that's owned by
18    one LLC that, in turn, is owned by another LLC?
19         A.    No.
20         Q.    So the structure that Mr. Kwok used
21    here was a unique structure?
22         A.    Yes.
23         Q.    One that you have never seen before
24    and never seen since?
25         A.    Correct.
```

ULLMAN

1

2       Q.     The security deposit, does that --

3   does that run down each month?  In other words,

4   when a maintenance payment is due, does the

5   money come out of the security deposit or does

6   that security deposit remain a fixed number?

7       A.     Remains a fixed number.

8       Q.     So the entire three plus million is

9   left, remains in security?

10      A.     Yes.

11      Q.     Has there ever been any attempt by

12  Mr. Kwok or anyone on his behalf to modify or

13  change the amount of the security deposit?

14      A.     Yes.

15      Q.     Did they want to increase it or

16  decrease it?

17      A.     They wanted to decrease it.

18      Q.     And who communicated that to you?

19      A.     I don't recall who it was.  I don't

20  recall which -- which person.

21      Q.     Was it Mr. Kwok or was it one of his

22  intermediaries?

23      A.     I believe it was one of his

24  intermediaries.

25      Q.     And do you recall approximately when

ULLMAN

1

2  this request came in?

3      A.     Maybe a year and a half ago would

4  put it 2016, somewhere in 2016, the best of my

5  recollection, which would be a year and a half

6  ago.

7      Q.     Do you remember how much they wanted

8  to reduce the security deposit by?

9      A.     They didn't say that.  They wanted

10  to be able to use it, I believe, to either do

11  tenant improvements or to pay their monthly

12  maintenance out of it.  They thought that that

13  was what it was there for, and we informed them

14  that was not the case.  I informed them it was

15  not the case.

16      Q.     But they hadn't been using it that

17  way for the first year and a half or so,

18  correct?

19      A.     That's correct.

20      Q.     Did they explain to you why they had

21  the belief, at some point in 2016, that it was

22  there to be used on a monthly basis?

23      A.     Other than it was such a large

24  amount and they felt that they should be

25  entitled to use it.

1                          ULLMAN

2          Q.    What did Mr. Horvitz say about it?

3          A.    That we are not going to let them

4    draw down.  The purpose of the security deposit

5    is just that, security in case they didn't pay.

6    So there was no -- no reason that we would

7    allow them to draw that down.

8          Q.    Other than Mr. Kwok -- strike that.

9                There are some other tenants or

10   residents who have security deposit at The

11   Sherry-Netherland?

12         A.    Yes.

13         Q.    And other than Mr. Kwok, have any of

14   the residents with a security deposit asked to

15   draw down to pay for maintenance or

16   improvements or for any purpose?

17         A.    No.

18         Q.    Now, you said -- I just want to see

19   if I can help you at all on the timing.  You

20   said it was approximately a year and a half ago

21   and that you think it might be in 2016.

22               It's now September 2018.  Do you

23   think maybe it was early '17 when this came

24   across?

25         A.    Could well have been late '16, early

```
 1                         ULLMAN
 2    '17.  Yeah, 2017 could be, yes.
 3         Q.    You also testified earlier that
 4    Mr. Kwok was very eager to close in only a few
 5    days; is that right?
 6         A.    It was a very short period of time.
 7    My memory was refreshed here.  I thought it was
 8    April, but it was May 6 that was I think -- I
 9    think what I read in one of these documents,
10    but I know it was a very short window to close.
11         Q.    Exhibit 3, if you can refer back to
12    Exhibit 3.
13         A.    Yeah.
14         Q.    Okay.  By the way, before we get
15    there, did you think it was odd at all that
16    somebody who has supposedly billions of dollars
17    in assets was making this request to try to
18    free up the security deposit?
19              MS. SEARLES:  Objection, calls for
20         speculation.
21              MR. MOSS:  No, I asked him what he
22         thought.
23         Q.    You can answer.
24         A.    Yes.
25         Q.    Okay.  Exhibit 3.  Sorry.  Let's go
```

```
 1                    ULLMAN
 2   back there.
 3        A.    Yes, which page am I on?
 4        Q.    Sure.  Paragraph 4(g), which is on
 5   page --
 6        A.    3.
 7        Q.    3.
 8        A.    Sorry.  4, page 4.
 9        Q.    All right.  So you see in the
10   answer, paragraph 4(g) starts, "Notwithstanding
11   the foregoing, the board's concerns regarding
12   Plaintiff's finances were heightened because
13   Plaintiff's representatives informed the board
14   that it had only three days until March 6 to
15   review and approve Plaintiff's application or
16   else Plaintiff would terminate its prospective
17   purchaser contract."
18              Do you see that?
19        A.    Uh-huh.
20        Q.    Do you recall that Mr. Kwok and
21   Mr. Kwok's representative informed the board
22   that they needed to review and approve his
23   application within three days or else he would
24   terminate?
25        A.    I do recall that.
```

```
 1                        ULLMAN
 2         Q.    Did you have any discussions around
 3    that?
 4         A.    Did I have any discussions around
 5    that?  No.
 6         Q.    Had The Sherry-Netherland ever
 7    received this sort of ultimatum from another
 8    prospective purchaser?
 9         A.    To the best of my recollection, no.
10         Q.    Did you have any view as to why
11    Mr. Kwok wanted the process to move so quickly?
12         A.    Well, the state of -- the stated
13    reason was what I mentioned earlier, he was
14    saying that the Feng Shui had had to fit in --
15    we had no other -- I don't believe we knew any
16    other reason that he had to close in such a
17    short period of time or get approved in such a
18    short period of time.
19              Since it was such a large
20    transaction, I think the board wanted to
21    accommodate him to the best of their ability.
22         Q.    When you have spoken with Mr. Kwok,
23    how do you find his English?
24         A.    Broken, need to really concentrate
25    to understand what he's saying.
```

ULLMAN

1

2      Q.      Is your impression that he

3   understands what you're saying?

4      A.      I believe so.

5      Q.      We have been talking about concerns

6   that The Sherry-Netherland had about Mr. Kwok

7   in 2015.

8             Are you aware of whether Mr. Kwok

9   has had lawsuits filed against him or

10  investigations as to him since 2015?

11     A.      Yes.

12     Q.      And, for example, have you read in

13  the press that many of his assets have been

14  frozen across the world?

15     A.      Yes.

16     Q.      And how, if at all, have your

17  concerns about the ability to access Mr. Kwok

18  in the event of a default changed in light of

19  the legal issues he's facing and the asset

20  freezing?

21     A.      Our concerns is that as long as his

22  maintenance is paid on a timely basis, we're

23  concerned, but as long as they're being paid,

24  we are not alarmed by it, and knowing that we

25  have this security deposit, which will cover us

1                           ULLMAN
2      should this -- should he -- should he stop
3      paying, we are at least protected for a given
4      amount of time.  So it helps allay some of
5      our -- some of our concerns.
6           Q.    But you still have concerns?
7           A.    Of course.
8           Q.    And if you didn't have the security
9      deposit, you would have big concerns, right?
10          A.    That's a very true statement.
11          Q.    Did there come a time when Mr. Kwok
12     attempted to transfer the ownership of the
13     apartment out of his name?
14          A.    Yes.
15          Q.    And what do you recall about that?
16          A.    I recall that -- I think the first
17     mention of it that I can recall was that his
18     realtor, who handled the transaction for him of
19     the purchase who spent I believe a fair amount
20     of time with him over the course of the --
21     after the closing, came to my office and asked
22     how that would work, how they could transfer to
23     the son and what that procedure would be.
24          Q.    Approximately when was that?
25          A.    From my notes that I looked back, it

```
 1                         ULLMAN
 2    was in June, I believe, of 2016.
 3           Q.    And who asked for that meeting, the
 4    broker or you?
 5           A.    The broker came to me, Kathy Sloane.
 6           Q.    And tell me what you recall about
 7    that meeting.
 8           A.    She asked me, they wanted to
 9    restructure and, you know, she was kind of
10    vague.  She may not have understood the whole
11    thing herself.  I can't vouch for her, but she
12    came and asked how they could transfer and what
13    they would need to go through.
14                 And I recall telling her, well, if
15    they want to put it in Mileson's name or in
16    Mileson in charge of -- in charge of the asset,
17    they would have -- they would have to go
18    through the entire process of purchase again,
19    and he would have to submit letters of
20    recommendation, updated financials and the
21    whole package that's required to transfer it.
22           Q.    Did Ms. Sloane explain to you why
23    Mr. Kwok wanted to transfer the apartment into
24    his son's name?
25           A.    No.
```

1                          ULLMAN

2          Q.    At any point did you gain an

3    understanding or have a view as to why Mr. Kwok

4    wanted to do this?

5          A.    Repeat that again.  Did you say at

6    any point?

7          Q.    At any point did you gain an

8    understanding or have a view as to why Mr. Kwok

9    wanted to make this transfer to his son?

10         A.    Up to and including that date,

11   right?  2016, not going forward?  You're asking

12   that question with regard to now in 2018 or are

13   you saying in 2016?

14         Q.    Well, let's start in 2016.

15         A.    No, I did not know in 2016.

16         Q.    Okay.  At any point did you form a

17   view as to why Mr. Kwok made this request?

18         A.    Yes, after -- yes.

19         Q.    And what was that view?

20         A.    When I started receiving copies of

21   the suit regarding PAX, it made sense why -- it

22   made sense to me why he was trying to move the

23   asset around.

24         Q.    Why did that make sense to you?

25         A.    Well, because he didn't -- that was

ULLMAN

1
2      the only asset he had here in the United States
3      that could be attached by an outside --
4      somebody making a claim against him.  So it
5      would make sense that he would want to move it
6      to somebody else, so that they couldn't get
7      after it.
8          Q.    At the time you had your
9      conversation with Ms. Sloane, in around June of
10     2016, do you recall whether the apartment was
11     on the market at that time?
12         A.    I'm not sure if it was at that time
13     on the market.
14         Q.    Has the apartment been on and off
15     the market?
16         A.    Yes.
17         Q.    And do you have any understanding as
18     to, when Mr. Kwok took it off the market, why
19     he took it off?
20         A.    No.
21         Q.    Do you have any understanding as to,
22     when he put it on, why he put it on other than
23     the obvious that he wants to sell it?
24         A.    That was the obvious.
25         Q.    Do you have any idea why Ms. Sloane,

1                          ULLMAN

2    whose task it was to sell the apartment, would

3    be talking to you about trying to transfer

4    ownership to the son?

5         A.    I can only guess that either Miles

6    Kwok or one of his representatives asked her to

7    do that, to ask me.

8                   (Ullman Exhibit 9, E-Mail Chain,

9         Bates Stamped SN 0018 through 23, marked

10        for identification.)

11        A.    (Document review.)

12        Q.    I have just handed you Exhibit 9,

13   which is an e-mail chain Bates stamped SN 0018

14   to SN 0023.

15        A.    Yes.

16        Q.    I'm also going to mark Exhibit 10,

17   which is an e-mail chain between you and

18   Ms. Sloane on June 28 of 2016.

19                   (Ullman Exhibit 10, Two-Page E-Mail

20        Chain, marked for identification.)

21        Q.    And I would actually like to start,

22   Mr. Ullman, if you don't mind, please, with

23   Exhibit 10.

24        A.    Okay.

25        Q.    You see the first e-mail

```
 1                         ULLMAN
 2        A.    I don't think there was discussion,
 3   to the best of my recollection.  It was just an
 4   informative that this was broached and that
 5   this is how we responded to it just to keep him
 6   appraised of what was going on -- apprised.
 7        Q.    So there has been no change to the
 8   ownership structure of the apartment?
 9        A.    There has not been.  May I add to
10   that?
11        Q.    Yes.
12        A.    Not that we know of.
13        Q.    And why did you make that addition?
14        A.    Because I'm not aware of any, but
15   that doesn't mean it may not -- they may not
16   have done that.
17        Q.    Would they be permitted to do it?
18        A.    No.
19              (Ullman Exhibit 12, E-Mail Chain,
20         Bates Stamped SN 0278 through 284, marked
21         for identification.)
22        Q.    You have been handed Exhibit 12,
23   Mr. Ullman.
24        A.    Yes.
25        Q.    And that is an e-mail exchange with
```

```
 1                        ULLMAN
 2   Yvette Wong and you, SN 0278.  The top e-mail
 3   is Monday, June 19, 2017.
 4              Do you see that?
 5        A.    I do.
 6        Q.    You have a long chain.  You're free
 7   to flip through it, but I'm going to direct
 8   your attention, at first, to the last e-mail --
 9   first e-mail in time, last e-mail on the page
10   00284.
11              And do you see point 5, "I was told
12   that our contact person to Sherry is my
13   principle {sic} himself, again for the
14   convenience of family, could we change this
15   person to be my principle's {sic} son."
16              Do you see that?
17        A.    I do.
18        Q.    Do you recall that, in or around
19   2017, there was a request made to change the
20   contact person at The Sherry-Netherland from
21   Mr. Kwok to Mr. Kwok's son?
22        A.    As the contact person, yes.
23        Q.    And what do you recall about that?
24        A.    I recall them requesting that, and I
25   would imagine I said we have no problem using
```

```
1                        ULLMAN
2    him as the contact person, but that doesn't
3    have any legal standing other than that's who
4    they want us to contact instead of the others,
5    meaning either Mr. Kwok or one of his
6    representatives.
7              So his son would just become another
8    representative, that we should get in touch
9    with him if there's any issues, but it's not a
10   legally binding that he -- that it was his
11   asset, so to speak.
12        Q.   Did you have a view that by making
13   this request they were somehow trying to end
14   around or circumvent the decision you had made
15   earlier that he couldn't transfer the apartment
16   to the son?
17        A.   I had an idea that that's what they
18   were trying to do, yes.
19        Q.   Why did you have that idea?
20        A.   Because of the conversations I had
21   before and gave them an outline of why they
22   couldn't do it, and they were still trying to
23   figure out a way -- I was assuming they were
24   trying to figure out a way so that they could
25   get the son in charge of the asset and remove
```

```
 1                      ULLMAN
 2   the father from it.  It was a premonition from
 3   the conversations.
 4        Q.    Was the contact person ever changed?
 5        A.    Not to his son.  I mean, the contact
 6   person from Yvette to Brenda, if that's --
 7   that's been changed, but it was never changed
 8   to his son.
 9        Q.    Did you have any discussions with
10   anybody regarding this request to change the
11   contact person, other than Yvette, of course?
12        A.    With our counsel, I would imagine.
13        Q.    Do you still communicate with
14   Yvette?
15        A.    She may have -- I may have
16   communicated with her recently.  I don't even
17   recall if it was Yvette or Brenda.  I think
18   Yvette got involved in something.  She said she
19   was moving on, if memory serves me going back
20   when she left, she was working on office stuff
21   and there was the house manager and that was
22   Brenda, and that's who I should go through.
23        Q.    Do you remember when that last
24   conversation with Yvette was?
25        A.    I don't.
```

1                          ULLMAN

2          Q.    Was it by e-mail?

3          A.    I believe so.

4          Q.    Do you know whether or not it was

5    this -- if you look at SN 0278 the top, do you

6    remember whether or not your last communication

7    with her was at the same Yvetteyue423 e-mail

8    address or if she used another e-mail address?

9          A.    I believe they changed their e-mail

10   address to something Spring.  The newer e-mails

11   are -- I don't remember exactly what it is.

12   There was the Kwok office and then there's

13   something Spring that sticks in my mind.

14         Q.    How about Golden Spring?

15         A.    Golden Spring, thank you.

16         Q.    That sounds familiar?

17         A.    At least I had -- yeah, got the

18   Spring part right.

19              And I'm not sure when my last

20   communication was with Yvette.  I have to go

21   back and look.

22         Q.    So you communicate with Mr. Kwok's

23   representatives about the apartment through a

24   Golden Spring e-mail address?

25         A.    Yes.

```
 1                      ULLMAN

 2        Q.    All right.  So let's start with

 3   Exhibit 15, and I will represent to you that

 4   this is a brief filed by Mr. Kwok in our case

 5   and that the affidavit was a exhibit supporting

 6   the brief that Mr. Kwok also filed.

 7        A.    Okay.

 8        Q.    And I would like to direct your

 9   attention to page 4 of the brief, Exhibit 15,

10   and I'm going to read in that first full

11   paragraph starting with the third sentence.

12        A.    Wait a minute.  Let me just get to

13   the page.

14        Q.    Sure.  No problem.  Take your time.

15        A.    No, I'm not.

16        Q.    Page 4 of --

17              MR. SARNOFF:  Of the brief.

18        Q.    Of the brief.

19        A.    Yeah, I'm on 15.

20        Q.    Okay.  Yep.  Page 4.  And do you see

21   the paragraph at the top says, "While PAX

22   fails" -- "What PAX fails however?"

23        A.    "What PAX fails to mention,

24   however"?

25        Q.    Yes.
```

```
1                        ULLMAN

2         A.    Yep.

3         Q.    So I'm going down to the fourth

4    line, "PAX also fails to disclose that the

5    assets of Genever BVI are entirely pledged to a

6    third party."

7              Do you see that?

8         A.    Yes.

9         Q.    And then it cites the Wang

10   affidavit.

11             Do you see that?

12        A.    Yes.

13        Q.    And then it says, "A certificate of

14   registration of charge confirms that pursuant

15   to a pledge and security agreement entered into

16   on or about May 2015 -- and before any action

17   was taken by PAX -- the assets of Genever BVI,

18   which by virtue of its ownership of Genever USA

19   include the apartment, were pledged to an

20   entity named Roscalitar 2, an exempted company

21   incorporated in the Cayman Islands."

22             Do you see that?

23        A.    Yes.

24        Q.    And then do you see the last

25   paragraph on that section says, "In other
```

```
 1                          ULLMAN
 2    words, the property PAX ultimately seeks to
 3    attach -- the apartment and Genever USA --
 4    cannot be used as collateral in this action as
 5    another non-related entity, Roscalitar 2, not
 6    associated with Kwok has a superior and
 7    already-existing claim on both by virtue of a
 8    lien against all assets of Genever BVI."
 9            Do you see that?
10        A.    Yes.
11        Q.    Were those among the statements you
12    read that led you to believe that Mr. Kwok had
13    violated the no pledge provision of the
14    proprietary lease and the agreement and consent
15    with respect to shares?
16        A.    Yes.
17        Q.    Now, if I can direct your attention
18    to page 9, please, of the same document.  In
19    the second paragraph, six lines down it says,
20    "While Kwok is the sole shareholder of Genever
21    BVI, since May 2015, the assets of Genever
22    BVI -- which by virtue of its ownership of
23    Genever USA include the apartment -- have been
24    pledged in their entirety to Roscalitar 2, an
25    unrelated third party not owned by Kwok."
```

```
1                          ULLMAN
2              And then two sentences later,
3    "Because they are owned by Genever BVI,
4    Roscalitar 2 has the superior claim to both
5    Genever USA and the apartment as a result of
6    the May 2015 pledge and security agreement
7    entered into between Genever BVI and Roscalitar
8    2.   In other words, any rights PAX claims it
9    might have to attach either Genever USA or the
10   apartment are subordinate to the
11   already-existing lien imposed by Roscalitar 2."
12             Do you see that?
13   A.    Yes.
14   Q.    And are those among the statements
15   that, when you read them, made you understand
16   that Kwok had violated the lease and the
17   agreement and consent with respect to the
18   shares of the lease?
19   A.    Yes.
20   Q.    Exhibit 16, please, is the affidavit
21   of Yan Ping Wang.
22   A.    Hold on one second.
23   Q.    Sure.
24   A.    Okay.  Go ahead.  Thank you.
25   Q.    Thank you, Mr. Ullman.  Sorry about
```

```
 1                        ULLMAN
 2   that.
 3              Paragraph 5 of the Wang affidavit,
 4   the second -- third sentence, "Annexed hereto
 5   as Exhibit B is a true and correct copy of a
 6   certificate of registration of charge
 7   confirming that the assets of Genever BVI,
 8   which by virtue of its ownership of Genever USA
 9   include the apartment, were pledged to
10   Roscalitar 2 in or about May of 2015."
11              Do you see that?
12        A.   Yes.
13        Q.   Was that one of the statements that
14   you read that helped you form the belief that
15   Mr. Kwok had pledged -- had violated his
16   agreements with The Sherry-Netherland?
17        A.   Yes.
18        Q.   Looking at the statements that we
19   just went over in Exhibit 15 and Exhibit 16, do
20   you have any doubt in your mind that Mr. Kwok's
21   papers represented to the court that the
22   apartment had been pledged?
23        A.   Yes.
24        Q.   Let me --
25        A.   I'm sorry.  Go ahead.  Repeat the
```

```
 1                        ULLMAN
 2   the appraiser?
 3        A.    Uh-huh.
 4        Q.    Yes?
 5        A.    Yes.  I'm sorry.
 6        Q.    No problem.
 7              Do you have any idea why Ms. Sloane
 8   did that?
 9        A.    I have no idea.
10        Q.    Did you ever confront her about it?
11        A.    No.  I probably have not spoken to
12   her since.
13        Q.    How did you find out that the
14   appraiser was not, in fact, working for
15   Mr. Kwok and that Ms. Sloane was lying?
16        A.    Because I had an idea of who the
17   purchaser was, and there were questions that
18   led me to believe that actually this person may
19   be working for the potential purchaser and not
20   for Mr. Kwok.
21        Q.    About how long ago was this?
22        A.    Four months ago, four to five months
23   ago.  I'm guessing.
24        Q.    May?
25        A.    Could have been May.  I'd have to
```

```
 1                        ULLMAN

 2    look in my notes.  I probably have it in my

 3    notes.  It could be May.  Yeah, May could have

 4    been.

 5        Q.    May sounds right?

 6        A.    Yeah.

 7        Q.    Do you think Mr. Kwok was and

 8    Ms. Sloane were trying to conceal the fact that

 9    they were close to selling the apartment?

10        A.    I don't know.

11        Q.    Can you think of any other reason

12    why they wouldn't tell you -- sorry, if I can

13    just finish the question.

14              Can you think of any other reason

15    why they would lie to you about the fact that

16    the appraiser had actually been hired by a

17    prospective purchaser?

18        A.    No.

19        Q.    Are there other instances in which

20    Mr. Kwok or his people have made

21    misrepresentations to you or to anyone at The

22    Sherry-Netherland?

23        A.    No, not that I know of.

24              MR. MOSS:  Can we go off the record?

25              THE VIDEOGRAPHER:  We are now off
```

```
 1                        ULLMAN
 2           the record at 2:34 p.m.
 3                   (Recess taken.)
 4                   THE VIDEOGRAPHER:   We are now back
 5           on the record at 2:41 p.m.
 6     BY MR. MOSS:
 7           Q.    Mr. Ullman, you testified earlier
 8     about a few misrepresentations that you believe
 9     Kwok or his representatives have made to you
10     and The Sherry-Netherland during the last
11     several years, right?
12           A.    Yes.
13           Q.    About how many tenants have you
14     dealt with in your 40-year history in the hotel
15     space?
16           A.    How many tenants?
17           Q.    How many residents of hotels?
18           A.    Many, hundred.
19           Q.    And have any one of those hundreds
20     made misrepresentations to you or to your hotel
21     employer to the extent that Mr. Kwok and his
22     representatives have?
23           A.    No.
24           Q.    I'm going to hand you what's been
25     marked as Exhibit 20.   This will be,
```

1               ULLMAN

2    mercifully, the last exhibit.

3         A.    Okay.   Thank you.

4               (Ullman Exhibit 20, Transcript in

5         Pacific Alliance v. Wan, marked for

6         identification.)

7         Q.    Now, this, Mr. Ullman, is a

8    transcript of a hearing that we had in our

9    litigation in front of the Supreme Court in New

10   York on June 27, 2018.

11              And I would like to direct your

12   attention to page 24, and this is in a part of

13   the transcript, I will represent to you, where

14   we're talking about the pledge or the lien that

15   we were talking about earlier, and I will also

16   represent to you that Mr. Harmon is one of the

17   lawyers who's representing Mr. Kwok.

18              I would like to direct your

19   attention to the bottom where Mr. Harmon

20   states, "I don't want to dance on semantics.

21   I'm not taking an exception.  For the purpose

22   of the integrity of the Court and myself and

23   the papers that we submit I want Your Honor to

24   be aware that the situs of the most important

25   filing, which is the British Virgin Islands,

```
 1                        ULLMAN
 2   that lien is still in effect today."
 3             Do you see that?
 4        A.    Yes.
 5        Q.    Now, can you reconcile a statement
 6   that that lien is in effect with the statement
 7   that we read in the letter to you that the
 8   apartment was never pledged?
 9        A.    No.
10        Q.    Mr. Ullman, I greatly appreciate
11   your time.  Thank you.  I believe Ms. Searles
12   will have some questions, and I don't have
13   anything further for you at this time pending
14   questions from Ms. Searles, but if she asks
15   questions, I may reengage a little bit.
16        A.    That's fine.
17   EXAMINATION BY
18   MS. SEARLES:
19        Q.    Good afternoon, Mr. Ullman.
20        A.    Good afternoon.
21        Q.    I have just a very few questions.
22             Have you ever been contacted by
23   anyone at PAX regarding this particular
24   litigation?
25        A.    No.
```

133

```
 1              C E R T I F I C A T E

 2

 3   STATE OF NEW YORK      )

 4                          :ss

 5   COUNTY OF RICHMOND     )

 6

 7           I, MELISSA GILMORE, a Notary Public

 8   within and for the State of New York, do hereby

 9   certify:

10           That MICHAEL ULLMAN, the witness

11   whose deposition is hereinbefore set forth, was

12   duly sworn by me and that such deposition is a

13   true record of the testimony given by such

14   witness.

15           I further certify that I am not

16   related to any of the parties to this action by

17   blood or marriage; and that I am in no way

18   interested in the outcome of this matter.

19           IN WITNESS WHEREOF, I have hereunto

20   set my hand this 3rd day of October, 2018.

21

22

23   _Melissa Gilmore_

24   _____

25   MELISSA GILMORE
```