# EXHIBIT 19

*PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P. vs.*
*KWOK HO WAN*

---

*MILES KWOK*
*October 3, 2018*

---



126 East 56th Street, Fifth Floor  New York, New York 10022
P:  212-750-6434   F:  212-750-1097
www.ellengrauer.com

1  SUPREME COURT OF THE STATE OF NEW YORK

2  COUNTY OF NEW YORK
   ------------------------------------------------x
3  PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

4                         Plaintiff,

5       -against-

6  KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN
   GUI, a/k/a GUO WENGUI, a/k/a GUO WEN-GUI,
7  a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK,
   a/k/a HAOYUN GUY,
8
                          Defendant.
9
   Index No.: 652077/2017
10 ------------------------------------------------x

11

12                         7 Times Square
                           New York, New York
13
                           October 3, 2018
14                         9:39 a.m.

15

16             Videotaped Examination Before Trial

17 of the MILES KWOK, before Kristi Cruz, a Notary

18 Public of the State of New York.

19

20

21

22

23       ELLEN GRAUER COURT REPORTING CO. LLC
              126 East 56th Street, Fifth Floor
24              New York, New York 10022
                      212-750-6434
25                    REF:  247294

```
 1   A P P E A R A N C E S:

 2

 3   O'MELVENY & MYERS LLP

 4   Attorneys for Plaintiff

 5        Times Square Tower

 6        7 Times Square

 7        New York, New York 10036

 8   BY:  EDWARD MOSS, ESQ.

 9        STUART SARNOFF, ESQ.

10        SARA N. PAHLAVAN, ESQ.

11        212.326.2000

12        emoss@omm.com

13        ssarnoff@omm.com

14        spahlavan@omm.com

15

16

17   HODGSON RUSS LLP

18   Attorneys for Defendant

19        605 Third Avenue, Suite 2300

20        New York, New York 10158

21   BY:  MARK A. HARMON, ESQ.

22        JILLIAN MARIE SEARLES, ESQ.

23        212.751.4300

24        mharmon@hodgsonruss.com

25        jsearles@hodgsonruss.com
```

1  A P P E A R A N C E S:  (Cont'd)

2

3  ALSO PRESENT:

4      ELIZABETH YAOYING JIANG, Mandarin Interpreter

5      DAN MACOM, Videographer

6      KARIN MAISTRELLO, Golden Spring

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

KWOK

A.     This Ms. Chiling (phonetic).

Q.     Who else?

A.     I need an interpreter.

Q.     Fair enough.  Who else was there?

A.     Yvette Wang would sometimes come in,
sometimes go out.

Q.     Who else was there?

A.     Oh, our colleague our colleagues
come in and out and security guards come in
and out.

Q.     Can you please tell me what you
discussed when Yvette Wang was in the room?

DI          MR. HARMON:  Objection.
Attorney/client privilege.  I direct the
witness not to answer.

Q.     Can you please tell me what was
discussed when your other colleagues were in
the room during that meeting?

A.     This I can't tell you.  It's all
about giving birth.  I don't think you want to
hear about that.  Six hours previous to that
my colleague just gave birth to a child.

Q.     Can you tell me what you discussed
with Ms. Searles and Mr. Harmon regarding this

KWOK

1
2  case during your meeting when other colleagues
3  were in the room?
4  DI        MR. HARMON:  I direct the witness
5        not to answer.
6        A.    I do not want to answer such a
7  question.
8        Q.    Can you tell me what you discussed
9  with Ms. Searles and Mr. Harmon regarding this
10  case during your meeting when security guards
11  were present in the room?
12  DI        MR. HARMON:  I direct -- I'm
13        directing the witness not to answer.
14        Q.    Mr. Kwok, do you communicate using
15  e-mail?
16        A.    No, no.
17        Q.    How do you communicate other than
18  speaking?  I'm going to withdraw.  That's too
19  broad.  That's a bad question.
20            Do you communicate by text message?
21        A.    Text message?  What is that?  I
22  don't understand.  Text message includes so
23  many things.  There's a thousand methods for
24  text message.  Which kind are you speaking of?
25  I do not understand.

KWOK

1

2     Q.    Do you communicate using any type of

3  text message?

4     A.    Text message to communicate?  Yes.

5     Q.    Do you communicate using the

6  WhatsApp application?

7     A.    I do.

8     Q.    What other types of text message do

9  you use?

10     A.    So many.  In China there's over

11  thousands.  If you have to ask me to think of

12  them, I have to sit here for several hours.

13     Q.    So you use several types of text

14  messaging?

15     A.    I don't understand when you say

16  several methods of text messaging.  I don't

17  understand what that means.

18     Q.    Well, you just told me that there

19  were thousands of types of text messaging, and

20  I'm asking you, generally speaking, whether or

21  not you use many different types of text

22  messages.

23     A.    I use three, four kinds.

24     Q.    Were your text messages searched in

25  connection with this litigation?

KWOK

A.    I did not use any one for this.  I
did not use any one or anything for this.  I
don't understand what you mean by that.  I
never discuss this litigation.  I think this
is just a crazy case.  I think this is just
scamming.  I think you guys are a bunch of
thugs.  I think you are just mafia.  You're
working for the communists.  You're doing
threats and racketeering.  The whole world
knows what you're doing.  You're helping the
mafia.  You're destroying a good person.  I
don't need to pay any attention to you at all.

Q.    Let me try it again.

Did you provide -- strike that.

Do you know whether your lawyers
searched any of your text messages to respond
or to try to respond to my client's document
requests in this case?

A.    I don't understand.  I don't
understand all the things you're saying.  The
question you're asking is completely
incomprehensible to me.  I think you're
speaking to me separated by the galaxy.  You
have created a completely nonexisting case and

KWOK

1

2  then you're ask me questions.  I'm completely

3  unable to answer you.

4      Q.    You cannot answer whether or not

5  your text messages were searched in connection

6  with this case?

7      A.    I really do not understand what your

8  meaning is.

9      Q.    You understand that it's possible to

10  run a search in a person's text messages?

11      A.    Of course I know that.  I know that

12  text can be searched.  But as for other

13  searching it or not, is this related?

14      Q.    My question is whether or not your

15  text messages were searched to try to find

16  documents that we asked for in this case.

17      A.    I really don't understand.  My text,

18  because the communist party are trying to

19  assassinate me, my text has many intelligences

20  and security guards.

21          THE INTERPRETER:  I missed the last

22      part of his speech.  I'll just ask him to

23      repeat.

24          THE WITNESS:  Sorry.  It a security

25      reason.  I don't want to die here should

1

2      you poison.

3            THE INTERPRETER:  I had to ask him

4      to repeat that.  I said, "What happened to

5      your text?  You were saying the communist

6      were trying to assassinate you?"  He said:

7      A.    Well, my text have to be prepare for

8  many copies for a lot of people to see it

9  every day.

10     Q.    So you don't know whether or not

11 your text messages were searched for this

12 case?

13     A.    You know, my text, so many search,

14 so many cases.  But specifically, I really

15 don't understand what you're saying.  I'm

16 really sorry.

17     Q.    That's okay.

18           MR. MOSS:  Let's take a break.

19           THE VIDEOGRAPHER:  We're now off the

20     record.  The time is 10:07 a.m.

21           (Recess was taken.)

22           THE VIDEOGRAPHER:  We're now back on

23     the record.  The time is 10:19 a.m.

24 BY MR. MOSS:

25     Q.    Mr. Kwok, I need to explain a few

KWOK

1
2  things for the record.  We are here
3  representing Pacific Alliance, nobody else.
4  Pacific Alliance has filed a lawsuit against
5  you, and under the law we are entitled to ask
6  questions and to get answers from you to those
7  questions unless you're instructed not to
8  answer those questions.  We have not gotten
9  answers to several questions so far and we are
10  going to ask all of our questions, and at the
11  rate we're going, it's going to take a very
12  long time.  And I've tried very hard, I've
13  prepared, to focus my questions so as not to
14  waste your time and not to waste anybody's
15  time.  And if you will answer my questions,
16  this whole thing will be over faster for all
17  of us.
18       MR. HARMON:  I'm sure he's doing his
19     best to answer the questions as he
20     understands them.
21       A.    A lot of your questions won't be so
22  ridiculous.  My attorney has told me to
23  truthfully answer all of your questions.
24       Q.    You have no reason to be, do you,
25  that these two attorneys sitting here,

1

2     Mr. Harmon and Ms. Searles, searched your text

3     messages in connection with this litigation

4     against PAX, Pacific Alliance?

5              MR. HARMON:  Object to the form of

6          the question.

7              THE INTERPRETER:  This is

8          interpreter.  You want me to interpret the

9          question to him and the objection, as

10         well?

11             MR. MOSS:  Sure.

12             MR. HARMON:  And tell him to answer

13         if he understands the question, please.

14         A.    I do not know.

15         Q.    You have no information to suggest

16    or no recollection that they did, in fact,

17    search your text messages?

18             MR. HARMON:  Object to the form of

19         the question.

20         A.    I do not know.

21         Q.    Did you provide your text messages

22    to Mr. Harmon or Ms. Searles to be searched?

23         A.    I do not know.

24         Q.    You don't know whether or not you

25    gave your phone to Mr. Harmon or Ms. Searles

KWOK

1

2      to search your text messages?

3              MR. HARMON:  Object to the form of

4          the question.

5          A.    I do not know.

6          Q.    Do you know whether or not you gave

7      a laptop or another computer to Mr. Harmon or

8      Ms. Searles to search your text messages or

9      documents?

10         A.    I do not know.

11         Q.    Did you provide any paper documents

12     to Mr. Harmon Ms. Searles to respond to

13     Pacific Alliance's request?

14         A.    No.

15         Q.    Did anyone ever ask you to search

16     your documents to respond to Pacific

17     Alliance's requests?

18         A.    No.

19         Q.    Did anyone ever ask you to search

20     your text messages to respond to Pacific

21     Alliance's requests?

22         A.    No.

23         Q.    Did you ever discuss with anybody

24     searching for documents or text messages to

25     respond to Pacific Alliance's requests?

```
 1                        KWOK
 2       A.    No.
 3       Q.    Thank you.
 4       A.    Do you think my responses are fast
 5    enough?
 6       Q.    Mr. Kwok, I get to ask the questions
 7    today.  But I will answer that one.  These
 8    responses are fine.  Thank you.
 9             Do you own a residence at the
10    Sherry-Netherland Hotel?
11       A.    No.
12       Q.    Do you live in a residence at the
13    Sherry-Netherland Hotel?
14       A.    Sometimes.
15       Q.    Who owns that residence?
16       A.    Mr. Zhang Wei.
17             THE INTERPRETER:  Z-H-A-N-G, W-E-I,
18       phonetic spelling.
19       Q.    Who is Zhang Wei?
20       A.    Is a working partner, a fund, a
21    conglomerate fund, a member of that.
22       Q.    Is Zhang Wei a person or an entity?
23       A.    It's a person.
24       Q.    Where does Zhang Wei live?
25       A.    In prison.
```

```
 1                           KWOK
 2        Q.    When did Zhang Wei purchase the
 3   residence?
 4        A.    This residence, it was in 2015.
 5        Q.    Do you have any ownership interest
 6   personally at all in the residence?
 7        A.    No.
 8        Q.    Have you heard of a company
 9   called -- we talked about this earlier --
10   Genever Holdings Corporation?
11        A.    I heard of it.
12        Q.    Does Genever Holdings Corporation
13   own the residence at the Sherry-Netherland
14   Hotel?
15        A.    Yes.
16        Q.    What is Zhang Wei's relationship to
17   Genever Holdings Corporation?
18        A.    Zhang Wei was entrusted by Genever.
19            THE INTERPRETER:  I'll instruct him
20        to say it in parts.
21            I just said because of accuracy, I
22        like to interpret 100 percent, and if he
23        gives me too much information, I will be
24        leaving out information.  So I just asked
25        him to give me in segments.
```

KWOK

1

2      A.    Mr. Zhang Wei was the initial person

3  who put out the funds.  I and this whole

4  Genever Corporation was the entrusted party,

5  and also to represent his investment,

6  investors.

7           THE INTERPRETER:  He said is this

8      okay, I said yes.

9      Q.    Were you the one who applied to the

10  Sherry-Netherland to live in the apartment?

11           MR. HARMON:  Object to the form of

12      the question.

13      A.    One of them.

14      Q.    Who else applied to live in that

15  apartment at the Sherry-Netherland?

16      A.    I do not know.

17      Q.    You don't know who else applied to

18  live in the same apartment at the

19  Sherry-Netherland --

20           MR. HARMON:  Object to the form of

21      the question.

22           MR. MOSS:  How about if I finish the

23      question and then you can object.

24           MR. HARMON:  I thought you did.

25           MR. MOSS:  Okay.

```
 1                          KWOK
 2    relating to Genever Holdings LLC and Genever
 3    Holdings Corporation that were produced from
 4    the files of the Sherry-Netherland Hotel.
 5              MR. HARMON:  Did you mark the
 6         document?
 7              MR. MOSS:  Yeah.  It's Exhibit 1.
 8              MR. SARNOFF:  Kwok 1.
 9              MR. HARMON:  Kwok 1?  Thank you.
10         Q.    Mr. Kwok, I'd like to direct your
11    attention, there are members at the bottom, we
12    call them Bates numbers.  I'd like to direct
13    your attention to SN 0159, please.  Do you see
14    this is the Certificate of Incorporation for
15    Genever Holdings Corporation?
16         A.    I do not understand it.
17         Q.    You cannot read the document?
18         A.    Absolutely not.
19         Q.    Are you aware that Genever Holdings
20    Corporation was formed on or around
21    February 13, 2015?
22         A.    I don't understand what you mean.  I
23    don't really remember this.  I've never seen
24    this document before.
25         Q.    You don't understand what I mean
```

KWOK

1

2  when I ask whether or not you're aware that

3  Genever Holdings Corporation was formed on or

4  around February 13, 2015?

5          MR. HARMON:  Object to the form of

6      the question.

7      A.    I don't really -- I don't really

8  know about it.  I don't really remember it.

9  This is all arranged by attorneys.

10     Q.    Let's look at SN 0161.  Can you read

11 anything on this document?

12     A.    I'm unable to.  I can only look at

13 the Arabic numerals, the one, the zeros.  The

14 others I do not know.

15     Q.    Maybe this will make things easier,

16 Mr. Kwok.  Can you read any English at all?

17     A.    No, I absolutely cannot.

18     Q.    So if I put any document in front of

19 you today, you would not be able to read it?

20     A.    Yes.  I am currently learning

21 English.

22     Q.    Okay.  Well, there will be many

23 fewer documents today than I thought there

24 might be.

25     A.    Oh, really.  I'm sorry about that.

```
 1                      KWOK
 2      Q.     That's quite all right.
 3      A.     I've never seen this thing.
 4      Q.     Are you the sole shareholder of
 5   Genever Holdings Corporation?
 6      A.     You know, the way you're putting it,
 7   I don't know.  I'm just agent and they just
 8   asked me to sign and I don't even know what
 9   I'm signing.  For you to say that I owe you 30
10   million, what F that is, I never sign
11   anything.
12      Q.     Are you the sole director of Genever
13   Holdings Corporation?
14             THE INTERPRETER:  This is the
15      interpreter.  Director meaning?
16             MR. MOSS:  Like a board member.
17             THE INTERPRETER:  Board member.
18      Okay.
19      A.     I really don't know.
20      Q.     Do you control Genever Holdings
21   Corporation?
22      A.     Of course I don't control it.
23      Q.     Zhang Wei controls it?
24      A.     Of course.
25      Q.     Does Genever Holdings corporation
```

KWOK

1
2    have any assets?
3         A.    I do not know.
4         Q.    Have you heard of a company called
5    Genever Holdings LLC, a New York Limited
6    Liability Company?
7         A.    I heard of it.
8         Q.    Does Genever Holdings corporation
9    own Genever Holdings LLC?
10        A.    Yes.   Yes.
11        Q.    Does Genever Holdings Corporation
12   have any assets other than Genever Holdings
13   LLC?
14        A.    I do not know.
15        Q.    Does Genever Holdings LLC own the
16   residence at the Sherry-Netherland Hotel?
17        A.    This I don't really know, but I
18   think so.   I can't give you specifics.
19        Q.    So if Genever Holdings Corporation
20   owns Genever Holdings LLC and Genever Holdings
21   LLC owns the residence, then Genever Holdings
22   Corporation ultimately owns the residence.
23             MR. HARMON:   Object to the form of
24        the question.
25        A.    I do not know.

KWOK

1

2      Q.    Do you know if Genever Holdings

3   corporation has any ownership interest in the

4   residence at the Sherry-Netherland Hotel?

5           MR. HARMON:   Object to the form of

6       the question.

7       A.    I do not know.

8       Q.    Did Genever Holdings Corporation

9   have any employees?

10      A.    I do not know.

11      Q.    Does Genever Holdings Corporation

12  have offices?

13      A.    I do not know.

14      Q.    Does Genever Holdings Corporation

15  have a phone number?

16      A.    I do not know.

17      Q.    Does Genever Holdings Corporation

18  have a board of directors?

19      A.    I do not know.

20      Q.    Had has there ever been a board

21  meeting of Genever Holdings Corporation?

22      A.    I do not know.

23      Q.    Does Genever Holdings Corporation

24  have any relationship to Shiny Times?

25      A.    I think representative relationship.

                        KWOK

1
2   applicant?
3        A.    I do not have any ideas about me
4   believing or not.  I don't have these ideas.
5        Q.    To your knowledge, did anyone at
6   Paul Weiss or Williams & Connolly or anyone
7   acting on your behalf or Zhang Wei's behalf
8   tell the Sherry-Netherland that Zhang Wei was
9   involved in this purchase?
10            MR. HARMON:  Asked and answered.  At
11       this time a third time that you've asked
12       that question.  I'll let him answer it
13       again.
14            THE INTERPRETER:  To your knowledge,
15       Paul Weiss, William Connolly, represent to
16       Sherry-Netherland that Zhang Wei was an
17       applicant?  Is that the question?
18       Q.    To your knowledge, did anyone at
19   Paul Weiss or Williams and Connolly or anyone
20   acting on your behalf or Zhang Wei's behalf
21   tell the Sherry-Netherland that Zhang Wei was
22   involved in this purchase?
23            MR. HARMON:  And please make sure
24       you translate my objection to the witness,
25       as well.

```
1                        KWOK
2        A.    I complete don't -- I don't
3    remember.
4        Q.    Did you authorize Paul Weiss and
5    Williams & Connolly to communicate with the
6    Sherry-Netherland on your behalf?
7        A.    I don't remember.
8        Q.    Do you have any reason to doubt that
9    you authorized Paul Weiss and Williams and
10   Connolly to communicate with the
11   Sherry-Netherland on your behalf?
12       A.    I don't quite understand what you
13   mean.
14       Q.    Why don't you take a look, please,
15   at SN 0060.  And I will represent, Mr. Kwok,
16   that this is a document that says Consolidated
17   Balance Sheet for December 31, 2014, of
18   Beijing Zenith Holdings Company and that this
19   was provided by Paul Weiss to the
20   Sherry-Netherland.
21       A.    I do not know.
22       Q.    You don't remember that Beijing
23   Zenith Holdings financials was presented to
24   the Sherry-Netherland board in connection with
25   your application?
```

KWOK

1

2      A.    I don't remember.

3      Q.    It's a long time ago.  Do you -- as

4 of 2015, did you have any ownership interest

5 in Beijing Zenith Holdings Company Ltd.?

6      A.    No.

7      Q.    Did Zhang Wei have an ownership

8 interest in Beijing Zenith Holdings Company

9 Ltd.?

10     A.    I do not know.

11     Q.    Do you know why Beijing Zenith

12 Holding Company's financials were submitted to

13 the Sherry-Netherland in connection with your

14 application to purchase?

15     A.    I do not know.

16     Q.    Who owned Beijing Zenith Holdings

17 Company Ltd. as of February 2015?

18     A.    Zhang Wei, the family member or

19 members of Zhang Wei was in dominating control

20 of it.  His wife's older sister controlled

21 about 90 percent.  I'm not sure, but that's

22 approximate.

23     Q.    So Zhang Wei's family members owned

24 Beijing Zenith Holdings?

25     A.    Yes.

```
1                    KWOK
2       Q.    And you personally had no ownership
3    interest at all?
4       A.    Yes.
5       Q.    And you no control at all over
6    Beijing Zenith at this time?
7       A.    Right.
8       Q.    Do you know why Paul Weiss
9    represented in the cover letter that Mr. Kwok
10   is the owner and controlling party of China
11   Zenith Holdings Company in that letter?
12      A.    I don't know why he would write it
13   like that.
14      Q.    You never told Paul Weiss that?
15 DI        MR. HARMON:  Object to the form of
16         the question.  Hold on a second.  I'm
17         going to object on attorney/client
18         privilege.
19      A.    Refuse to answer.
20      Q.    That's fine.  Let me try it this
21   way, as a yes/no question:  Do you have any
22   idea how Paul Weiss got the understanding that
23   you, Mr. Kwok, were the owner and controlling
24   party of China Zenith Holdings?
25         MR. HARMON:  Just yes or no.
```

1

2      A.    I don't know.

3            You know, I'm sorry, my leg and my

4      shoulder, because previously in prison I was

5      beaten, I'm in great pain.  It was in '89.

6      Q.    Do you want to take a break?

7      A.    No, I'm just letting you know when

8      I'm in pain, I have to move, so please

9      don't -- you know, I like to just sit there

10     and not move, but then, because the pain, I

11     have to constantly move.  Usually when I'm in

12     the office I'm always standing, I'm not

13     sitting.

14     Q.    As I said earlier, if at any time

15     you need a break for as long as you need, just

16     please tell me and I'm happy to --

17     A.    Thank you, sir.  But you know what?

18     Right now I'd really like to sleep.  I haven't

19     been sleeping for two days.

20     Q.    Me too.

21     A.    You are very successfully abusing me

22     on behalf of CCP.

23     Q.    Mr. Kwok, did you know, at the time

24     this Beijing Zenith Holdings balance sheet was

25     submitted to the Sherry-Netherland that

KWOK

Beijing Zenith Holdings' assets had been

frozen by the Chinese government?

     MR. HARMON:  Object to the form of

  the question.

  A.   I refuse to answer.

     MR. HARMON:  You can answer this one

  if you understand the question.

  A.   In that case, I know.  Yes.

  Q.   Mr. Kwok, I'm now -- I know you

can't follow along with me, but I'm now

turning to page SN 0063, which had is the

Williams Connolly document, and Williams

Connolly writes to the board of the

Sherry-Netherland that "Mr. Kwok is eager to

become a resident at the Sherry, but also

feels keenly the need for confidentiality

regarding his business and financial affairs."

     Do you recall that Williams &

Connolly made that representation to the

Sherry-Netherland on your behalf?

  A.   I do not know with this letter.

  Q.   Did you communicate to anyone that

there was a strong need to maintain

confidentiality around your financials and

```
 1                    KWOK
 2   business affairs?
 3        A.    No.
 4        Q.    And are aware that the Williams &
 5   Connolly letter on page SN 0062 also
 6   represented that you, Mr. Kwok, were the one
 7   who was applying to become a shareholder
 8   tenant?
 9        A.    I don't remember.
10        Q.    What is Bravo Luck?
11        A.    I think Bravo Luck -- I think Bravo
12   Luck is a company that is -- has some relation
13   to Mr. Zhang Wei, but I'm not really sure.
14   When you say English, I become confused.
15        Q.    Do you have any relation to Bravo
16   Luck?
17        A.    I really don't know.
18             THE VIDEOGRAPHER:  We're now off the
19        record.  The time is 12:25 p.m.
20             (Luncheon recess taken at 12:25
21        p.m.)
22
23             THE VIDEOGRAPHER:  This marks the
24        beginning of Tape Number 3 in the
25        deposition of Mr. Miles Kwok.  We're now
```

```
1                        KWOK

2          back on the record.  The time is

3          12:57 p.m.

4                    (Kwok Exhibit 5, UBS Hong Kong

5          statement for Bravo Luck Limited entitled

6          Debit Advice, marked for identification,

7          as of this date.)

8    BY MR. MOSS:

9          Q.    Good afternoon, Mr. Kwok.

10         A.    Good afternoon everybody.

11         Q.    Thank you.  I have handed you -- the

12    court reporter has handed you Exhibit 5, which

13    is a statement entitled Debit Advice from UBS

14    in Hong Kong for Bravo Luck Limited, and it's

15    Bates stamped Kwok 510, and it was produced by

16    your counsel to us in this case, Mr. Kwok.

17                Bravo Luck Limited is a company

18    owned by Zhang Wei?

19         A.    Yes.

20         Q.    You have no ownership interest in

21    Bravo Luck Limited?

22         A.    I do not remember having any.

23         Q.    You don't remember having any

24    interest in Bravo Luck Limited at any time,

25    right?
```

KWOK

A. I do not remember.

Q. Sitting here today, you believe you never had an interest in Bravo Luck Limited?

A. I really truly don't remember because I can't read this document and I don't remember this Bravo Luck Limited. I'm sorry, I don't know.

Q. This document says that it's in favor of Ivey Barnum & O'Mara LLC. Do you know who that is?

A. What is that? Where is that?

Q. Well, it's in the middle of the document.

A. What is that called? I don't know.

Q. I'll tell you, Mr. Kwok, based on my rudimentary Google searches it's a law firm in Connecticut. Does that refresh your recollection?

A. I really don't know. Where is Connecticut? Is it in Hong Kong?

Q. It's very close to here. It's close to New York.

A. Oh. I don't know.

Q. Is Bravo Luck Limited the entity

KWOK

from where the funds came to purchase the

Sherry-Netherland apartment?

    A.    It should be so.

    Q.    And the purchase price in March of

2015 was $67.5 million?

          THE INTERPRETER:  I'm sorry.  I did

      66.2 million.  The interpreter -- I made a

      mistake.  The interpreter, I made a

      mistake in my interpretation.  I believe I

      said 6 billion and he made correction, oh,

      67 million.

    A.    Oh, I don't remember that.

    Q.    Do you remember approximately how

much the apartment was purchased for?

    A.    I don't really remember.  I just

remember that Mr. Zhang Wei had at that time a

$100 million budget.  But as for how much that

was at that time, I don't remember.

    Q.    Do you know who sold the

Sherry-Netherland apartment?

    A.    Cathy, Cathy Sloan.

    Q.    Who spoke with Mr. Sloan to

negotiate the purchase price?  Was it -- oh,

oh, scholarship.  Cathy Sloan.  Cathy Sloan

1                          KWOK
2    was your real estate broker?
3          A.     Yes.  Yes.
4          Q.     And was the apartment purchased from
5    Gilbert Haroche?
6          A.     I don't know who that person is.
7          Q.     Do you know who the owner of the
8    apartment was before Zhang Wei and you
9    purchased it?
10               MR. HARMON:  Object to the form of
11          the question.
12         A.     I really can't remember.  I do not
13   know.
14         Q.     Did you negotiate the price, you
15   personally negotiate the price with the
16   seller?
17         A.     No.
18         Q.     Did Zhang Wei negotiate with the
19   seller?
20         A.     I do not know.
21         Q.     Do you know who did negotiate on
22   behalf of the purchaser with the seller?
23         A.     I was one among many.  There was
24   Zhang Wei's attorney and the employee or
25   employees of his office.  Many people.  I was

KWOK

1

2      Q.    And that was in connection with our

3    lawsuit and our motion for the attachment on

4    the residence, right?

5      A.    Yes.

6      Q.    When you spoke to Yvette about the

7    pledge, did she communicate to you, in

8    substance, that the apartment had been

9    pledged?

10     A.    This?  No.

11     Q.    Do you have any idea why the pledge

12   came up for the first time in response to our

13   motion to attachment apartment, then?

14     A.    I don't understand what you mean.

15     Q.    Do you understand that there were

16   papers filed on your behalf that argue that

17   Pacific Alliance couldn't get a lien or an

18   attachment on the apartment because the

19   apartment had been pledged?

20     A.    Wang Yan Ping --

21           THE INTERPRETER:  W-A-N-G, Y-A-N,

22      P-I-N-G.

23     A.    -- had told me about it.

24     Q.    And that's Yvette?

25     A.    Yes.

KWOK

1

2     Q.     She told you that your side filed

3     papers arguing that the apartment had been

4     pledged already?

5     A.     Yes.

6     Q.     And as far as you know, those papers

7     were accurate?

8     A.     Yes.

9     Q.     And Yvette believed that the

10    apartment had, in fact, been pledged?

11                MR. HARMON:  Object to the form of

12         the question.

13    A.     You can ask Wang Yan Ping those

14    questions.  I cannot answer on behalf of her.

15    Q.     That's completely fair.  Let me try

16    to rephrase it.

17                Did Yvette communicate to you that

18    the apartment had been pledged?

19    A.     Yes.

20                MR. MOSS:  I'm happy to take a quick

21         break now, if that's okay with everyone.

22                MR. HARMON:  That's fine.

23                THE VIDEOGRAPHER:  We're now off the

24         record.  The time is 2:02 p.m.

25                (Recess was taken.)

```
 1                        KWOK

 2              THE VIDEOGRAPHER:  This marks the

 3       beginning of Tape Number 4 in the

 4       deposition of Mr. Miles Kwok.  We're now

 5       back on the record.  The time is 2:28 p.m.

 6              I just want to note for the record

 7       that the witness is standing for his

 8       comfort.

 9  BY MR. MOSS:

10       Q.    Mr. Kwok, how old is Zhang Wei?

11       A.    I think around 38 years old.

12       Q.    What did he do for a living before

13    he was imprisoned?

14       A.    Invested in real estate securities.

15       Q.    What types of securities?

16       A.    He just did a lot of these -- he did

17    a lot of these securities related things,

18    selling and purchasing.

19       Q.    What city did he live in?

20       A.    Henan Zhengzhou.

21              THE INTERPRETER:  H-E-N-A-N,

22       Z-H-E-N-G-Z-H-O-U.

23       Q.    And when did he go to prison?

24       A.    It should be around after May of

25    2015.  Around May, June, approximately.  I
```

                        KWOK
1
2    can't remember too precisely.
3         Q.    Was there any press, publicity
4    around him going to prison?
5         A.    A lot of Chinese press reporting.
6    So many of them.
7         Q.    Including him?
8              MR. HARMON:  I'm sorry?
9              THE INTERPRETER:  I'm sorry?
10        Q.    Including press about him going to
11   prison?
12             THE INTERPRETER:  Including about
13        Zhang Wei going to prison?
14             MR. MOSS:  Yes.
15        A.    Yes.  So in the information we
16   provided to you of the Hong Kong police,
17   Chinese police about their sealing off and
18   also arrest, in that list includes the name of
19   Zhang Wei.
20        Q.    Where was that information provided?
21        A.    This was shown to me about Wang Yan
22   Ping.  Yvette showed it to me.
23        Q.    Do you know whether or not that was
24   something that was filed in the lawsuit with
25   the court?

```
 1                        KWOK
 2        A.     No, this is about police, about the
 3   police going after arrest, and because it's in
 4   English and partly in Chinese, and I saw the
 5   part with Zhang Wei's name.
 6        Q.     Was it an article, article in
 7   English?
 8        A.     No, it is not article, it's a
 9   document provided by the police to the Hong
10   Kong company.
11        Q.     What Hong Kong company?
12        A.     Oh, so many companies.  I don't
13   remember.  It definitely includes Hong Kong
14   Zenith -- Hong Kong Golden Spring.
15        Q.     Are you aware of a company called
16   Henan Yuda Real Estate?
17        A.     Can I not answer this question?  I
18   refuse to answer this question because I think
19   this is unrelated to the topic at hand today.
20        Q.     Does Mr. Zhang Wei have an interest
21   in Henan Yuda Real Estate Company?
22             MR. HARMON:  I think I'm going to
23        need you to explain to me, if you want him
24        to answer the question, the relationship
25        of that entity to the attachment
```

```
 1                         KWOK
 2        proceeding, because otherwise we'll take
 3        the position that it's beyond the scope of
 4        the attachment discovery and direct the
 5        witness not to answer.  But I'm open to
 6        having you explain to me its connection.
 7             MR. MOSS:  Sure.  So Mr. Kwok, I
 8        believe, testified that Zhang Wei lived in
 9        the Henan Province.
10             Is that correct?
11             THE WITNESS:  Yes.
12             MR. MOSS:  And for first time we're
13        hearing about somebody named Zhang Wei who
14        apparently owns the apartment, and there's
15        press about a Kwok-controlled Henan Yuda
16        Real Estate Company, and I'm trying to
17        understand the relationship between
18        Mr. Kwok and Zhang Wei.
19   DI        MR. HARMON:  I'll direct the witness
20        not to answer.  I'll stand on the
21        objection.
22        A.   I refuse to answer.
23        Q.   Okay.  Do you and Mr. Zhang Wei both
24     have interests in the Henan Yuda Real Estate
25     Company?
```

```
 1                           KWOK
 2   DI              MR. HARMON:  I direct the witness
 3         not to answer.
 4                 THE INTERPRETER:  The interpreter
 5         did not interpret, and Mr. Kwok says:
 6         A.    I refuse to answer.
 7         Q.    Was that company, Henan Yuda Real
 8      Estate Company, accused of loan fraud?
 9   DI              MR. HARMON:  I direct the witness
10         not to answer.
11         A.    Refuse to answer.
12         Q.    Okay.  Are you aware that in two
13      rounds of attachment briefing relating to the
14      apartment, that in the lawsuit that you filed
15      against the Sherry-Netherland Hotel, that
16      there's never been a reference to Zhang Wei in
17      any document that's been filed on your behalf
18      in any litigation relating to the apartment?
19      Are you aware of that?
20         A.    I don't really know.
21         Q.    Can you point to any document that
22      evidences Zhang Wei's ownership of the
23      apartment?
24         A.    The fund came from Zhang Wei's
25      company.  This is the simplest evidence.  And
```

1          KWOK

2  Zhang Wei is the person who borrow from that R

3  something.

4       Q.    Is there any other evidence besides

5  the document showing where the funds came

6  from, any other document that you can identify

7  that shows Zhang Wei's ownership of either the

8  apartment or of either of the Genever

9  entities?

10          THE INTERPRETER:  This is the

11      interpreter asking for clarification.

12      A.    I, with him, have this agreement to

13  represent him and also have the one for

14  financial arrangement and investment planning.

15      Q.    You have a written agreement with

16  him?

17      A.    Yes.

18      Q.    Do you have a copy of that agreement

19  in your possession?  Let me just clarify --

20      A.    I have original and he has original.

21      Q.    Did you provide that document to

22  your attorneys in connection with responding

23  to our document request in this case?

24      A.    I believe not.

25      Q.    Did you provide it to the

1                          KWOK

2      Sherry-Netherland in connection with applying

3      for the apartment?

4          A.    I do not know.

5          Q.    You said you have an agreement for

6      investment planning.  Is that a separate

7      written agreement with Zhang Wei?

8          A.    No, it's the same.  No, that was 100

9      million investment all together.

10         Q.    So you have one written document

11     showing your relationship with Zhang Wei?

12         A.    Yes.

13         Q.    Does that agreement actually mention

14     the Sherry-Netherland apartment?

15         A.    Yes.

16         Q.    Why did Zhang Wei, if you know, why

17     was he imprisoned?

18         A.    He was falsely accused by the

19     communist.  It was wrongfully -- it was

20     wrongful.

21         Q.    Did it have to do with you?

22         A.    Of course it did.

23         Q.    So he's a political prisoner in

24     China?

25         A.    Of course.

KWOK

1

2     Q.    Is it your testimony that as a

3  political prisoner in China, that he has

4  access to speak to his lawyers?

5     A.    No, impossible.  In China, no

6  political prisoner can be able to speak to

7  anyone.  Well, strictly speaking, he was

8  kidnapped.  He was kidnapped by the

9  communists.

10     Q.    Have you ever heard of somebody

11  called Guo Qiang, G-U-O, Q-I-A-N-G?

12     A.    As I said to you before, that's my

13  son.

14     Q.    That's Mileson Kwok?

15     A.    Yes.  I only have one son.

16     Q.    Sorry.  Thank you for clarifying.

17          Have you ever heard of a company

18  called Blue Capital?

19     A.    I don't remember that.

20     Q.    You remember we discussed earlier

21  your conversation with Yvette about the

22  pledges, or the pledge of the apartment to

23  Roscalitar 2, or R2?  Remember I asked you

24  questions about that earlier?

25     A.    Yes.

KWOK

Q.   Are you aware that the pledge to
Roscalitar was terminated in 2017?

A.   I don't know.

Q.   Who would know that?  Would that be
Yvette?

A.   It would be Zhang Wei's attorneys
and then that something, the R company, I
think they'd know.

Q.   So you didn't know that when it was
represented to this Court that the apartment
was pledged to Roscalitar 2, that at the time
of that representation the pledge had actually
been terminated?

MR. HARMON:  Object to the form of
the question.

A.   I did not know.

Q.   Remember earlier I asked you about
the seizing of the Zenith assets and whether
or not you knew that the assets were seized?

A.   I refuse to answer.

Q.   Well, you answered earlier that
the -- that you knew that the Zenith assets
were seized.  Do you remember that testimony?

A.   I refuse to answer it now.

KWOK

1

2     Q.    Did you also know that the Beijing

3 Pangu assets were seized?

4     A.    I refuse to answer.

5     Q.    Do you recall that you personally

6 signed an agreement agreeing to the

7 Sherry-Netherland proprietary lease?

8     A.    I think I remember signing it.  But

9 as for the content of that, I don't really

10 know, but I think I did sign that.  But what,

11 in fact, that document was, I do not know.

12     Q.    So you signed something, but you

13 hadn't reviewed it?

14     A.    I do not have the ability to review

15 it.

16     Q.    Did you ever gain an understanding

17 of what you were agreeing to when you signed

18 the agreement with the Sherry-Netherland

19 adopting the proprietary lease?

20     A.    Even to this day I do not

21 understand.

22     Q.    Your lawyers didn't review the

23 document with you before you signed it?

24          MR. HARMON:  I think that would be

25     an attorney/client privileged

```
 1                    KWOK
 2      communication.  I take it back, I take it
 3      back --
 4           MR. MOSS:  I think the fact of
 5      reviewing --
 6           MR. HARMON:  The fact --
 7           MR. MOSS:  -- as a yes/no question
 8      is fine.
 9           MR. HARMON:  You could answer the
10      question.
11           THE INTERPRETER:  I'm sorry.
12           MR. HARMON:  You can answer the
13      question.
14      A.    I refuse to answer.  I don't know.
15      Q.    You don't know or you refuse to
16   answer?
17      A.    I -- I don't know.
18      Q.    You don't remember reviewing the
19   document with your lawyers?
20      A.    I don't remember.
21      Q.    Mr. Kwok, you're aware that our
22   client is seeking an attachment of the
23   Sherry-Netherland apartment?
24      A.    I think this is just robbery.  I
25   don't think this is attachment.  I think this
```

```
 1                          KWOK
 2    is just robbers.  I never signed the 30
 3    million agreement, the money was never given
 4    to us, and the Sherry-Netherland is not ours
 5    either and they're just robbers.
 6         Q.    I just want to ask a simple
 7    question.  I know that you dispute everything
 8    in the lawsuit.  I understand that.  My
 9    question is just are you aware that our client
10    has filed papers seeking what we say at least
11    is a request to attach the apartment?
12         A.    I know now.
13         Q.    And my question is:  Is it your
14    position that our client cannot attach the
15    apartment because you don't own it, but rather
16    Zhang Wei does?
17              MR. HARMON:  Object to the form of
18         the question.
19         A.    Yes.
20         Q.    And I know you've testified a lot
21    about how you think that this is an
22    illegitimate lawsuit.  My question is:  If the
23    court finds for our client and orders you to
24    pay a judgment in this lawsuit, money to us,
25    will you pay it?
```

```
1                          KWOK
2   DI          MR. HARMON:  Don't answer the
3           question.  It's beyond the scope of the
4           attachment proceeding, discovery.
5           A.    Refuse to answer.
6                   MR. MOSS:  And of course,
7           Mr. Harmon, you added discovery after a
8           second there to your instruction because
9           it obviously goes to the very heart of the
10          attachment motion.
11                  MR. HARMON:  I completed my
12          sentence.  Thank you.
13          Q.    Mr. Kwok, you testified earlier that
14      you signed the agreement adopting the
15      proprietary lease without knowing what was in
16      that document.  Do you recall that testimony?
17                  MR. HARMON:  Object to the form of
18          the question.
19          A.    Yes, I did say that.
20          Q.    Is it your practice to sign
21      agreements or documents that are in English
22      without knowing what's in them?
23          A.    Yes.
24                  MR. MOSS:  Why don't we go off the
25          record.
```

```
 1                       KWOK
 2              THE VIDEOGRAPHER:  We're now off the
 3       record.  The time is 2:55 p.m.
 4              (Recess was taken.)
 5              THE VIDEOGRAPHER:  We're now back on
 6       the record.  The time is 3:13 p.m.
 7              MS. MAISTRELLO:  He just said if you
 8       could take a photo of me later.
 9              THE WITNESS:  I want to remember you
10       abuse me here.
11              MR. MOSS:  Well, Mr. Kwok, it's all
12       going to end soon.  Just a few more
13       questions.
14              THE WITNESS:  Thank you.
15  BY MR. MOSS:
16       Q.    You remember, we've talked about
17    this lawsuit today, and you understand that my
18    client is suing because they claim that they
19    made a loan to one of your companies and that
20    that loan was never repaid.  You understand
21    that at least that's what we're claiming?
22       A.    I understand with absolute lies.
23    This is defamation, this is --
24              THE INTERPRETER:  I'm blanking on
25       the word.  To get you money from --
```

```
 1                         KWOK
 2              MR. SARNOFF:  Extortion?
 3              THE INTERPRETER:  Yes, thank you.
 4         A.    Extortion.  I'd like for you to
 5    provide me with the truth for the $30 million
 6    loan for the payment, for the loan, to give me
 7    truth on that.
 8         Q.    So that's what I want to try to
 9    understand.  Is it your testimony that my
10    client never actually made the loan?
11 DI           MR. HARMON:  Objection.  Direct the
12           witness not to answer.
13         A.    I refuse --
14              MR. HARMON:  Beyond the scope of
15           attachment discovery at this time.
16              MR. MOSS:  It's in the scope of his
17           testimony.  I'm trying to clarify what
18           he's already said.
19 DI           MR. HARMON:  I understand that.  You
20           asked him a question.  He could have
21           answered yes or no.  He gave you an
22           answer.  So I know you want to follow up
23           on that answer, but the follow-up is
24           beyond the scope of attachment discovery.
25           I direct him not to answer.
```

C E R T I F I C A T E

STATE OF NEW YORK        )

                                            ) SS.:

COUNTY OF SUFFOLK        )


        I, KRISTI CRUZ, a Notary Public within AND

for the State of New York, do hereby certify:

        That MILES KWOK, the witness whose

deposition is hereinbefore set forth, was duly

sworn by me and that such deposition is a true

record of the testimony given by such witness.

        I further certify that I am not related to

any of the parties to this action by blood or

marriage; and that I am in no way interested in

the outcome of this matter.

        IN WITNESS WHEREOF, I have hereunto set my

hand this 8th day of October 2018.




_____

KRISTI CRUZ