# EXHIBIT 56

No. 86
**Notice of application for leave to apply for judicial review**
(O. 53 r. 3(2))



IN THE HIGH COURT OF THE (Folio 1)
HONG KONG SPECIAL ADMINISTRATI **HCAL 1639/2018**
COURT OF FIRST INSTANCE
CONSTITUTIONAL AND ADMINISTRATIVE LAW LIST
NO.            OF 2018

*Hon Chow J*

Anton Development Limited                                          Applicant

---

**Notice of application for leave to apply
for judicial review**
(O. 53 r. 3(2))

---

This form must be read together with notes for guidance obtainable from the Registry.

---

To the Registrar, High Court, Hong Kong.

| | |
|---|---|
| Name, description and address of applicant | Anton Development Limited<br><br>Room 805-806 8th Floor<br>Tai Yau Building<br>181 Johnston Road Wanchai<br>Hong Kong |
| Name and description of proposed respondent | Commissioner of Police |
| Judgment, order, decision or other proceeding in respect of which relief is sought | The decision of the police to impose "no consent" regime pursuant to s.25A(2)(a) of Organized and Serious Crimes Ordinance, Cap. 455 on DBS Bank's dealing with the bank accounts of Anton Development Ltd (the "First Decision")<br><br>The decision of the police not to apply for a restraint order to deal with the bank accounts of Anton Development Ltd (the "Second Decision") |

<u>Relief Sought</u>

1. Leave to apply for judicial review;
2. If leave is not granted on the papers, an oral hearing of this appli... pursuant to O.53 r.3(3) of the Rules of High Court, Cap 4A;

3. A declaration that the "no consent" regime pursuant to s.25A(2)(a) of the Organized and Serious Crimes Ordinance, Cap. 455 is an unlawful and unconstitutional interference with the applicant's rights, and is thus illegal;

4. A declaration that the decision of the police not to apply for a restraint order to deal with the bank accounts of Anton Development Ltd with DBS Bank is illegal;

5. A declaration that both the First and Second Decisions are disproportionate and unreasonable;

6. A declaration that the both the First and Second Decisions are irrational and oppressive;

7. A prohibition order that the letter or letters of "no consent" against the bank accounts of Anton Development Ltd be stayed until the determination of the application or until the Court otherwise orders pursuant to O.53 r.3(10)(a);

8. An extension of time for the applicant to commence judicial review application, if so required;

9. An order for costs; and

10. Such further or other relief as may be just and convenient.

| Name, description and address of all interested parties, (if any) known to the applicant | |
|---|---|
| Name and address of applicant's solicitors, or, if no solicitors acting, the address for service of the applicant | Michael Li & Co., Solicitors, 19/F Prosperity Tower No.39 Queen's Road Central Hong Kong |
| Signed | Dated 14 August 2018 |

*Grounds on which relief is sought*
(If there has been any delay, include reasons here).

Note: – Grounds must be supported by an affidavit which verifies the facts relied on.

## GROUNDS ON WHICH RELIEF IS SOUGHT

### A.    Introduction

1.    The crux of the present application lies in the police's decision of suspending the operation of the bank accounts held by Anton Development Limited (the Applicant) ("Anton"), Hong Kong International Funds Investments Limited ("HKIFIL") and its related company with DBS Bank since 12 July 2017. It is perceived that the suspension was made on the strength of a letter or letters of "no consent" issued by the police to DBS Bank.

2.    In connection with the suspension of operation of the bank accounts, the allegation made against Anton by the police is that there was a conspiracy made between Madam Qu Guojiao ("Madam Qu"), Mr. Guo Wengui ("Mr. Guo"), Mr. Guo Qiang, Madam Guo Mei and Mr. Han Chunguang by using their personal bank accounts and the bank accounts of Anton, HKIFIL and others to deal with a total sum of HK$32,920,076,510, known or believed to represent proceeds of an indictable offence in contravention of s.25 of the Organized and Serious Crime Ordinance, Cap. 455 ("OSCO").

3.    The Applicant's grounds of judicial review against the police's decision of deploying the "no consent" regime, by way of summary:

(a)    Illegality – whether the "no consent" regime pursuant to s.25A(2)(a) of OSCO is inconsistent with articles 6 and/or 105 of the Basic Law and is thus unconstitutional; (First Ground)

(b)    Illegality – failure and/or refused to apply for a restraint order in order to freeze the bank accounts of Anton; (Second Ground)

(c)    Disproportionality and Wednesbury unreasonableness; (Third Ground)

(d)     Irrationality and oppression. (Fourth Ground)

The Applicant submits, as very often is the case in judicial review that these Grounds are closely related to and significantly overlap.

## B.     The Parties

4.    Anton is a private company incorporated in Hong Kong under the Companies Ordinance, Cap. 32.  Currently, Madam Guo Mei, daughter of Mr. Guo, is the sole shareholder and sole director of the company.  Madam Qu was at the material time the manageress of Anton.

5.    HKIFIL is a private company incorporated in Hong Kong under the Companies Ordinance, Cap. 32.  Currently, Madam Guo Mei is the sole shareholder and sole director of the company.  Madam Qu was at the material time manageress of HKIFIL.

6.    In gist, Anton and HKIFIL, as well as certain related companies were incorporated by Guo's family for investment purpose.  Mr. Guo and/or his family members are interested in these companies.  The Guo's family carried out their own investment and in some occasions in joint venture with other global investors, one of them being a sovereign fund of Abu Dhabi.  Indeed, the amount left in the USD account of DBS Bank, as discussed below, was funds originated from Abu Dhabi sovereign fund to discharge the liability under an investment agreement between the interested companies of Guo's family and its investment partner in Abu Dhabi.

## C.     The police investigations and freezing of the Accounts

7.    At all material time, Anton held the following banks accounts with DBS Bank, the operation of which were all suspended by DBS Bank on 12 July 2017 on the strength of "no consent" letter issued by the police:

2

    (a)    Current Account (HKD) 471492183 (balance unknown);

    (b)    Current Account (USD) 470516593 (balance unknown)

    (c)    Statement Savings Account 475445573 (USD) with a closing balance of US$93,031,425.35 as at 1 March 2018;

    (d)    Statement Savings Account 475445573 (HKD) with a closing balance of HK$829,746,595.44 as at 1 March 2018; and

    (e)    Statement Savings Account 475445672 (RMB) with a closing balance of RMB$3,012,156.29 as at 1 March 2018.

(collectively referred to as "the Accounts")

8.    As informed by DBS Bank through two emails respectively dated 12 and 13 July 2017, the Accounts have been put on hold as directed by the authority but without stating any reasons. According to the contacting information of the police as stated in the reply emails, it is perceived that the Accounts were frozen on the strength of "no consent" regime as directed by the police (the "First Decision").

9.    On 1 and 2 August 2017, the police applied for search warrants against, amongst others, the office premises of Anton and HKIFIL.

10.    On 3 August 2017, Madam Qu was arrested of the suspected money laundering offence and put on police bail.

11.    Up to time when the present application is taken out, the Accounts are still being frozen due to the alleged police investigation of the suspected money laundering offence.

*Anton's prompt requests for release of the Accounts*

12.    As early as on 19 July 2017, around a week after freezing of the Accounts, Anton through its solicitors sent letters to DBS Bank and the police respectively requesting for release of the Accounts. Anton also indicated in

3

the letter to the police that they were prepared to meet with the police for interview with a view to assisting its investigation.

13.   The police by letter dated 21 July 2017 did not respond to Anton's request, merely stating that Anton was involved in a money laundering investigation, and that they could not disclose further details as the investigation was ongoing. Same request was made by Anton on 25 July 2017 but was again denied on 28 July 2017. Likewise, there was no reply to Anton's request of releasing the Accounts, or any explanation as to when or whether the Accounts would be released at all.

*Prolonged negotiation with the police*

14.   Despite the refusal of the police upon Anton's requests for "unfreezing" the Accounts in around July 2017, the solicitors acting for Anton have been actively making contacts with the police, putting forward proposals in order to expedite the police's investigation and urging for early release of the Accounts.

15.   Letters dated 30 November 2017 (copied to the Department of Justice) and 11 December 2017 were sent by counsel representing Anton to the police, giving detailed explanations of the nature and provenance of the funds in the Accounts, and requesting for release of the Accounts. In particular, the aforesaid letter clarified in length that the approximate sum of USD$93 million held in account No.475445573 (USD) was indeed investment funds from Abu Dhabi sovereign fund. Also, in the same letter it was indicated that Anton maybe willing to consent to the granting of a restraint order if the said approximate sum of USD$93 million would no longer be frozen. Be that as it may, the police merely stated in their reply letter dated 15 December 2017 that Anton, amongst other companies, was involved in their ongoing investigations, and the police requested for holding an interview with the representative of Anton.

16.   Subsequently, a letter dated 22 December 2017 was sent to the police by Anton's solicitors concerning the arrangement of relevant persons to meet

4

with the police with a view to assisting the police in deciding whether the "no consent" decision be withdrawn. The police replied on 29 December 2017 for some clarifications. Letters further on this matter was sent on 29 December 2017 and 4 January 2018, to which the police replied on 5 January 2018. Letters by Anton's solicitors were further sent respectively on 5 January 2018 and 9 January 2018, to which the police replied on 9 January 2018. In gist, the police would only agree to interview the beneficial owner of Anton.

17.     In February 2018, it was already more than 7 months since the freezing of the Accounts. Letter was sent on 22 February 2018 to the police by Anton's solicitors requesting again the withdrawal of "no consent" letter, and reiterated that Anton would agree to a restraint order being made over the funds in the Hong Kong dollars account No. 475445573. In their purported reply made on 1 March 2018, the police failed to address any of Anton's requests, and merely reiterated their request for interviewing the beneficial owner of Anton.

18.     The latest and last letter sent by Anton's solicitors was on 1 June 2018, to which the police replied on 8 June 2018. It was stated in the said letter that if Anton received no positive reply from the police, it was assumed that the police had no intention whatsoever to apply for a restraint order. The police's reply letter dated 8 June 2018 made no mention of the issue of restraint order, or to give any concrete explanation as regards the "no consent" regime (the "Second Decision").

19.     Up to time when this application is taken out, notwithstanding Anton's repeated requests and proposals made through its solicitors, the police have not directly responded to any of them while the Accounts are still frozen under the "no consent" regime.

## D.     Laws and regulations pertinent to "no consent" regime

20.     Section 25(1) of OSCO creates an offence of dealing with property known or believed to represent the proceeds of an indictable offence. Section 25A(1) creates a duty to disclose suspicious property, failing which is an offence

5

under s.25A(7). Section 25A(2)(a) provides a defence to a s.25(1) charge if the person, who made a disclosure, had consent from an authorised officer prior to further dealing with the suspicious property.

21. Upon investigation of the present case, the Joint Financial Intelligence Unit has issued to DBS Bank a letter or letters of "no consent" to its dealing with the Accounts pursuant to s.25A(2)(a) and thus, DBS Bank has suspended the operation of the Accounts upon the direction of the police.

*The applicable guidelines*

22. The guidelines and operations of the "no consent" regime were addressed in a recent judicial review case of *Interush Ltd v Commissioner of Police* [2015] 4 HKLRD 706. In gist, the relevant internal guidelines of the police are summarized at §§59 to 62 as follows:

   (a) Upon receipt of suspicious transaction report, the Joint Financial Intelligence Unit ("JFIU") will refer the matter to an investigation unit for action;

   (b) The Superintendent of the investigation unit would decide whether a "no consent" letter is warranted;

   (c) Relevant factors for consideration in making the decision include: "the nature of the offence; prospect of a conviction; value of proceeds and realizable property; reasonable likelihood of obtaining a restraint order; reasonable likelihood of obtaining an injunction by the victim and the preservation of proceeds of crime for confiscation";

   (d) Once a "no consent" letter is issued through the JFIU, its extension (if any) would be reviewed by the Superintendent of the investigation unit on a monthly basis;

6

(e)     If the aggregate extension exceeds three months, the Formation Commander (either a Senior Superintendent or Chief Superintendent) would review the matter on a monthly basis; and

(f)     Under normal circumstances, a "no consent" letter should not exceed six months. In exceptional cases, the Formation Commander will review the situation critically and consult the Department of Justice for legal advice.

**E.    The Legal Context**

23.    Next, it is necessary to set out the constitutional provisions, which are relevant to the present application as follows.

24.    Article 6 of the Basic Law in so far as relevant provides:

*"The Hong Kong Special Administrative Region shall protect the right of private ownership of property in accordance with law."*

25.    Article 105 of the Basic Law in so far as relevant provides:

*"The Hong Kong Special Administrative Region shall, in accordance with law, protect the right of individuals and legal persons to the acquisition, use, disposal and inheritance of property and their right to compensation for lawful deprivation of their property."*

*Constitutional challenge*

26.    As a derogable right, it is well established that interference can only be justified following the application of the proportionality test. Indeed, the full approach to considering whether the interference with the constitutional right or rights can be justified has already been explored in *Secretary for Justice v Latker* [2009] 2 HKC 100, per Ma CJHC (as he then was) at §§19-21:

7

(a)     First, the relevant offence (whether or not contained in statutory form) must be analysed to see whether a constitutional right (to be found in the Basic Law or the Bill or Rights) is engaged in the first place. If no such right is engaged, that is the end of the challenge.

(b)     Secondly, on the assumption a right or rights are engaged, the next inquiry then is to see whether the relevant right or rights have been infringed. Again, if the answer is in the negative, this is also the end of any constitutional challenge.

(c)     Thirdly, if, however, there has been an infringement, *the court then has to examine whether such infringement can be justified.* Where a criminal offence is involved, *the burden is on the prosecution (the Secretary for Justice) to demonstrate that the infringement of constitutionally protected rights is justified (in a non-criminal context, usually in Judicial Review proceedings, the burden will be on the relevant decision maker which may or may not be the Government).*

(d)     Where justification cannot be shown, the relevant offence will not survive a constitutional challenge.

The following additional points on justification of an infringement of constitutional protected rights should be made: -

(a)     Some rights are absolute, not capable of any derogation. Where, therefore, such rights are infringed, no justification for their derogation or qualification can ever be shown. The right that no one shall be arbitrarily deprived of his life (Article 2(1) of the Bill of Rights) or that no one shall be held in slavery (Article 4(1) of the Bill of Rights) are perhaps ready examples of this. I shall have more to say about this aspect below.

(b)     Where, however, the constitutional right is not absolute (meaning that derogation or qualification is possible in certain circumstances), the

8

court's approach is to see whether the circumstances of the case will allow a derogation or qualification. *Here, the court applies what is known as 'proportionality test'. If this test is satisfied, then the justification of an infringement of the constitutional right in question will be demonstrated.*

(c)    The proportionality test has been formulated by the Court of Final Appeal as follows:

    (i)    The derogation from (or, as it is sometimes, referred to in the cases, the 'restriction to' or the 'encroachment on') the constitutional right must be shown, first, to be rationally connected to one or more legitimate purposes or aims. There are two steps here: first, the identification of a legitimate purpose or aim (the societal justification) and secondly, the determination of a rational connection between the relevant restriction or qualification and that purpose or aim.

    (ii)   Next, it must also be shown that the derogation is no more than is necessary to accomplish the legitimate purposes or aims in question. See, for example, the approach of the Court of Final Appeal in *HKSAR v Lam Kwong Wai* (2006) 9 HKCFAR 574, at 593 (paragraph 21). This was a case brought to our attention by the respondent but there are many others.

(d)    The burden, I would reiterate, is on the prosecution to satisfy this test and therefore provide the necessary justification. Another facet of this burden in many cases (and this is relevant in the present; see paragraph 13(4)(a) above) is the obligation to provide evidence to the court to advance any argument based on legitimate purposes: - see, for example, *Kwok Hay Kwong v Medical Council of Hong Kong* [2008] 3 HKLRD 524, at 537-8 (paragraph 24). However, whether or not evidence is actually required in any given case must naturally depend on the circumstances. The point, as articulated by Stock JA in *Dr Kwong*

9

*Kwok Hay v Medical Council of Hong Kong (No 2)* [2007] 4 HKC 446, at 453-4 (paragraph 18) (the same case at an earlier stage when additional evidence was sought to be adduced prior to the appeal proper), is really this: -

> '18. Where there is an infringement on the freedom of expression (or, for that matter, on any other fundamental freedom) but it is argued that the infringement is lawful, *it is for the body imposing the restriction - in this case, the Council - to show a justifiable societal objective for the restriction, and that the restriction goes no further than is necessary to achieve that objective.* It is difficult, if not impossible, to envisage an infringement that could be justified without a clearly explained rationale, even though the depth of the explanation required will vary according to the nature of the restriction and its context.'

Where a constitutional right is capable of derogation or qualification, the court must closely examine the circumstances to see whether such derogation or qualification can be justified in the application of the proportionality test.                                (emphasis added)

## F.   First ground of review: infringement of articles 6 and/or 105 of the Basic Law by s.25A(2)(a), OSCO

27.   It is trite legal principle that the interference with Basic Law rights, articles 6 and/or 105 in this instance, can only be justified after the exercise of the proportionality test, as discussed below.

28.   Section 25A(2)(a) which confers the power to an authorised officer to give consent and to issue a letter or letters of "no consent" infringes arts. 6 and/or 105 of the Basic Law. It is clear that the "no consent" decision interferes with the use or disposal of the property of an individual, which imposes criminality

liability without prescribing any time limit for the expiry of such decision and more importantly, any rights of the affected person or individual to apply to the Court to vary or dismiss the decision.

29.    Nonetheless, according to the legislative scheme, the police may freeze the property of a suspect for an "indefinite period" so long as there is no consent given by the authorised officer prescribed by the provision to further deal with the property, as the person (viz. the bank in the present context) which makes the disclosure may be in contravention of s.25(1). Hence, it is a clear infringement of the right of private ownership of property.

30.    This rule of law is in line with the jurisprudence in England and Wales where public law decisions must also comply with proportionality and the European Convention on Human Rights. In *R (Q) v Secretary of State for the Home Department* [2004] QB 36, it was stated per Lord Phillips at §112:

> The common law of judicial review in England and Wales has not stood still in recent years. Starting from the received checklist of justiciable errors set out by Lord Diplock in *Council of Civil Sevice Unions v Minister for the Civil Service* [1985] AC 374, the court, as Lord Diplock himself anticipated they would, have developed an issue-sensitive scale of intervention to enable them to perform their constitutional function in an increasingly complex polity. They continue to abstain from merits review - in effect, retaking the decision on the facts - but in appropriate classes of case they will today look very closely at the process by which facts have been ascertained and at the logic of the inferences drawn from them. Beyond this, courts of judicial review have been competent since the decision in *Anisminic Ltd v Foreign Compensation Commission* [1969] 2 AC 147 to correct any error of law whether or not it goes to jurisdiction; and since the coming into effect of the Human

Rights Act 1998, errors of law have included failures by the
state to act compatibly with the Convention.

G.    **Second ground of review: Failure and/or refuse to apply for a restraint order**

31.    In conjunction with the first ground above, the police ought to apply for a
restraint order, which would have allowed Anton to submit its grounds of
opposition and be heard by this Honourable Court, instead of simply relying
on the "no consent" regime for the purpose of freezing the suspected property,
which clearly exceeds the language of the provisions of s.25A(1) and
s.25A(2)(a), and steps into the boundary and regime of "restraint order". It is
thus clear that the "no consent" regime in reality performs and usurps the
function of a restraint order in freezing the Accounts, but lacking the scrutiny
of the court.

32.    Upon investigation, arrest action took place on 3 August 2017, and
proceedings ought to have been instituted. Section 14(1) of OSCO provides
that, the restraint powers under s.15 are exercisable once "proceedings have
been instituted…" It is abundantly unreasonable that the decision-maker has,
over more than 12 months later, still refrain from applying for a restraint order,
and choose to hold on to a letter or letters of "no consent", thus depriving
Anton its rights under the law. Hence, a public law decision which fails to
recognise the fundamental rights of an individual invites the intervention and
the anxious scrutiny of this Honourable Court.

33.    As an ancillary relief to restraint order, it is also important to note that it is the
inherent jurisdiction of the court when granting a restraint order to include an
express provision that the order so granted is subject to an exemption related
to the respondent's legal expenses (see Order 117 rule 5 of the Rules of the
High Court). To the contrary, there is no such provision of legal expenses so
far as "no consent" regime is concerned. Since Anton is a legal entity which
has no financial means to meet with the legal expenses except the funds in the
Accounts, it will only be fair in the circumstance to deal with the funds by way

12

of a restraint order so that legal expenses can be met with by any order
incidental to a restraint order.

34.    In *R v Lord Saville of Newdigate. exp A* [2000] 1 WLR 1855, it was stated per
Lord Woolf MR at §37:

> What is important to note is that when a fundamental right such as
> the right to life is engaged, the options available to the reasonable
> decision-maker are curtailed. They are curtailed because it is
> unreasonable to reach a decision which contravenes or could
> contravene human rights unless there are sufficiently significant
> countervailing considerations. In other words it is not open to the
> decision-maker to risk interfering with fundamental rights in the
> absence of compelling justification. Even the broadest discretion is
> constrained by the need for there to be countervailing circumstances
> justifying interference with human rights. The courts will anxiously
> scrutinise the strength of the countervailing circumstances and the
> degree of the interference with the human right involved and then
> apply the test accepted by Sir Thomas Bingham M.R. in *Reg. v.*
> *Ministry of Defence, Ex parte Smith* [1996] Q.B. 517 which is not in
> issue.

35.    In *R v Human Fertilisation and Embryology Authority* [1999] Fam. 151, it was
stated per Lord Woolf MR at 184G:

> It is the authority's decision that therefore has to be capable of being
> justified in relation to article 59. In coming to its decision the
> authority was required to take into account that to refuse permission to
> export would impede the treatment of Mrs. Blood in Belgium and to
> ask whether in the circumstances this was justified. The material
> which was placed before the authority in order to assist them to
> perform this task is known. Unfortunately it makes no mention of this
> requirement.

13

36.    In *Machado v Secretary Of State For The Home Department* [2005] 2
C.M.L.R. 43 it was stated per Sedley LJ at §15:

> What was, however, treated separately by all parties at both levels was
> the appellant's Art.8 claim based on the state's duty to respect his family
> life. Particularly in the light of Regulation 29(2) of the 2000
> Regulations (ante), this seemed to the court to be in principle a
> mistaken approach, and both counsel agreed, when it was put to them,
> that the right approach is to include any Art.8 issue in the evaluation of
> the proportionality of deporting a foreign national married to an EU
> national who is here by right. Taking the issues one after the other can
> be clumsy and logically unsatisfactory; taking them as parts of a whole
> conforms with Regulation 29(2) and makes it much easier to reach a
> rounded decision.

and per Arden LJ at §49:

> In my judgment, the proportionality exercise required to be
> performed by the tribunal for the purposes of Art.8 is thus not
> different in character simply because the exercise has to be
> performed under European Union law. Therefore I agree with my
> Lords that the application of Art.8 in this case should not have been
> treated as separate from the other issues which arise under European
> Union law.

37.    By reason of the foregoing, it is doubtful whether the police, when making the
"no consent" decision, have ever taken into account of the prospect of
applying for a restraint order to deal with the huge sums of money in the
Accounts, which is undoubtedly a more reasonable and fairer way of dealing
with the matter. Failing which, such decision is open and subject to challenge.

**H.    Third ground of review: Disproportionality and Wednesbury unreasonableness**

38.   For the same reasons in the First and Second Grounds of review, the decision
      is also disproportionate and unreasonable. See *R (Khatun) v London Borough
      of Newham* [2005] QB37, per Laws LJ at 41:

> "Clearly a public body may choose to deploy powers it enjoys under
> statute in so draconian a fashion that the hardship suffered by
> affected individuals in consequence will justify the court in
> condemning the exercise as irrational or perverse. That is of course
> the language of Wednesbury, as I have said. It may well be that the
> court's decision in such cases today would more aptly be articulated
> in terms of the proportionality principle; indeed, as likely as not one
> or other of the guarantees secured in the European Convention for
> the Protection of Human Rights and Fundamental Freedoms would
> be engaged, although in this case Mr Luba has not advanced any
> claim distinctly grounded in the Human Rights Act 1998. At all
> events it is plain that oppressive decisions may be held repugnant to
> compulsory public law standards. I need not lengthen this judgment
> by setting out instances."

39.   The word 'unreasonableness' in the context of granting an order for judicial
      review is neatly illustrated and explained in Order 53 rule 14 of the Rules of
      High Court; at paragraph 53/14/29, Hong Kong Civil Procedure 2018 as
      follows:

> "The decisions of persons or bodies performing public functions are
> liable to be quashed or otherwise dealt with by an appropriate order in an
> application for judicial review where the court concludes that the
> decision is one such that no such person or body properly directing itself
> on the relevant law and acting reasonably could have reached that
> decision. This is the Wednesbury principle (*Associated Picture Houses
> Limited v Wednesbury Corp.* [1948] 1 K. B. 223). See also *Secretary of
> State for Education and Science v. Tameside M.B.C.* [1977] A.C 1014
> per Lord Diplock at 1064E-F:

"... in public law 'unreasonable' as descriptive of the way in
which a public authority has purported to exercise a
discretion vested in it by statute has become a legal term of
art. To fall within this expression it must be conduct which
no sensible authority acting with due appreciation of its
responsibilities would have decided to adopt. The very
concept of administration discretion involves a right to
choose between more than one possible course of action upon
which there is room for reasonable people to hold differing
opinions as to which is to be preferred."

Unreasonableness may arise because the body in question has failed to
take into account a relevant matter or has taken into account an irrelevant
matter. See *Associated Picture Houses Limited v Wednesbury Corp.*
[1948] 1 K.B. 223 per Lord Greene M.R. at 228:

"If, in the statute conferring the discretion, there is to be
found expressly or by implication matters which the authority
exercising the discretion ought to have regard to, then in
exercising the discretion it must have regard to those
matters ... if the nature of the subject-matter ... and general
interpretation of the Act make it clear that certain matters
would not be germane to the matter in question, the authority
must disregard those irrelevant collateral matters. A decision
that is made in bad faith is an unreasonable one: *R. v.
Derbyshire Newspaper, ex. p. The Times Supplements Ltd*
[1991] C.O.D. 129."

When considering whether a decision is unreasonable the court will
defer to the decision-maker's assessment of facts and relevant issues but
may be more critical in its examination of the decision-making process
where fundamental human rights are involved, particularly where those
rights are protected by a constitutional instrument such as the Basic Law.
See *R. v. Minstry of Defence, ex p. Smith* [1996] Q.B. 517 per Sir

16

Thomas Bingham at 554 where he approved counsel's formulation of principle to be adopted where the issue of unreasonableness arose in the context of a human rights issue arising:

> "The court may not interfere with the exercise of an administrative discretion on substantive grounds save where the court is satisfied that the decision is unreasonable in the sense that it is beyond the range of responses open to a reasonable decision-maker. But in judging whether the decision-maker has exceeded this margin of appreciation the human rights context is important. The more substantial the interference with human rights, the more the court will require by way of justification before it is satisfied that the decision is reasonable in the sense outlined above."

40.    First, the freezing of the Accounts under "no consent" regime has been unduly or indefinitely long. As stated above, the Accounts were frozen as early as on 12 July 2017, which lasted for more than a year from the time of the present application. Regardless of explanation of the source and nature of funds in the Accounts through correspondences, there has been no indications on the side of the police that whether or when the operation of "no consent" regime would cease. While there is no legal provision setting out time limit for the "no consent" regime, the continuation of the "no consent" decision for such excessive lengthy period of time as in the present case is utterly unreasonable and unfair so far as the adverse effect and consequences on Anton is concerned.

41.    Secondly, despite repeated requests by Anton, the police have given no justification or update as regards the situation of the "no consent" decision imposed on the Accounts. All along, Anton has had no idea on what basis did the police continue with the freezing of the Accounts months after months, and whether the police did any review of the "no consent" regime at all. Not even a single rule or guideline has been referred to by the police in support of their indefinite freezing of the Accounts. Much as Anton respects the

17

investigation work of the police and the necessary confidentiality in it, it is
wholly unreasonable and disproportionate to keep Anton in the dark
indefinitely, not to mention the large amount of money involved.

42.     Thirdly, while Anton has all along been playing an extremely co-operative
role in the investigation and has urged the police to obtain a restraint order
from this Honourable Court, the police has however taken a difficult, delaying
and evasive attitude throughout the investigation process:

   (a)    Anton through its solicitors proposed to the police that the in-house
          counsel of ACA Capital Group Limited, the fund manger of Anton's
          investment funds, was willing to meet the police to assist them in
          understanding the provenance of funds that were in the Accounts, and
          to provide further information for police investigations. However, the
          police refused and insisted to meet the beneficial owner of Anton
          instead, knowing full well that none of them resides or being present in
          Hong Kong. While there are only advantages for the police to meet
          with persons who can speak for Anton, there is simply no good reason
          why the police did not, or refused to, do so.

   (b)    Anton more than once showed its willingness to subject itself to a
          restraint order if funds from Abu Dhabi were released. However, the
          police never responded to that proposal. The police's act was
          unreasonable as it is common understanding that the threshold of
          applying for a restraint order is higher than that of "no consent" letter.
          The only explanation is that the police chose to stick to "no consent"
          regime for greater flexibility and power in terms of freezing the
          Accounts.

43.     To summarize, it is unreasonable and disproportionate for the police to freeze
the Accounts merely by "no consent" regime and without any justifications
instead of applying for a restraint order.

I.    **Fourth ground of review: irrationality and oppression**

44.    Given the fact that the two sums of approximately USD93 million and HKD829 million, now being frozen in the Accounts, are huge and large amount of money, any wrongful restraint of the use of them would certainly create dire financial consequences to Anton.

45.    In the correspondence between Anton and the police, Anton has clearly expressed the hardship and dire financial loss caused to it by the "no consent" decision. Nonetheless, the police's continuation of the "no consent" decision, which has no legal limit of duration, regardless of the hardship suffered by Anton, is apparently irrational and oppressive.

46.    Laws LJ at §41 of *R (Khatun) v Newham London Borough Council* [2005] QB 37 :

> Clearly a public body may choose to deploy powers it enjoys under statute in so draconian a fashion that the hardship suffered by affected individuals in consequence will justify the court in condemning the exercise as irrational or perverse.

J.    **Time of the present application**

47.    Section 21K(6) of the High Court Ordinance, Cap.4 generally requires applications for leave to judicial review without undue delay, and Order 53 r.4(1) of the Rules of the High Court, Cap.4A requires such applications to be made within 3 months form the date when grounds for the application first arose.

48.    It shall be clarified that the present application does not belong to the type that Anton sits and only applies for judicial review in last minute or even out of time manner. As reflected by the correspondences stated above, Anton has been actively contacting the police and suggesting different proposals, with the hope that the freezing of the Accounts by "no consent" regime could be

replaced by an alternative solution or other legal means. Nonetheless, the police have not been addressing the issues properly and therefore there was a prolonged negotiation of the matter.

49. Throughout the material period, the police have not addressed the issue of applying for a restraint order properly, and Anton was forced to make an "ultimatum" to the police in letter dated 1 June 2018 threatening that judicial review proceedings would be taken out if the police still refuse to do so. Again, the police had taken an evasive attitude by ignoring Anton's final request as shown in their reply letter dated 8 June 2018. By reason of foregoing, the date (8 June 2018) should be regarded as the time when grounds for the application first arose.

## K.    Conclusion

50. Anton respectfully asks for the relief identified above.

Dated the 14th day of August 2018

Wong Ting Kwong
Counsel for the Applicant

Michael Li & Co.,
Solicitors for the Applicant

HCAL        /5..18

# IN THE HIGH COURT OF THE
## HONG KONG SPECIAL ADMINISTRATIVE REGION
### COURT OF FIRST INSTANCE
### CONSTITUTIONAL AND ADMINISTRATIVE LAW LIST
### NO.        OF 2018

---

ANTON DEVELOPMENT LIMITED                    Applicant

---

**Notice of application for leave to apply for judicial review**

---

Dated 14ᵗʰ August 2018

Filed on        ~~04 AUG 2018~~

        14 AUG 2018

        1 620 ƒ

**Michael Li & Co.**
Solicitors for the Applicant
19/F., Prosperity Tower,
No. 39 Queen's Road Central,
Central, Hong Kong
Tel: 2110 2929   Fax: 2110 9180
Ref: HW/AT/1711465