# EXHIBIT 61



**FILED**

**HIGH COURT**

**TERRITORY OF
THE VIRGIN ISLANDS**

Affirmation of Kwok Ho Wan

**Submitted Date:03/09/2020 17:35**

Applicant

**Filed Date:04/09/2020 08:30**

Exhibit KHW-2

**Fees Paid:274.20**

THE EASTERN CARIBBEAN SUPREME COURT
**VIRGIN ISLANDS**
IN THE HIGH COURT OF JUSTICE
COMMERCIAL DIVISION

Claim No. BVIHCOM 170 of 2019

BETWEEN

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND LP

Respondent

and

GENEVER HOLDINGS CORPORATION

Applicant

---

### SECOND AFFIRMATION OF KWOK HO WAN

---

I, Kwok Ho Wan of 49th Floor, Bank of China Tower, No.1 Garden Road, Central Hong Kong do hereby
**SINCERELY** and **TRULY AFFIRM** and say follows:

**Introduction**

1. I am the sole director and sole registered member of the Applicant, Genever Holdings Corporation, a
   company incorporated in the BVI with registered company number 1862840 ("**Genever BVI**"), in these
   proceedings.

2. Save where otherwise sufficiently appears, the facts and matters hereinafter are within my own
   knowledge and are true to the best of my knowledge, information and belief. Where the facts and
   matters hereinafter are not within my own direct knowledge, I believe them to be true to the best of

1

my knowledge, information and belief and the sources and grounds of my belief are set out. Nothing contained in this affirmation is intended to be a waiver of legal privilege.

3. A paginated bundle of true copies of documents is now produced and shown to me and exhibited hereto as "KHW-2". References to this bundle to page numbers in "KHW-2" will take the form [page no./KHW-2]. Although I can speak and understand some English, I cannot read English and often have difficulty speaking it. Therefore, I have been provided with a true and certified translation of this second affirmation in Mandarin [176-208/KHW-2] that I have read and confirmed its accurate before I have affirmed this English version of my second affirmation. This second affirmation has been validly executed in accordance with the laws of New York State, USA.

4. I am duly authorised by Genever BVI to make this second affirmation on its behalf. I make this second affirmation in support of an application by Genever BVI for an order that the interim order of this Honourable Court made in these proceedings at an *ex parte* hearing (without notice) on 3 December 2019 (the "Injunction Order") [1-8/KHW-2] on the application of Pacific Alliance Asia Opportunity Fund LP, an investment fund that was incorporated in the Cayman Islands and owned by Pacific Alliance Group that is headquartered in Hong Kong, ("PAX") be discharged (the "Discharge Application") and/or that the interim Injunction Order should not be continued.

5. The terms of the Injunction Order (as modified by the Consent Order dated 20 December 2019 [9-11/KHW-2]) prevent Genever BVI until the adjourned return date from:

   (a) Permitting any changes to be made to its Register of Members or Charges;

   (b) Discontinuing or redomiciling itself from the Virgin Islands;

   (c) Sell, assign, pledge, transfer, dilute or otherwise deal by any means whatsoever with its shareholding in Genever Holdings LLC, a company incorporated in New York State, USA ("Genever NY"); and

(d) In any other way diminish the value of its shareholding in Genever NY, or permit or consent to any step being taken by Genever NY, which would have that effect.

6. In this affirmation I will address various matters set out in the first affidavit of Hilarie Lam ("Mr Lam") dated 22 November 2019 (**"Mr Lam's First Affidavit"**), the exhibit to Mr Lam's First Affidavit (**"Exhibit HL-1"**) and allegations that were made at the ex parte hearing of the Injunction Order application. References to Exhibit HL-1 below will take the form **[page no./HL-1]**. If I do not address any particular matter dealt with in Mr Lam's First Affidavit that should not be construed as my agreement with Mr Lam.

7. In summary, the main grounds of the Discharge Application and/or why the interim Injunction Order should not be continued are:

(a) I am not the beneficial owner of Genever BVI, Genever NY nor the Residence (as defined below) that are held on trust for a third party in the circumstances I describe below.

(b) There is no risk that Genever BVI has or will do any of the acts prohibited by the Injunction Order. In truth, PAX has simply sought to allege that there are real risks of the matters set out in sub-paragraphs 5 (a)-(d) above by reference to just the alleged risk of the dissipation of 18th Floor, Sherry-Netherland Hotel, 781 Fifth Avenue, New York, USA (the **"Residence"**). However, I believe that PAX has not shown that I have dealt with the Residence in any way outside the ordinary course of business and there is no risk of dissipation of the Residence for the reasons I set out below, which includes an existing number of safeguards for PAX in any event.

(c) There was no requirement or necessity for the Injunction Order to have been obtained on an ex parte basis because there was no urgency and providing Genever BVI with notice of the application would not have defeated the object of the Injunction Order.

(d) Additionally, there were a number of serious breaches of PAX's duty to give full and frank disclosure and a fair representation of the facts when the ex parte application for the Injunction Order was made. The seriousness of these non-disclosures are themselves sufficient to require

the discharge of the Injunction Order. I will highlight these failings throughout the course of this affidavit. I exhibit a copy of the transcript of the *ex parte* hearing that I will refer to below at [12-17/KHW-2]. Unfortunately, due to delays caused by the COVID-19 pandemic, the transcript of the *ex parte* hearing was only supplied by PAX to Genever BVI's legal practitioners on 19 May 2020.

(e) The Injunction Order is a clearly an attempt to re-litigate matters in the BVI Court that have already been determined in proceedings in the New York State Court entitled *Pacific Alliance Asia Opportunity Fund LP v Kwok Ho Wan et al* No. 652077/2017 (the "**New York Proceedings**"). In these proceedings PAX has sought and been denied a pre-judgment attachment order concerning the Residence on three separate occasions between 2017 to 2019, which I believe is an abuse of process and relevant to whether it is just and convenient to keep the Injunction Order in place. I also believe that these proceedings in the BVI are an attempt to open a new and unnecessary front of litigation in a further effort by PAX to dwindle my resources that could be gainfully employed in the New York Proceedings.

(f) I also understand that the Injunction Order was sought by PAX and granted by the Court at the *ex parte* hearing pursuant to the Court's apparent jurisdiction under *Black Swan Investment ISA v Harvest View Limited* BVIHCV 2009/399, which I understand the East Caribbean Court of Appeal has recently said was incorrectly decided. However, this will be the subject of legal submissions in due course and I do not address this.

**Beneficial Ownership of the Residence**

8.  I note that it is alleged:

(a) At paragraph 3(ii) of Mr Lam's First Affidavit that it has emerged from disclosure in the New York Proceedings that the Residence is ultimately an asset of mine, which any favorable judgment that PAX obtains in the New York Proceedings is liable to be enforced against; and/or

(b) That I am the ultimate beneficial owner of the Residence and it is therefore an asset, which is susceptible to enforcement. I refer, for instance, to paragraphs 8, 50 and 53 of PAX's skeleton

4

argument dated 27 November 2019 ("**PAX's Skeleton Argument**") in support of the Injunction Order; and/or

(c) That the Residence is an asset that may be enforceable against me because I have admitted PAX's allegations about the corporate structure of Genever NY and Genever BVI, and, that I have admitted that I am the sole shareholder of Genever BVI.

9. These allegations are seriously misleading for the following reasons.

10. It is simply incorrect to allege that I am the ultimate beneficial owner of the Residence or that I have, to the best of my recollection, made the alleged admissions in the NY Proceedings. I exhibit at [18-20/KHW-2] a copy of the Declaration of Trust and Agreement dated 17 February 2015 (the "**Trust Agreement**") that Genever BVI, Genever NY, Bravo Luck Limited (a company incorporated in the BVI) ("**Bravo Luck**") as owner, and me as trustee entered. I recall that the Trust Agreement was based upon a trust document that Mileson and his business partners had used in another transaction, which had involved some USA attorneys, that we used as a template and modified for the Trust Agreement. Therefore, I do not believe that any lawyers were involved with the drafting or execution of the Trust Agreement.

11. I note that under the Trust Agreement:

(a) Genever BVI was incorporated on 13 February 2015 as a special purpose vehicle to hold Genever NY;

(b) Genever NY was incorporated as a special purpose vehicle to hold the Residence;

(c) I hold the shares in Genever BVI and Genever NY on trust for Bravo Luck;

(d) Bravo Luck is the beneficial owner of Genever BVI and Genever NY, and therefore in turn the Residence; and

5

(e) Bravo Luck had on or around 17 February 2015 transferred the sum of US $70 million to be used to purchase the Residence.

12. Bravo Luck is an investment vehicle that was incorporated by my son, Mileson Guo, also known as Guo Qiang, ("**Mileson**") in or around April 2013. The general purpose of Bravo Luck is to hold various investments on behalf of Mileson. I recollect that when Mileson was first looking to invest in New York real estate, such as acquiring properties like the Residence, in or around early January 2015, Mileson was advised by various real estate brokers and lawyers that he would have difficulties obtaining a New York co-operative board's approval, such as the co-operative Board of Directors of The Sherry-Netherland for the Residence (the "**Board**"), to own a residence worth many millions given his relatively young age. At that time, I believe he was 29. Therefore, in anticipation of these issues, in or around January 2015, Mileson transferred 50% of the ownership of Bravo Luck to me to allow me to assist Mileson with his intended acquisition of the Residence.

13. My recollection is that the transfer in or around January 2015 of the 50% ownership in Bravo Luck was agreed orally with Mileson and therefore no documents were created to effect the transfer, but I am searching for such documents and I will disclose and exhibit them to a further affirmation if they do exist and are found.  However, I have located two Certificates of Incumbency dated 25 March 2014 and 27 January 2015 respectively **[21-22/KHW-2]** that show: (i) Mileson originally held the 1 ordinary share in Bravo Luck; and (ii) by 27 January 2015 I owned 1 of 2 ordinary shares in Bravo Luck at that time.

14. The transfer of 50% of the ownership of Bravo Luck to me in or around January 2015 is reflected in the letter from Stevenson, Wong & Co to the Board dated 4 March 2015 in which it was stated that Mileson and me each legally and beneficially owned 50% of Bravo Luck **[666-667/HL-1]**. In the event, the Board agreed to the application, and Mileson, through Bravo Luck, became the beneficial owner of the Residence under the Trust Agreement. I further note that Mileson himself paid the security deposit for the Residence at the time by way of a check dated 5 March 2015 in the sum of US $3,369,000 payable to the Sherry-Netherland **[23/KHW-2]**.

6

15. I also note that Mileson, through Bravo Luck, borrowed the funds of US $70 million (which in turn it lent to Genever NY) to acquire the Residence from an ultimate lender, a Mr Zhang Wei. Mr Zhang married the daughter of my eldest brother and he is currently a political prisoner in PRC who is awaiting trial while on bond. Mr Zhang is also a member of a fund I used to work with. At present, I do not have any documents relating to Mr Zhang's loan to Bravo Luck in my possession or control, but I am making enquiries with the parties to that loan to see if any such documents can be found.

16. After Mileson completed the purchase of the Residence, I then transferred my 1 ordinary share in Bravo Luck (i.e. 50% of the ownership) to Mileson on 12 May 2015 for US $1 so that Mileson became again the 100% owner of Bravo Luck. I exhibit a copy of the Instrument of Transfer dated 12 May 2015 at **[24/KHW-2]**. I was only a 50% owner of Bravo Luck for a short period of around 4 months to help my son acquire the Residence because of his age. However, the arrangements under the Trust Agreement are still in place so that I remain trustee in order to placate the Board.

17. For the avoidance of any doubt, my position in the New York Proceedings is that Genever BVI, Genever NY and the Residence are all held on trust for Bravo Luck. My USA attorneys and I have made this clear in the New York Proceedings, and it is shown by, for instance:

    (a) An extract from PAX's memorandum filed in support of its third pre-judgment order of attachment in the New York Proceedings in which PAX conceded that Bravo Luck transmitted the funds used to acquire the Residence to the seller's attorneys (see in particular footnote 26) **[643/HL-1]**. Despite this concession by PAX, I see it is alleged at paragraph 33 of Mr Lam's First Affidavit that, on the basis of an article in a Forbes Magazine, that I "discretely" paid USD 67 million in cash to buy the Residence and that I used a shell company to do. This is seriously misleading and incorrect because Bravo Luck transferred the funds to acquire the Residence.

    (b) An extract from my USA attorney's memorandum in opposition to PAX's third pre-judgment order of attachment in the New York Proceedings in which it is stated that Bravo Luck provided the funds for the acquisition of the Residence and Bravo Luck was an unconnected entity to the NY Proceedings **[743-744/HL-1]**.

(c) An extract from my USA attorney's transcribed submissions to the Court on 8 March 2019 (at the hearing of the third pre-judgment order of attachment) in which again it was stated that Bravo Luck provided the funds for the acquisition of the Residence [103/HL-1].

(d) I am informed by Ms Jillian Searles, one of my USA attorneys at Hodgson Russ Attorneys LLP, that a copy of the Trust Agreement was disclosed by email to Mr Edward Moss, one of PAX's USA attorneys of O'Melveny & Meyers LLP, in the New York Proceedings, on 22 April 2019 [25/KHW-2], which was some 7 months before Mr Lam's First Affidavit.

18. I also see that Mr Lam exhibited in Exhibit HL-1 selective portions of the transcript of my deposition on 3 October 2018 in the New York Proceedings. Although those transcript extracts from my deposition do touch upon the relationship between Bravo Luck and the Residence, the transcripts are incomplete (see [375-412/HL-1]. Nevertheless, I observe, by way of example, that the Judge at the *ex parte* hearing was not referred to any of the following extracts that were included in Exhibit HL-1:

(a) Page 27 of the transcript in which I stated that Mr Zhang owned the Residence, by which I meant that Mr Zhang was the ultimate lender to Mileson to acquire the Residence under the Trust Agreement [380/HL-1]. As I have stated above, I sometimes have difficulty speaking English, which inhibits my ability to make my meaning absolutely clear; and

(b) Pages 83-84 of the transcript in which I stated that I believed that the funds used to purchase the Residence came from Bravo Luck and that Mr Zhang had a $100m investment budget at that time [393-394/HL-1].

19. I consider that PAX has been very selective in choosing pages of the transcription of my deposition on 3 October 2018 in order to give a misleading impression that I was being untruthful in my responses. I exhibit a complete transcript of that deposition at [26-174/KHW-2]. The transcript pages that were missing from Exhibit HL-1, by way of example, include:

(a)  Page 29 in which I stated "Mr Zhang Wei was the initial person who put out the funds. I and this whole Genever Corporation was the entrusted party, and also to represent his investment, investors" [55/KHW-2];

(b)  Page 33 in which I stated that the formation of Genever BVI had been arranged by Mr Zhang and his attorneys [59/KHW-2];

(c)  Page 36 in which I was asked whether I was the sole shareholder of Genever Holdings Corporation (i.e. Genever BVI) and I replied that I was "just agent" by which I meant trustee [62/KHW-2]. I repeat that I have occasional difficulties speaking English and making my meaning clear, especially in the context of legal terms of art;

(d)  Page 47 in which I agreed with a question that Mr Zhang had provided the funds to acquire the Residence [73/KHW-2];

(e)  Pages 50 and 53 in which I stated that Mr Zhang had me become a representative to purchase the Residence, which again was another way I was trying to describe my role as trustee [76/KHW-2] and [79/KHW-2].

20. Unfortunately, PAX did not in its Court documents for the *ex parte* hearing and at the *ex parte* hearing of the Injunction Order take the Judge to any of the pages of Exhibit HL-1 or the missing transcript pages that I have identified above, which again, I believe is a serious breach of its duty to make full and frank disclosure. Although paragraph 48 of Mr Lam's First Affidavit made an anonymous reference to Bravo Luck as one of "two foreign companies in which [I] claimed to have an ownership stake" (in the context of information presented to the board of the Sherry-Netherland), PAX did not draw the attention of the Court to my position concerning Bravo Luck and the beneficial ownership of Genever BVI at all. Similarly, the first footnote reference in PAX's Skeleton Argument is a misrepresentation of my position in the New York Proceedings.

21. I find it extremely regrettable that PAX did not inform the Court of the existence or terms of the Trust Agreement nor its disclosure during discovery in the New York Proceedings at the *ex parte* hearing of

9

the Injunction Order, especially when PAX's own USA attorneys had complained about the absence of the Trust Agreement in its memorandum in support of its third pre-judgment order of attachment at [646/HL-1] and sought to use the alleged failure to disclosure of this document against me in that third motion.

22. I understand that it will be a matter of legal submissions in due course, but I believe that because the Residence is held on trust for Bravo Luck, that neither Genever BVI, Genever Holdings nor me can be the beneficial owner of the Residence. Therefore, the Residence is not an asset that can be enforced against if a judgment is obtained against either Genever BVI, Genever NY or me in the New York Proceedings. Notwithstanding the legal merits of the beneficial ownership of Genever BVI, there is no final judgment yet on any of these issues; the New York Court will have to determine all of these contested issues at trial, including PAX's motion to pierce the corporate veil of Genever BVI. Nevertheless, my position, including the Trust Agreement, that has been repeated in the New York Proceedings, was not brought to the attention of the Court in any way. I remind myself that at the *ex parte* hearing PAX submitted to the BVI Court that I had simply accepted I was the owner of Genever BVI without any qualification or context, which was untrue.

**Risk of dissipation**

23. The Injunction Order prohibits Genever BVI from: (i) changing its Register of Members or Charges; (ii) discontinuing or redomiciling itself from the Virgin Islands; (iii) selling, assigning, pledging, transferring, diluting or otherwise dealing in its shareholding of Genever NY; and (iv) diminishing the value of its shareholding in Genever NY. However, I do not believe that PAX has adduced any evidence that there is a risk that Genever BVI is likely to or has taken any steps to do any of the specific matters prohibited under the Injunction Order.

24. In truth, PAX has sought to allege that there are real risks of the matters set out in paragraph 5(a) to (d) above by reference to the alleged risk of the dissipation of the Residence. To the extent that the risk of dissipation of the Residence by Genever BVI is relevant, there is still no real risk of dissipation of the Residence for the following reasons.

10

25. First, the Residence is held on trust through Genever BVI and Genever NY by me under the Trust Agreement for Bravo Luck (see paragraphs 10 to 16 above). The Trust Agreement specifies under clause 3.3 **[19/KHW-2]** that I cannot assign or part with possession of Genever BVI and Genever NY without the prior written approval of Bravo Luck or the "co-owners". PAX have not provided any evidence that Bravo Luck or any co-owners have given such prior written approval or intend to do so that would allow any changes to Genever BVI.

26. Second, under very restrictive rules surrounding co-operative ownership in New York, the Board must approve any prospective purchaser of the Residence. Some of the approval processes of the Board was explained to the New York Court by Michael Ullman, Chief Operating Officer of the Sherry-Netherland Hotel (**"Mr Ullman"**), at an evidential hearing on 26 April 2019 (the **"Evidential Hearing"**) (see **[824/HL-1]**). Further, I understand, from the experience of acquiring the Residence on trust for Bravo Luck, that the approval process begins only once a seller has come to an agreement with a prospective purchaser. The prospective purchaser must then submit an application to the Board, which includes, for instance, financial details, a background check, credit-check and references. If the Board notionally approves the application, the Board then interviews the prospective purchaser in person and may then hold a vote on whether to approve. It is common for this process to take several months, which means it is impossible for me or Genever BVI or Genever NY to conduct a 'fire-sale' of the Residence, especially at the very high worth of the Residence of US \$55 million.

27. Third, there are already a number of existing safeguards to PAX in the New York Proceedings that prevent any dissipation of the Residence as result of its 3 pre-judgment attachment motions between 2017 to 2019:

    (a) The first safeguard is that the Board (as confirmed by Mr Ullman at the Evidential Hearing: see **[841-842/HL-1]**) has already received a copy of the June 2018 order made in the New York Proceedings **[630-633/HL-1]** by which the New York Court ordered that there be disclosure to PAX in the event of "any contract for sale or assignment of the Residence". I also note from the transcript of the Evidential hearing that:

(i)     Mr Ullman confirmed to the New York Court that the Board would notify that Court if such a sale or assignment of the Residence was to occur. Further, I should also add here that the Board has an almost unconditional right to veto a purchaser for any reason by way of the "business judgment rule", which I believe the Board would invoke in light of the June 2018 order if it was asked to approve a sale of the Residence. I also understand that the New York courts will not interfere with a board's exercise of a business judgment rule except in extraordinary circumstances, which means that Genever NY could not overturn the Board's refusal to approve a sale;

(ii)    The New York Court Judge noted that there could be no transfer of the ownership of the Residence without the approval of the Board [851-852/HL-1] and furthermore any transfer involving Genever BVI would not in the Judge's view be binding, and, could not proceed with the New York Court's approval [853/HL-1] and [864/HL-1] (particularly at lines 14-19).;

(iii)   The New York Judge noted that the only entity that could transfer ownership of the Residence was Genever NY, which PAX's USA attorney agreed with [871/HL-1];

(iv)    The New York Judge ordered that he would amend the existing order so that Genever NY, Genever BVI and I could not transfer, assign or pledge the Residence without first giving PAX notice [872/HL-1] and if such notice was received PAX could renew its pre-judgment attachment motion [874/HL-1], which again PAX's USA attorney agreed with. The New York Judge then went further and stated that he would make also make an order that Genever BVI and Genever NY could not sell or transfer or pledge any of its assets without giving notice [876/HL-1] that led to the order at [892-893/HL-1] (the "April 2019 New York Order").

(b)  The second safeguard is that Genever BVI's New York attorney, again Mr Harmon, sent an email to PAX's USA attorneys (setting out the agreement of both counsel for PAX, Genever BVI, Genever NY and I) dated 22 July 2019 that confirmed that Genever BVI is subject under the April 2019 New York Order to the same conditions as Genever NY and me "unless it is determined that the [New

12

York] Court cannot assert personal jurisdiction over Genever BVI" [914/HL-1]. Although Mr Lam suggests at paragraph 58 of Mr Lam's First Affidavit that this email should be read with care, I believe that Mr Harmon merely stated that the April 2019 New York Order binds Genever BVI until the New York Court determines whether it has personal jurisdiction over Genever BVI. In any event, I am informed by Mr Harmon that as Genever BVI has not sought the dismissal of the New York Proceedings against it on jurisdictional grounds by this time, it has submitted to the jurisdiction of the New York Court and/or waived its ability to dispute jurisdiction. In any event, it must be remembered that Genever BVI is an asset holding company for Genever NY, a New York limited liability company. For these reasons, I consider that the caveat in Mr Harmon's email of 22 July 2019 is no longer applicable. This second safeguard means that there is no real risk of dissipation of the assets of Genever BVI and PAX's concerns that Genever BVI will flout the April 2019 New York Order are without foundation.

28. Fourth, all of the matters relied upon by PAX, particularly paragraphs 65 to 73 of Mr Lam's First Affidavit, are historic and all occurred prior to the April 2019 New York Order and the email dated 22 July 2019. I note that PAX did not identify one matter to the Court at the *ex parte* hearing of the Injunction Order, which suggests there is any real risk of dissipation at this time. I also note in this context that the Residence was on the market since September/October 2015, which again was some time before the New York Proceedings commenced in April 2017.

29. Turning to some of the alleged factors that PAX relies upon to establish a real risk of dissipation, to the extent they are understood, I note the following:

(a) It is alleged at paragraph 66 of Mr Lam's First Affidavit that in June 2016 (some 10 months after the New York Proceedings had commenced), my representatives sought to undertook some restructuring in relation to the Residence to ensure that ownership of Genever NY would pass to a trust of which my son is the beneficiary. It is important to clarify that the proposed restructuring was in relation to the pre-existing Trust Agreement that I have explained at paragraphs 10 to 16 above (which again PAX did not inform this Court about) by which the *legal* ownership of Genever NY would potentially be transferred to Mileson (through another trust) so that I was no longer trustee. In any event, Mr Ullman confirmed at the Evidential Hearing that this enquiry was not

13

pursued after it was made [848/HL-1]. In the circumstances, I do not believe that an unpursued request in June 2016 concerning the transfer of the legal ownership of Genever NY to Mileson is probative evidence of a risk of dissipation by Genever BVI.

(b) It is also alleged at paragraphs 68 to 70 of Mr Lam's First Affidavit that various witnesses, my USA attorneys and I made various misrepresentations to the New York State Court. I completely disagree with this partisan characterisation for the following reasons:

    (i)    The New York Court did not make any findings that misleading evidence or submissions had been given to it. In fact, the New York Court denied all of PAX's motions for pre-judgment attachment orders and PAX has issued no appeal against those orders. My USA attorneys did not make any submissions to the New York Court about evidence given to it at the Evidential Hearing because the New York Judge simply made his order when he lost patience with PAX in the afternoon of the Evidential Hearing (see [866-876/HL-1]).

    (ii)    In relation to the issue about the pledges, this was dealt with by the New York Judge in June 2018 and was addressed by my USA attorneys in their response to the third pre-judgment attachment motion (see [870/HL-1]). I note that any pledge of Genever BVI was released in June 2018 and there have been no pledges or attempts to pledge since then. Therefore, the issue about the pledges is irrelevant to the Injunction Order for those same reasons.

    (iii)    In particular, PAX did not provide this Court with my USA attorney's response of 9 May 2019 to the accusation that Yvette Wang ("Ms Yang") gave false testimony at the Evidential Hearing concerning when the Residence was de-listed from the market [175/KHW-2]. In fact, the Residence was not de-listed from the market on the day of the Evidential Hearing (see paragraph 69 of Mr Lam's First Affidavit), but had been de-listed several weeks before. It is obvious that Ms Yang and I were not in control of when notification of the de-listing was made known to brokerage firms and/or public sites that contain details of such listings, but again this Court was not informed of my position.

14

(c) I also see that Mr Lam has referred to a great deal of superfluous allegations including the alleged dissipation of a yacht, which I apparently wanted to sell quietly, and unsubstantiated hearsay press reports in 2016 and 2017, which I consider are nothing more than unsubstantiated and untrue allegations, which I completely refute. I should also add that the yacht has not been sold, but it is listed for sale as it is commonplace for owners in the yachting industry to market their vessels because of the rapid depreciation of value and costs of maintenance.

**Notice ought to have been given**

30. I see that the only ground put forward by PAX as to why the Injunction Order was brought without notice is at paragraphs 80 and 81 of Mr Lam's First Affidavit. It is suggested that to give Genever BVI notice of the *ex parte* hearing would have exposed potential loopholes, which I might exploit if I was placed on notice of them. Therefore, it is submitted by PAX that to give notice of the *ex parte* hearing would have defeated the object of the Injunction Order. I consider this is misconceived for following reasons.

31. At the Evidential Hearing it was stated by Mr Sarnoff, PAX's USA attorney, that:

" *The ownership structure is that the New York LLC that owns the apartment is owned by a B.V.i LLC that owns the New York apartment, that owns — and Mr. Kwok is the ultimate beneficial owner. What i was asking was whether or not, if Mr. Kwok transferred, to some other party, ownership of the B.V.i LLC; the board wouldn't necessarily know it. It wouldn't involve a new purchase or sale agreement, and he could transfer the LLC ownership to a third party, away from himself, and it wouldn't be his any more, even though the Sherry-Netherland board did not enter into a new purchase or sale contract for the apartment...*" **[852/HL-1]**.

32. And, Mr Moss, also PAX's USA attorney, stated at the Evidential Hearing that:

"*I think that the main problem, or one of the main problems, with the notice order is that under the notice order, Mr. Kwok.. has to provide us with immediate written notice once he already has a*

15

contract for sale, or assignment of the residence. So at that point, he has already agreed to sell it to somebody. They may have a claim against the apartment, even if the Sherry-Netherland doesn't approve it. Second, it doesn't apply to transfers if Genever, and I know the Court -- and I understand, as a practical matter, if Genever -- that there are two Genever entities on top of the apartment. If one of those, or both of those, are transferred, then this order doesn't apply to that. The Sherry-Netherland wouldn't know about that... So if the order were broadened to include transfers of the Genever entities, pledges, assignments, sales, and done so before the transfer, that would take care of one of the problems..." [870-871/HL-1].

33. The potential loopholes that the Injunction Order seeks to address are therefore not new nor novel as they were aired in public court when I was in attendance. I believe it is a complete fiction to suggest that such loopholes might have only occurred to me after I had been served with the documents relating to the Injunction Order. Further, it is manifest that any loopholes with the April 2019 New York Order were addressed by the email dated 22 July 2019 that I have addressed above at paragraph 27(b).

34. I also believe that there was no urgency to the Injunction Order (and none has been suggested by PAX) because the New York Court considered the 3 pre-judgment attachment applications on various occasions that were all on notice between 2017 to 2019 and the Residence had been on the market since September/October 2016. I also note that PAX has not identified (nor could it) any 'trigger point' as to why the injunction Order was brought in November/December 2019 following the outcome of third pre-judgment attachment order the Evidential Hearing in April 2019, that expanded the protections afforded PAX.

**Just and Convenient**

35. PAX has not obtained a final and conclusive judgment against me in New York and has not obtained any judgment or order against Genever NY and Genever BVI that pierces the corporate veil of those entities. In the circumstances, the Injunction Order causes hardship to Genever NY and Genever BVI because even though they are holding companies the Injunction Order prevents them from obtaining finance if, for example, those companies wanted to invest in a separate purchase or hold another

asset, which is a serious disruption to their business. I believe that the balance of convenience clearly favours Genever BVI being able to carry on its normal course of business, and me (as director) dealing with its assets as I think fit in the best Interests of Genever BVI and the beneficiaries under the Trust Agreement.

36. PAX has applied unsuccessfully on 3 separate occasions in the New York Proceedings for a pre-judgment attachment order and I am very concerned that is has only brought these proceedings in the BVI Court to further decrease the resources I have available to defend the New York Proceedings, especially in the context of the number of safeguards that already exist for PAX as I have described above. Further, the immobilization of shares in Genever BVI could have easily been obtained by a Stop Order from this Court, were any such remedy necessary. It was entirely unnecessary to seek injunctive relief, even if PAX genuinely believed that there was any prospect I was intending to dissipate assets, which I hold on trust in any event.

### Conclusion

37. My clear position is that in the circumstances the Injunction Order should be discharged and/or not continued: there is no basis for continuing the Injunction Order in circumstances where there is no risk of dissipation, Further, had this Court been aware of the full position at the *ex parte* hearing then the Injunction Order would not have been granted in the first place and is liable to be discharged.

38. PAX's failure to give a full and clear picture of the case is apparent from the transcript of the *ex parte* hearing [14-15/KHW-2] when the Judge twice asked counsel for PAX whether there was anything else that needed to be disclosed to the Court and counsel for PAX twice specifically stated that there was nothing else, notwithstanding everything I have referred to above.

39. In view of the foregoing matters, I humbly request that this Court grant an order on the terms sought in the Discharge Application and/or to not continue the Injunction Order.

Affirmed by the within-named }
**KWOK HO WAN** }
At }
}

On   1      September 2020

**Kwok Ho Wan**

Before me:

Notary public

DANIEL THOMAS PODHASKIE
Notary Public, State of New York
Reg. No. 02PO6394578
Qualified in Queens County
Commission Expires July 8, 2023

THE EASTERN CARIBBEAN SUPREME COURT
VIRGIN ISLANDS
IN THE HIGH COURT OF JUSTICE
COMMERCIAL DIVISION
Claim No. BVIHCOM 170 of 2019

BETWEEN

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND LP
Respondent

and

GENEVER HOLDINGS CORPORATION
Applicant

---

SECOND AFFIRMATION
OF KWOK HO WAN

---



FORBES HARE

Contact: Robert Nader
P.O. Box 4649
Road Town, Tortola
British Virgin Islands
Tel: (284) 494 1890
Legal Practitioners for the Applicant