| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK<br>-------------------------------------------------------------x<br>In re:<br><br>Genever Holdings LLC,<br><br>                                        Debtor.<br>-------------------------------------------------------------x | Hearing Date and Time:<br>January 12, 2021 at 10:00 a.m.<br><br>Chapter 11<br><br>Case No. 20-12411 (JLG) |

**DEBTOR'S RESPONSE AND RESERVATION OF RIGHTS
WITH RESPECT TO THE MOTION OF PACIFIC ALLIANCE ASIA
OPPORTUNITY FUND FOR RELIEF FROM THE AUTOMATIC STAY**

**TO:    THE HONORABLE JAMES L. GARRITY JR.
        UNITED STATES BANKRUPTCY JUDGE**

Genever Holdings LLC (the "Debtor"), as and for its response and reservation of rights with respect to the motion (the "Lift Stay Motion") of Pacific Alliance Asia Opportunity Fund ("Pacific Alliance") for relief from the automatic stay pursuant to 11 U.S.C. §362(d) to continue pre-petition litigation in the Supreme Court, New York County (the "New York Action"), respectfully states and alleges as follows:

**Preliminary Statement**

1.    Pacific Alliance's Lift Stay Motion is not entirely unexpected, but the vitriol is unwarranted, since the Chapter 11 filing serves a legitimate business purpose. Indeed, the bankruptcy confers a significant benefit irrespective of Pacific Alliance's litigation claims, since it allows the Debtor's cooperative apartments to be sold in a stable, court-supervised environment. The legitimate business purposes supporting the Chapter 11 should be separated from the underlying litigation, which is complex and involves multiple suits by Pacific Alliance in two different jurisdictions.

2.    Besides the New York Action, Pacific Alliance has also sued Bravo Luck Limited ("Bravo Luck"), Genever Holdings Corp. (which owns 100% of the Debtor), and Miles Kwok,

the principal of the Debtor, in the British Virgin Islands (the "BVI Action") over the fundamental issue as to the beneficial ownership of the Debtor's equity interest (and ultimately entitlement to the units or the residual proceeds thereof). Because the core ownership issues in the BVI Action overlap with the New York Action, the larger question raised by the Lift Stay Motion is not whether the litigation should proceed outside of bankruptcy, but, rather, what jurisdiction provides the most efficient forum for a complete resolution of the claims as between the New York Action and the BVI Action.

3.   The Chapter 11 case was filed with due recognition that although the underlying litigation would invariably proceed elsewhere, the framework of the Bankruptcy Code and Rules nevertheless provides the best path forward to market the units. This is no easy task, given the super high-end values involved and the limitations imposed by the current Covid-19 restrictions. In fact, the Debtor's primary asset (*i.e.*, apartment units at the Sherry Netherland Hotel) has always presented unique challenges, which were exacerbated by uncertainty over ownership. Notably, outside of bankruptcy, the apartment units are effectively rendered unsaleable in the face of the ongoing disputes and uncertainty as to ownership, not to mention the impact of the Sherry Netherland's consent rights[1].

4.   In its Lift Stay Motion, Pacific Alliance raises the spectre of purported bad faith in connection with the Chapter 11 filing. It suffices to say that the Debtor disputes these allegations, as the Chapter 11 filing meets the objective and subjective tests of good faith under *In re Cohoes Indus. Terminal, Inc.,* 931 F.2d 222, 227 (2d Cir.1991) and *In re C-TC 9th Ave. P'ship,* 113 F.3d 1304, 1310 (2d Cir. 1997). That Pacific Alliance – while referencing bad faith

---

[1] Among other things, the Sherry Netherland does not permit financing for the purchase of any units in the Building, and imposes significant cash and liquidity requirements on new buyer. This certainly narrows the universe of potential buyers.

2

— moved to lift the automatic stay rather than seek dismissal of the Chapter 11 case is, perhaps, a signal that Pacific Alliance also recognizes that the bankruptcy serves a legitimate purpose.

**Current Sale Strategy**

5.  Despite the contentious litigation, the Debtor and Pacific Alliance have begun earnest negotiations, subject to Bankruptcy Court approval, to develop a mutually acceptable bankruptcy sale process and protocol, including selection of a capable broker, agreement on the timeline for the marketing and sale of the units, and agreement on the means or mechanism to address any disagreements which may arise during the sale process. Among other things, the Debtor and Pacific Alliance have already jointly interviewed a potential broker, Brown Harris Stevens, and the Debtor has circulated a motion for proposed bidding procedures in an effort to garner consent and support. The Debtor remains committed to seeking agreement on bidding procedures with all interested parties.

**Choice Between Multiple Forums and Actions[2]**

6.  Practically speaking, Pacific Alliance's alter-ego claims are not likely to be tried before a jury in the New York Action until vaccinations are prevalent in the City of New York and the pandemic ends. In fact, the Debtor understands that the state court judge (Hon. Barry Ostrager) has already advised the parties, including Pacific Alliance, that a trial will not begin until the fall at the earliest, and set the next pre-trial conference for May 4, 2021. Hence, there is no immediate urgency to this motion.

---

[2] The Debtor recognizes that an analysis of the principles set down by the Second Circuit Court of Appeals in *In re Sonnax*, 907 F.2d 1280 (2d Cir. 1990) ("*Sonnax*") militates in favor of resolution outside of bankruptcy, since the pending litigation over beneficial ownership of the Debtor's equity does not present core bankruptcy matters arising in or under the Bankruptcy Code. The alter ego claims are certainly related to the Chapter 11 case, but involve jury trial rights and other considerations of state law that limit Bankruptcy Court jurisdiction under *Stern v. Marshall* and its progeny of cases.

7. Bravo Luck has filed an objection to the Lift Stay Motion (ECF #21) arguing that the BVI Action is the more efficient forum for adjudication of the various competing claims. The Debtor concurs. Pacific Alliance and Bravo Luck are already joined in the BVI Action, as compared to the New York Action which does not include Bravo Luck. Conversely, the Debtor is not a party in the BVI Action, so stay relief is not required at this time, and the Debtor would not have to expend any resources therewith. The Debtor recognizes that both litigations could proceed simultaneously, but that presents the potential for conflicting decisions.

8. While the mantra of forum shopping has been bandied about, proceeding with the BVI Action does not give any party tactical advantage (perceived or real), since Pacific Alliance itself commenced this action. Moreover, as noted by Bravo in its objection, Pacific Alliance has previously indicated that the alter ego claims in the New York Action may be dismissed in favor of bringing direct claims against Mr. Kwok under supplemental judgment enforcement proceedings. It is difficult to imagine that Pacific Alliance can be prejudiced by continuation of the BVI Action since it is the plaintiff there. At any rate, resolution of the competing claims through the BVI Action avoids the need for the Debtor's estate to participate in any aspect of the litigation in New York.

**Essential Background Information**

9. The Debtor's primary assets consist of its ownership interest in the entire 18th Floor Apartment and auxiliary units in the Sherry Netherland Hotel located at 781 Fifth Avenue, New York, NY 10022 (the "Units"), as memorialized by approximately 3,000 shares of Sherry Netherland cooperative stock and corresponding proprietary leases.

10. The Units were acquired in 2015 for the total sum of approximately $70 million. The acquisition was largely funded by Bravo Luck pursuant to a certain trust agreement.

Although the validity of the trust is disputed, Bravo Luck was the prime funding source, and retains claims for reimbursement even if it is not deemed the beneficial owner.

11. Pacific Alliance and Mr. Kwok have been engaged in litigation pending in the Supreme Court, New York County (Index No. 652077/2017) (previously defined as the "New York Action") in connection with Mr. Kwok's guaranty of a debt owed to Pacific Alliance, unrelated to the Debtor or the acquisition of the Units. There are two causes of action; the first is directed against Mr. Kwok for monies due and owing; and the second is directed at other entities, including the Debtor, under various veil piercing theories.

12. The immediate lead-up to the Chapter 11 was the result of a combination of events. In the face of disputes over ownership, the Units themselves became subject to maintenance arrears, and the Sherry Netherland instituted multiple collection actions as delineated in the schedules and statements (ECF #1 and #4). Ongoing disputes with the Sherry Netherland over ownership were also a driving force behind the Debtor's decision to sell the Units, which cannot be readily accomplished outside of Chapter 11.

13. On September 30, 2020, the State Supreme Court entered an Order to Show Cause, with a TRO preventing Mr. Kwok from selling, assigning transferring or interfering with any property in which he has an interest. Although this Order to Show Cause was not directed against the Debtor, the undersigned advised the State Court of its intent to seek Chapter 11 relief pursuant to the attached letter, annexed hereto as Exhibit "A". Notifying the state court – in advance – of an intended Chapter 11 filing is not the hallmark of bad faith or forum shopping.

14. Moreover, the Debtor has several creditors, including the disputed claim of Pacific Alliance, the claims of the Sherry Netherland Hotel, and potential claims of Bravo. This is not a two-party dispute in any true sense, and Pacific Alliance is not even a creditor of the

Debtor, and never did business with the Debtor. Pacific Alliance holds claims against Mr. Kwok based on the award of summary judgment in the sum of approximately $46.5 million. The veil piercing claims contend that the Debtor's sole equity holder, the BVI company Genever Holdings Corp., is the alter ego of Mr. Kwok, and therefore subject to Pacific Alliance's claims. Even if this is true, Bravo Luck would still have a monetary claim against the Debtor.

**The Chapter 11 Case was Filed in Good Faith**

15. While the *Sonnax* factors can be debated, the notion that the Chapter 11 case was allegedly filed in bad faith lacks merit, and ignores the chilling impact that the dispute as to ownership has on the ability to sell the Units at fair market value. Moreover, the Debtor's relationship with the Sherry Netherland has soured to the point that a sale of the Units is the only reasonable path forward, and cannot be achieved without the certainty of a bankruptcy process.

16. When the Units are sold, the net proceeds of sale will be held in escrow for the benefit of either Bravo Luck or Pacific Alliance, depending on the outcome of the litigation, to be distributed under a plan of reorganization. The sale of the Units at this point ought to be an agnostic process, designed solely to maximize value. It is difficult to believe that either Bravo Luck or Pacific Alliance can legitimately complain about such a reorganization goal, particularly since the Chapter 11 process provides a necessary counterbalance to any ability of the Sherry Netherland to assert veto power over a sale. The Debtor recognizes that the sale of the Units remains subject to Sherry Netherland Co-op Board approval, but the Chapter 11 certainly provides protection against any type of arbitrary decisions.

17. Even though Pacific Alliance correctly cites to the Second Circuit Court of Appeals decisions rendered in *In re Cohoes Indus. Terminal, Inc., supra*, and *In re C-TC 9th Ave. P'ship, supra*, it offers a flawed analysis of whether the Debtor meets the applicable tests of

objective futility and subjective bad faith to determine whether a reasonable possibility exists that the debtor will emerge from bankruptcy. See, *In re 68 West 127th Street LLC,* 285 BR. 838, 846 (Bankr. S.D.N.Y. 2002) (synthesizing *Cohoes Indust. Terminal* and *C-TC 9th Avenue*) ("The critical test of a debtor's bad faith remains whether on the filing date there was no reasonable likelihood that the debtor intended to reorganize and whether there is no reasonable possibility that the debtor will emerge from bankruptcy."); *In re Kingston Square Assocs.,* 214 B.R. 713, 725 (Bankr. S.D.N.Y. 1997) ("[T]he standard in this Circuit is that a bankruptcy petition will be dismissed if both objective futility and subjective bad faith in filing the petition are found." (emphasis in original)); *In re RCM Global Long Term Corp. Appreciation Fund Ltd.,* 200 B.R. 514, 520 (Bankr. S.D.N.Y. 1996) ("In this Circuit, a petition will be dismissed if both objective futility of the reorganization process and subjective bad faith in filing the petition are found . . . But a court should reach the conclusion that there is no demonstrable ability to reorganize only upon the strongest evidentiary showing."). *Accord In re Sylmar Plaza, L.P.*, 314 F.3d 1070 (9th Cir. 2002); *In re Carolin*, 886 F.2d 693 (4th Cir. 1989).

18. Here, considering that the Debtor owns an unencumbered asset having a value of tens of millions of dollars even in a bad market, it cannot be said that the Debtor is incapable of confirming a plan of reorganization. Yet, despite the Debtor's wherewithal, Pacific Alliance ignores any discussion of subjective bad faith or objective futility, and performs a robotic application of the factors enumerated in *C-TC*. But as prior courts have explained:

> In applying the *C–TC* factors, the Court will not "engage in a mechanical counting exercise" to determine whether the Debtor filed this bankruptcy case in bad faith. *See In re Century/ML Cable Venture,* 294 B.R. 9, 34 (Bankr. S.D.N.Y. 2003). These factors are to be considered in the context of the totality of the circumstances and not in a vacuum. *In re R & G Properties, Inc.,* 2009 WL 1076703, at *3 (Bankr. D.Vt. April 16, 2009). No one factor is determinative of good faith and, "[i]t is the totality of

> circumstances, rather than any single factor, that will determine whether good faith exists." *In re Kingston Square Assocs.,* 214 B.R. at 725; *see also In re C–TC 9th Ave. P'ship*, 113 F.3d at 1312 (indicating that a finding of bad faith "requires a full examination of all the circumstances of the case" and is "a highly factual determination").

*In re Consolidated Distributors, Inc.,* 2013 WL 3929851 *7, fn. 47 (Bankr. E.D.N.Y. 2013); *see also*, *In re 68 W. 127th St., LLC, supra*. at 844 ("[t]he existence of ‒bad faith' depends not on any one specific factor but on a combination of factors determined after careful examination of the facts of the particular debtor's case." (*quoting In re Shar*, 253 B.R. 621, 629 (Bankr. D.N.J. 1999)). Indeed, the mechanical application of the *C-TC* factors suggested by Pacific Alliance would "automatically doom" almost every single asset case from the outset. *Id.* It is for that reason that courts have recognized that the *C-TC* factors "do no more than assist the [Court's] exercise of discretion in deciding when a debtor has improperly invoked the Bankruptcy Code." *Id*.

19. Even at that, the *C-TC* factors militate against a finding of bad faith. These factors include:

> a. the debtor only has one asset;
> b. the debtor has few unsecured creditors, whose claims are small in relation to those of the secured creditors;
> c. the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;
> d. the debtor's financial condition is, in essence a two-party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;
> e. the timing of the filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;
> f. the debtor has little or no cash flow;
> g. the debtor cannot meet current expenses including the payment of personal property and real estate taxes; and
> h. the debtor has no employees.

*In re C-TC 9th Ave. P'ship, supra,* 113 F.3d at 1311-12. Taking this factors in turn:

*A. The Debtor has More than One Asset* – The Units consist of multiple apartments which were purchased together by the Debtor. Moreover the Debtor maintains a $3 million security deposit, more than $2 million more than is owed in maintenance fees to the Sherry Netherland.

*B. The Debtor has Substantial Unsecured Debt and No Mortgage* – The Units are not encumbered by any mortgage debt, and Pacific Alliance is not asserting rights as a secured creditor. Even if Pacific Alliance is successful in piercing the corporate veil, its ownership of the Units remains subject to the claims of other creditors.

*C. There is No Foreclosure Action* – The Debtor is not a subject to any pending foreclosure action, and did not file for the purpose of seeking to delay a foreclosure sale.

*D. This is not a Two-Party Dispute* – As set forth above, the Debtor has multiple creditors.

*E. The Filing was in Response to the Pressing Need to Sell the Units* – The decision to file was made to protect the value of the Units.

*F. and G. The Debtor has a security deposit to cover fees owed to the Sherry Netherland* – While the Debtor has no immediate cash flow, it can potentially pay ongoing maintenance by means of the $3 million security deposit as potential DIP loans.

*H. The Debtor has no Employees* – While the Debtor does not have employees, this factor does not warrant a finding of bad faith, especially when analyzed in combination with the other *C-TC* factors.

20.  In short, whether viewed in subjective and objective terms, or through application of the factors identified by the Second Circuit, the Debtor has acted in good faith by invoking the Chapter 11 sale process to monetize the Units while Pacific Alliance pursues its multiple actions.

**Reservation**

21. Under any circumstances, the Debtor objects to the motion to the extent that Pacific Alliance seeks leave to enforce any potential judgment against the Units. Thus, any relief that may be granted should modify the stay to the extent of allowing Pacific Alliance to pursue its claims through trial, with this Court retaining continuing supervision over the sale process.

WHEREFORE, the Debtor respectfully requests that the Court enter an Order consistent with the foregoing.

Dated: New York, New York
January 5, 2021

        GOLDBERG WEPRIN FINKEL
        GOLDSTEIN LLP
        Counsel for the Debtor
        1501 Broadway, 22nd Floor
        New York, NY 10036
        (212) 221-5700

        By:   /s/ Kevin J. Nash, Esq.