O'MELVENY & MYERS LLP
Stuart Sarnoff
Edward Moss
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2224
Email: ssarnoff@omm.com
      emoss@omm.com

-and-

FOLEY & LARDNER LLP
Douglas E. Spelfogel
Alissa Nann
90 Park Avenue
New York, NY 10016
Telephone:  (212) 682-7474
Facsimile: (212) 687-2329
Email: dspelfogel@foley.com
      anann@foley.com

*Attorneys for Pacific Alliance Asia Opportunity Fund L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>GENEVER HOLDINGS LLC,<br><br>        Debtor. | Chapter 11<br><br>Case No. 20-12411 (JLG) |

**PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR AN ORDER UNDER 11 U.S.C. § 1112(b) CONVERTING THE DEBTOR'S CASE TO A CASE UNDER CHAPTER 7 OR, IN THE ALTERNATIVE, FOR AN ORDER UNDER 11 U.S.C. § 1104(a) APPOINTING A TRUSTEE TO ADMINISTER THE DEBTOR'S ESTATE**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

JURISDICTION ....................................................................................................... 7

BACKGROUND ...................................................................................................... 7

    I.     PAX and Kwok Enter Into the Personal Guarantee. .............................. 7

    II.    On The Verge of Default, Kwok Forms The Debtor and Purchases the Sherry-Netherland Residence Through Fraud. ....................................... 8

    III.   The Underlying Litigation Between PAX and Kwok Before Justice Ostrager. ............................................................................................... 11

         A.    The Attachment Phase and Kwok's Attempts to Shield the Residence. ...................................................................... 11

         B.    The Merits and Kwok's Perjury. ........................................ 15

         C.    The Summary Judgment Decision and Judgment Enforcement. ............. 17

         D.    The Upcoming Trial. ......................................................... 18

    IV.   Bravo Luck and the Purported Trust Agreement. ............................... 20

    V.    The Debtor's (Kwok's) Sham Bankruptcy Petition. ........................... 25

ARGUMENT .......................................................................................................... 28

    I.     THE COURT SHOULD CONVERT THE CHAPTER 11 CASE TO CHAPTER 7 FOR "CAUSE." .......................................................... 28

         A.    The Court Should Convert the Case for "Cause" Because this Bankruptcy Was Filed in Bad Faith. ..................................... 29

         B.    The Court Should Convert the Case for "Cause" Because the Debtor's Management—*Kwok*—Has Not and Will Not Comply With the Fiduciary Duties of a Debtor-In-Possession. ........... 32

         C.    The Court Should Convert the Case for "Cause" Because There Are Continuing Losses to the Estate and No Likelihood of Rehabilitation. ................................................................. 36

         D.    The Court Should Convert the Case for "Cause" Because the Debtor Cannot Effectuate a Plan. ..................................... 38

    II.    IN THE ALTERNATIVE, THE COURT SHOULD APPOINT A CHAPTER 11 TRUSTEE. ................................................................ 40

         A.    There is "Cause" to Appoint a Trustee. ............................. 41

         B.    Appointing a Trustee Is in the Interests of All Parties. ........... 43

CONCLUSION ....................................................................................................... 44

**Cases**

*Celotex Corp. v. Edwards*,
514 U.S. 300 (1995) .................................................................................... 26

*C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*,
113 F.3d 1304 (2d Cir. 1997) ................................................................. 29, 32

*In re 167 West 133rd St. Hous. Dev. Fund Corp.*,
No. 18-12043 (JLG), 2018 WL 4637460 (Bankr. S.D.N.Y. Sept. 25, 2018) ........................ 30

*In re 500 Fifth Ave. Assocs.*,
148 B.R. 1010 (Bankr. S.D.N.Y. 1993), *aff'd*, No. 93 CIV. 844 (LJF), 1993
WL 316183 (S.D.N.Y. May 21, 1993) .......................................................... 39

*In re Adamo*,
No. 14-73640-LAS, 2016 WL 859349 (Bankr. E.D.N.Y. Mar. 4, 2016) .............................. 29

*In re AdBrite Corp.*,
290 B.R. 209 (Bankr. S.D.N.Y. 2003) ........................................................ 37

*In re Ancona*,
No. 14-10532 (MKV) 2016 WL 7868696 (Bankr. S.D.N.Y. Nov. 30, 2016) ................ passim

*In re Ashley River Consulting, LLC*,
No. 14-13406 (MG), 2015 WL 1540941 (Bankr. S.D.N.Y. Mar. 31, 2015) ................... 40, 41

*In re B & B W. 164th St. Corp.*,
147 B.R. 832 (Bankr. E.D.N.Y. 1992) ........................................................ 38

*In re Babayoff*,
445 B.R. 64 (Bankr. E.D.N.Y. 2011) ......................................................... 38

*In re Bonded Mailings Inc.*,
20 B.R. 781 (Bankr. E.D.N.Y. 1982) ......................................................... 41

*In re Centennial Textiles, Inc.*,
227 B.R. 606 (Bankr. S.D.N.Y. 1998) ........................................................ 32

*In re Citi-Toledo Partners*,
170 B.R. 602 (Bankr. N.D. Ohio 1994) ....................................................... 33

*In re East Coast Airways, Ltd.*,
146 B.R. 325 (Bankr. E.D.N.Y. 1992) ........................................................ 36

*In re Eljamal*,
No. 17-CV-7870 (KMK), 2018 WL 4735719 (S.D.N.Y. Sept. 28, 2018) ............................. 43

*In re FRGR Managing Member LLC*,
419 B.R. 576 (Bankr. S.D.N.Y 2009) ...................................................... 36, 37

*In re Futterman*,
584 B.R. 609 (Bankr. S.D.N.Y. 2018) ........................................................ 43

*In re Hampton Hotel Invs., L.P.*,
270 B.R. 346 (Bankr. S.D.N.Y. 2001) ........................................................................ passim

*In re HBA E., Inc.*,
87 B.R. 248 (Bankr. E.D.N.Y. 1988) ................................................................. 29, 30

*In re Ionosphere Clubs, Inc.*,
113 B.R. 164 (Bankr. S.D.N.Y. 1990) ..................................................... 32, 35, 41, 43

*In re Kanterman*,
88 B.R. 26 (S.D.N.Y. 1988) ..................................................................................... 36

*In re Korn*,
523 B.R. 453 (Bankr. E.D. Pa. 2014) ....................................................................... 38

*In re Kuvykin*,
No. 18-10760 (JLG), 2019 WL 989414 (Bankr. S.D.N.Y. Feb. 26, 2019) ......... 32, 35, 36, 37

*In re Lyons Transp. Lines, Inc.*,
123 B.R. 526 (Bankr. W.D.Pa. 1991) ....................................................................... 36

*In re Midwest Props. of Shawano, LLC*,
442 B.R. 278 (Bankr. D. Del. 2010) ......................................................................... 28

*In re Reyes*,
No. 14-13233 (SMB), 2015 WL 4624156 (Bankr. S.D.N.Y. Aug. 4, 2015) ........................ 30

*In re Ridgemour Meyer Props., LLC*,
413 B.R. 101 (Bankr. S.D.N.Y. 2008) ....................................................................... 43

*In re Rundlett*,
136 B.R. 376 (Bankr. S.D.N.Y. 1992) ................................................................. 37, 38

*In re Sal Caruso Cheese, Inc.*,
107 B.R. 808 (Bankr. N.D.N.Y. 1989) ....................................................................... 31

*In re Sillerman*,
605 B.R. 631 (Bankr. S.D.N.Y. 2019) ................................................................. 32, 40

*In re Strawbridge*,
No. 09-17208-MG, 2010 WL 779267 (Bankr. S.D.N.Y. Mar. 5, 2010 ...................... 6, 31, 35

*In re Syndicom Corp.*,
268 B.R. 26 (Bankr. S.D.N.Y. 2001) ......................................................................... 31

*In re Taub*,
427 B.R. 208 (Bankr. E.D.N.Y. 2010), *aff'd*, No. 08 BK 44210 ESS, 2011 WL
1322390 (E.D.N.Y. Mar. 31, 2011) ........................................................................... 37

*In re Taylor*,
No. 97 Civ. 5967, 1997 WL 642559 (S.D.N.Y. 1997) ................................................. 38

*In re The Bridge to Life, Inc.*
330 B.R. 351 (Bankr. E.D.N.Y. 2005) ....................................................................... 30

Page

*In re Tornheim*,
  181 B.R. 161 (Bankr. S.D.N.Y. 1995) ................................................................. 38

*In re V. Savino Oil & Heating Co., Inc.*,
  99 B.R. 518 (Bankr. E.D.N.Y. 1989) .................................................................. 40

*In re Wally Findlay Galleries (New York), Inc.,*
  36 B.R. 849 (Bankr. S.D.N.Y. 1984) .................................................................. 31

*Jenkins v. Harrington (In re Jenkins)*,
  No. 17-CV-5819 (PKC), 2018 WL 2139209 (E.D.N.Y. May 9, 2018) .................. 30

*Local Union 722 Int'l Bhd. Of Teamsters*,
  414 B.R. 443 (Bankr. N.D. Ill. 2009) .................................................................. 39

*Matter of Natrl Plants & Lands Mgmt. Co., Ltd.*,
  68 B.R. 394 (Bankr. S.D.N.Y. 1986) .................................................................. 36

*Midatlantic Nat'l Bank v. Anchorage Boat Sales, Inc. (In re Anchorage Boat*
  *Sales, Inc.)*,
  4 B.R. 635 (Bankr.E.D.N.Y.1980) ...................................................................... 40

*Presidential Gardens Assocs. V. U.S. ex rel. Sec'y of Hous. and Urban Dev.*,
  175 F.3d 132 (2d Cir. 1999) ................................................................................. 26

*See In re Lettick Typografic, Inc.*,
  103 B.R. 32 (Bankr. D. Conn. 1989) ................................................................... 40

*Wilk Auslander LLP v. Murray (In re Murray)*,
  900 F.3d 53 (2d Cir. 2018) ................................................................................... 30

*Wolf v. Weinstein*,
  372 U.S. 633 (1963) .............................................................................................. 33

**Statutes**

11 U.S.C. § 1104 .................................................................................................... 1, 40

11 U.S.C. § 1112 .......................................................................................... 1, 28, 36, 38

11 U.S.C. § 1126(c) ..................................................................................................... 39

11 U.S.C. § 1129(a)(10) ............................................................................................. 39

28 U.S.C. § 1334 ........................................................................................................... 7

28 U.S.C. § 157 ............................................................................................................. 7

**Other Authorities**

*Amended Standing Order of Reference from the United States District Court for*
  *the Southern District of New York*, dated January 31, 2012 ..................................... 7

Pacific Alliance Asia Opportunity Fund L.P. ("PAX"), by its counsel, O'Melveny & Myers LLP and Foley & Lardner LLP, hereby moves for the entry of an order (the "Motion")[1] under 11 U.S.C. § 1112 converting the above-captioned Chapter 11 bankruptcy case (the "Chapter 11 Case") of Genever Holdings LLC (the "Debtor") to a case under Chapter 7 or, in the alternative, for entry of an order under 11 U.S.C. § 1104 appointing a Chapter 11 trustee to administer the Debtor's estate.  In support of the Motion, PAX respectfully states as follows:

## PRELIMINARY STATEMENT[2]

1. This Chapter 11 Case is the latest effort by Miles Kwok ("Kwok")—a bad actor with a long history of deception and fraud—to avoid liability under a personal guarantee he entered with PAX in 2011 (the "Personal Guarantee").

2. In 2015, instead of repaying his debt to PAX, Kwok spent $67.5 million (almost the precise amount he owed to PAX at the time under the Personal Guarantee) to purchase a luxury New York City apartment (the "Residence") in the Sherry-Netherland Hotel (the "Sherry-Netherland").  To shield the Residence from creditors, Kwok purchased it through the Debtor, Genever Holdings LLC—a single asset shell entity whose sole member is its parent entity, Genever Holdings Corporation ("Genever BVI" and together with the Debtor, the "Genever Entities"), another shell entity incorporated in the British Virgin Islands whose sole shareholder and director is Kwok.  Kwok formed both Genever Entities at the time he purchased the

---

[1] This Motion is made pursuant to PAX's reservation of rights stated in its related Motion to Modify the Automatic Stay [ECF Doc. No. 12] (the "Stay Motion") and the Stay Motion is fully incorporated herein.  Any capitalized terms used, but not otherwise defined in this Motion, shall have the meanings ascribed to them in the Stay Motion.
[2] Most exhibit citations are to the exhibits attached to the December 16, 2020 Declaration of Edward Moss in Support of the Stay Motion [ECF Doc. No. 14], and are referred to herein as "Ex. __."  The five exhibits attached to the January 8, 2021 Declaration of Edward Moss in support of this Motion and filed herewith are referred to herein as "Moss Aff. Ex. __."  The Debtor's Declaration Pursuant to Local Bankruptcy Rule 1007-2 attached to the Voluntary Petition for Non-Individuals Filing for Bankruptcy [ECF Doc. No. 1] is referred to as the "Debtor's Decl."

Residence solely to hold and shield the Residence.  The Residence was, and remains, ostensibly the Debtor's sole asset.[3]

3.     In 2017, following years of evasion by Kwok, PAX filed suit against Kwok (the "State Court Action") in the New York Supreme Court (the "Supreme Court") to, among other things, obtain judgment on the Personal Guarantee and pursue Kwok's largest known U.S. asset—the Residence—to satisfy a portion of that judgment.

4.     Now, after nearly four years of litigation in the State Court Action (and endless shenanigans by Kwok, as detailed below), PAX has prevailed on summary judgment against Kwok on its claim for breach of the Personal Guarantee.  In response, Kwok caused the Debtor to file its Chapter 11 petition (the "Petition") as a last ditch ***and bad faith*** attempt to impede the State Court Action and avoid more adverse rulings and any enforcement efforts by PAX.  The filing was made after several recent setbacks for Kwok—including the aforementioned entry of summary judgment which will be in excess of $115 million and a restraining order to prevent him from transferring or dissipating assets, including the Residence (which Kwok is now alleged to have violated, as discussed below)—and before an upcoming trial in the State Court Action to determine whether PAX may enforce its judgment against the Debtor and its assets (the Residence) as the alter ego of Kwok.  Kwok's sole and transparent purpose in filing the Petition at this time is to stop the bleeding in the State Court Action and seek a more favorable outcome before a different court under the guise of a purported reorganization under Chapter 11.  This is a classic example of a party improperly using the bankruptcy reorganization process as a tactical step to gain an advantage in a separate, non-bankruptcy litigation.

---

[3] The Residence covers the entire 18th floor of the Sherry Netherland, and is made-up of multiple apartments that have been combined.  Pursuant to the Debtor's filings, it also holds a relatively small amount of cash and a security deposit collateralizing its obligations to the Sherry-Netherland.

5.      Significantly, this Chapter 11 filing is only the latest in a long pattern of gamesmanship and malfeasance employed by Kwok to avoid repaying his debt to PAX. Specifically, since the Personal Guarantee became due in 2012, Kwok has engaged in numerous dishonest acts (collectively, "Kwok's Malfeasance") to try to thwart PAX's collection efforts, including, among other things:

- Contracting to transfer to PAX three apartments in China to settle his liability under the Personal Guarantee even though those apartments (unbeknownst to PAX) had previously been seized by Chinese authorities as a result of criminal charges against Kwok;

- Fleeing to New York City without notice to PAX and, once there, purchasing the Residence for $67.5 million (approximately the amount he owed PAX at the time) through two shell companies (the Genever Entities) that he contemporaneously set up in an effort to strip his personal assets and shield them from PAX;

- Lying on several occasions and in material ways to the Sherry-Netherland and its co-op board, in order to induce their approval to his purchase of the Residence;

- Repeatedly attempting to change ownership of the Residence to further shield and dissipate that asset for his own benefit and ultimately fabricating a so-called "Trust Agreement" (defined below) through which the Genever Entities purportedly hold the Residence for an insider entity, Bravo Luck, formed by Kwok and now allegedly owned by Kwok's son;

- Lying about his ownership of the Residence—while Kwok was listed as an applicant to purchase the Residence and represented to the Court in the State Court Action that he had an "ownership interest" in the Residence, he later testified in his deposition in the State Court Action that he was not the owner, but rather, the owner was someone named Zhang Wei;

- Lying about his ownership and control of the Debtor—while Kwok represented that he was the sole shareholder of Genever BVI in the State Court Action, he later testified he did not control Genever BVI but Zhang Wei did;

- Lying about pledges of the Residence—Kwok and his representatives, including Yan Ping Wang (the Debtor's declarant in the Chapter 11 Case and witness at the 341 meeting of creditors, conducted on December 18, 2020 (the "341 Meeting")), made multiple false statements during the State Court Action about pledges of the Residence (and other matters);

- Lying about the validity of the Personal Guarantee and related agreements—

calling them forgeries under oath despite previously submitting his own copies of those very same documents in the State Court Action and representing that they were authentic;[4]

- Violating a restraining order entered in the State Court Action to prevent Kwok from disposing of assets, including the Residence and a $30 million yacht owned by Kwok. In direct contravention of the order, Kwok had the yacht moved outside the jurisdiction of the United States (upon information and belief, it is currently in or near the Bahamas). A motion to hold Kwok in contempt for this violation is pending in the State Court Action; and

- Causing the Debtor to falsely assert in the Chapter 11 declaration that the Debtor is not the true owner of the Residence based on the bogus Trust Agreement, in direct contradiction of previous filings in the State Court Action, while at the same time listing the Debtor as the owner on the Chapter 11 schedules.

6.      Indeed, Kwok's Malfeasance was well-recognized by Justice Ostrager, who has presided over the State Court Action since its inception. During a hearing on PAX's motion under CPLR 5229 seeking, among other things, an order restraining Kwok from dissipating assets, including the Residence, which may be available to satisfy PAX's judgment against Kwok, Justice Ostrager stated:

> Look, this is a 2017 case. We've had multiple motions relating to Mr. Kwok's assets. ***The Court believes, as reflected in the September 15, 2020 [summary judgment] order that Mr. Kwok has attempted to mislead the Court. The Court believes that Mr. Kwok is, as the plaintiff contends, playing a shell game with his assets, and has violated if not the letter of court orders, the spirit of court orders***. . . . So we are not going to have any more shell games. Wherever these assets are held, they are going to remain held where they presently reside, and if it's determined that the entities that are presently listed as the owners of the assets are the alter ego of Mr. Kwok or are wholly dominated and controlled by Mr. Kwok, those assets will be made available to satisfy any judgment that the plaintiff recovers.[5]

7.      Accordingly, both the timing of the Petition and Kwok's Malfeasance make clear that this Chapter 11 Case has ***nothing*** to do with rehabilitating the (single asset) Debtor or

---

[4] In fact, the Supreme Court granted PAX's request to preclude Kwok from arguing either at summary judgment or trial that such contracts were forgeries because he "on more than one occasion, [had] sponsored [those same contracts] to the Court as authentic documents." Ex. 45 at 25:24–26:3.
[5] Ex. 54 at 21:10–22:14 (emphasis added).

protecting the rights of legitimate creditors like PAX, as it must. Rather, the instant Chapter 11 Case seeks to advance Kwok's own personal interests by continuing in this Court his elaborate shell game through which he uses related, insider entities to shield his own assets from PAX and presumably other creditors. Kwok's Malfeasance confirms he cannot (and should not) be trusted as a debtor-in-possession to administer the estate. As a result, under well-established authority, this Court should convert the case to a Chapter 7 or, alternatively, appoint a Chapter 11 Trustee.

8. *First*, under Bankruptcy Code 1112(b), conversion or dismissal is mandated where cause exists. Here, as described in detail below, cause exists under well-settled law because, among other things: (i) the Petition was filed in bad faith in order to delay and frustrate PAX's legitimate efforts to enforce its rights against Kwok and the Residence in the State Court Action; (ii) Kwok, who controls the Debtor, cannot be entrusted to comply with the Debtor's fiduciary duty to protect and conserve the Residence for the benefit of all creditors; rather, consistent with Kwok's Malfeasance, Kwok has engineered the Chapter 11 Case to further shield the Residence from PAX—this time through insider and alter ego, Bravo Luck—for his own continued use and benefit; (iii) there are continuing losses to the Debtor's estate including, among other things, $73,000/month in unpaid maintenance fees (plus additional monthly assessments) for the Residence and no likelihood of rehabilitation because the Debtor intends to sell its sole asset; and (iv) the Debtor likely cannot effectuate a Chapter 11 plan over the objection of the largest non-insider general unsecured creditor, PAX, which holds well over 50% of the total amount of scheduled unsecured claims.

9. Indeed, in light of Kwok's Malfeasance and the Debtor's stated intention to sell the Residence through the Chapter 11 Case, PAX submits that Kwok must not be permitted to remain in possession of the Debtor's primary asset, as manager, but the Chapter 11 Case must be

converted to a case under Chapter 7 where a trustee can fairly and properly liquidate and marshal the Debtor's asset for the benefit of all creditors without the taint of conflicts, self-dealing and general impropriety, which currently abound.  *See, e.g.*, *In re Strawbridge*, No. 09-17208-MG, 2010 WL 779267, at *5 (Bankr. S.D.N.Y. Mar. 5, 2010) (holding Debtor's "misuse of the bankruptcy laws to avoid her obligations to creditors requires conversion to chapter 7 to protect the creditors[,]" because a Chapter 7 trustee will "examine [Debtor's] estate and properly value and liquidate her personal property in an effort to make her creditors whole").[6]

10.    *Second*, if the Court determines not to convert the Chapter 11 Case, it should appoint a Chapter 11 trustee under § 1104(a).  Here, as detailed below, cause exists to appoint a Chapter 11 trustee under § 1104(a)(1) for many of the same reasons described under § 1112(b) because, among other things: (i) Kwok's Malfeasance includes numerous dishonest and fraudulent acts designed to frustrate non-insider creditors, including PAX's efforts to collect its debt under the Personal Guarantee; (ii) the Debtor has inherent conflicts of interest where, among other things, Bravo Luck—now the purported beneficial owner of the Debtor's sole asset—is an insider of the Debtor and alter ego of Kwok; and (iii) Kwok, as the Debtor's manager, cannot be trusted to honor the fiduciary duties of a debtor-in-possession to fairly preserve and protect the Debtor's asset for the benefit of all creditors.

11.    Further, and alternatively, the Court should appoint a Chapter 11 trustee under § 1104(a)(2) because such appointment is in the best interests of creditors where, among other things: (i) the Debtor, by Kwok, is not trustworthy based on, among other things, Kwok's Malfeasance; (ii) the Debtor improperly seeks to delay and frustrate the State Court Action and

---

[6] As discussed at the 341 Meeting, the Debtor allegedly has never paid (or had the ability to pay) the monthly maintenance costs at the Residence.  Such amounts and other costs associated with the upkeep of the Residence apparently have always been paid by Kwok's related entities, including Bravo Luck and Golden Spring.  This further demonstrates that the Debtor is nothing more than a shell entity, ultimately owned and controlled by Kwok.

has no prospects for rehabilitation because it seeks to sell its sole asset, the Residence; (iii) the Debtor's primary (and largest) non-insider creditor, PAX, lacks any confidence in the Debtor and Kwok; and (iv) the benefits of a Chapter 11 trustee, *i.e.*, preservation of the Residence for the benefit of creditors, far outweigh the costs of such appointment.

12.     For all of these reasons, each discussed in more detail below, PAX respectfully submits that the Court should convert the Chapter 11 Case to a case under Chapter 7 under section 1112(b) of the Bankruptcy Code or, in the alternative, appoint a trustee under section 1104(a) of the Bankruptcy Code.

## JURISDICTION

13.     This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory bases for the relief requested herein are Bankruptcy Code sections 1104 and 1112.

## BACKGROUND

**I.     PAX and Kwok Enter Into the Personal Guarantee.**

14.     This dispute goes back nearly a decade. In March 2011, Kwok and PAX entered the Personal Guarantee under which Kwok personally guaranteed a loan facility—approximately $46 million at the time—that PAX had issued to one of Kwok's companies.[7]

---

[7] PAX and Kwok began their relationship in early 2008, when PAX lent Kwok and his controlled companies $100 million in two tranches in order to fund the completion of construction of the Pangu Plaza in Beijing, China. Ex. 1. By 2011, Kwok and his companies still had not repaid one of those loans. *See* Ex. 2. On March 16, 2011, a Kwok-controlled entity, Shiny Times, and PAX entered into the "2011 Loan Facility," which superseded the prior agreements and memorialized Shiny Times' debt to PAX as of December 31, 2010, at $46,426,489, with a 15% annual interest rate and a June 30, 2012 repayment date. Ex. 3. The 2011 Loan Facility was conditioned on Kwok's execution of a personal guarantee that secured performance by Shiny Times. *Id.* at 1. As required, Kwok entered into that Personal Guarantee, also on March 16, 2011. Ex. 4.

15.     Although repayment was due in 2012, neither Kwok nor his company has repaid the debt to PAX; instead, Kwok has effectuated a campaign of fraud and delay.

## II.     On The Verge of Default, Kwok Forms The Debtor and Purchases the Sherry-Netherland Residence Through Fraud.

16.     In an attempt to settle the debt, on April 19, 2013, PAX, Shiny Times Holdings Ltd. ("Shiny Times") (Kwok's company/borrower), Kwok, and Beijing Pangu Investment Co. Ltd. ("Beijing Pangu") (the Kwok-affiliated entity that owns real property known as "Pangu Plaza"), entered into the "2013 Deed of Settlement," which provided that Shiny Times' debt to PAX would be discharged in return for PAX receiving legal ownership of three residential apartments at Pangu Plaza (the "Apartments").[8]  The 2013 Deed of Settlement contained ten conditions precedent to conveying the Apartments to PAX (the "Conditions Precedent") that were required to be satisfied by a July 31, 2013 deadline, or else the settlement would terminate, and the 2011 Loan Facility and Personal Guarantee would revert to being in full force and effect.[9]  The Conditions Precedent were not satisfied by the agreed-upon deadline, or by any of the four deadline extensions thereto,[10] and so the 2011 Loan Facility and Personal Guarantee did ultimately revert to being in full force and effect.

17.     In "late January or early February 2015," the People's Republic of China ("PRC") Government charged Kwok with multiple crimes, including corruption, and seized his PRC assets—among them the Pangu Plaza complex that included the Apartments that were intended to be used in settlement of the obligations to PAX.[11]  Kwok never informed PAX of this seizure.

---

[8] Ex. 5.
[9] *Id.* at §§ 3.2, 3.4.
[10] Exs. 6–9.
[11] Ex. 10 at ¶ 57; *see also* Ex. 11 at PAX-KWOK-073379, 91 (Beijing land records showing "[j]udicial seizure" of Beijing Pangu properties beginning February 2, 2015).

18.     On February 10, 2015, Kwok entered into the final extension of the 2013 Deed of

Settlement, extending until June 30, 2015, his deadline to satisfy the Conditions Precedent and

convey the Apartments to PAX.[12]  In other words, despite the seizure of his PRC assets

(including the Apartments), Kwok continued to promise to convey such assets to PAX to induce

a further forbearance.  Around the same time, unbeknownst to PAX, Kwok fled China for New

York City,[13] where he worked in secret to strip and hide his other, available assets.

19.     Specifically, once in New York, Kwok promptly formed two shell companies—

the Debtor[14] and Genever BVI[15] (the Genever Entities)—to enable him to continue his shell

game.  Kwok is the sole shareholder[16] and sole director of Genever BVI,[17] which in turn is the

sole member of the Debtor.[18]  Other than the Residence (apart from Genever BVI's stock in the

Debtor and nominal cash), neither the Debtor nor Genever BVI has any assets,[19] employees,[20]

phone number,[21] offices,[22] or source of revenue;[23] their exclusive purpose is to hold and shield

the Residence for Kwok.

20.     Kwok formed the Genever Entities (in February 2015) to purchase the Residence,

which occurred on March 6, 2015[24] for $67.5 million in cash.[25]  The purchase price was almost

precisely the amount Kwok owed to PAX at that time, including accrued interest.  Thus, Kwok

was able to direct virtually the exact amount he knew he owed to PAX into a U.S. asset that he

---

[12] Ex. 9 at § 2.1(a).
[13] Ex. 10 at ¶ 23.
[14] Ex. 12 at SN 0156.
[15] *Id.* at SN 0159.
[16] *Id.* at SN 0160–61; Ex. 13 at ¶ 4 & Ex. A.
[17] Ex. 12 at SN 0162–63.
[18] *Id.* at SN 0198, 206.
[19] Ex. 14 at 47:19–22; 100:8–101:19.
[20] *Id.* at 36:17–19; 96:18–20.
[21] *Id.* at 36:20–23; 96:21–23.
[22] *Id.* at 35:4–6; 96:10–14.
[23] *Id.* at 26:4–13, 86:16–87:22, 100:8–25.
[24] Ex. 15 at SN 0351.
[25] Ex. 16 at SN 0084; Ex. 66.

made sure was doubly shielded (by two holding companies) three months before the proposed settlement with PAX would finally fall apart (as he knew it would, because at the time he knew the Chinese authorities had already seized his Pangu Plaza and other assets).

21.     During his purchase application process with the Sherry-Netherland, Kwok acted like a man in a hurry to hide his assets.  The Sherry-Netherland's Vice President and Chief Operating Officer ("COO") testified that he had "never seen"—before or since—an apartment purchased through **two** LLCs.[26]  And Kwok pressured the Sherry-Netherland to approve his application quickly, threatening to walk away unless they approved him within three days.[27] Indeed, the Sherry-Netherland Vice President and COO later testified that he had never "received this sort of ultimatum from another prospective purchaser."[28]  Kwok also made several fraudulent misrepresentations in his purchase application, including claiming to own companies that he later testified he never actually owned.[29]

22.     When confronted with Kwok's deposition testimony—*i.e.*, that he never owned the companies he represented as his in an attempt to demonstrate financial suitability to purchase and maintain a luxury New York apartment—the President of the Sherry-Netherland's Board of Directors testified that "we were defrauded."[30]  Similarly, the Vice President and COO of the

---

[26] Ex. 17 at 68:16–25.
[27] Ex. 16 at SN 0084.
[28] Ex. 17 at 75:6–9; *see also id.* at 39:18–40:2 (describing it as "odd" that Kwok "wanted to close very quickly").
[29] For example, in response to the Sherry-Netherland's request for financial disclosure, Kwok represented that he "owned" and "controlled" Beijing Zenith Holdings Company Ltd. ("Beijing Zenith") and that it had almost $4 billion in assets. Ex. 18 at SN 0058–72.  But Kwok later testified under oath not only that he never had **any** ownership interest in Beijing Zenith, but also that he **knew** at the time he presented the financials to the Sherry-Netherland to bolster his application that Beijing Zenith's assets had been seized by the PRC government (along with his other assets) a month before (a fact he never disclosed to the Sherry-Netherland).  Ex. 19 at 77:16–78:7, 79:23–80:9.
[30] Ex. 20 at 75:20–76:7.

Sherry-Netherland testified that in his four decades dealing with hundreds of residents, none "made misrepresentations . . . to the extent that Mr. Kwok and his representatives have."[31]

### III.    The Underlying Litigation Between PAX and Kwok Before Justice Ostrager.

23.    As of early 2015, PAX did not know that Kwok had fled Asia for New York. PAX thus sent Kwok and Shiny Times (the primary obligor) demand letters to Kwok's Hong Kong addresses[32] and also initiated liquidation proceedings[33] in the British Virgin Islands (Shiny Times' home jurisdiction) seeking to recover the debt. But Kwok never responded, and Shiny Times was found to be insolvent in the liquidation proceeding.[34] So PAX recovered nothing.

24.    After PAX learned Kwok had fled to New York, it filed the State Court Action against Kwok in the Supreme Court on April 18, 2017, for breach of the Personal Guarantee.[35] Because the Petition is a transparent attempt by Kwok to evade the judgment in that case—and because that case has spanned nearly four years and has involved more than 650 docket entries, nearly a dozen motions and hearings, and several written decisions—we address that lawsuit's history below.

### A.    The Attachment Phase and Kwok's Attempts to Shield the Residence.

25.    By the time PAX filed the State Court Action, it understood full well with whom it was dealing. PAX knew that Kwok would take any step possible to try to shield and secret his assets and frustrate PAX's collection efforts. As a result, before proceeding to the merits of the case, PAX sought to protect itself against a subsequent pyrrhic victory by seeking a pre-

---

[31] Ex. 17 at 119:19–23.
[32] Exs. 21–22.
[33] Ex. 23 at ¶ 23.
[34] *Id.*
[35] Ex. 24.

judgment order of attachment of the only significant asset it knew Kwok held in the United States—the Residence.[36]

26.     Discovery revealed that even after purchasing the Residence through the double-holding-company structure, Kwok took further steps to try to shield it:

(a)     In May 2015, just two months after purchasing the Residence, Kwok pledged it to an entity named Roscalitar 2.[37] (Kwok terminated that pledge, which had violated his Sherry-Netherland proprietary lease, in March 2017.[38])

(b)     In October 2015—just seven months after purchasing the Residence and while it was still pledged to Roscalitar 2—Kwok listed the Residence for sale.[39] (He has had it on and off the market ever since, dropping the asking price repeatedly.[40])

(c)     In June 2016 (after Shiny Times was liquidated and found insolvent), Kwok's employee asked the Sherry-Netherland to "***undertake some restructuring in relation to the property so that the ultimate beneficial ownership will pass to his son***" by transferring ownership of the Debtor to "***a trust of which the son is a beneficiary.***"[41] The Sherry-Netherland denied the request, informing Kwok that his son would need to go through the regular application and approval process.[42]

(d)     In June 2017, two months after PAX filed suit against Kwok, he attempted to change the "contact person" for the Residence to his son.[43] The Sherry-Netherland Vice President and COO testified that he believed this was an attempt to "circumvent the [Sherry-Netherland's June 2016] decision . . . that he couldn't transfer the apartment to the son."[44]

(e)     In February 2018, Kwok pledged the Residence to a new entity, Blue Capital.[45] (He terminated that lease-violating pledge after six months, in June 2018.[46])

(f)     In April 2019, Kwok produced—for the first time, and despite its being responsive to earlier discovery requests—a document supposedly dated February 17, 2015, by which the two Genever Entities purported to declare they held their assets (including the Residence) in trust for an entity called Bravo Luck.[47] But

---

[36] Ex. 25.
[37] Ex. 26; *see also* Ex. 13 at ¶ 5.
[38] Ex. 27.
[39] Ex. 28 at 2.
[40] Ex. 29 at 3.
[41] Ex. 30 at SN 0018–19 (emphasis added).
[42] Ex. 17 at 77:11–78:25.
[43] Ex. 31 at SN 0278.
[44] Ex. 17 at 92:12–93:3.
[45] Ex. 32.
[46] Ex. 33.
[47] Ex. 34.

that purported Trust Agreement is nothing more than a forged, sham document that is part of Kwok's continuing shell game. ***Not once*** during the proceedings before Justice Ostrager did Kwok rely on this document, including when he was attempting to avoid attachment by relying on the other pledges discussed above. But now, as discussed below, Kwok claims that Bravo Luck is wholly owned by his (now) 33-year-old son, and is the rightful owner of the Residence.

27. Continuing his improper efforts to shield the Residence, Kwok engaged in gamesmanship throughout the attachment phase, including making numerous false representations to Justice Ostrager and committing perjury at his deposition. To cite just a few examples:

28. ***False Statements About Ownership of the Residence***. Kwok listed **himself** as the "Applicant" on his Sherry-Netherland purchase application,[48] he submitted letters that recommended **himself** personally to the Board,[49] and he represented to the Court that **he** had an "ownership interest" in the Residence.[50] But at his subsequent deposition, Kwok testified that he was not in fact the owner; rather, he testified that the Residence was owned by someone named Zhang Wei, a mysterious alleged associate who had been imprisoned in China since May or June 2015[51]—and whose name does not appear on a single document related to the Residence, or on Kwok's interrogatory responses listing people with knowledge about the Residence.[52] Similarly, the Debtor does not mention Zhang Wei in its Petition, schedules, or the Debtor's Declaration.

29. ***False Statements About Ownership and Control of the Debtor***. Although Kwok represented to the Court that he was the "sole shareholder" of Genever BVI,[53] he testified at his deposition that he did not know whether he was Genever BVI's sole shareholder and that "of

---

[48] Ex. 15 at SN 0368–70.
[49] *Id.* at SN 0371–77.
[50] *See, e.g.*, Ex. 13 at ¶ 2.
[51] Ex. 19 at 27:9–16, 114:23–25.
[52] Ex. 35 at 9–10.
[53] Ex. 13 at ¶ 4.

course" he did not control Genever BVI—Zhang Wei did.[54]  And despite testifying that he had a written agreement to evidence Zhang Wei's ownership,[55] Kwok (not surprisingly) has never produced it.[56]

30.     ***False Statements About Pledges of the Residence***.  Kwok twice tried to evade an attachment based on the false argument that the Residence already had been pledged to a third-party.  First, Kwok's employee Yan Ping "Yvette" Wang swore in an affidavit filed with the Court that "the assets of Genever BVI, which by virtue of its ownership of [the Debtor] include the [Residence], were pledged to Roscalitar 2."[57]  At her subsequent deposition, however, Wang admitted that she in fact knew absolutely ***nothing*** about any pledges, had "no idea" if the Residence or the Genever Entities had been pledged, and had never spoken to Kwok about any pledges.[58]  PAX also demonstrated that Wang's sworn statement was false through evidence of publicly available filings that the Roscalitar 2 pledge had actually been terminated ***in March 2017***—before PAX even filed its lawsuit.[59]  Of note, the same Ms. Wang is the signatory on the Petition and the declarant in support of this chapter 11 filing.[60]

31.     When confronted by the Sherry-Netherland about the unequivocal statement in Wang's affidavit that the Residence had been pledged to Roscalitar 2, Kwok's lawyers argued, counter-factually, that the affidavit "***made no such representation.***"[61]  Kwok then changed course, submitting (through his since-fired counsel) documents to the Court at oral argument

---

[54] Ex. 19 at 36:20–24.
[55] *Id.* at 119:4–24.
[56] Ex. 36.
[57] Ex. 13 at ¶ 5.
[58] Ex. 37 at 80:2–23.
[59] Ex. 38 at 5; Ex. 27.
[60] *See* Petition and Debtor's Decl. at ECF Doc. No. 1.
[61] Ex. 39 at SN 0437.  Kwok had a motive to deny this, because the pledge violated his lease agreement with the Sherry-Netherland.  Moss Aff. Ex. A at § 3.14.

showing that the Residence was instead pledged to a different entity called Blue Capital.[62]

Kwok and his counsel, however, failed to provide the Court with the publicly available filings

demonstrating that this pledge, too, had actually been terminated—***two weeks*** before Kwok's

counsel touted the pledge in open court.[63]

32.     On this record (and more), Justice Ostrager found that "the fact pattern here [was]

very problematic" for Kwok,[64] and ultimately entered a notice Order requiring Kwok to "provide

Plaintiff with immediate written notice of any contract" for sale or assignment of the

Residence.[65]

**B.     The Merits and Kwok's Perjury.**

33.     With the Residence effectively secured by the Court's notice Order, PAX

proceeded to the merits of its breach of contract case.  Kwok relied on no documents he

produced, called no witnesses, and—as it quickly became clear—had no defense.  So, true to

form, Kwok lied again and tried to make one up.

34.     At his deposition, nearly two-and-half years into the case, Kwok raised the

argument ***for the first time*** that the Personal Guarantee and several related contracts between the

---

[62] Ex. 40.

[63] Ex. 33.  Beyond making misrepresentations to the Court and committing perjury, Kwok has made a mockery of the entire discovery process.  For example, the key question before the Court on PAX's attachment motion was whether Kwok would attempt to frustrate any judgment that might be entered for PAX.  But when PAX's counsel asked Kwok that precise question, Kwok's counsel instructed him not to answer: "Q. . . . If the court finds for our client and orders you to pay a judgment in this lawsuit, money to us, will you pay it?  Mr. Harmon: Don't answer the question.  It's beyond the scope of the attachment proceeding, discovery.  A. Refuse to answer."  Ex. 19 at 125:20–126:5.  Perhaps nothing better illustrates Kwok's disdain for and mockery of the legal process than his answer to the question whether his text messages were searched in response to document requests: "I don't understand what you mean by that.  I never discuss this litigation.  I think this is just a crazy case.  I think this is just scamming.  *I think you guys are a bunch of thugs.  I think you are just mafia.  You're working for the communists . . . I don't need to pay any attention to you at all . . .* You have created a completely nonexisting case and then you're ask [sic] me questions.  I'm completely unable to answer you."  *Id.* at 21:3–22:3 (emphasis added).

[64] Ex. 41 at 31:16–17.

[65] Ex. 42 at 1–2.  During the attachment phase, as advised by the Court, PAX added the two Genever Entities as defendants on a veil-piercing claim in order to be able to collect against the Residence.

parties (*e.g.*, the 2011 Loan Facility and the 2013 Deed of Settlement and its extensions) were actually falsified documents with his signatures forged.[66]

35. PAX moved for sanctions based on Kwok's blatant lies, and the Court granted PAX's request that it estop Kwok from arguing either at summary judgment or trial that the contracts were forgeries[67] because he "on more than one occasion, [had] sponsored [those same contracts] to the Court as authentic documents."[68] Most egregiously, at the outset of the case, Kwok ***himself had sponsored these very agreements by attaching copies of them to an affidavit he submitted to the Court*** to support a dismissal motion. Kwok submitted the affidavit from Fiona Yu, his "appointed person," who swore to the Court "under penalty of perjury" that she was attaching "true and correct copies of" the agreements.[69] This is worth repeating: ***Kwok filed his own copies of several agreements with the Court to support his motion to dismiss, only to falsely testify more than two years later that those exact same agreements were forgeries.***

36. Kwok also previously had stipulated in a letter to the Court that he "d[id] not dispute the authenticity" of those key contracts.[70] Similarly, he had admitted in several briefs that the contracts were authentic, including admissions that "***[i]n 2011***, PAX LP and Shiny Times entered into another written agreement superseding prior agreements between the parties about repayment of this loan facility," and that, "***at the same time, Kwok also entered into a separate personal guarantee***."[71]

---

[66] Ex. 43 at 225:6–22, 230:24–231:7, 233:17–19, 234:12–18, 238:18–24.
[67] Ex. 44 at 1.
[68] Ex. 45 at 25:24–26:3.
[69] Ex. 46 at 1.
[70] Ex. 47.
[71] Ex. 48 at 1 (emphasis added).

### C. The Summary Judgment Decision and Judgment Enforcement.

37. PAX moved for summary judgment on its breach of contract claim in the summer of 2020, and Kwok managed only one argument on the merits in response—that the Court should reverse its prior estoppel ruling and allow Kwok to continue to offer his (perjured) testimony that the Personal Guarantee was a forgery.[72] But in a Decision and Order entered on September 15, 2020, the Court granted PAX's motion, rejected Kwok's argument, held him "liable for breach of the Personal Guarantee," and directed PAX to move "to establish damages . . . so that the Clerk of Court may calculate the total amount due and owing as of the date of entry of judgment."[73]

38. On September 25, 2020, in view of Kwok's long history of misconduct, PAX also moved for relief under CPLR § 5229,[74] which provides that any "party in whose favor a verdict or decision has been rendered" may, with Court approval, enforce the judgment before it is formally entered (and before damages are determined) by (i) taking discovery of the adverse party, and (ii) obtaining an order restraining the adverse party from dissipating assets.[75]

39. Recognizing that Kwok might well try to dissipate his assets before the Court could enter an order under CPLR § 5229, PAX also asked the Court to preserve the status quo until PAX could be heard on its motion.[76] On September 30, 2020, after oral argument, the Court granted PAX's requested TRO,[77] "enjoin[ing] Mr. Kwok from any activity that alters the status quo, except ordinary course expenses" and set a hearing for October 15, 2020, on the CPLR § 5229 motion.[78]

---

[72] Ex. 49 at 8–12.
[73] Ex. 50 at 7–8.
[74] Ex. 51.
[75] CPLR § 5229.
[76] Ex. 51 at 4–5.
[77] Ex. 52.
[78] Ex. 67 at 7:20–22.

40. On October 12, 2020, the Debtor filed its Petition—a clear attempt by Kwok to further delay and frustrate PAX's attempt to collect on its forthcoming nine-figure judgment.

41. On October 15, 2020, the Court held oral argument and granted PAX's requested relief. In addition to allowing PAX to take discovery of Kwok's assets, the Court restrained Kwok

> from making or causing any sale, assignment, transfer, or interference with any property in which he has an interest, whether directly or indirectly, and from paying over or otherwise disposing of any debt now due or thereafter coming due to him subject to the exceptions set forth in CPLR 5222, in accordance with the proceedings on the record of October 15, 2020. **Specifically, Mr. Kwok and/or the registered owners of (1) the Residence at the Sherry-Netherland Hotel** and (2) the yacht, "the Lady May" **are restrained from making or causing any sale, assignment, transfer, or interference with those assets**.[79]

42. During the hearing, the Court made clear that the case had been ongoing for years, had occupied a considerable amount of the Court's time, and that it would no longer tolerate Kwok's gamesmanship and abuse of the litigation process:

> Look, this is a 2017 case. We've had multiple motions relating to Mr. Kwok's assets. **The Court believes**, as reflected in the September 15, 2020 [Summary Judgment] order **that Mr. Kwok has attempted to mislead the Court. The Court believes that Mr. Kwok is, as the plaintiff contends, playing a shell game with his assets, and has violated if not the letter of court orders, the spirit of court orders**. . . . So **we are not going to have any more shell games**. Wherever these assets are held, they are going to remain held where they presently reside, and **if it's determined that the entities that are presently listed as the owners of the assets are the alter ego of Mr. Kwok or are wholly dominated and controlled by Mr. Kwok, those assets will be made available to satisfy any judgment that the plaintiff recovers**.[80]

### D. The Upcoming Trial.

43. As noted above, the Court granted summary judgment for PAX on liability on its

---

[79] Ex. 53 at 1 (emphasis added).
[80] Ex. 54 at 21:10–22:14 (emphasis added).

breach-of-contract claim against Kwok.[81]  At such time, the Court scheduled oral argument on

December 18, 2020, on PAX's motion to establish damages as to Kwok on its contract claim.

Also at such time, the Court indicated that it would set a trial on the issue of whether the Debtor

and Genever BVI are liable for Kwok's debt under a veil-piercing theory as early as practicable

in 2021 given the pandemic.[82]  Essentially, the trial will resolve whether PAX has a judgment

against the Debtor as Kwok's alter ego, and thus can collect against the Debtor's sole asset, the

Residence.[83]

44.     On December 18, 2020, the Court granted PAX's damages motion and issued an

order directing the Clerk of Court "to enter in favor of plaintiff Pacific Alliance Asia

Opportunity Fund L.P. and against defendant Kwok Ho Wan in the amount of $46,426,489.00

plus contractual interest pursuant to the 2011 Personal Guarantee at a rate of 15% per annum

from effective date of December 31, 2010 and at the statutory rate of 9% per annum from the

date of entry of this decision and order."  As of today's filing, this amount with accrued interest

exceeds $115 million.  Moss Aff. Ex. B.  In addition, at such time, the Court invited PAX to

move for an order of contempt against Kwok as a result of Kwok's alleged willful violation of

the restraining order by moving his $30 million yacht outside the jurisdiction of the United

States.[84]  PAX filed the Contempt Motion on December 24, 2020,[85] and Kwok's response is due

January 19, 2021.[86]

---

[81] Ex. 50 at 8.
[82] *Id.*
[83] The Court subsequently indicated that the trial would likely be later in 2021 depending upon the continuing impact of the COVID-19 pandemic.
[84] Moss Aff. Ex. C at 25:15–28:20.
[85] Moss Aff. Ex. D.
[86] Moss Aff. Ex. E.

## IV.    Bravo Luck and the Purported Trust Agreement.

45.    In a further distortion of the truth, Kwok (and the Debtor, as discussed below) now claims that Bravo Luck (an entity based in BVI) is actually the beneficial owner of the Residence under a purported trust agreement (the "Trust Agreement")—a document supposedly dated February 17, 2015, by which the two Genever Entities purported to declare that they held their assets (including the Residence) in trust for Bravo Luck.[87]  The Trust Agreement, however, is a total fraud, and Bravo Luck is the ultimate bogus insider—it is a shell company controlled by Kwok.

46.    ***The Purported Trust Agreement***.  The Trust Agreement has all the indicia of being a bogus, backdated document.  For example, the Trust Agreement is dated February 17, 2015, and describes the Debtor as "a limited liability company formed in New York [] at Unit 1801, the Sherry-Netherland Apartments, 781 Fifth Avenue, New York, New York."[88]  But the Sherry-Netherland did not approve Kwok's purchase application ***until March 4, 2015***.[89]  In fact, Kwok did not even submit his purchase application until February 26, 2015.[90]  The Trust Agreement's representation that the Debtor owned the Residence (and used the Residence's address) ***more than two weeks before the Residence was even acquired*** reveals the document for what it is: a poorly crafted fraud.

47.    Further, not once did Kwok even try to rely on the purported Trust Agreement in ***any*** proceedings or papers at any point in the State Court Litigation before Justice Ostrager— even though Kwok had argued on multiple occasions that PAX could not attach the Residence because it had been pledged to ***other*** third-party entities (*e.g.*, Roscalitar 2 and Blue Capital).

---

[87] Ex. 34.
[88] *Id.* at KWOK000543.
[89] Ex. 55 at SN 0086–87.
[90] Ex. 15 at SN 0368.

***Put another way, if the Genever Entities' assets (including the Residence) were legitimately held in trust for Bravo Luck as of February 2015, then Kwok certainly would (and should) have relied on that fact in opposing PAX's several attachment motions, instead of making false claims about other (extinguished) pledges.***

48.     In fact, Kwok did not produce a copy of the purported Trust Agreement to PAX until April 2019, despite the fact that it was responsive to earlier discovery requests. In the cover email for production, Kwok's counsel stated that the Trust Agreement had been only "recently obtained" by Kwok,[91] which is surprising because Kwok was a signatory.

49.     Moreover, if the Genever Entities truly were holding the Residence in trust for Bravo Luck, then surely Kwok would have known something about Bravo Luck—especially in the context of a deposition, the subject matter of which was primarily the Residence. But, under oath, Kwok actually testified that he knew almost nothing:

> Q.  What is Bravo Luck?
>
> A.  . . . I think Bravo Luck is a company that [] has some relation to Mr. Zhang Wei, but I'm not really sure . . .
>
> Q.  Do you have any relation to Bravo Luck?
>
> A.  I really don't know.
>                    . . .
> Q.  You have no ownership interest in Bravo Luck Limited?
>
> A.  I do not remember having any.[92]

50.     ***Kwok Controls Bravo Luck***.  Kwok has a history of using his children to conceal his wealth.[93]  The Debtor states in the Wang Declaration that Bravo Luck is ***wholly owned by***

---

91 Ex. 34.
92 Ex. 19 at 81:10–82:22.
93 *See, e.g.*, Ex. 56 at ¶¶ 4–6.

*Kwok's now-thirty-something-year-old son, Qiang Guo.*[94]  This belies that Kwok controls, and

has a beneficial interest in, Bravo Luck, and is only using his son as a "front" person.  Further,

PAX expects that Kwok will argue—based on a document that he has relied on in proceedings

pending against Genever BVI and other third-parties in the BVI, but never produced in the State

Court Action—that his son owns 100% of Bravo Luck because Kwok transferred his 50%

interest in that company to his son for $1 in mid-2015.[95]  Kwok had represented to the Sherry-

Netherland during the approval process that he and his son each owned 50% of Bravo Luck.[96]

But this is just more fraud designed to conceal the obvious: just as Kwok owns and controls the

Debtor, he also owns and controls Bravo Luck.[97]

51.     If Kwok's son (through Bravo Luck) really were the beneficial owner of the

Residence by virtue of the purported Trust Agreement, then Kwok would never have asked the

Sherry-Netherland, as he did in June 2016, to "undertake some restructuring in relation to the

property so that the ultimate beneficial ownership will pass to his son" by transferring ownership

to "a trust of which the son is a beneficiary."[98]  The reason Kwok did ask is because he himself

has owned and controlled Bravo Luck all along.

52.     In April 2020, PAX obtained an order from the BVI Courts directing the

registered agent of Bravo Luck to provide disclosure of certain documents, including ownership

---

[94] Debtor's Decl. ¶ 4.

[95] PAX filed certain ancillary actions in BVI in 2020 under case No. BVIHCM 2020/0137, against non-debtor third-parties, including (i) Genever BVI, (ii) Bravo Luck, (iii) Kwok, and (iv) Guo (Kwok's son) seeking to enforce the NY Judgment; attacking the sham Trust Agreement as a fraud; for a declaration that Bravo Luck is in any event Kwok's company; and for damages for conspiracy.  PAX has obtained injunctive relief in support of these proceedings.

[96] Ex. 18 at SN 0074.

[97] On March 5, 2015 (one day before closing on the Residence), Bravo Luck paid $6,300,000 to Kwok's son, Qiang Guo, *see* Ex. 66, who then paid $3,369,000 to the Sherry-Netherland (as part of the purchase price for the Residence). Ex. 61 at ¶ 14.  However, it is not clear why Bravo Luck would have needed to transfer the money to Qiang Guo to pay on to the Sherry-Netherland if Bravo Luck were really Qiang Guo's company.  Indeed, this was Kwok's attempt to create a paper trail to suggest that part of the purchase price was funded by Qiang Guo.

[98] Ex. 30 at SN 0022.

information.[99]  That disclosure showed that the sole shareholder of Bravo Luck on incorporation

was Qiang Guo, and on January 26, 2015, 50% of Bravo Luck's shares were transferred to

Kwok.[100]  Accordingly, as of January 2015—two months prior to purchase of the Residence—

Kwok held at least 50% of the equity in Bravo Luck (which he has always controlled and

beneficially owned).  The corporate documents obtained do not show any transfer by Kwok of

his 50% to his son in mid-2015.

53.     Bravo Luck was struck off the register of companies in BVI on March 20, 2019,

only to be restored with a new registered agent on October 6, 2020.[101]  During the interim, no

change to the identity of the Bravo Luck shareholders was possible under BVI law—meaning

Kwok remained the holder of at least 50% of the shares issued by Bravo Luck (putting aside his

actual control and beneficial interest).[102]

54.     The registered agent's disclosures also demonstrate Kwok's control of Bravo

Luck through his agents and representatives.  For example, the additional disclosures provide as

follows:

- The disclosure from Bravo Luck's former registered agent shows that the "client of record" was Stevenson Wong & Co., Kwok's Hong Kong lawyers.[103]

- That changed on June 19, 2017, when the new client of record became William Je of Kingdom Rich Limited.[104] William Je is Kwok's moneyman and long-term associate, as well as the person who imported Kwok's yacht, the Lady May II,

---

[99] Ex. 57 at 2–3.

[100] Ex. 58.

[101] Ex. 65.

[102] PAX obtained a further disclosure order in BVI on October 30, 2020, which has resulted in significant further disclosures from the new registered agent.  PAX obtained the BVI Court's permission to disclose that evidence to U.S. courts, but Bravo Luck has gone so far as to apply to the BVI Courts to set aside that permission.  It comes as no surprise to PAX that Bravo Luck (Kwok) is trying to conceal relevant evidence from seeing the light of day in this Court.

[103] Ex. 62 at 1.

[104] *Id.*

into the United States.[105]  The address given for William Je[106] is the same as Kwok's Hong Kong address, as recorded in Bravo Luck's Register of Members.[107]

- An in-house lawyer at ACA Capital Group Ltd. (a group of companies in which Kwok holds interests) certified the due diligence materials supplied to the registered agent.[108]

55.     As ever, an important clue to the real ownership of Bravo Luck is to follow the money.  The funds used to purchase the Residence were diverted by Kwok through Bravo Luck's Hong Kong Bank account in March 2015,[109] at the time Kwok held at least a 50% equity interest (and 100% beneficial interest, having used his son as a straw man)[110] in Bravo Luck and faced imminent default to PAX.  At that time, ***Kwok represented to the Sherry-Netherland that he owned 50% of Bravo Luck*** (while stating that his then-twenty-something-year-old son owned the other half).[111]   In fact, Kwok not only told the Sherry-Netherland that he owned 50% of Bravo Luck during the application process,[112] but when asked to provide disclosure of his finances, he showed the Sherry-Netherland a Bravo Luck bank statement showing over $490 million in a UBS Hong Kong bank account,[113] and provided a letter from UBS Hong Kong stating:

> Kwok Ho Wan has been a client of ours through a personal investment company since July 2012 and during this time Mr. Kwok Ho Wan has had a satisfactory banking relationship with us.  As at 18 Feb 2015, the funds involved in this banking relationship is not less than USD 400,000,000.[114]

56.     The overwhelming inference is that the "personal investment company" that UBS

---

[105] *See* Exs. 59–60.
[106] Ex. 62 at 5.
[107] Ex. 58.
[108] Ex. 62 at final attachment.
[109] Ex. 66.
[110] Ex. 18 at SN 0073–74.
[111] *Id.*
[112] *Id.*
[113] *Id.* at SN 076–82.
[114] Ex. 64.

was referring to was Bravo Luck.  In other words, Kwok held out Bravo Luck as his own

***because it is***, and he is now attempting disingenuously to use Bravo Luck as the instrument to

divert his assets and render himself judgment-proof.

**V.      The Debtor's (Kwok's) Sham Bankruptcy Petition.**

57.      It is difficult to imagine a more egregious example of a Petition filed in bad faith

than this one, which is an obvious attempt by Kwok to (continue to) abuse the judicial process.

Kwok bought the Residence through fraud and represented to Justice Ostrager that he had an

"ownership interest" in it.  Kwok wired funds to purchase the Residence from a company (Bravo

Luck) that he controlled and he represented to the Sherry-Netherland he owned with his then-20-

something son.  Kwok took these actions to divert his assets and shield them from PAX in the

face of his defaulted Personal Guarantee.

58.      Now, by the Petition, Kwok is trying to say that he has no "ownership interest" in

the Residence or Bravo Luck (despite actually owning and controlling the Debtor and Bravo

Luck and living in the Residence).  Rather, Kwok suggests that his son actually owns the

Residence because his son purportedly owns all of Bravo Luck (which purportedly owns the

Residence via the Trust Agreement), and that Bravo Luck, instead of PAX, should receive the

proceeds from any sale of the Residence.  Kwok makes this argument about Bravo Luck—which

he ***never*** made in the nearly-four-year-long State Court Action, despite arguing that the

Residence had been pledged to other entities—based on fraudulent documents and at the

eleventh hour, just on the heels of Justice Ostrager's order temporarily restraining him from

dissipating his assets.  Justice Ostrager already has found that Kwok has misled him, has

engaged in "gamesmanship" and "dissembling," and is playing a "shell game" with his assets

that must cease.[115]  This Petition is the next move in Kwok's game.

59.  In addition, the Debtor's contentions reveal just how abusive this filing is.  Here, the Debtor asserts that it is not the "true" owner of the Residence (in complete contradiction of the record in the State Court Action), but nevertheless has filed the Chapter 11 Case to protect that asset.  The Debtor then goes on to assert that this Court (notwithstanding years of litigation concerning PAX's dispute with Kwok over the Residence) should adjudicate issues between two non-debtors—PAX and Bravo Luck—regarding their alleged competing claims to the Residence.  Such a request—for the Bankruptcy Court to hear a dispute between two non-debtors, regarding issues that at best are collateral to the bankruptcy—is improper, particularly where, as here, the Debtor would not receive any property or benefit irrespective of the outcome of such a litigation.[116]

60.  Here, a review of the Petition (filed three days prior to the CPLR § 5229 hearing), supporting documents, and the relevant facts demonstrates this bankruptcy filing is nothing more than Kwok's latest shell game and attempt to shield the Residence from PAX.

61.  Although the Debtor names several purported creditors in its schedules, the two named in the Wang Declaration—*filed by the same Yan Ping Wang who filed the demonstrably false affidavit in the State Court Action*—are PAX and Bravo Luck.  The Debtor asserts in the Wang Declaration that Bravo Luck is the beneficial owner of the Residence under the purported Trust Agreement and has purported priority over PAX because Bravo Luck supposedly paid for the Residence and continues to fund the maintenance costs[117] (which are nearly a year overdue—

---

[115] Ex. 54 at 22:7, 24:10.
[116] *See, e.g.*, *Celotex Corp. v. Edwards,* 514 U.S. 300, 308 n. 6 (1995) ("[B]ankruptcy courts have no jurisdiction over proceedings that have no effect on the estate of the debtor."); *Presidential Gardens Assocs. v. U.S. ex rel. Sec'y of Hous. & Urb. Dev.*, 175 F.3d 132, 142 (2d Cir. 1999) (holding dispute between two third-parties did not fall within the scope of the Bankruptcy Court's jurisdiction).
[117] Debtor's Decl. ¶¶ 4–5.

hence the Sherry-Netherland's status as a creditor). But while the Debtor tries to suggest that Bravo Luck is somehow a *bona fide* third-party creditor and holds ownership rights to the Residence that should take priority/precedence over PAX, as described above, that suggestion is dishonest and untrue.

62. As an initial matter, such assertions are directly contrary to the Debtor's own schedules of assets and liabilities—signed under penalty of perjury—which list the Debtor as the owner of the Property, and Bravo Luck only as a general unsecured creditor.[118]

63. In addition, the Debtor claims that Kwok serves only in a "representative capacity" as the Debtor's "manager" and "trustee."[119] The Wang Declaration goes so far as to claim that "[c]ontrary to published reports, *Mr. Kwok does not have an ownership interest in the [Residence]*."[120]

64. Putting aside public reports, Wang's Declaration is ***directly at odds with her own affidavit submitted to Justice Ostrager***, in which she swore to the very opposite—that Kwok ***did*** have an ownership interest in the Residence: "***Mr. Kwok's ownership interest in the Apartment***, through a limited liability company, is not in real property. Rather, ***it consists of an ownership interest*** in certain shares of The Sherry Netherland, Inc. . . . and the assignment of a proprietary lease agreement."[121]

65. Moreover, a review of the Debtor's schedules confirms that Kwok is just trying to use this Chapter 11 Case to pay himself. Although the schedules list several purported creditors, (i) many are owed $0, and (ii) Kwok's only major creditors besides the Sherry-Netherland (to

---

[118] *See* ECF Doc. No. 4.
[119] Debtor's Decl. ¶ 4.
[120] *Id.* ¶ 12 (emphasis added).
[121] Ex. 13 at ¶ 2 (emphasis added). Wang's affidavit before this Court is also inconsistent with Kwok's concession in a November 9, 2020 letter to PAX that Kwok "does have an ownership interest in Genever [BVI]." Ex. 63.

whom he owes $891,362.06, but which holds a security deposit in excess of $3 million) and PAX (to whom he owes more than $115 million for breach of contract) are ***Kwok himself and his alter egos***.  The Debtor claims to owe (i) $67,500,000 to Bravo Luck (*i.e.*, Kwok's shell company in his son's name); (ii) $5,000,000 to Kwok's son, Qiang Guo, in "care of Bravo Luck"; and (iii) $1,800,000 to Golden Spring New York Ltd., yet another company that Kwok controls through family members.[122]

66.     In sum, Kwok—the man behind the Debtor—has filed this Petition to try to forum shop and dupe this Court into determining that Kwok (through ***his*** shell company purportedly now in his son's name) is the priority creditor and should be entitled to the Residence—while PAX is left empty-handed.  These issues are nothing but a continuation of the shell game that Judge Ostrager has condemned, and an attempt to forum shop for a new court unfamiliar with Kwok's years of gamesmanship.

**ARGUMENT**

**I.     THE COURT SHOULD CONVERT THE CHAPTER 11 CASE TO CHAPTER 7 FOR "CAUSE."**

67.     Under Bankruptcy Code § 1112(b), "on request of a party in interest, and after notice and a hearing, the court ***shall*** convert a [Chapter 11] to a [Chapter 7] . . . for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate."  11 U.S.C. § 1112(b) (emphasis added).

68.     The 2005 amendments to the Bankruptcy Code made conversion under section 1112(b) mandatory.  Specifically, "[t]he statutory language [was] changed from the permissive (a court 'may' convert or dismiss a case) to mandatory (a court 'shall' convert or dismiss a case)." *In re Midwest Props. of Shawano*, *LLC*, 442 B.R. 278, 283 (Bankr. D. Del. 2010).  As courts in

---

[122] ECF Doc. No. 4 at 9.

- 28 -

this Circuit recognize, "[i]f cause is found to exist, and the Court determines that the limited

exceptions do not apply, dismissal or conversion is mandatory—the Court must dismiss or

convert the chapter 11 case." *In re Adamo*, No. 14-73640-LAS, 2016 WL 859349, at *10

(Bankr. E.D.N.Y. Mar. 4, 2016).

69.     Although section 1112(b)(4) lists examples of "cause" for conversion (or

dismissal) of a Chapter 11 case, "this list is illustrative, not exhaustive." *In re Ancona*, No. 14-

10532 (MKV), 2016 WL 7868696, at *3 (Bankr. S.D.N.Y. Nov. 30, 2016) (citing *C-TC 9th Ave.*

*P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304, 1311 (2d Cir. 1997)).  Indeed,

this Court has maximum flexibility in determining whether cause exists under section 1112(b):

> [T]he precise perimeters of 'cause' are intentionally omitted from the statute so as
> to afford maximum flexibility and, among other things, to enable a bankruptcy
> court to dismiss [or convert] a Chapter 11 case for any reason cognizable to the
> equity power and conscience of the court as constituting an abuse of the
> bankruptcy reorganization process.

*In re Hampton Hotel Invs., L.P.*, 270 B.R. 346, 358 (Bankr. S.D.N.Y. 2001) (quoting *In re HBA*

*E., Inc.*, 87 B.R. 248, 258 (Bankr. E.D.N.Y. 1988)).

70.     As discussed in detail below, the Court here should exercise its discretion to find

cause for several reasons: (i) Kwok is a serial fraudster who caused the Petition to be filed in bad

faith; (ii) Kwok's pattern and practice of fraud and dishonesty make it plain that he cannot be

entrusted to carry out his fiduciary duties as manager of the Debtor; (iii) there are continuing

losses to the estate and no possibility (let alone likelihood) of rehabilitation; and (iv) the Debtor

cannot effectuate a plan over the opposition of PAX, the largest creditor.

**A.      The Court Should Convert the Case for "Cause" Because this Bankruptcy
        Was Filed in Bad Faith.**

71.     Here, Kwok's bad faith in filing the Petition on behalf of the Debtor warrants

appointment of a disinterested trustee in order to preserve, marshal and monetize the assets of the

estate for the benefit of all creditors. "[I]t is well-settled that the filing of a bankruptcy petition in bad faith constitutes cause for dismissal or conversion of a case under the Bankruptcy Code section 1112(b)." *In re 167 West 133rd St. Hous. Dev. Fund Corp.*, No. 18-12043 (JLG), 2018 WL 4637460, at *8 (Bankr. S.D.N.Y. Sept. 25, 2018) (internal quotation marks and citation omitted); *see also Jenkins v. Harrington (In re Jenkins)*, No. 17-CV-5819 (PKC), 2018 WL 2139209, at *2 (E.D.N.Y. May 9, 2018) (affirming conversion for cause where bankruptcy court found "that Appellant's filing of the bankruptcy petition was in bad faith"); *In re Ancona*, 2016 WL 7868696 at *4 (concluding "that 'cause' for conversion under section 1112 exists on the basis that the Debtor's bankruptcy case was commenced in bad faith").

72. PAX explained in detail in its Stay Motion why this Petition was filed in bad faith (*see* Stay Mot. § I. A.) and refers the Court to that discussion (incorporated herein by reference), which is briefly summarized here.

73. *First*, "inappropriate use [of the Bankruptcy Code is] evidence of bad faith," *Wilk Auslander LLP* v. *Murray (In re Murray)*, 900 F.3d 53, 60 (2d Cir. 2018), and this Petition is plainly inappropriate. It is just the latest effort by Kwok—who wholly owns and controls the Debtor through its parent, Genever BVI—to abuse the judicial process and impede PAX's efforts to collect its judgment against Kwok after adverse rulings in the State Court Action. This is a classic example of one party improperly trying to gain an advantage in a two-party litigation "involving non-bankruptcy law [by filing a Petition] in the bankruptcy court in the guise of being a reorganization of some sort under Chapter 11." *In re The Bridge to Life*, *Inc.* 330 B.R. 351, 357 (Bankr. E.D.N.Y. 2005) (quoting *In re HBA E., Inc.*, 87 B.R. at 260).[123]

---

[123] Other cases in this Circuit are in accord. *See, e.g., In re Reyes*, No. 14-13233 (SMB), 2015 WL 4624156, at *5 (Bankr. S.D.N.Y. Aug. 4, 2015) (finding bad faith under § 1112(b) where the debtor "filed the bankruptcy case solely as a litigation tactic to try the dispute in a forum he deemed more favorable."); *Strawbridge*, 2010 WL

74.     *Second*, Kwok's bad-faith conduct here goes beyond simply filing an action that does not belong in this Court:  it "evidence[s] an intent to abuse the judicial process and the purposes of the reorganization provisions."  *In re Syndicom Corp.*, 268 B.R. 26, 49 (Bankr. S.D.N.Y. 2001) (internal quotation marks and citation omitted).  Kwok caused the Debtor to file this Petition just after Justice Ostrager restrained him from dissipating his assets, and on the eve of having a nine-figure judgment entered against him.  He did so solely to create delay and confusion and to position himself in a different forum before a new judge to frustrate judgment enforcement in the State Court Action and to advance his own conflicted agenda of delay and deceit.  This is just the latest iteration of the improper "shell game" that Justice Ostrager already has found Kwok to be playing.

75.     Indeed, the Debtor cannot get its story straight, and its contradictions in the Chapter 11 Case itself confirm that Kwok caused the Petition to be filed in bad faith to try and deceive this Court.  For example, the Debtor asserts in the Declaration—in complete contradiction of the record in the State Court Action—that it is not the "true" owner of the Residence, but nevertheless has filed the Chapter 11 Case purportedly to protect that very asset.  Debtor's Decl. ¶ 2.  In addition, the Debtor testified at its recent 341 Meeting that Kwok's son has always owned 100% of Bravo Luck even though Kwok represented in 2015 something quite different (*i.e.*, that **he** owned 50%).

---

779267, at *4 (converting case for cause under § 1112(b)  where "[t]he Court conclude[d] that [debtor] did not file her petition in good faith."); *In re Sal Caruso Cheese, Inc.*, 107 B.R. 808, 819, 821 (Bankr. N.D.N.Y. 1989) (converting case for "a congery of cause within the meaning of Code § 1112(b)" where, *inter alia*, "the record suggests an alter ego relationship between the Debtor and [its principal]" and also noting that "[w]ere this Debtor to have exercised good faith and an honesty of intention in its pre and post-filing conduct, the Court presumably would have been willing to allow it to pursue its Chapter 11 reorganization."); *In re Wally Findlay Galleries (New York), Inc.,* 36 B.R. 849, 851 (Bankr. S.D.N.Y. 1984) (finding bad faith and holding "[i]t is clear that the debtor did not file its petition to reorganize, but rather as a litigating tactic … to avoid the consequences of adverse state court decisions … [and] to use this court not to reorganize, but to relitigate.  This is an impermissible use of Chapter 11 of the Bankruptcy Code.").

76.     *Third*, as PAX demonstrated in its Stay Motion (*see* Stay Mot. § I. A. at ¶ 67), ***all***

of the bad-faith factors that courts consider in the bad-faith analysis—set forth in *In re C-TC 9th*

*Ave. P'ship* and *Syndicom*—weigh in PAX's favor.[124]

77.     For all these reasons, the Debtor (really, Kwok) filed its Petition in bad faith,

which warrants conversion to Chapter 7.

**B.      The Court Should Convert the Case for "Cause" Because the Debtor's**
**         Management—*Kwok*—Has Not and Will Not Comply With the Fiduciary**
**         Duties of a Debtor-In-Possession.**

78.     "The willingness to allow a Debtor to remain in possession of its assets is

predicated upon the assumption that the Debtor will carryout [sic] its fiduciary obligations." *In*

*re Sillerman*, 605 B.R. 631, 640 (Bankr. S.D.N.Y. 2019) (citing *In re Centennial Textiles, Inc.*,

227 B.R. 606, 612 (Bankr. S.D.N.Y. 1998)).  It is well established that "[a] debtor-in-possession

has all the duties of a trustee in a Chapter 11 case, including the duty to protect and conserve

property in its possession for the benefit of creditors." *In re Ionosphere Clubs, Inc.*, 113 B.R.

164, 169 (Bankr. S.D.N.Y. 1990).  "A debtor in possession is also bound by a duty of loyalty that

includes an obligation to refrain from self-dealing, to avoid conflicts of interests and the

appearance of impropriety, to treat all parties to the case fairly, and to maximize the value of the

estate." *In re Hampton Hotel Invs., L.P.*, 270 B.R. at 362 (quoting Collier ¶ 1107.02[4]).

79.     Where a debtor-in-possession fails, or should be expected to fail, in fulfilling its

fiduciary duties to creditors, courts have found cause to convert the Chapter 11 case.  *In re*

---

[124] In *In re C-TC 9th Ave. P'ship*, 113 F.3d at 1311, for example, the Second Circuit identified eight factors that support a finding that a Chapter 11 case was filed in bad faith: (i) the debtor has only one asset; (ii) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors; (iii) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt; (iv) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action; (v) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights; (vi) the debtor has little or no cash flow; (vii) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and (viii) the debtor has no employees.

*Kuvykin*, No. 18-10760 (JLG), 2019 WL 989414, at *8 (Bankr. S.D.N.Y. Feb. 26, 2019)

("[W]here a debtor in possession has failed to perform its fiduciary duties, conversion is

warranted." (citing *In re Citi-Toledo Partners*, 170 B.R. 602, 609 (Bankr. N.D. Ohio 1994))); *see*

*also, e.g., In re Ancona*, 2016 WL 7868696 at *8 ("[T]he Court's lack of confidence in the

Debtor's willingness to comply with the fiduciary duties of a debtor-in-possession . . .

constitute[s] additional 'cause' under section 1112(b)."); *In re Hampton Hotel Invs., L.P.*, 270

B.R. at 358 (granting motion to convert Chapter 11 case to Chapter 7 where "the Court's total

lack of confidence in [the Debtor's general partner's] ability and inclination to comply with

fiduciary duties of a debtor in possession all constitute further 'cause' as well").

80.     Here, Kwok—who controls and manages the Debtor –cannot be trusted and quite

obviously has ***no*** intention of complying with the Debtor's fiduciary duties[125] to creditors,

including to the largest non-insider creditor: PAX.  Just the opposite.  Kwok has done everything

in his power to try to thwart PAX's ability to collect on his debt to it.  As detailed above, while

Kwok's Malfeasance including, among other things, deceit, self-dealing, and conflicts of interest

go back nearly a decade, more recently, he has taken multiple steps to improperly shield the

Residence from PAX, and his pattern of lies and deception in the State Court Action has been,

frankly, beyond the pale.

81.     In fact, Justice Ostrager was sufficiently concerned about the "shell game" Kwok

was playing to hide his assets from PAX that he issued an order restraining Kwok from

dissipating assets—***including the assets of the Debtor, i.e., the Residence***—that might be

---

[125] In addressing the fiduciary duties of a corporate debtor in possession to its creditors, the Supreme Court held "[i]t
is equally apparent that in practice, these fiduciary responsibilities fall not upon the inanimate corporation, but upon
the officers and managing employees who must conduct the Debtor's affairs under the surveillance of the court…"
*Wolf v. Weinstein*, 372 U.S. 633, 649-50 (1963).

available to satisfy the judgment. What is more, Kwok has **_violated_** that restraining order by moving his $30 million yacht outside the jurisdiction of the United States (PAX's motion for contempt is pending in the State Court Action).[126]

82.     The Chapter 11 Case is more of the same. Kwok has no intention of protecting and conserving the Residence for the benefit of creditors, as he must. Rather, he is using the Chapter 11 Case for just the opposite purpose—to assert that Bravo Luck (his alter ego) is a "creditor" that has a claim to the Residence that takes priority over PAX. In making this assertion, however, Kwok is attempting to mislead this Court the same way he has misled Justice Ostrager throughout the State Court Action. The Debtor (under the guise of Bravo Luck) will rely on documentation (the purported Trust Agreement) that PAX already has demonstrated (_see_, _supra_), and Kwok's own conduct confirms, is fraudulent. Indeed, **_not once_** during the entire State Court Action did Kwok even try to rely on the purported Trust Agreement, even though he argued on multiple occasions that PAX could not attach the Residence because it had been pledged to **_other_** third-party entities (_e.g._, Roscalitar 2 and Blue Capital). Moreover, if the Genever Entities truly were holding the Residence in trust for Bravo Luck, then surely Kwok would have known something about Bravo Luck—especially in the context of a deposition, the subject matter of which was primarily the Residence. But under oath (and despite producing documents in which he represented to the Sherry-Netherland that he owned 50% of Bravo Luck), Kwok actually testified that he knew almost nothing about that entity.[127]

83.     In sum, it could not be clearer that the Debtor, through its manager Kwok, will not carry out its fiduciary duties. Kwok has played a "shell game" with his assets to try to shield them from PAX, including engaging in self-dealing by, most recently, filing the Petition to try to

---

[126] Moss Aff. Ex. D.
[127] Ex. 19 at 81:10-82:22.

ensure that his son, rather than PAX, receives the proceeds from the sale of the Residence.

Kwok has misled Justice Ostrager. Kwok has violated court orders. Kwok has committed

perjury. Kwok has forged documents. PAX, the largest non-insider creditor, therefore has very

good reason to have absolutely ***no confidence*** that the Debtor's assets will be properly preserved

and marshalled by Kwok so as to maximize ***legitimate*** creditor recoveries at arm's length—a

foundational purpose of and requirement under the Chapter 11 reorganization process. *In re*

*Ionosphere Clubs, Inc.*, 113 B.R. at 169 (highlighting duty to protect and converse property for

creditors' benefit; "The job of a debtor-in-possession remains … to get the creditors paid.").[128]

84.     Under these circumstances, the case for conversion to Chapter 7 could not be

stronger. *See*, *e.g.*, *In re Hampton Hotel Inv'rs, L.P.*, 270 B.R. at 359-60 (holding that

"conversion is particularly appropriate in the Court's view, because given the extraordinary

conflicts of interest affecting [Debtor's general partner's] past conduct and reasonably

foreseeable future conduct, it is only with the appointment of a trustee that the Court can feel

confident that creditor interests, rather than [Debtor's general partner's], are being advanced.");

*In re Kuvykin*, 2019 WL 989414 at *8 (converting under Section 1112(b), where "the Debtor

filed this case … to advance his own interests to the detriment of creditors …"); *In re*

*Strawbridge*, No. 09-17208-MG, 2010 WL 779267, at *5 (Bankr. S.D.N.Y. Mar. 5, 2010)

(holding Debtor's bad faith filing and "misuse of the bankruptcy laws to avoid her obligations to

creditors requires conversion to chapter 7 to protect the creditors[,]" because a Chapter 7 trustee

will "examine [Debtor's] estate and properly value and liquidate her personal property in an

---

[128] Indeed, PAX further understands that the Debtor intends to retain Kathy Sloane from Brown Harris as a broker to market and sell the Residence in this case. Upon information and belief, Sloane is a long-time associate of Kwok and previously was involved with Kwok when he attempted to transfer title of the Residence to Kwok's son as part of the ongoing shell game to shield and improperly divert this asset from creditors. Ex. 17 at 78:3-25. In doing so, Kwok immediately creates yet another conflict in the case and confirms he has no intention of avoiding such conflicts and complying with his fiduciary duties to all creditors.

effort to make her creditors whole"); *In re FRGR Managing Member LLC*, 419 B.R. 576, 585

(Bankr. S.D.N.Y 2009) ("[W]here [debtor's principal] appears to be acting in his own personal

interest rather than the interests of the estate and its creditors … the Court believes that the better

course is the conversion of this case to a case under chapter 7."); *Matter of Natrl Plants & Lands

Mgmt. Co., Ltd.*, 68 B.R. 394, 396 (Bankr. S.D.N.Y. 1986) (granting conversion to Chapter 7 and

noting "interests of the creditors may be jeopardized by allowing the debtor to proceed with a

liquidation without the benefit of an independent trustee's supervision"); *In re Kuvykin*, No. 18-

10760 (JLG), 2019 WL 989414, at *7 (Bankr. S.D.N.Y. Feb. 26, 2019) (concluding that

"Debtor's inconsistent and contradictory representations regarding his assets … supports the

appointment of a chapter 7 trustee to ascertain the scope of the Debtor's estate

and liquidate estate property for the benefit of all creditors.").

> **C.     The Court Should Convert the Case for "Cause" Because There Are
> Continuing Losses to the Estate and No Likelihood of Rehabilitation.**

85.     Section 1112(b)(4)(A) provides that "cause" includes "substantial or continuing

loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."

11 U.S.C. § 1112(b)(4)(A).  "A party seeking to demonstrate cause under § 1112(b)(4)(A) must

establish both the 'substantial or continuing loss' prong as well as the 'absence of a reasonable

likelihood of rehabilitation.'"  *In re FRGR Managing Member LLC*, 419 B.R. at 581.  There need

not be significant diminution to satisfy the first prong of Section 1112(b)(4)(A).  *See In re E.

Coast Airways, Ltd.*, 146 B.R. 325, 336 (Bankr. E.D.N.Y. 1992); *In re Kanterman*, 88 B.R. 26,

29 (S.D.N.Y. 1988).  An estate's liability for administrative expenses constitutes a diminution in

assets.  *In re FRGR Managing Member LLC*, 419 B.R. at 581; *see also In re Lyons Transp.

Lines, Inc.*, 123 B.R. 526, 531 (Bankr. W.D.Pa. 1991).  As to the second prong, "[r]ehabilitation

means to put back in good condition and reestablish on a sound basis."  *In re AdBrite Corp.*, 290

B.R. 209, 216 (Bankr. S.D.N.Y. 2003); *see also In re Rundlett*, 136 B.R. 376, 380 (Bankr.

S.D.N.Y. 1992) ("Rehabilitation signifies that the debtor will be reestablished on a second

financial basis, which implies establishing a cash flow from which current obligations can be

met").  Both prongs are satisfied here.

86.     *First*, there are continuing losses to the estate here.  The Debtor testified at its

recent 341 Meeting that the maintenance charges for the Residence are $73,000 per month plus

assessments for improvements, and confirmed that it is not paying those charges to the Sherry-

Netherland.  Meanwhile, Kwok continues to occupy the Residence without paying rent, utilities,

or maintenance costs to the Debtor, and the Debtor's filings do not indicate that the Debtor has

made any effort to collect any rent or maintenance from Kwok.  *See In re Kuvykin*, 2019 WL

989414, at *8 (holding "[c]onversion of the Chapter 11 Case and the appointment of a chapter 7

trustee [wa]s warranted to protect creditors' interests" where debtor continued to occupy

property as his residence and failed to make payments to creditor for the same); s*ee also*, *In re

Taub*, 427 B.R. 208, 223 (Bankr. E.D.N.Y. 2010), *aff'd*, No. 08 BK 44210 ESS, 2011 WL

1322390 (E.D.N.Y. Mar. 31, 2011) (holding that individual's "failure to pay rent has deprived

the Debtor's estate of income that should accrue to the benefit of all of her creditors").

Moreover, as this case remains in Chapter 11, administrative costs including U.S. Trustee fees

and legal fees continue to accrue, which contribute to the continuing losses to the estate and to

the detriment of creditors.  *See In re FRGR Managing Member LLC*, 419 B.R. at 581 ("[I]t is

apparent from the facts… that [debtor's] actions are causing a diminution to the estate.  [Debtor]

continues to incur quarterly U.S. Trustee fees as well as legal fees, causing a continuing loss to

the estate.").

87.     *Second*, there is no possibility of, let alone a desire for, rehabilitation here.  The

Debtor has no "cash flow from which current obligations can be met" (*In re Rundlett*, 136 B.R. at 380), and it never has. Indeed, the Debtor has confirmed its intention to sell its sole asset, the Residence. Accordingly, there is no intent to reorganize or rehabilitate by the Debtor; rather, Kwok has put the Debtor in bankruptcy for the sole and improper purpose of frustrating PAX's efforts to collect on its judgment in the State Court Action.[129]

### D. The Court Should Convert the Case for "Cause" Because the Debtor Cannot Effectuate a Plan.

88. "[C]ause under Section 1112(b) may be established where the record shows that the debtor cannot effectuate a plan." *In re Babayoff*, 445 B.R. at 76 (finding cause to convert or dismiss where the largest unsecured creditor, with an impaired claim and without whose support the plan could not be confirmed, stated its intention not to vote for plan). *See also*, *e.g.*, *In re B & B W. 164th St. Corp.*, 147 B.R. 832, 841-42 (Bankr. E.D.N.Y. 1992) (finding cause under § 1112(b) where a plan could not be confirmed because the single unsecured creditor controlling

---

[129] Cause to convert also exists under section 1112(b)(4)(F) where there is "unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter." 11 U.S.C. § 1112(b)(4)(F); *In re Babayoff*, 445 B.R. 64, 80 (Bankr. E.D.N.Y. 2011). Failures constituting cause under section 1112(b)(4)(F) include the submission of false or inaccurate schedules and statements. *See*, *e.g.*, *In re Korn*, 523 B.R. 453, 467 n. 32 (Bankr. E.D. Pa. 2014) ("Debtor's failure to provide accurate schedules and statements falls under § 1112(b)(4)(F)"); *In re Tornheim*, 181 B.R. 161, 170 (Bankr. S.D.N.Y. 1995) (finding cause where, *inter alia*, the debtors "misrepresented the true ownership of their only asset"). Here, the Debtor's schedules and statement of financial affairs are, at best, confusing and misleading and, at worst, intentionally false. On the one hand, the Debtor lists itself as the owner of the Residence (ECF Doc. No. 4 at 3), while on the other hand, it states that the Debtor holds or controls the Residence for the benefit of its insider, Bravo Luck. ECF Doc. No. 4-1 at 5. Moreover, and as described herein, the Debtor's Declaration states that the Debtor owns the Residence (Debtor's Decl. ¶ 3), but immediately after that states that Bravo Luck is the "beneficial owner." *Id.* ¶ 4. These inconsistent statements (provided under penalty of perjury) are not only highly misleading (if not false), they do not satisfy the Debtor's fiduciary obligation to accurately report on its financial condition. *See In re Korn*, 523 B.R. at 467 n. 32 ("Filing a piece of paper is meaningless if the content is inaccurate, misleading, or wrong.").

Additional failures constituting cause under Section 1112(b)(4)(F) include failures to file monthly operating reports. Here, the Debtor has yet to file a single monthly operating report, although the deadlines for two have already passed. *See* Operating Guidelines at 4. This lack of information cannot be underestimated, as "[t]imely and accurate financial disclosure is the life blood of the Chapter 11 process.... [and] [t]he failure to file operating reports in itself constitutes cause for dismissal." *In re Taylor*, No. 97 Civ. 5967, 1997 WL 642559, at *2 (S.D.N.Y. 1997) (internal quotation marks omitted).

over one-third of the class "will not vote for any reorganization plan… [and] Debtor is [not] capable of effectuating a confirmable plan without improperly classifying creditors.").

89.     Here, cause exists to convert because PAX will not vote for any plan proposed by the Debtor and, even taking the Debtor's filings at face value (and PAX disputes their veracity), PAX controls approximately 61% of the class of unsecured creditors (well over the greater-than-one-third threshold).  *See* ECF Doc. No. 4 at 9 (listing PAX's claim as $121 million, or approximately 61% of the total unsecured claims listed); *see also*, 11 U.S.C. § 1126(c) (requiring that two-thirds of the total amount of claims in a class vote in favor of the plan).

90.     Further, any effort to segregate PAX into a class separate from the other scheduled unsecured creditors would constitute "improper gerrymandering."  *See*, *e.g.*, *Local Union 722 Int'l Bhd. Of Teamsters*, 414 B.R. 443, 453 and n.2 (Bankr. N.D. Ill. 2009) (rejecting debtor's effort to classify a creditor holding a majority of unsecured claims in a separate class, where debtor's basis for separate classification was that creditor's claim was a disputed judgment; "[T]he fact this claim is disputed would not constitute a valid reason for segregating it from other unsecured claims.").  Indeed, the Debtor "may not separately classify claims only to conjure up an impaired, assenting class."  *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1019 (Bankr. S.D.N.Y. 1993), *aff'd*, No. 93 CIV. 844 (LJF), 1993 WL 316183 (S.D.N.Y. May 21, 1993).

91.     Moreover, § 1129(a)(10) of the Bankruptcy Code provides:  "[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider."  11 U.S.C. § 1129(a)(10).  Here, PAX is the only non-insider creditor listed by the Debtor as a general unsecured creditor.  *See* ECF Doc. No. 4 at 9.  As such, even if PAX's claim were

separately classified (which, as described above would constitute improper gerrymandering), the remaining class would consist solely of insiders whose votes would be excluded for purposes of § 1129(a)(10). *See In re Lettick Typografic, Inc.*, 103 B.R. 32, 38 (Bankr. D. Conn. 1989) (holding that "since [impaired class] is an insider, its acceptance [of a plan] does not satisfy (a)(10)").

## II. IN THE ALTERNATIVE, THE COURT SHOULD APPOINT A CHAPTER 11 TRUSTEE.

92. Even if the Court does not convert the Chapter 11 Case to Chapter 7 (which it should), it should appoint a Chapter 11 trustee under Bankruptcy Code section 1104(a).

93. Section 1104(a)(1) of the Bankruptcy Code provides that the Court "***shall*** order the appointment of a trustee for cause, including fraud, dishonesty, incompetence or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case." 11 U.S.C. § 1104(a)(1) (emphasis added). The enumerated "list of wrongs constituting 'cause' that warrants the appointment of a trustee is not exhaustive." *In re Ashley River Consulting, LLC*, No. 14-13406 (MG), 2015 WL 1540941, at *9 (Bankr. S.D.N.Y. Mar. 31, 2015) (citation omitted). "[A]ny one of these causes… mandates appointment of a trustee." *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 527 (Bankr. E.D.N.Y. 1989). "A court may consider both the pre- and post-petition misconduct of the current management when making the determination that 'cause' exists for the appointment of a trustee." *In re Ashley River Consulting*, 2015 WL 1540941 at *10 (citing *Midatlantic Nat'l Bank v. Anchorage Boat Sales, Inc. (In re Anchorage Boat Sales, Inc.)*, 4 B.R. 635, 644–45 (Bankr.E.D.N.Y.1980)). "The statute is mandatory and dictates that upon a finding of cause, the court is required to appoint a chapter 11 trustee." *In re Sillerman*, 605 B.R. at 642.

94. "Even if a court does not find that cause exists to appoint a chapter 11 trustee

under section 1104(a)(1), the court may still appoint a trustee under section 1104(a)(2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate…" *In re Ancona*, 2016 WL 7868696 at *12 (citing 11 U.S.C. § 1104(a)(2)).  Section 1104(a)(2) "creates a flexible standard and allows the appointment of a trustee even when no 'cause' exists." *In re Ionosphere Clubs Inc.*, 113 B.R. at 168.

### A.    There is "Cause" to Appoint a Trustee.

95.    *First*, there is "cause" to appoint a trustee because, as detailed above, Kwok has a long history of dishonest and fraudulent conduct.  *See, e.g., In re Ashley River Consulting*, 2015 WL 1540941 at *10 (finding cause under § 1104(a)(1) where "the Debtors' principal… was not only found to be guilty of affirmative fraud and gross, wanton, and willful misconduct…, but he was also found to be the 'alter ego of [debtor]' that should be held accountable for diverting and commingling funds…"); *In re Bonded Mailings Inc.*, 20 B.R. 781, 786 (Bankr. E.D.N.Y. 1982) (appointment of a trustee warranted where debtor had committed fraud upon one of its creditors by conduct designed to frustrate the creditor's attempt to enforce its judgment which resulted in a shifting of assets between two corporate debtors and hopelessly confused their records).

96.    Justice Ostrager recognized precisely that in the State Court Action:

> The Court believes, as reflected in the September 15, 2020 [summary judgment] order that **Mr. Kwok has attempted to mislead the Court**.  The Court believes that **Mr. Kwok is, as the plaintiff contends, playing a shell game with his assets, and has violated if not the letter of court orders, the spirit of court orders**. . . . So we are not going to have any more shell games.[130]

97.    Knowing that Justice Ostrager will not tolerate any more, Kwok has brought his shell game to this Court in an attempt to have the Residence awarded to his son while PAX is left with nothing.

---

[130] Ex. 54 at 21:14-22:7 (emphasis added).

98.     *Second*, there is "cause" to appoint a trustee because the Debtor has inherent

conflicts of interest with its related entities.  "[F]actors warranting the appointment of a trustee

under section 1104(a)(1) include conflicts of interest."  *In re Ancona*, 2016 WL 7868696 at *9.

Here, as detailed above, the Debtor suffers from incurable conflicts of interest that require

appointment of a trustee.  Bravo Luck—the purported beneficial owner of the Debtor's sole

asset—is at best an insider of the Debtor (because the Debtor claims that Kwok's son owns

100% of Bravo Luck) and at worst (as PAX contends) Kwok's alter ego.  Kwok filed the Petition

for the precise purpose of trying to have Bravo Luck deemed the priority creditor over PAX.

Kwok cannot possibly be expected to navigate that conflict during the Chapter 11 Case and

comply with his fiduciary duty to fairly marshal the Residence for the benefit of **all** creditors,

including PAX—because he filed the Chapter 11 precisely to try to exploit that conflict to PAX's

detriment (and Kwok's own benefit).  Under similar circumstances, Courts have determined such

a conflict untenable and grounds for appointment of a trustee.  *See, e.g.*, *id.* at *9-10 (debtor's

"refusal … to investigate claims that are held by insiders evidences the unhealthy conflict of

interest in this case, and highlights the need to appoint a neutral trustee to carry out, in an

unbiased manner, the Debtor's fiduciary duties."); *In re Hampton Hotel Inv'rs, L.P.*, 270 B.R. at

357 ("If allowed to manage the Debtor, [Debtor's general partner] would continue to face a

blatant conflict of interest, as between maximizing the assets of the partnership available for

satisfaction of creditor claims, on the one hand, and looking to his personal resources to satisfy

those claims, on the other.  [Debtor's general partner] has every incentive to delay and/or impair

any attempt to marshal his assets for the benefit of the Debtor's creditors.").

99.     *Third*, there is "cause" to appoint a trustee because, as detailed above (section I.

B.), the Debtor is unable or unwilling to comply with its basic fiduciary duties.  *See, e.g.*, *In re*

*Futterman*, 584 B.R. 609, 619 (Bankr. S.D.N.Y. 2018) (finding cause under section 1104(a)(1) due to a lack of "confidence that [debtor] will abide by the fiduciary obligations that he would owe" and noting that debtor "does not have the confidence of his main creditors…"); *see also, In re Ancona*, 2016 WL 7868696 at *8 (finding cause under § 1104(a) "based on its finding of 'cause' under section 1112(b)" including debtor's failure to comply with the fiduciary duties of a debtor-in-possession).[131]

### B.    Appointing a Trustee Is in the Interests of All Parties.

100.    Even if the Court finds there are no grounds for cause (and PAX respectfully submits that the grounds for cause are overwhelming), the Court should appoint a trustee under the interest of creditors' test of subsection (a)(2).  Among the factors to be considered in appointing a trustee under Section 1104(a)(2) are:

> (i) the trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence—or lack thereof—of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment.

*In re Ridgemour Meyer Props., LLC*, 413 B.R. 101, 112 (Bankr. S.D.N.Y. 2008) (quoting *In re Ionosphere Clubs Inc.*, 113 B.R. at 168).  However, "the standard is a flexible one."  *In re Eljamal*, No. 17-CV-7870 (KMK), 2018 WL 4735719, at *7 (S.D.N.Y. Sept. 28, 2018) (quoting *Ridgemour Meyer Props., LLC*, 413 B.R. at 112).

101.    As set forth in detail above, those factors all weigh heavily against the Debtor remaining in possession.  <u>*First*</u>, the Debtor, through its owner and sole manager, Kwok, is the

---

[131] In addition to the foregoing bases for appointment of a Chapter 11 trustee, facts supporting a finding of "cause" under § 1112(b) also support cause under 1104(a), including, among other things, inadequate reporting (section I. C. n. 121, *supra*).  *See, In re Ancona*, 2016 WL 7868696 at *8 (finding cause under § 1104(a) "based [on] its finding of 'cause' under section 1112(b).").

antithesis of trustworthy. *Second*, Kwok put the Debtor in bankruptcy for the sole and improper purpose of delaying and frustrating the State Court Action in order to shield the Residence from collection by PAX; the Debtor has no prospects for rehabilitation because its sole asset is the non-commercial Residence that has never generated any cash flow and which the Debtor now intends to sell. *Third*, PAX, the Debtor's largest non-insider creditor, rightfully has no confidence in Kwok's management and control of the Debtor or his ability to do anything constructive (or legal) with its sole asset, the Residence. *Fourth*, the benefits of appointing a trustee far outweigh the costs. Once appointed, the trustee would assume immediate control and oversight over the Debtor's sole asset, the Residence, which was purchased for $67.5 million in 2015. Not only does that potential value far outweigh the costs of a trustee, a trustee is required (and its costs further justified) where Judge Ostrager previously determined it necessary to legally restrain Kwok from dissipating this asset to the detriment of PAX.

## CONCLUSION

For all of the reasons stated above, PAX respectfully requests that this Court: (i) convert the Debtor's Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, or, in the alternative, (ii) appoint a Chapter 11 trustee, and (iii) grant such other and further relief as the Court may deem just and proper.

DATED:  January 8, 2021             Respectfully submitted,
        New York, New York

                                    O'MELVENY & MYERS LLP
                                    By: */s/ Edward Moss*
                                    Stuart Sarnoff (ssarnoff@omm.com)
                                    Edward Moss (emoss@omm.com)
                                    7 Times Square
                                    New York, NY 10036
                                    (212) 326-2000

                                    -and-

                                    FOLEY & LARDNER LLP
                                    By: */s/ Douglas E. Spelfogel*
                                    Douglas E. Spelfogel
                                    (dspelfogel@foley.com)
                                    Alissa Nann (anann@foley.com)
                                    90 Park Avenue
                                    New York, NY 10016
                                    212-338-3566


                                    *Attorneys for Pacific Alliance Asia*
                                    *Opportunity Fund L.P.*