UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

In re

GENEVER HOLDINGS, LLC,

               Debtor.

-----------------------------------------------------------x

Case No. 20-12411 (JLG)

Chapter 11

**OBJECTION OF THE UNITED STATES TRUSTEE TO
DEBTOR'S APPLICATION TO EMPLOY A SALES
OFFICER, AND REPLY IN FURTHER SUPPORT OF
MOTION OF THE UNITED STATES TRUSTEE FOR THE
APPOINTMENT OF A CHAPTER 11 TRUSTEE PURSUANT
TO SECTION 1104 OF THE BANKRUPTCY CODE**

William K. Harrington, the United States Trustee for Region 2 (the "**United States Trustee**"), respectfully submits this Objection to the Debtor's Application, as revised, to employ a Sales Officer (the "**SO Application**"), filed by Genever Holdings, LLC ("**Debtor**"), and replies in further support of his motion for the appointment of a chapter 11 trustee in the above-referenced case pursuant to sections 1104(a) and (b) of title 11, United States Code (the "**Bankruptcy Code**"). In opposition to the SO Application, and in support of his motion (the "**UST Motion**"), the United States Trustee respectfully states as follows:

**I. PRELIMINARY STATEMENT**

The Debtor's primary purpose in filing its bankruptcy case was to liquidate its primary asset, a residential apartment (the "Primary Asset"). The parties do not dispute that, to maximize the value of the Primary Asset, time is of the essence, and that the sale needs to be conducted expeditiously. Unfortunately, the Debtor and its primary creditors have been at odds throughout the case as to whether the Debtor is capable or competent to exercise its fiduciary obligations in

1

executing the sale of the Primary Asset. The level of acrimony and distrust caused by this dispute has risen to a level that extends beyond the healthy conflicts that always exist between debtor and creditor, and have caused the case to stagnate to the potential detriment of all stakeholders.

Here, the parties have spent months attempting to reach a settlement and a path forward, but have yet to reach an agreement which would pass muster under the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor-in-possession retains the authority and responsibility to manage its own affairs for the benefit of any creditors. If the debtor-in-possession is not capable of assuming these responsibilities – as is the case here – the Bankruptcy Code provides for the appointment of a chapter 11 trustee. Although clothed otherwise, the Debtor proposes an unacceptable alternative to a chapter 11 trustee by seeking to appoint what amounts to a receiver with full authority over the marketing and sale of the Debtor's only asset, which is expressly prohibited under section 105 of the Bankruptcy Code.

Here, the Debtor and its creditors have spent months negotiating over a settlement agreement whereby a "Sales Officer" would be appointed to independently market and sell the Primary Asset. In short, despite the nomenclature, and regardless of the various iterations of the settlement agreement, (which continues to be proposed by the parties even after the motion to approve the settlement was filed), and even though the Court has held three separate hearings on the motion, and the record has been closed to allow post-hearing briefing, the proposed Sales Officer would nonetheless still be functioning as an *in rem* receiver, which is expressly prohibited by the Bankruptcy Code. Furthermore, not only is the appointment of the Sales Officer, with the duties as proposed, violative of the provisions the Bankruptcy Code, it is explicitly prohibited by the Debtor's Operating Agreement, which was filed of record and

2

presented to the Court at the last hearing, and is also violative of applicable state law. In the ordinary course of business, the Debtor is authorized to make certain corporate governance changes and to modify its corporate documents if it adheres to the proper corporate formalities and state law procedures in doing so. But here, despite comments by the parties that the Debtor intends to do so, the Debtor has not taken such actions. Moreover, certain actions, like the relinquishment of management of the sales process to a third party, as is currently being contemplated here, is inconsistent with the Bankruptcy Code and constitutes independent "cause" for the appointment of a trustee, and also is inconsistent with state law and the Debtor's Operating Agreement. The Bankruptcy Code does not authorize a debtor-in-possession to surrender its authority to a third party to control an integral part of the Debtor's chapter 11 case, state law does not permit a company to violate its operating agreement, which, in this case, specifically provides that termination of an officer is revocable by the Debtor's managing member. Finally, the parties cannot use the Bankruptcy Court to override state law and the Operating Agreement by casting the Court in the role of the ultimate "manager" to make corporate governance decisions.

Because the Debtor's main creditor does not have confidence in the Debtor's principal to manage the sale process, and, by extension, this chapter 11 case, the case simply cannot move forward. The remedy is as clear today as it was when the UST Motion was filed. The Court should direct the appointment of a chapter 11 trustee who would have the confidence of the creditors in the marketing and sale of the Property, as well as all other aspects of the case.

## II.  FACTS

1. The facts set forth in the UST Motion, ECF Doc. No. 64, are incorporated by reference herein and are made a part hereof.

2.  Subsequent to the filing of the UST Motion on March 22, 2021, ECF Doc. No. 64, three (3) parties – Bravo Luck Limited ("**Bravo Luck**"), ECF Doc. No. 76, Pacific Alliance Asia Opportunity Fund L.P. ("**PAX**"), ECF Doc. No. 81; and the Debtor, ECF Doc. No. 83 – filed objections to the UST Motion.

3.  Meanwhile, on April 9, 2021, the Debtor filed the SO Application. ECF Doc. No. 72.

4.  On May 12, 2021, the Debtor filed a Letter regarding the status of negotiations among the parties and, as an attachment to the Letter, a Redlined Version of Amended and Restated Settlement Agreement (the "**Amended Settlement Agreement**"). ECF Doc. No. 86.[1]

5.  On May 14, 2021, the Debtor filed a second Letter regarding the status of negotiations among the parties and, as an attachment to the second Letter, also filed the Limited Company Agreement of Genever Holdings LLC, dated February 13, 2015 (the "**Operating Agreement**").[2] ECF Doc. No. 88.

6.  The Court held hearings on, among other matters, the SO Application and the UST Motion, on May 11 and May 13, 2021. On May 14, 2021, the Court also held a status conference at which it directed the parties to file supplemental briefing on certain issues arising from the SO Application and the UST Motion.

---

[1] The original Settlement Agreement was attached to the Debtor's Amended Motion to Approve Attached Stipulation of Settlement with Bravo Luck and PAX, dated March 5, 2021, ECF Doc. No. 62.

[2] Prior to the filing of the May 14, 2021 status letter, the Debtor had not attached the Operating Agreement to any document filed with the Court.

**The Amended Settlement Agreement**

7. Unlike the original Settlement Agreement, the Amended Settlement Agreement provides that the Sales Officer is to manage the marketing and sale process for the Property "in consultation with the Debtor," along with Bravo Luck and PAX. *See*, *e.g.,* Amended Settlement Agreement, ¶¶ 2, 3, 4. Notwithstanding such consultation rights, the Sales Officer is "to have final authority in the event of any dispute" among the Debtor, Bravo Luck and PAX. *Id*. at ¶ 5f. Moreover, the Sales Officer is to have final approval power with respect to the marketing and sale process, subject only to Court approval. *Id.* at ¶ 6.

8. Under the Amended Settlement Agreement, any successor to the Sales Officer is to be nominated by Bravo Luck and PAX, not by the Debtor. *Id.* at ¶ 7.

9. In response to issues raised by the United States Trustee, the Amended Settlement Agreement gives the Debtor's manager the power to remove the Sales Officer, but only so long as the Bankruptcy Court approves of such removal upon notice. *Id.* at ¶ 27F[3]

### III. DISCUSSION

Although the parties to the Amended Settlement Agreement have agreed that the Debtor's manager is no longer to be excluded from even a "consulting" role in the marketing and sale of the Property, the parties have preserved the aspect of their agreement that is central to the United States Trustee's objection: The mandate of the Sales Officer, even under the Amended

---

[3] The Amended Settlement Agreement contains several provisions that reflect agreements among the Debtor, Bravo Luck, and PAX that are unrelated to the employment of the Sales Officer. For example, the Amended Settlement Agreement provides for stay relief to enable the state court litigation between PAX and the Debtor to proceed. In addition, the parties have agreed that Bravo Luck and PAX may proceed with their BVI Litigation. The United States Trustee does not object to the provisions of the Settlement Agreement that are unrelated to the employment of the Sales Officer, but notes that they may be impacted, not only if the Court rejects the Amended Settlement Agreement, but also in the event that the Court grants the UST Motion.

Settlement Agreement, is still to seize from the Debtor's manager the reins of the marketing and sale process and to make her own, independent determinations regarding that process, subject only to Court approval. Amended Settlement Agreement, ¶ 6 (conferring Sales Officer with final approval power with respect to the, subject only to Court approval). By limiting the Debtor's manager to a consultive role, he is to be a spectator, a mere eyewitness to the disposition of the Debtor's Primary Asset. PAX's continued insistence that the Debtor cannot be trusted to control the sale process – coupled with the Debtor's continued willingness to relinquish that control – makes it impossible for the Debtor to carry out its fiduciary obligation as a debtor-in-possession to manage this case.

Furthermore, although the Sales Officer is to be an employee of the Debtor, the Debtor's manager will have no control of the Sales Officer. In fact, the Amended Sales Agreement contains no provision that would give the Debtor's manager the authority to terminate the Sales Officer. Finally, under the Amended Sales Agreement, the Debtor's manager may not revoke the delegation of the marketing and sale process to the Sales Officer, a clear violation of the Operating Agreement. Accordingly, the Sales Officer, who could not be terminated by the Debtor without court approval, would act as a receiver in all but name. That the Sales Officer cannot be terminated by the Debtor demonstrates that the latter has no control over the former. Such an arrangement cannot be approved by the Bankruptcy Court.

Moreover, because the Debtor's main creditor will not consent to an arrangement whereby the Debtor remains in possession of its principal asset, the Debtor cannot proceed with this chapter 11 case. Accordingly, the appointment of a Chapter 11 trustee is warranted – and the UST motion should be granted.

### A. The SO Application Should be Denied, and the UST Motion Should Be Granted, Because The Debtor's Agreement to the Amended Sales Agreement Renders it Incapable of Carrying Out its Fiduciary Duties

The Bankruptcy Code generously allows a debtor which has filed for the protections of chapter 11 to remain in possession because "current management is generally best suited to orchestrate the process of rehabilitation. . . ." *In re V. Savino Oil Heating Co.*, 99 B.R. 518, 524 (Bankr. E.D.N.Y. 1989). But the success of a chapter 11 case hinges not only on the fact that current management is most familiar with the debtor's business, but also on the presumption that the debtor-in-possession can act in the creditors' interest as a fiduciary. *Marvel Entertainment Group, Inc.*, 140 F.3d, 463, 471 (3d Cir. 1998) ("presumption against appointing an outside trustee is that there is often no need for one").

Although section 1104(a)(1) lists the types of "cause" that may trigger the appointment of a trustee – "fraud, dishonesty, incompetence, or gross management" – that list is not exhaustive. *Id.* at 472. The finding of cause to warrant the appointment is within the discretion of the Court. *Id.* In reaching a determination regarding the propriety of directing the appointment of a trustee, courts balance the protection of creditors' interests under the Bankruptcy Code with the policy of "giving debtors a second chance." *Id.*, citing *Committee of Dalkon Shield Claimants v. A.H. Robins Co.*, 828 F.2d, 239, 242 (4th Cir. 1987).

Acrimony between the debtor and a creditor can provide a basis for cause under section 1104(a)(1).[4] *See Marvel*, 140 F.3d at 472 (Bankruptcy Code permits "appointment of a trustee based on a finding of acrimony between debtor and creditor. . . ."); *In re Sammy ElJamal*, No.

---

[4] The United States Trustee's arguments under sections 1104(a)(1) and 1104(a)(2) of the Bankruptcy Code are set forth in the UST Motion, ECF Doc. No. 64, and are incorporated herein and made a part hereof.

7

17-CV-7870 (KMK), 2018 WL 4735719, *8-9 (S.D.N.Y Sept. 28, 2018) (same; in analysis of 11 U.S.C. § 1104(a)(2), affirming trustee order based on long-standing acrimony).  To be sure, it is hardly unusual in a bankruptcy case for hostility to exist between a debtor and a creditor.  However, "when the inherent conflicts extend beyond the healthy conflicts that always exist between debtor and creditor," the appointment of a trustee is warranted.  *Cajun Elec. Power Coop., Inc.*, 74 F.3d 599, 600 (5th Cir.) (adopting on rehearing the opinion of dissent in 69 F.3d at 751), *cert. denied*, 519 U.S. 808 (1996).  Courts – which have "wide latitude" in ruling on a motion under section 1104(a)(1), *In re The 1031 Tax Group, LLC*, 374 B.R. 78, 86 (Bankr. S.D.N.Y. 2007) – will determine on a case-by-case basis whether debtor-creditor hostility is sufficient cause for the appointment of a trustee.  *Marvel*, 140 F.3d at 472-73.[5]

Here, the longstanding conflict between the Debtor and PAX has clearly risen to such a level that the latter does not believe that the former can act as a fiduciary for the creditors.  In fact, PAX has made every effort to ensure that the Debtor will not be able to administer its case – and, specifically, the Property – independently.  The record is clear that PAX's acrimony toward the Debtor has been developing for a long time.  *See* Debtor's Declaration Pursuant to Local Bankruptcy Rule 1007-2 (the "**1007-2 Declaration**"), ¶ 6, ECF Doc. No. 1.

As the Debtor has acknowledged, litigation between the Debtor and PAX began in 2017, years before the commencement of this chapter 11 case.  *See id.*.  The hostility between the parties continued post-petition.  On December 16, 2020, the Debtor filed a Motion to Modify the Automatic Stay to Proceed with the State Court Action, ECF Doc. Nos. 12-14, alleging, among

---

[5] The Court in *Marvel* noted that debtor-creditor "conflicts" that may warrant the appointment of a trustee can be either acrimony between the parties or conflicts-of-interest.  *Marvel*, 140 F.3d at 472-73.

other things, that the Debtor's voluntary chapter 11 petition had been filed in bad faith. Memorandum of Law in Support of Lift-Stay Motion, ¶¶ 1, 2.

Then, on January 8, 2021, PAX filed a Motion for an Order Under 11 U.S.C. § 1112(b) Converting the Debtor's Case to a Case Under Chapter 7 or, in the Alternative, for an Order Under 11 U.S.C. § 1104(a) Appointing a Trustee to Administer the Debtor's Estate (the "**Conversion/Chapter 11 Trustee Motion**"). ECF Doc. Nos. 28-30. Not mincing words, PAX argued that the Debtor "cannot be entrusted to comply with the Debtor's fiduciary duty to protect and conserve" the Property. *Id.* at ¶ 8, ECF Doc. No. 29. Accordingly, PAX concluded, the Court should either convert the case to chapter 7 or direct the appointment of a chapter 11 trustee, so as to avoid "the taint of conflicts, self-dealing and general impropriety, which currently abound. *Id.* at ¶¶ 7, 9. Either way, PAX has asserted, "[a]ny sale process requires removing the Debtor as the decision-maker. . . ." Pacific Alliance Asia Opportunity Fund L.P.'s Reply (I) in Further Support of its Motion to Modify the Automatic Stay to Proceed with State Court Litigation, and Related Relief, and (II) in Response to Objections, at ¶ 14 n.26, ECF Doc. No. 41.

Since the filing of the Conversion/Chapter 11 Trustee Motion, PAX has evidently determined that its wish that the Debtor be supplanted "as the decision-maker" in the sale process can be granted by means of the Amended Settlement Agreement. Instead of litigating with the Debtor and Bravo Luck over the issue of whether the appointment of a chapter 11 trustee is appropriate, PAX has consented to permit the Debtor to remain in possession – but only so long as the latter does not control the sale process.[6] For its part, the Debtor, in an

---

[6] PAX's insistence that the Sales Officer be independent could not be clearer: The sale process must "include[s] oversight by an experienced, *disinterested third-party*, with appropriate

9

attempt to fend off the Conversion/Chapter 11 Trustee Motion, is willing to surrender control of the disposition of its principal asset.  Notwithstanding several changes in language, including the removal of the word "independent" from the written agreement, the Sales Officer's *in rem* mandate remains clear:  She is "to control and oversee the sale of the [Property]. . . ."  Amended Settlement Agreement, ¶ 2.  Although the Sales Officer is to be an "employee" of the Debtor, unlike other employees, this particular employee cannot be terminated by the Debtor without court approval.  Amended Settlement Agreement, ¶ 27F.

The parties' solution is unworkable.  Despite the characterization of the position as a sales officer, the duties and functions to be performed by the sales officer are similar – if not identical – to the duties and functions of a receiver appointed by a state court.  Section 105(b) of the Bankruptcy Code specifically precludes the Bankruptcy Court from appointing a receiver.  Even if the officer is not called a "receiver" by name, if that person is given control of the debtor's sole asset, subject only to further orders of the court, she is exercising the types of *in rem* powers and performing the types of duties traditionally given to receivers.

Only a receiver appointed by another court, such as a state or federal district court, can take on the role of receiver or a receiver-equivalent in a bankruptcy case,  11 U.S.C. § 105(b); *see In re Bayou Group, L.L.C.*, 363 B.R. 674, 689 (S.D.N.Y. 2007), a*ff'd sub nom. Adams v. Marwil (In re Bayou Group, LLC)*, 564 F.3d 541 (2d Cir. 2009) (in enacting section 105(b), Congress precluded bankruptcy courts from appointing a federal equity receiver, but did not bar a United States District Court from appointing a managing member to control property); *see also*

---

safeguards, and oversight by non-insider creditors, including PAX, the U.S. Trustee, and the Court."  Memorandum of Law in Support of Lift-Stay Motion, ¶ 77, ECF Doc. No. 13 (emphasis added).  This statement reflects PAX's belief that the sale process must be conducted by a "disinterested third party," someone independent of the Debtor's manager.

10

*S.E.C. v. Byers*, 609 F.3d 87, 93 (2d Cir. 1987). As the Court in *Rudin v. Tax Comm'n of the City of New York (In re Olympia & York Maiden Lane Company, LLC)*, 233 B.R. 662 (Bankr. S.D.N.Y. 1999), explained, section 105(b) prevents a bankruptcy court from appointing "receiver in lieu of a bankruptcy trustee,", but does not bar the court from "*continuing* the appointment of a state court equity receiver." *Id.* at 669 (emphasis added).

Here, the Sales Officer's job would be akin to that of a state-court *in rem* receiver. First, the Sales Officer's duties, like those of a receiver, are *in rem*, that is, relate to "the preservation and care of the property under [the receiver's] control." *In re 400 Madison Avenue Ltd. Partnership*, 213 B.R. 888, 894 (Bankr. S.D.N.Y. 1997). Second, the Sales Officer, like a receiver, is not to assume other fiduciary obligations of a debtor-in-possession, such as filing a chapter 11 plan. *Id.* at 894-95. Third, both the Sales Officer's mandate falls squarely within the very definition of a receiver:

> A person appointed by a court for the purpose of preserving property of a debtor pending an action against him, or applying the property in satisfaction of a creditor's claim, whenever there is danger that, in the absence of such appointment, the property will be lost, removed or injured. . . .

Black's Law Dictionary (6th ed. 1990), *quoted in 400 Madison Avenue*, 213 B.R. at 894 n.14. Finally, just as a creditor in a state court action would move for the appointment of a receiver in a state court action to wrest control of the subject property from the creditor's adversary, PAX supports the appointment of a Sales Officer to ensure that the Debtor is not to be "the decision-maker" in the sale process. *See* Conversion/Chapter 11 Trustee Motion, ¶ 14 n.26, ECF Doc. No 29.

In addition to the striking similarities, there is one major difference between authorizing a receiver to *retain* control of the subject property under the Bankruptcy Code and *giving* the Sales

11

Officer *in rem* control of the Property in this case. An order – permitted under the Bankruptcy Code -- keeping a receiver in place under section 543(d) of the Bankruptcy Code is "in the nature of abstention," an act merely to leave the property in the control of the receiver, who has been appointed by the state court pre-petition. *Id.* at 895; *see also Matter of Plantation Inn Partners*, 142 B.R. 561, 564 (Bankr. S.D. Ga. 1992) (where court "excuse[s] state court-appointed receivers from the obligation to turnover property," it "is exercising a form of abstention. . . ."). By contrast, the parties to the Amended Settlement Agreement are asking the Court to take the more active step – in the face of section 105(b)'s express prohibition—of installing a *de facto* receiver post-petition.

In short, by trying to push through the Amended Settlement Agreement, the parties to that agreement are creating a Sales Officer to play the same role that, had this "officer" – a receiver – been appointed by the state court pre-petition, would have played. Though the Court could have allowed a receiver appointed by the state court pre-petition to continue in his or her role, section 105(b) specifically precludes the Court from creating that role for the Sales Officer.

The parties to the Amended Settlement Agreement have argued that the agreement finds support in the 1986 decision by the Court of Appeals for the Seventh Circuit in *Matter of Gaslight Club, Inc.*, 782 F.2d 767 (7th Cir. 1986). In that case, the Court affirmed a lower court's determination that sections 105(a) and 1107(a) could support "a grant of authority to a Responsible Officer," where the debtor's principal had sought to back out of the agreement surrendering his authority. *Id.* at 772. The Court, denying the principal's request, stated that "we would certainly question recourse to the present procedure as a means generally to avoid the appointment of a trustee." It was only "the peculiar circumstances of the case before us as well as the consent on all sides to the procedure followed make this case different." *Id.* at 772. The

12

Seventh Circuit, however, did not hold in *Gaslight*, that a bankruptcy court's appointment power was limitless. In fact, also in 1986, the Seventh Circuit issued an opinion in *In re Memorial Estates, Inc.*, 797 F.2d 516 (7th Cir. 1986). In that case, the Court observed that section 105(b) "states flatly" that the Bankruptcy Court cannot appoint a receiver. *Id.* at 519. The Court, quoted the legislative history behind the enactment of section 105(b):

> [t]he bankruptcy code has ample provision for the appointment of a trustee when needed. Appointment of a receiver would simply circumvent the established procedures."

*Id.*, quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. 316 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 29 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5815, 6273. In light of the ruling in *Memorial Estates* regarding the appointments of receivers under section 105(b), the parties' reliance on the ruling *Gaslight* which addresses a different kind of officer, is misplaced.

### B. The Parties to the Amended Settlement Agreement Improperly Seek to Cast the Bankruptcy Court in the Role of Ultimate Manager of the Limited Liability Corporation

Although a debtor-in-possession retains its pre-petition right to hire officers and other employees, the Bankruptcy Code does not authorize the Court to appoint an "alternative fiduciary" in the place of a chapter 11 trustee. *See In re Adelphia Comm. Corp.*, 336 B.R. 610, 664 (Bankr. S.D.N.Y. 2006) (court declined to use section 105(a) to "[a]ppoint a trustee equivalent"). The Court's appointment power in chapter 11 is found only section 1104, under which the Court may appoint chapter 11 trustees and examiners. 11 U.S.C. § 1104; *see Adelphia*, 336 B.R. at 664 (section 1104 calls for only "two types of fiduciaries, trustees and examiners") (footnotes omitted).

The Court's appointment power is not to be found either in section 105(a) or in section 1107(a). *See id.*; *see also K.G. IM, LLC*, 620 B.R. 469, 482 (Bankr. S.D.N.Y. 2020), *quoting In*

*re 1031 Tax Group, LLC*, No. 07-11448 (MG), 2007 WL 2085384, at *3 n.4 (Bankr. S.D.N.Y. July 17, 2007) ("Sections 105(a) and 1107(a) . . . do not provide the Court with an independent power of appointment").[7]  These Code sections certainly do not authorize the appointment of a *de facto* receiver, whose appointment in a bankruptcy case is expressly prohibited by Section 105(b).  *See*, *e.g.*, *Olympia & York*, 233 B.R. at 669.

To be sure, the Debtor may employ a Chief Restructuring Officer ("**CRO**") under section 363(b) of the Bankruptcy Code, but only under certain conditions.  The Protocol for engagement of Jay Alix & Associates and Affiliates dated November 3, 2004, (commonly known as the "**J. Alix Protocol**"), first appeared in the District of Delaware out of *In re Safety-Kleen Corp.*, Case No. 00-2303 (Bankr. D. Del. 2000) and *In re Harnischfeger Industries Inc.*, Case No. 99-2171 (Bankr. D. Del. 1999), and it has been adopted by the United States Trustee and professionals and approved by courts in this District for many years.  The J. Alix Protocol, however, does not apply unless the CRO reports to, and take direction from, a board of directors.

Here, the parties to the Amended Settlement Agreement effectively seek court approval of at least two modifications to the J. Alix Protocol.  First, the Debtor is a limited liability corporation with a manager, not a corporation with a board of directors.  Second, unlike a CRO who generally manages all aspects of a chapter 11 case, the Sales Officer's mandate would be limited to the marketing and sale of the Property.  Although the United States Trustee has no *per se* objection to certain modifications of the traditional CRO appointment, (apart from the fact that the *in rem* Sales Officer cannot be appointed in light of section 105(b)'s express prohibition against the appointment of receivers), the balance of the requirements under the J. Alix Protocol

---

[7] Although the Court in *K.G. IM, LLC* permitted the appointment of a new "Responsible Person" to manage the debtor, that Responsible Person was not to assume the role of an *in rem* receiver, as the Sales Officer is to do in the instant case.  *See K.G. IM, LLC*, 620 B.R. at 482-83.

must be met. Specifically, the Sales Officer must report to, and take direction from, the manager. Here, the Sales Officer would not be accountable to the Debtor's manager, as the Debtor has agreed to surrender his authority over not only the sale process, but also over the Sales Officer herself. Also, as the Debtor has waived its authority to terminate its employee without Court approval, the analogy between the Sales Officer and a CRO falls apart. Accordingly, we are left with a situation where the parties to the Amended Settlement Agreement are asking the Court to step into the role of the ultimate manager of the Debtor under state law, a role the Court cannot play.

In *In re 1031 Tax Group, LLC*, 2007 WL 2085384, the Court observed that "positions of manager or director are creatures of state law specifically governed by the applicable state limited liability company acts and state corporation codes". *Id.* at *1, *3. These state laws must be followed to make the proposed appointment of a manager or director. *Id.* at *3. "The Bankruptcy Code does not authorize the bankruptcy court to fill these positions, or to bypass the procedures that the state statutes mandate." *Id.*

Here, however, the Sales Officer would be ultimately accountable not to the Debtor's manager, but rather to the Court. *See* Amended Settlement Agreement, ¶ 6. Should the Debtor's manager wish to terminate the Sales Officer for any reason, the Court must approve such termination. *Id.* at ¶ 27F. Moreover, under the Amended Sales Agreement, the Bankruptcy Court would have the ability to overturn the Debtor's corporate governance decision either to revoke the delegation of authority to, or the remove the Sales Officer "[n]otwithstanding anything to the contrary in the Debtor's Operating Agreement." *Id.* The parties' attempt to have the Court effectively order amendments to the corporate governance documents, namely, the Operating Agreement, must fail. *See 1031 Tax Group*, 2007 WL 2085384, at *1 ("governance

positions [are] created by the applicable state limited liability company acts and state corporation codes" – not by the Bankruptcy Court).

      **C.    The Parties Improperly Seek Bankruptcy Court Approval of an Agreement that Violates Both <u>the Operating Agreement and State Law</u>**

The Debtor has agreed to relinquish its power to revoke the delegation of authority over the marketing and sale process to the Sales Officer in violation of relevant state law, and in the face of a specific provision of the Operating Agreement to the contrary. Under the New York Limited Liability Company law,

> (a)    Except as provided in the operating agreement, in managing the affairs of the limited liability company, electing managers or voting on any other matter that requires a vote at a meeting of the members pursuant to this chapter, the articles of organization or the operating agreement, each member of a limited liability company shall vote in proportion to such member's share of the current profits of the limited liability company in accordance with section five hundred three of this chapter.
>
> . . .
>
> (d)    Except as provided in the operating agreement . . . the vote of at least a majority in interest of the members entitled to vote thereon shall be required to:
>
> . . .
>
> (2) approve the sale, exchange, lease, mortgage, pledge or other transfer of all or substantially all of the assets of the limited liability company.

NY LLC Law, § 402.

Section 9.3 of the Operating Agreement provides, in relevant part, as follows;

> The Members may, from time to time as they deem advisable, select one or more natural persons and designate them as officers of the Company (the "Officers") and assign titles . . . to any such person. The Members may, by written agreement, *delegate to any Officer . . . the power to bind the Company. Any delegation pursuant to this Section 9.3 may be revoked at any time by the Members. An Officer may be removed with or without cause by the Members. . . .*

16

Operating Agreement, § 9.3 (emphasis added).[8]

Thus, the parties, in requesting approval of the Amended Settlement Agreement, are asking the Court to vitiate the Debtor's power under the Operating Agreement, which is governed by the New York Limited Liability Company Law. Specifically, the Member -- that is, the Debtor's manager – has the power under section 402(d) of the New York Limited Liability Company Law and the Operating Agreement both to delegate the power to an officer to bind the company, and he may revoke that power "at any time", "with or without cause. . . ." Operating Agreement, § 9.3. The authority of the Debtor's manager clearly extends to the "sale . . . of all or substantially all of the assets of the limited liability company. NY LLC Law, § 402(d)(2).

The parties, however, are asking the Court to overturn both state law and the Operating Agreement in two ways. First, the Court is being asked to approve the delegation under state law. Second, the parties are asking the Bankruptcy Court to modify the Operating Agreement by conditioning the Debtor's manager's power to revoke the delegation on Court approval. It is not, however, the province of the Bankruptcy Court to act as the Debtor's ultimate manager to have the final say on the Debtor's decision-making under the Operating Agreement and state law. *See*

---

[8] Although the parties first introduced the (original) Settlement Agreement by filing the Amended Motion to Approve Compromise on March 5, 2021, ECF Doc. No. 62, and although several pleadings and letters have been filed since that date, the Operating Agreement was first filed with the Court as an attachment to a Status Letter dated May 14, 2021, ECF Doc. No. 88. Moreover, to date the Operating Agreement has not been amended to reflect the Debtor's agreement to limit its manager's authority regarding the delegation of authority to the Sales Officer. Instead, the Amended Settlement Agreement provides that the Operating Agreement can simply be ignored. *See* Amended Operating Agreement, ¶ 27F.

*1031 Tax Group*, 2007 WL 2085384, at *1 (". . . state laws must be followed to make the Debtors' proposed appointments . . . to fill . . . positions")[9]

### D. Section 1107(a) of the Bankruptcy Code Does Not Authorize The Debtor to Employ the Sales Officer in Violation of the Operating Agreement and State Law

Section 1107(a) of the Bankruptcy Code provides, in pertinent part, as follows:

(a)     Subject to any limitations on a trustee servicing in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all rights. . . and shall perform all the functions and duties, except the duties specified in section s 1106(a)(2), (3), and (4) of this title, of a trustee serving in a case under this chapter.

11 U.S.C. § 1107(a). This section authorizes the court to limit debtors-in-possession in certain respects. For example, the court can invoke section 1107(a) to prevent a debtor from waiving its claims against insiders. *See In re Ralph C. Tyler, P.E., P.S., Inc.*, 156 B.R. 995, 997 (Bankr. N.D. Ohio 1993) ("prohibition of the DIP's waiver of claims against insiders is mandated for the protection of creditors"). The Debtor, however, cannot use section 1107(a) to relinquish one of its core functions – namely, to conduct the sale process – to an independent third party in violation of the Operating Agreement. *See 1031 Tax Group,* 2007 WL 2085384, at *3 n.4 (court has no "independent power of appointment" under sections 105(a) and 1107(a)).

The only way the Court can remove the powers of a debtor-in-possession altogether, or with respect to a core function of a debtor, is under section 1104 of the Bankruptcy Code. As set forth in the UST Motion, ECF Doc. No. 64, when a debtor-in-possession is unable or unwilling

---

[9] As the Second Circuit has noted, unless a chapter 11 trustee is appointed, chapter 11 debtors retain their corporate governance rights under state law. *In re Johns-Manville Corp.*, 801 F.2d 60, 63 (2d Cir. 1986). Here, however, the Debtor has entered into an agreement to make corporate governance decisions that are inconsistent with the Operating Agreement and State law. Instead, the Debtor, along with the other parties to the Amended Settlement Agreement, is asking the Court to override the Operating Agreement by conditioning the Debtor's right to revoke the delegation of power to the Sales Officer without court approval.

18

to meet its fiduciary obligations, Congress has provided two ways to eliminate or reduce management's control while allowing the case to remain in chapter 11: The first is the appointment of a trustee pursuant to 11 U.S.C. § 1104(a). *See In re V. Savino Oil*, 99 B.R. at 526 ("And if the debtor-in-possession defaults in this respect, [s]ection 1104(a)(1) [of the Bankruptcy Code] commands that stewardship of the reorganization effort must be turned over to an independent trustee."). Alternatively, under section 1104(c), the Court has the authority to direct the appointment of an examiner, whose role is more restricted that that of a chapter 11 trustee. *See In re Boileau*, 736 F.2d 503, 506 (9th Cir. 1984) (debtor-in-possession, displaced by appointment of examiner in its customary duty to conduct an investigation under section 1106(a)(3), lost authority to waive attorney-client privilege). As the Court in *Boileau* points out, it is section 1106(b), not 1107(a) that allows an examiner to perform certain duties that the court directs a debtor not to perform. Section 1106, however, does not, however, authorize anyone else to do so – other than, of course, a chapter 11 trustee. *Id.*; *see also Adelphia,* 366.B.R. at 666 (suggesting that the court might be "altogether forbidden" from using section 1107(a) to impose limitations on the rights of a DIP that circumvented other sections of the Bankruptcy Code, such as section 1104.

     **E.    Because the Amended Settlement Agreement Preserves the Independence of the Sales Officer and Fails to Cure the Deficiencies in the Original Settlement Agreement, the SO Application Should be Denied and the UST Motion Should be Granted**

The Court should not countenance the proposed takeover of the marketing and sale process by a Sales Officer, whose *in rem* function is that of a *de facto* receiver – and whose status as an employee of the Debtor is only nominal. Further, the Debtor's agreement to turn the sale process over to an independent third party makes the continuation of this case as a debtor-in-

possession case untenable. Obviously, the relinquishment of such authority was the Debtor's response to pressure from PAX -- which has stated quite plainly that it has "absolutely *no* confidence that the Debtor's assets will be property preserved and marshalled by [the Debtor's principal] (emphasis in original)." Memorandum of Law in Support of Conversion/Chapter 11 Trustee Motion, ¶ 83, ECF Doc. No. 36. Whatever the motivation for its action, the Debtor has agreed to abandon the field with respect to the disposition of its principal asset. This, a fiduciary wishing to retain its debtor-in-possession status, cannot do. A chapter 11 trustee must be appointed to administer this case and, in particular, sell the Property.

For the reasons stated both in the UST Motion and herein, the motion to approve the Amended Settlement Agreement must be rejected, and the UST Motion granted.

## IV. CONCLUSION

WHEREFORE, the United States Trustee respectfully requests that the Court deny the Motion for approval of the Amended Settlement Agreement, direct the appointment of a Chapter 11 trustee pursuant to section 1104(a) of the Bankruptcy Code, and grant such other and further relief as may be deemed just and proper.

Dated: New York, New York
       May 24, 2021

                              Respectfully submitted,

                              WILLIAM K. HARRINGTON
                              UNITED STATES TRUSTEE, Region 2

By:   */s/ Richard C. Morrissey*
       Richard C. Morrissey
       Trial Attorney
       201 Varick Street, Room 1006
       New York, New York 10014
       Tel. (212) 510-0500