# EXHIBIT 9

Case Number : BVIHCOM2020/0137
20-12411-jlg Doc 177-10 Filed 03/15/22 Entered 03/15/22 18:12:10 Exhibit 9 - November 20 2021 Affidavit of Qiang Guo filed in Pacific Alliance Pg 2 of 14

FILED
HIGH COURT
TERRITORY OF
THE VIRGIN ISLANDS

THE EASTERN CARIBBEAN SUPREME COURT
VIRGIN ISLANDS
IN THE HIGH COURT OF JUSTICE
COMMERCIAL DIVISION
CLAIM NO: BVIHCM 0137 OF 2020
BETWEEN:

Submitted Date:30/11/2021 15:03

Filed Date:30/11/2021 15:03

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND LP

Claimant

Fees Paid:274.20

-and-

(1) GENEVER HOLDINGS CORPORATION
(2) BRAVO LUCK LIMITED
(3) KWOK HO WAN
(also known as MILES KWOK, HO WAN KWOK and GUO WEN GUI)
(4) QIANG GUO

**Defendants**

## AFFIDAVIT OF QIANG GUO

I, **QIANG GUO** of c/o O'Neal Webster, 2nd Floor Commerce House, Road Town, British Virgin Islands **MAKE OATH AND STATE AS FOLLOWS**:

### A. INTRODUCTION

1. I am the Fourth Defendant in the above proceedings. I am also the sole shareholder and director of the Second Defendant, Bravo Luck Limited ("**Bravo Luck**"), on whose behalf I am also authorised to make this affidavit.

2. I make this affidavit in response to the Claimant's application dated 1 November 2021, which was filed on 12 November 2021 (the "**PAX Application**"). The PAX Application is pursued by the Claimant and the orders sought in the Notice of Application relate only to the First ("**Genever BVI**") and Third Defendant. The Claimant asks the court to vary injunctions granted by the Honourable Mr Justice Adrian Jack against Genever BVI on 3 December 2019 [QG1 at 1-8] (the "**Genever BVI Order**") and against the Third Defendant on 30 October 2020 (the "**Kwok Order**") for the purposes of facilitating allowing the Third Defendant's transfer of shares he legally holds in Genever BVI to the Claimant and for the same to recorded in Genever BVI's register of members. The Third Defendant is not the beneficial owner of Genever BVI. The Third Defendant holds the shares in Genever BVI pursuant to an express trust for the ultimate benefit of Bravo Luck and, alternatively, he holds an 18th Floor Apartment in the Sherry-Netherland Hotel (the "**Residence**") in New York on an implied resulting trust for Bravo Luck, which provided the entire funds for the purchase . As the beneficial owner of Genever BVI, Bravo Luck's rights would be severely prejudiced if the Court granted the PAX Application. I am the legal and beneficial owner of Bravo Luck and my rights would similarly be prejudiced if the PAX Application was granted and the Third Defendant was permitted and required to transfer the shares in Genever BVI to the Claimant.

3. Bravo Luck opposes the PAX Application. Bravo Luck has filed a cross application (the "**BL Cross-Application**") seeking the dismissal of the PAX Application and for the Genever BVI Order and Kwok Order to be maintained and continued until judgment has been handed down on Bravo Luck's counterclaim in these proceedings or further order of the Court..

4. For the reasons set out below, the PAX Application is an attempt by the Claimant to pre-empt Bravo Luck's counterclaim in the proceedings and take control of the shares in the First Defendant prior to any determination by the Court as to who the true beneficial owner of Genever BVI is. A hearing has been listed for 1 hour on 6 December 2021. Bravo Luck's position is that the Court does not have all the relevant information before it, nor is 1 hour sufficient to deal with the PAX Application and BL Cross-Application. In the first instance, Bravo Luck proposes that the hearing

on 6 December 2021 be adjourned with directions being provided to allow for the filing of further evidence and a relisted hearing in the following terms:

(1) The Claimant files its evidence in response to the BL Cross-Application and this Affidavit by 24 December 2021.

(2) Bravo Luck files any evidence in reply by 14 January 2021.

(3) The hearing on 6 December 2021 be adjourned and relisted for the first available date convenient to the parties and the Court after 28 January 2022 with a time estimate of 1 day.

5. The facts and matters set out in this affidavit are within my own knowledge unless otherwise stated, and I believe them to be true. When I refer to information supplied by others, the source of the information is identified; facts and matters derived from other sources are true to the best of my knowledge and belief. I have been assisted by my lawyers in preparing this statement and understanding the process of litigation. For the avoidance of doubt, no waiver of privilege is intended.

6. There is now produced and shown to me marked "**QG1**", a paginated bundle of copies of the documents referred to herein. Unless otherwise indicated, reference to page numbers in squared brackets in this affidavit are to the pages of QG1.

**B. NEW YORK PROCEEDINGS AGAINST THE THIRD DEFENDANT**

7. I am aware of proceedings before the New York Supreme Court that have been brought by the Claimant against the Third Defendant, who is my father (the "**US Proceedings**"). I understand from documents that I have been provided with in these proceedings that in the US Proceedings the Claimant claims that the Third Defendant is in breach of a personal guarantee entered into on or around 16 March 2011. To the best of my recollection, I have no direct knowledge of and did not participate in this underlying transaction. As such, I make no comments about the Claimant's or the Third Defendant's position in the US Proceedings. The Claimant appears to have filed its claim in the US Proceedings on or around 18 April 2017.

8. I have not discussed the US Proceedings in any real detail with the Third Defendant, as it is ultimately an issue and matter for him on which I have limited knowledge. The Third Defendant did not keep me abreast of what was occurring in the US Proceedings and during the relevant time of the US Proceedings, I was mostly based in the UK and visited the US infrequently. I have largely been made aware of the nature and scope of the allegations advanced by the Claimant in the US proceedings through documents that have been served and provided to my solicitors in the context of these proceedings.

9. While it is obvious from the documents exhibited by the Claimant to various statements filed in these proceedings that neither myself, nor Bravo Luck were party to the US Proceedings it is worth stating, for the avoidance of doubt, that at no time have we been joined to the US Proceedings, participated in the US proceedings or been served with any official documents by the Claimant in the context of US Proceedings. Moreover, I did not have any involvement with preparing the Third Defendant's submissions to the New York court, nor did I assist him with preparing any of his evidence. The Third Defendant did not ask for my assistance in this matter. As of 5 March, 2021, Bravo Luck has filed a claim in the bankruptcy proceedings of Genever Holdings LLC ("**Genever NY**"), a company incorporated in New York, which is ultimately owned by Genever BVI.

10. On 18 April 2019, the Claimant amended its complaint in the US Proceedings to join Genever NY and Genever BVI to the proceedings. While the Third Defendant is the legal shareholder of the Genever entities, as mentioned above, the Third Defendant is not the beneficial owner of the Genever entities. He holds the shares of Genever entities pursuant to an express trust and/or holds the Residence pursuant to an implied resulting trust for the benefit of Bravo Luck.

11. On 15 September 2020, the Hon. Barry R. Ostrager granted partial summary judgment on part of the Claimant's Amended Complaint dated 18 April 2019 against the Third Defendant [QG1 at 9-17] . The New York court found that the Third Defendant was liable for breach of contract for failing to pay the sums set out in a formal Notice of Demand dated 16 October 2015. It appears the New York court granted partial summary judgment on liability only. The Claimant was ordered to file further evidence in support of its damages claim and the issue of whether Genever BVI and Genever US are liable for the Third Defendant's debt to the Claimant as his alter egos was

scheduled for a trial by jury at a later date.

12. On 18 December 2020, the Hon. Barry R. Ostrager awarded the Claimant damages of US$46,426,489, together with pre-judgment contractual interest accrued at the rate of 15% per annum (the "**NY Judgment**"). The NY Judgment was formally entered into against the Third Defendant on 3 February 2021, in the sum of US$116,402,019.57 [QG1 at 18 to 21].

13. On 22 September 2021, the Hon. Barry R. Ostrager granted a "Turnover Order" to the Claimant, where he directed that the Third Defendant take necessary steps to transfer the shares he legally owns in Genever BVI to the Claimant [QG1 at 22 to 23] (the "**Turnover Order**"). The Turnover Order was made "*expressly subject to the approval of Justice Adrian Jack*". This is what prompted the PAX Application to vary the Genever BVI Order and Kwok Order. Bravo Luck was not a party to the application for the "Turnover Order", made no representations to the New York Court about the Turnover Order, nor was Bravo Luck formally served or notified of such an application.

14. I understand the Third Defendant has filed an appeal in the US proceedings, but I do not know what the basis of the appeal is or what it relates to.. As far as I am aware, I have not had sight of any appeal notice or submissions made by either party.

15. Genever NY has commenced bankruptcy proceedings in New York. A settlement agreement was entered into on 24 September 2021 between Genever NY, Bravo Luck and the Claimant [QG1 at 24-35]. I do not repeat the terms of the settlement agreement here; however, it was agreed that a sales officer would be appointed to control and oversee the sale of the Residence, as well as a real estate broker to sell the Residence. Clause 4g provided that the gross proceeds of sale, less customary close costs and expenses, shall be placed in escrow, subject to release solely with Bankruptcy Court approval on prior notice, including to Bravo Luck and the Claimant. The settlement agreement was approved by the bankruptcy court on 8 October 2021. [

16. I am informed by my lawyers in the BVI that the NY Judgment is not currently enforceable in the BVI, as the Claimant has to go through the process of enforcement at common law.

## C. PROCEEDINGS IN THE BVI

17. From the documents served in these proceedings, I have seen that the Claimant unsuccessfully attempted, on multiple occasions, to obtain a pre-attachment order over the Residence. The Residence is where my family and I reside, from time to time, when in New York. The Residence is ultimately owned by me through a structure described further below. Following the failed attempts to obtain a pre-attachment order in the US Proceedings, it appears the Claimant sought and obtained the Genever BVI Order pursuant to the BVI court's Black Swan jurisdiction (as it existed at the time). Neither I, nor Bravo Luck were served with proceedings at this time. I note from the Affidavit of Stuart Sarnoff sworn on 2 November 2021 that the Genever BVI Order was continued by consent on 17 December 2019.

18. The Claimant issued and filed substantive proceedings in the BVI on 2 September 2020, which named Bravo Luck and I as Defendants in these proceedings. The Statement of Claim was amended and redated on 16 October 2020 (the "**ASOC**") . The Claimant alleged in the ASOC alleged that the Third Defendant was the holder of 50% of the shares issued in Bravo Luck and was also the "*de facto or shadow director of Bravo Luck*", because I was acting "*at all relevant times as a mere cypher and nominee*" for the Third Defendant (as alleged at [6]). These allegations are untrue as set out further below.

19. The Claimant also applied for and obtained the Kwok Order on 30 October 2020 . The Kwok Order was served on the solicitors representing Bravo Luck and I on 2 November 2020, together with the ASOC. As well as containing a freezing injunction against the Third Defendant, the Kwok Order also granted injunctive relief to the Claimant against Bravo Luck. The Kwok Order provided that Bravo Luck must not:

   (1) Whether by itself or by encouraging or instructing or permitting any other person from:

      (a) Making or permitting there to be made any changes to the Register of Member of Bravo Luck or to the Register of Charges of Bravo Luck, whether public or private;

(b) Discontinuing or redomiciling itself from the BVI or placing itself into a voluntary liquidation process under the BVI Business Companies Act 2004; and

(c) Alter the whereabouts of its statutory registers, unless it is to deliver the originals thereof to its Registered Agent or to some other address in the BVI.

(2) Until further order of the Court, remove from the BVI any of its assets up to value of US$112 million; or

(3) In any way dispose of, deal with or dimmish the value of any of their assets whether they are in or outside the BVI up to US$112 million.

20. The allegations advanced by the Claimant in the ASOC against Bravo Luck and I are of the utmost seriousness. It is alleged among other things, by the Claimant that:

(1) The Third Defendant conspired with Genever BVI, Bravo Luck and I pursuant to a scheme hatched by each of us to divert c.US$68 million to Bravo Luck to conceal that money in an opaque structure so as to allow the Third Defendant to act in continued breach of his contractual obligations to the Claimant, to use that money to instead purchase the Residence and ultimately to avoid enforcement of a judgment in the US proceedings (ASOC at [27]-[28]).

(2) The Declaration of Trust dated 17 February 2015 (the "**Declaration of Trust**") [QG1 at 36 to 38], which evidences the terms of an express trust, whereby the Third Defendant holds the shares in Genever BVI and Genever NY on trust for the benefit of Bravo Luck, is alleged to be a fraudulent document. The arrangement provided for in the Declaration of Trust is alleged to be a sham that was not intended to have legal effect as between Bravo Luck and the counterparties to it but was devised for the sole purpose of concealing an asset of the Third Defendant from his creditors (ASOC at [32]-[34]).

(3) I am a mere nominee for the Third Defendant, and he ultimately holds the whole beneficial interest in Bravo Luck. As such, the Claimant alleges that the shares issued by Bravo Luck are an asset of the Third Defendant available to satisfy the NY Judgment. Alternatively, the Claimant alleges that at least 50% of those shares are available to satisfy the NY Judgment (ASOC at [37]-[38]).

(4) The Instrument of Transfer dated 12 May 2015 [QG1 at 39, by which the Third Defendant transferred his share in Bravo Luck back to me, is not genuine and was not signed on the date that it bears. Furthermore, it was not delivered to the Registered Agent of Bravo Luck and was not intended to have legal effect (ASOC at [39]).

21. The Claimant has sought, but not obtained, among other things, the following declaratory relief against Bravo Luck and I:

(1) That the shares issued by Bravo Luck are held by me beneficially for the Third Defendant;

(2) That thee shares issued by Bravo Luck and Genever BVI are assets of the Third Defendant that will be available to satisfy the NY Judgment; and

(3) That the Declaration of Trust (and, if necessary, the Instrument of Transfer) is invalid, void and of no legal effect. In the alternative, the Claimant seeks an order setting aside the Declaration of Trust (and, if necessary, the Instrument of Transfer).

**D. THE TURNOVER ORDER MADE IN THE US PROCEEDINGS**

22. On 21 June 2021, the Claimant filed a motion for a Turnover Order against the Third Defendant and for the appointment of a receiver (see SS-1, page 93). The Claimant brought the motion to request the New York Court to issue an order:

"(i) directing Kwok to turn over all share certificates with respect to his 100% ownership in Genever BVI; (ii) directing Kwok to execute an Instrument of Transfer by which he conveys his shares in Genever BVI to PAX or its

designed; (iii) directing Kwok to send the executed Instrument of Transfer to Genever BVI's registered agent (iv) arranging Kwok to execute a resolution that Genever BVI's Register of Members be updated to reflect the new 100% ownership (to ensure the update occurs in the event that the registered agent requires instructions to update Genever BVI's Register of Members); and (v) appointing a receiver over Kwok's Genever BVI shares, including with the power (a) to instruct Genever BVI's registered agent to update Genever BVIs Register of Members to reflect PAX or a designee as its sole legal owner, and (b) to exercise voting rights with respect to all of Genever BVI's shares."

23. The Claimant's motion was supported by an affirmation by Andrew Willins dated 18 June 2021, which set out the steps required under BVI law for transferring share ownership (see SS-1, page 109).

24. As to the intended consequence of the Turnover Order, the Claimant made the following representations to the New York Court:

(1) In its Reply Memorandum dated 2 August 2021:

"Kwok's and the Genever Defendant's argument that PAX is trying to circumvent the veil-piercing trial in this case fundamentally misunderstands the relief PAX seeks. If PAX were to prevail on veil piercing, it would have a judgment against the Genever Defendants for the same amount as its judgment against Kwok. In other words, veil piercing would allow PAX to hold Kwok's alter egos responsible for his judgment. Turnover is quite different. If the Court grants PAX's Motion, PAX would *not* (yet) have, or be able to enforce, a judgment against either Genever Defendant. Rather, Kwok's personal property (*i.e.,* the Genever BVI shares would be "turned over" such that PAX would become the registered owner of those shares. Now that a judgment has been entered, APX is entitled to turnover of Kwok's 100% ownership interest in Genever BVI's shares under black-letter New York law." (SS-1, page 146).

...

"The relief PAX seeks here fundamentally differs from veil piercing. Turnover would entitled PAX to become the owner of Genever BVI; veil piercing would allow PAX to hold Genever BVI liable for Kwok's judgment by giving PAX a separate judgment (in the same amount) against Genever BVI. Even if PAX prevails on turnover, it may well pursue veil piercing too." (SS-1, page 148).

(2) During the hearing before the New York court on 22 September 2021, the attorney for the Claimant, Mr. Edward Moss, stated to the court that:

"If PAX prevailed on veil piercing it would have a judgment against Genever entities. In other words, it would be their judgment creditor. But if PAX prevails on turnover, it will become the owner, the equity holder of Genever BVI. It will not be a judgment creditor. These are two totally different things. Now, what PAX may do in the future as an equity holder of Genever BVI if the Court grants turnover, that's not before this Court today. And frankly, Judge, we are still working through these issues because Mr. Kwok has made such a mess of it with his machinations. The implications of turnover and veil piercing, they are tricky. Do we need one? Do we need both? Mr. Kwok is surely going to argue that we need both, any maybe even more than that. Right? But that it not before the Court today. Under the law, under the facts, PAX is entitled to turnover, and that's where the analysis should begin and end. And Mr. Kwok's argument here that veil piercing is somehow a prerequisite to turnover, is incorrect." (SS-1, pages 170-171)

25. It would, therefore, appear that what is intended by the Turnover Order and the PAX Application is for the Third Defendant to transfer the 100% legal ownership which he holds in Genever BVI to the Claimant (and ignoring any and all rights of Bravo Luck as the beneficial owner). The Claimant is intending by the Turnover Order and the PAX Application to become the owners of Genever BVI. There appears to have been no consideration for the fact that the Third Defendant is not the beneficial owner of the shares in Genever BVI and that the Turnover Order would interfere with the rights of Bravo Luck, as beneficial over of Genever BVI. The New York court granted the Turnover Order "*directing Kwok to take the steps necessary to effect the turnover his shares in Genever BVI to PAX*"; however, the Judge made the Turnover Order "*expressly contingent on the approval of Justice Jack in the related proceeding in the British Virgin Islands*" (SS-1, page 165).

E. BRAVO LUCK'S DEFENCE AND COUNTERCLAIM IN THE BVI PROCEEDINGS

26. The allegations advanced by the Claimant against Bravo Luck and I, as summarised at paragraph 20 above, are denied in their entirety. The case advanced by the Claimant, which is a case based in fraud, is advanced entirely on the basis of inferences being drawn. I fully intend to defend the claim brought by the Claimant against Bravo Luck and myself and a joint Defence and Counterclaim was filed on 14 January 2021 (the "**D & CC**") in furtherance of this. A counterclaim has been pursued, whereby declaratory relief is sought in the following terms:

    (1) That the entire shareholding in Bravo Luck is beneficially and solely owned by me; and

    (2) That the shares issued by Genever BVI and Genever NY are held by the Third Defendant beneficially for Bravo Luck.

27. It should be noted that the Claimant filed an Amended Reply and Defence to Counterclaim on 25 May 2021. There has been no determination of the matters in issue between the parties and, therefore, the beneficial ownership of Genever BVI remains in issue to be determined by the Court. Moreover, the Claimant, having defended the counterclaim, has not applied for summary judgment on the counterclaim, nor is it accepted that the counterclaim would be appropriate for determination on a summary basis, or that the Claimant would succeed on any such application. Given the seriousness of the allegations made by the Claimant, it is imperative and necessary that these proceedings proceed in the usual way and move onto the disclosure and evidential phase of the litigation, and ultimately through to trial. I understand from my solicitors that the case has not yet even progressed to a Case Management Conference as the parties are still in the process of agreeing a protocol for disclosure.

28. The correct position as to the ownership of Genever BVI, and ultimately the Residence, is as set out in the D & CC. While I do not exhaustively set out all the evidence that I will rely on or that will be available to me at trial, I have set out a summary of my position on the ultimate ownership of Bravo Luck, Genever BVI and the Residence further below.

29. In sum, I am the ultimate beneficial owner of Genever BVI, Genever US and the Residence by virtue of my ownership of Bravo Luck and the Declaration of Trust, which provides that the Third Defendant holds the Genever entities on trust for Bravo Luck. I signed the Declaration of Trust on behalf of Bravo Luck and the Third Defendant signed in his personal capacity and on behalf of Genever BVI and Genever US, which he legally holds the shares of on trust for Bravo Luck. Alternatively, the Third Defendant holds the Residence for the ultimate benefit of Bravo Luck pursuant to an implied resulting trust in circumstances where Bravo Luck provided the entire funding for the acquisition of the Residence.

(i) **The incorporation and ownership of Bravo Luck**

30. Bravo Luck was incorporated in the BVI on or around 2 April 2013 [**QG1 at 40**]. Bravo Luck had only one issued share as of 22 July 2013, which was issued to me. I was the sole shareholder and director of Bravo Luck at the time of its incorporation.

31. The legal ownership of Bravo Luck was changed for a limited period of approximately four months between 26 January 2015 and 12 May 2015, whereby I transferred 50% legal ownership of Bravo Luck to the Third Defendant for the purposes of helping me complete the purchase of the Residence [QG1 at 41 -42 &46]. The entire beneficial ownership of Bravo Luck always remained mine, pursuant to an express trust as evidenced by the Declaration of Trust [QG1 at 36-38]. Save for this four-month period, I can confirm that at all other times, I have been the sole legal and beneficial owner and sole director of Bravo Luck.

32. The Third Defendant returned the 50% legal ownership of Bravo Luck to me on 12 May 2015, as demonstrated by the Instrument of Transfer dated the same date [QG1 at 39] (the "**IOT**"). Contrary to what is alleged by the Claimant, the IOT is a genuine document and no evidence has been presented by the Claimant to prove otherwise. The IOT was prepared when both the Third Defendant and I were living in New York. It was drafted in Hong Kong by the firm, Stevenson, Wong & Co ("**SWC**"), who were the appointed secretary for Bravo Luck with the responsibility of maintaining the register. I retained SWC to act for me in relation other matters, from the time I was still living in Hong Kong. SWC have also acted for other members of my wider family.

I signed the IOT in New York, which was witnessed by Glen Clayton, an individual who had previously worked and travelled extensively with the 3rd Defendant. The IOT was signed at the Sherry Netherland Hotel, 781 5th Avenue, New York Building, New York, USA 10153  The Vistra Group ("**Vistra**") were the registered agents of Bravo Luck until 20 March 2019. I have been able to obtain emails from June 2017 that show SWC had provided the updated information to as to the beneficial ownership of Bravo Luck [QG1 at 43 to 46].

(ii) **Purchasing the Residence and Incorporation of Genever BVI and Genever NY**

Source of Funds used by Bravo Luck to purchase the Residence

33. My family has been wealthy since the 1980s. By family, I mean to include my immediate family, as well as extended family. The family owned several properties in China, including four real estate developments and financial institutions, before we were targeted by corrupt Chinese high officials within the Chinese government. The reason for this targeting was the fact that the Third Defendant had become a prominent political dissident. I intend to seek permission from the Court in due course to adduce expert evidence to address this issue, which is also directly relevant to why I structure my dealings in certain ways and why a documentary trail is not always possible.

34. In or around the year 2000, me and five of my cousins were sent to the United Kingdom for education purposes and so that we would be fully prepared to take over and expand the family business outside the People's Republic of China (the "**PRC**"). In or around 2007, I was given the responsibility of managing and expanding the family's assets outside of the PRC. By 2010 I was, in effect, the investment arm of the family outside of the PRC. As I recall, I was chosen to lead this because I was fluent in English and had gained experience of life and culture outside of the PRC. The money for the investments would generally be pooled from particular family members. This approach to investment via a commercial family cooperating, and in some cases pooling resources for investment is not unusual for wealthy Chinese families, where the members of the family trust each other. I was not alone in doing this for the family and my siblings and cousins would also undertake a similar role.

35. Whenever I decided to make an investment or purchase real estate on behalf of the family business, I would discuss the details of the investment/purchase with my family members. Those who were interested in that investment/purchase would provide me with the funding to make the investment. The assets would generally be legally and beneficially owned by me through a corporate structure. However, when the investment/real property is liquidated or sold, the funds from the family members who invested in that asset would be returned plus a share of the profit, if any, would also be paid as per my discretion.

36. In or around 2014, I was allowed to be more flexible and active in my investment and asset management activities on behalf of the family. The keys areas for growth were property and technology. I was particularly keen on investing in property in New York. Approximately US$ 500,000,000.00 was provided from pooled funds from the family and was transferred to Bravo Luck for me to invest in property and technology-based investments outside of the PRC. The funds were arranged and transferred, as needed, to Bravo Luck by Zhang Wei and Guo Li Jie. Guo Lie Jie is my cousin and responsible for a significant element of my family's assets. Zhang Wei is the husband of another one of my cousins, and he was also involved in managing the family's assets and business. Contrary to what has been said by the Claimant, the Third Defendant was not one of the family members who contributed his own funds towards the purchase of the Residence.

37. I understand that the Claimant has made allegations or implied in the US proceedings that the Third Defendant is lying about the existence of Zhang Wei. I have been able to obtain a true copy of Zhang Wei's passport [QG1 at 47] and identity card [QG1 at 48].

38. I chose Bravo Luck as the entity to make the investments given it was a company of good standing with operational bank accounts, etc.

39. The funds for the general investments outside of the PRC, as well as for the purchase of the Residence, were transferred to Bravo Luck by Hong Kong International Funds Investment Limited ("**HKIFIL**"), a company controlled by Zhang Wei, pursuant to a Loan Agreement, HKIFIL made the followings transfers to Bravo Luck's account with UBS pursuant to the Loan Agreement. On 22 January 2015, HKIFIL transfer US$150 million to Bravo Luck's account with UBS pursuant to the Loan Agreement and for the purposes of purchasing the Residence [QG1 at 49].

Identifying the Residence and arranging the Purchase using the Third Defendant

40. I told my lawyer in Washington DC, Robert (Bob) Barnett, that I was looking to potentially invest in real estate in New York. He referred me to a broker he knew, Kathleen Sloane ("**Kathy**"). I made the initial contact with Kathy and explained that I was searching for a property in New York. Kathy proceeded to make various arrangements and showed me several apartments which were for sale. A true copy of my initial email to Kathy is exhibited to this affidavit [QG1 at 50]. I was interested in 2 apartments - one at the Pierre Hotel and the Residence. I decided against the apartment at the Pierre Hotel as it was quite dated, needed extensive renovation/redecoration and they we unwilling to negotiate on the purchase price.

41. I was advised that I should purchase the Residence through a New York limited liability company (LLC) because one of the requirements for ownership of the Residence is that the owner must be a USA citizen or a USA entity. The decision was thereafter made that an LLC would be incorporated to purchase the Residence, but the funding for the purchase would be provided by Bravo Luck as originally contemplated, and Bravo Luck would be the beneficial owner of the LLC and ultimately of the Residence. This is borne out by the Genever NY Corporation on Income Tax return for the year ending 31 December 2017 [QG1 at 51 to 56]. On that return Bravo Luck is shown as a related party to Genever NY.

42. Kathy began discussions with the representatives of the Sherry-Netherland. I was told by Kathy that although the members of the Board of the Sherry-Netherland were receptive to my intended application, (which as indicated above was going to be made through an LLC) they would prefer that the individual supporting the LLC's application for the property be older than me. I was 28 years old at that time.

43. To avoid any issues and given the Sherry-Netherland's likely preference regarding the age of its applicants, as reported to me by Kathy, and in addition, the Sherry-Netherland's request for personal letters of recommendation from high-profile people to accompany the purchase applications, I was advised by Bob Barnett and Kathy that I should get the Third Defendant to be the formal individual supporting the LLC that would be incorporated to make the application for the purchase of the Residence. I did not have any issues with approaching the purchase in this manner.

44. I accepted this advice and asked the Third Defendant to assist Bravo Luck in acquiring the Residence by supporting the application to purchase it and he agreed. As the ultimate beneficial owner and the entity providing the funding for the Residence, the Sherry-Netherland required financial information from Bravo Luck and information relating to its ownership. Therefore, I issued a share in Bravo Luck to my father, as set out at paragraph 31 above. Having issued a share to my father, Bravo Luck's corporate records would reflect that he also had an interest in that company. This was intended to strengthen the application for the Residence.

The incorporation of Genever BVI and Genever NY and completing the purchase of the Residence

45. Genever BVI was incorporated on 13 February 2015 [QG1 at 57] to hold all the issued shares of the LLC which was to be incorporated. Given the Third Defendant was to be the legal owner of the Residence, he held all the issued shares in Genever BVI and was appointed its sole director [QG1 at 58]. However, Genever BVI was only to be held by the Third Defendant pursuant to an express trust, as evidenced by the Declaration of Trust, for the ultimate benefit of Bravo Luck. Bravo Luck in the beneficial owner of the shares in Genever BVI and it provided the funds for the purchase of the Residence on that basis.

46. On 17 February 2015, Genever NY was incorporated as the LLC to hold the Residence, through the relevant shares of capital stock in the Sherry-Netherland. Genever BVI is the sole shareholder of Genever NY, and the Third Defendant is the sole director.

47. On 26 February 2015, the application for the Residence, which was signed by the Third Defendant, on behalf of Geneva NY along with some of the required supporting documents, including Bravo Luck's corporate and financial information, were submitted to the Sherry-Netherland [QG1 59 to 61].

48. After these arrangements had been made, on 4 March 2015, SWC submitted a letter to the Sherry-Netherland Board in support of the purchase application [QG1 at 62 to 64]. SWC stated that (i) it had reviewed Bravo Luck's certificate of incorporation,

registers of members and directors, certificate of incumbency, the memorandum and articles of association, and documents confirming that Bravo Luck is beneficially owned equally by the Third Defendant and myself; and (iii) a specified bank account maintained by Bravo Luck with UBS AG was operated and could be accessed by either the Third Defendant or myself signing solely. SWC also provided the Sherry-Netherland Board with a statement from Bravo Luck's UBS' bank account, showing available funds in U.S. dollars in the amount of US$491,379,045 [QG1 at 65 to 71].

49. On the same day, I arranged for Bravo Luck to transfer US$62,990,741.86 to the seller the purchase of the Residence [QG1 at 72x]. The purpose of the transfer was to "*buy a property in New York*" as described in wire transfer documents [QG1 at 72.

50. A further US$6,300,000.00 was also transferred from Bravo Luck directly to me on 5 March 2015 so that I could pay fees and taxes related to the Residence, which were due and owing to the Sherry-Netherland and the relevant tax authorities [QG1 at 73]. Those payments were necessary to complete the purchase.

51. On 6 March 2015, I was authorised by Genever BVI to act on its behalf. Genever BVI also granted me the non-exclusive authority to: (i) manage and direct Genever NY; (ii) manage the disposition of Genever NY's funds and assets; and (iii) execute contracts on Genever US's behalf. This was to allow me to maintain control and manage the Residence given it was my investment and ultimately my asset. Shortly after this, on 12 May 2015 (when the Third Defendant's legal ownership of Bravo Luck was transferred back to me), by written resolution of the Third Defendant (who was the sole director at the time), I was appointed as an officer of Genever BVI with the title of President.

52. Both prior to and after the purchase of the Residence I handled most, if not all, matters relating to the Residence either directly or through Yvette Wang, who works for me and the family. Examples of this include: I signed the Co-op Exclusive Right-to-sell Agreement in relation to the Residence with the real estate broker on behalf of Genever NY; the management fees for the Residence which include electricity, water and gas have been and are being paid by one of my companies, Golden Spring New York, on behalf of Bravo Luck; and I applied for the internet service from Verizon and the account is still in my name. A true copy of a letter to me from Verizon in respect of an outstanding bill dated 12 October 2020 is exhibited [QG1 at 74 to 75]. Where certain arrangements required the intervention of the legal owner of the Residence, the Third Defendant would assist as required.

(iii) **The Declaration of Trust**

53. Contrary to the allegations advanced by the Claimant, the Declaration of Trust [QG1 at 36 to 38]is a genuine document which evidences the arrangements of an express trust. I note that the Claimant has provided no actual or cogent evidence to prove the Declaration of Trust is a sham, rather they invite the Court to reach such a conclusion at trial based on adverse inferences being drawn. The Declaration of Trust was prepared around the time it was decided that the Third Defendant should be used to progress the application to purchase the Residence and when the Genever entities were being incorporated. The terms recorded in the Declaration of Trust are clear and I do not repeat them here.

54. I signed the Declaration of Trust on behalf of Bravo Luck and the Third Defendant signed it on behalf of himself and the Genever entities on 17 February 2015. We were both in New York at the time. The Declaration of Trust was prepared by in-house employee of Golden Spring Hong Kong . I understand it was based on a previous agreement for a similar type of transaction that was drafted in respect of another transaction, which was then used as a template to prepare the Declaration of Trust.

55. The Declaration of Trust is not a sham. The sole intention for executing the Declaration of Trust was to protect Bravo Luck's interest in the Residence with the company having provided the purchase price for the Residence plus taxes and management fees.

56. Notwithstanding the above and in the alternative, if the Claimant is correct that the Declaration of Trust is invalid for any reason (which is denied) the funding for the purchase of the Residence was provided entirely by Bravo Luck and the Third Defendant holds the Residence pursuant to an implied resulting trust for the ultimate benefit of Bravo Luck, as has pleaded in the D & CC (paragraph 3 and 18).

**F. THE PAX APPLICATION SHOULD BE DISMISSED**

57. I am deeply concerned that the Claimant is trying to pre-empt the determination of Bravo Luck's counterclaim in these proceedings by applying to vary the terms of the Genever BVI Order and the Kwok Order to facilitate the transfer of the shares in Genever BVI to itself. Were this to happen prior to the determination of who the beneficial owner of Genever BVI is (for the avoidance of doubt, it is Bravo Luck), it would give ultimate control of the Residence to the Claimant. The Court is invited to maintain the current status quo, which will cause no real prejudice to the Claimant. As to this:

(1) While the Claimant does have the benefit of the NY Judgment, which I understand is under appeal, it does not currently have an enforceable judgment in the BVI, although the proceedings have been commenced. The proceedings in this jurisdiction raise serious and unproven allegations, which are denied. Even if the NY Judgment is recognised in the BVI, it is not a judgment against Genever BVI.

(2) The disputed beneficial ownership of Genever BVI has not been determined by this Court, which is the correct and appropriate jurisdiction to make such a determination and to which the parties have submitted to. The Claimant specifically seeks a declaration that the Declaration of Trust is invalid, void and of no legal effect, alternatively an order setting aside the Declaration of Trust. Until such time as the Court grants such relief (if at all), the status quo should be maintained. The presumption should be that the terms evidenced in the Declarations of Trust are valid and effective until such time as the Court determines otherwise.

(3) Further to (2), the reality is that the disputed beneficial ownership of Genever BVI has not even been determined in the US Proceedings or any other jurisdiction. From the documents filed in these proceedings, I understand there was going to be a further trial in New York to determine whether or not Genever BVI and Genever NY were alter egos of the Third Defendant which are liable for judgment debt (as alleged by the Claimant, which I deny).

(4) These proceedings have not even reached the stage of disclosure and witness evidence. The Claimant has not provided real and cogent evidence thus far to support their claims against Bravo Luck and I, nor have they applied for summary judgment on the claim or counterclaim. This includes a failure to provide clear and cogent evidence that, as it alleges, the money paid by Bravo Luck for the Residence belonged to the Third Defendant.

(5) Adjourning or dismissing the application to be renewed post judgment being handed down on the Claimant's claim and Bravo Luck and my counterclaim does not cause any prejudice to the Claimant, but does cause real prejudice to me and Bravo Luck. In particular:

   (a) The Genever BVI Order and Kwok Order already provide the Claimant with sufficient protection that the shareholding in Genever BVI cannot be altered in any way, nor can Genever BVI dispose of, deal with or dimmish the value of any of its assets, which include Genever NY and, indirectly, the Residence.

   (b) The parties have reached an agreement in the bankruptcy proceedings in New York for Genever NY, which requires the gross sale proceeds from the sale of the Residence to be paid into and held in escrow pending further order of the bankruptcy court. As such, even if the Residence is sold the proceeds of sale will be preserved should it be determined that the Claimant is entitled to enforce against it.

   (c) Were the Claimant to be given ownership and control of Genever BVI, I understand that it could take control of the bankruptcy process in New York and ultimately deal with the Residence as it sees fit, as it will become the owner of Genever NY. It could do all of this, notwithstanding the fact the Court may well conclude (and should conclude) that the Residence is ultimately owned by me through Bravo Luck and it is not an asset that is available to enforce the judgment debt of the Third Defendant against.

   (d) Were the Court to grant the PAX Application, it would effectively render the counterclaim pursued by Bravo Luck and myself nugatory. If we succeeded on our counterclaim at trial, the declarations sought would

be of no value as the shares in Genever BVI would have already been transferred to the Claimant and the newly incorporated limited partnership in the Cayman Islands. There is no guarantee that once they have control of the shares in Genever BVI and control of the Residence that it would be possible to get them back, or for me and Bravo Luck to pursue the Claimant if they did not return the shares. It is entirely possible the Claimant would be dissolved prior to trial if the PAX Application is granted.

58. Further to the points I have made above at paragraph 56, I have also not been afforded the opportunity to present my evidence and my case that shows I am the true beneficial owner of Bravo Luck, the Genever entities and the Residence. The question of beneficial ownership is a matter for evidence at trial. This will necessarily, and subject to the permission of the Court, include expert evidence. The evidence I give above, including the exhibits to this affidavit, support my case that Bravo Luck is the beneficial owner of the Residence by the Genever entities through which the Residence is held. I intend at the trial of this action to adduce expert evidence to support the description I have given of the family investment structure. It is intended that the expert will comment on the proposition that such commercial family investment structures are not uncommon amongst wealthy Chinese business families. This is an important issue in this case as much is made of alleged discrepancies in documentation in support of the serious allegations made by the Claimant. Such alleged discrepancies may be seen to be less remarkable in a family structure under pinned by trust and by shared cultural norms.

59. Another area of expert evidence which will be an important part of the case that Bravo Luck and I will present will relate to the persecution of my father by the Chinese government. The reason for this persecution is the fact that my father is a prominent political dissident and has devoted considerable resources to highlighting serious flaws in the Chinese system of government. This issue is highly relevant to this litigation. The reason for this is that I believe I will be able to demonstrate connections between the Chinese government and the Claimant, and also to show the extent to which records and documentation have been removed from me, and from Bravo Luck, and witnesses deterred from coming forward by improper actions of the Chinese state. This is a significant issue in this litigation because the Claimant has sought to dismiss Bravo Luck's counterclaim out of hand and indeed avoid it being properly adjudicated at all. By way of example of the material that already exists in the public domain:

   (1) There is now produced and shown to me at [QG1 at 76 to 100] an article issued by an arm of the University of Stanford in the US. I refer the court to paragraph 4.2 where the Third Defendant is discussed. This article references a campaign carried out via Twitter by various accounts attributed to the PRC. I refer the court to the summary on page 3 of the article. This article supports my evidence that the Third Defendant, and by extension our family, has been the subject of a sustained campaign of harassment by the PRC.

   (2) At pages [QG1 at 101 to 104 is now produced and shown to me an article appearing in the Internet journal "Above the Law". This article reports on a case brought by the Third Defendant against a US law firm, Clark Hill, which was acting for him. The article references a *"targeted hack of the firm by the Chinese Government"*. The article also observes that: *"[t]here seems to be no dispute as to the source of the hacking – both parties* [i.e. Clark Hill and my father] *implicitly understanding it was the CCP…"*. The author of this article is a US lawyer specializing in cyber security.

60. While these articles are far from the last word on the issue of Chinese government persecution; and that persecution impacting the manner in which Bravo Luck and I can present our case, they do support Bravo Luck's position that if its counterclaim is to be adjudicated fairly, complex issues of expert evidence will require to be considered by this Court before any substantive determination can occur on the issues in dispute.

61. Taking into account the above factors, a 1-hour hearing listed on 6 December 2021 is not sufficient to consider the PAX Application and BL Cross-Application. The determination of both applications will very likely have serious consequences for the proceedings as a whole. As such, the Court is invited to adjourn the hearing on 6 December 2021 and relist it following further directions as provided for as paragraph 4 above. As a further point, Hodge Malek QC and Yash Bheeroo, Leading and Junior Counsel, who settled the D & CC and who have been appointed to act for me and Bravo Luck in the proceedings are both travelling on and around 6 December 2021 and thus may have difficulties being available to prepare and attend the hearing.

### G. CONCLUSION

62. In the circumstances, it is clear that the Claimant is seeking the pre-empt the adjudication of Bravo Luck's counterclaim. To allow this to occur would be unjust as there has been no disclosure, no witness evidence, no expert evidence which is required in this case both as to Chinese commercial practice and the oppression visited upon my family by the Chinese government. Further given the very serious allegations which the Claimant makes so freely, cross examination of witnesses will be required if a just outcome is to be arrived at. I emphasize that Bravo Luck's claim as asserted in its counterclaim has not been adjudicated anywhere.

63. In the first instance, I would invite the Court to adjourn the hearing on 6 December 2021 and to set down directions to allow for a hearing with a realistic time estimate of 1 day to be fixed after further evidence has been filed. The PAX Application and BL Cross-Application has the potential to bring finality to the proceedings through an interlocutory application and as such, the Court should allow for sufficient time to consider the issues and have the relevant information and evidence before it.

64. Further to the above, the Court is invited to dismiss the PAX Application and allow this case to proceed to the next phases of litigation and to trial. Should the Court be minded to grant the PAX Application, the Court is invited to grant an injunction restraining the Claimant's ability to dispose of or deal with the shares of Genever BVI and its underlying assets.

SWORN to by Qiang Guo
On the 30th day of November 2021
at 7 Savoy Court, London, WC2R 0EX UK.

BEFORE ME:

NOTARY PUBLIC

QIANG GUO

Q.G.

**Jonathan Phillip Hewitt**
Notary Public & Commissioner for Oaths
7 Savoy Court, London, WC2R 0EX
+44 (0)20 7667 5225 / jonathan.hewitt@harbottle.com
My commission expires with life



THE EASTERN CARIBBEAN SUPREME COURT
VIRGIN ISLANDS
IN THE HIGH COURT OF JUSTICE
COMMERCIAL DIVISION
CLAIM NO: BVIHCM 0137 OF 2020
BETWEEN:

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND LP

**Claimant**

-and-

(1) GENEVER HOLDINGS CORPORATION
(2) BRAVO LUCK LIMITED
(3) KWOK HO WAN (also known as MILES KWOK, HO WAN KWOK and GUO WEN GUI)
(4) QIANG GUO

**Defendants**

---

**AFFIDAVIT OF QIANG GUO**

---



Legal Practitioners for the Second and Fourth Defendants.
2nd Floor, Commerce House
181 Main Street, P.O. Box 961
Road Town, Tortola
British Virgin Islands VG 1110
Tel: (284) 494 5808 | Fax: (284) 494 5811

www.onealwebster.com

1