# EXHIBIT D

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

```
------------------------------------------------------x
                                          :
In re:                                    :            Chapter 11
                                          :
HO WAN KWOK,                              :            Case No. 22-50073 (JAM)
                                          :
            Debtor.                       :
------------------------------------------------------x
HK International Funds Investments         :
(USA) Limited, LLC                        :
                         Plaintiff         :            Adv. Proceeding No. 22-05003
v.                                        :
Ho Wan Kwok                               :
                         Defendant         :            September 23, 2022
                                          :
------------------------------------------------------x
                                          :
Chapter 11 Trustee Luc A. Despins          :
                         Counter-Plaintiff :
                                          :
v.                                        :
HK International Funds Investments         :
(USA) Limited, LLC, and Mei Guo           :
                         Counter-Defendants.  :
------------------------------------------------------x
```

## CHAPTER 11 TRUSTEE'S ANSWER AND COUNTERCLAIMS

Mr. Luc A. Despins, in his capacity as the chapter 11 trustee (the "Trustee") appointed in

the chapter 11 case (the "Chapter 11 Case") of Ho Wan Kwok (the "Debtor"), files this answer

(the "Answer") to the complaint (the "Complaint") filed by HK International Funds Investments

(USA) Limited, LLC ("HK USA") [Adv. Proc. Docket No. 1] and asserts the counterclaims set

forth herein (the "Counterclaims").

## ANSWER AND AFFIRMATIVE DEFENSES

### I.  SPECIFIC ADMISSIONS AND DENIALS

To the extent a response is required to the statements and allegations contained in the first three unnumbered paragraphs of the Complaint under the heading entitled "Summary of HK USA's Cause of Action," the Trustee denies those statements and allegations except to the extent they are admitted in response to the Complaint's numbered allegations, as follows.

1.     The Trustee is without knowledge or information sufficient to admit or deny the allegations in paragraph 1 of the Complaint.  To the extent paragraph 1 of the Complaint implies that HK USA is an independent legal entity, the Trustee denies that allegation because HK USA is the alter ego of the Debtor, for the reasons discussed in the Trustee's Counterclaims.

2.     The Trustee admits that HK USA is nominally the registered owner of the Lady May; however, the Trustee denies that such registered ownership status means that the Lady May is not property of the Debtor's chapter 11 estate.

3.     The Trustee admits that Ms. Mei Guo (the "Debtor's Daughter") is the Debtor's daughter and that she lives in the United States.  The Trustee is without knowledge or information sufficient to admit or deny HK USA's allegations regarding the Debtor's Daughter's immigration proceedings or issues with the Chinese government or CCP, and on that basis denies such allegations.  The Trustee denies the remaining allegations in paragraph 3 of the Complaint.

4.     The Trustee is without knowledge or information sufficient to admit or deny the allegations in paragraph 4 of the Complaint, and on that basis denies such allegations.

5.     The Trustee is without knowledge or information sufficient to admit or deny the allegations in paragraph 5 of the Complaint, and on that basis denies such allegations.

6.     The Trustee admits the allegation contained in paragraph 6 of the Complaint.

2

7.      The Trustee admits that the Complaint purports to seek the relief described in paragraph 7 of the Complaint but denies that Plaintiff is entitled to such relief.

8.      The Trustee admits that the Court has jurisdiction over this adversary proceeding.

9.      The Trustee admits that the Court has jurisdiction to determine what property constitutes property of the estate.

10.      The Trustee admits that this is a core proceeding.

11.      The Trustee admits that venue is proper in this Court.

12.      The Trustee is without knowledge or information sufficient to admit or deny the allegation in paragraph 12 of the Complaint, and on that basis denies such allegation.

13.      The Trustee is without knowledge or information sufficient to know whether "Ms. Qu was a trusted business partner of Ms. Guo's older brother, Qiang, Guo," and on that basis denies such allegation.  The Trustee further denies the remaining allegations in paragraph 13 of the Complaint.

14.      The Trustee denies the allegations in paragraph 14 of the Complaint.

15.      The Trustee is without knowledge or information sufficient to admit or deny the allegations in paragraph 15 of the Complaint, and on that basis denies such allegations.

16.      The Trustee denies the allegations in paragraph 16 of the Complaint.

17.      The Trustee denies the allegations in paragraph 17 of the Complaint.

18.      The Trustee is without knowledge or information sufficient to admit or deny the allegations in paragraph 18 of the Complaint, and on that basis denies such allegations.

19.      The Trustee is without knowledge or information sufficient to admit or deny the allegations in paragraph 19 of the Complaint, and on that basis denies such allegations.

20.     The Trustee is without knowledge or information sufficient to admit or deny the allegations in paragraph 20 of the Complaint, and on that basis denies such allegations.

21.     The Trustee admits that ownership of HK International was transferred to the Debtor's Daughter on June 27, 2017.  The Trustee denies that it was Ms. Qu who transferred such ownership and also denies the remaining allegations in paragraph 21 of the Complaint.

22.     The Trustee is without knowledge or information sufficient to admit or deny that HK International's only asset when it was transferred to the Debtor's daughter was the Lady May, and on that basis denies such allegation.  The Trustee denies the remaining allegations in paragraph 22 of the Complaint.

23.     The Trustee admits the allegations in paragraph 23 of the Complaint.

24.     The Trustee admits that Golden Spring and Lamp Capital paid expenses associated with the Lady May and that HK USA has never held a bank account.  The Trustee denies the remaining allegations in paragraph 24 of the Complaint.

25.     The Trustee denies the allegations in paragraph 25 of the Complaint.

26.     The Trustee is without knowledge or information sufficient to admit or deny the allegations in paragraph 26 with respect to the Lady May's traditional or typical movements, and on that basis denies such allegations.  The Trustee further denies the allegations in the last two sentences of paragraph 26 asserting that HK USA's representatives directed the Lady May's movements and that the Debtor lacked authority to give such directions.

27.     The Trustee is without knowledge or information sufficient to admit or deny that the Lady May often hosts guests, and on that basis denies such allegation.  The Trustee denies the allegations in the second sentence of paragraph 27 of the Complaint.

28.     The Trustee denies the allegations in paragraph 28 of the Complaint.

29.     The Trustee admits that PAX obtained summary judgment against the Debtor on September 15, 2020, and the State Court's decision speaks for itself.   The Trustee admits that neither HK USA nor Ms. Guo is a named party to the litigation in front of Justice Ostrager (the "State Court Action").

30.     The Trustee admits that PAX obtained the order referenced in paragraph 30 of the Complaint, and such order speaks for itself.

31.     The Trustee admits that NY CPLR § 5229 states that "[i]n any court, before a judgment is entered, upon motion of the party in whose favor a verdict or decision has been rendered, the trial judge may order examination of the adverse party and order him restrained with the same effect as if a restraining notice had been served upon him after judgment."  The Trustee denies the remaining allegations in paragraph 31 of the Complaint.

32.     The Trustee admits that the State Court issued a contempt order on March 16, 2021, and such order speaks for itself.  The Trustee denies the remaining allegations in paragraph 32 of the Complaint.

33.     The Trustee admits that the State Court entered a final order of contempt against the Debtor on February 9, 2022, and such order speaks for itself.

34.     The Trustee admits the Debtor's Daughter testified as a witness before the State Court and that she was not a named party to the litigation.  The Trustee denies the remaining allegations in paragraph 34 of the Complaint.

35.     The Trustee admits that PAX filed the referenced motion on March 1, 2022, and such motion speaks for itself.

36.     The Trustee admits that PAX has commenced certain legal proceedings that relate to the Lady May.  The Trustee denies the remaining allegations in paragraph 36 of the Complaint.

37.     The Trustee admits that PAX contended in the State Court that the Lady May is a critical asset of the Debtor's estate.  The Trustee denies the remaining allegations in paragraph 37 of the Complaint.

38.     The Trustee admits that there is a dispute between HK USA, the Trustee, and other parties concerning the Debtor's and HK USA's interest in the Lady May and that the resolution of such dispute will impact the administration of this case.

39.     The Trustee incorporates by reference its responses to paragraphs 1-38 of the Complaint.

40.     The Trustee denies the allegations in paragraph 40 of the Complaint.

41.     The Trustee denies the allegations in paragraph 41 of the Complaint.

42.     The Trustee denies the allegations in paragraph 42 of the Complaint.

## II.     <u>AFFIRMATIVE DEFENSE</u>

1.      HK USA's claims are barred, in whole or in part, by the doctrines of collateral estoppel and/or res judicata.

2.      HK USA's claims are barred, in whole or in part, by the doctrine of unclean hands or *in pari delicto*.

3.      HK USA's claims are barred, in whole or in part, by the doctrines of setoff and recoupment.

## <u>COUNTERCLAIMS</u>

## III.     <u>NATURE OF COUNTERCLAIMS</u>

1.      The issues relevant to this action extend well beyond the narrow question of

whether HK USA should be held to be the owner of the Lady May, which the Trustee contests based on, among other things, the preclusive effect of rulings made by Justice Ostrager of the New York Supreme Court (the "State Court") in his decision of February 9, 2022 (the "Final Contempt Decision").[1]

2.    Beyond the Trustee's defenses to the Complaint, the Trustee holds a series of affirmative claims against HK USA based on HK USA's well-documented role as one of a large number of shell companies used by the Debtor to protect his assets from creditors.

3.    First, HK USA is an alter ego of the Debtor, and this Court should issue a declaratory judgment to that effect. Justice Ostrager already found that HK USA is a shell company the Debtor used to protect assets from his creditors and that the Debtor "beneficially owns and controls"[2] HK USA's only asset: the Lady May. Justice Ostrager's conclusions are supported by voluminous evidence in the record showing that HK USA is a mere instrumentality of the Debtor, with no independent existence. Among other things, HK USA has no income, bank account, directors, officers, or employees, and, upon information and belief, it has never observed corporate formalities. At all relevant times, HK USA was under-capitalized, and its expenses (including its legal fees) have been paid for by Golden Spring (New York) Ltd. and Lamp Capital LLC, entities purportedly owned by the Debtor's son that also pay for the Debtor's attorneys' fees and living expenses (enabling him to claim that he has no assets of his own while living a life of extreme luxury). HK USA has also shared an address with the Debtor and other Debtor-linked entities. Based on these and the other facts discussed herein, the Trustee seeks an order declaring that HK USA is the Debtor's alter ego pursuant to sections 541 and 544 of the

---

[1] Ex. 1, February 9, 2022 Decision and Order, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 1181.

[2] Final Contempt Decision at 4.

Bankruptcy Code and that, therefore, all of the property of HK USA, including the $37 million deposited into escrow and/or rights related thereto under the applicable escrow agreement, is property of the Debtor's chapter 11 estate.

4.  <u>Second</u>, for the same reasons that HK USA is the Debtor's alter ego, the Debtor, and not the Debtor's Daughter, is the equitable owner of HK USA.  Therefore, HK USA is property of the Debtor's chapter 11 estate pursuant to section 541 of the Bankruptcy Code.

5.  <u>Third</u>, assuming the Court does not rule that HK USA is an alter ego of or equitably owned by the Debtor, the Trustee asserts that HK USA was the recipient of an actual fraudulent transfer by the Debtor consisting of the value of the Lady May and/or the funds used to purchase the Lady May.  Therefore, the Trustee seeks, as alternative relief, the return of the Lady May or its value to the Debtor's chapter 11 estate pursuant to New York's fraudulent conveyance statute and sections 544, 548, and 550 of the Bankruptcy Code.

6.  <u>Finally</u>, again assuming the Court does not rule that HK USA is an alter ego of or equitably owned by the Debtor, the Trustee asserts a negligence claim against HK USA based on HK USA having taken and kept the Lady May overseas in violation of court orders, causing the Debtor to incur a $134 million contempt fine.

## IV.  <u>FACTS</u>

### A.  <u>Debtor's Shell Game</u>

7.  As established in the State Court Action, the Debtor's *modus operandi* for years has been to use family members and shell companies to shield his assets from creditors.  Justice Ostrager accurately referred to the Debtor's asset protection strategy as a "shell game" numerous times in hearings and written decisions and orders in the State Court Action.

8.  The Debtor's shell game has allowed him to continue, up to this day, to (1) refuse to pay his debts; (2) enjoy all the benefits of massive wealth, such as yachts, private planes, and

8

luxury cars and lodging; (3) spend millions of dollars on the attorneys' fees necessary to litigate

against PAX, the Trustee, and numerous other parties; and (4) engage in his daily business of

peddling disinformation, conspiracy theories, and cryptocurrency schemes.[3]

9.      The aspect of the Debtor's shell game most critical to this adversary proceeding

(i.e., the Debtor's use of HK USA to shield the Lady May from creditors), ***is only one example***

of the Debtor's massive abuse of the corporate form to judgment-proof himself and keep

creditors at bay.  The Debtor has, upon information and belief, established numerous, potentially

hundreds, of entities (including many in off-shore jurisdictions such as the British Virgin Islands

("BVI")), that he uses to hold or transfer property so that he can avoid liability and protect assets

from creditors.  The Debtor's use of these shell companies makes it impossible to believe he is

truly a pauper dependent on family charity, a position that is insulting to the intelligence of the

Court and all parties in interest.

10.     Certain of the Debtor's important shell companies include, in addition to HK

USA:

a)      **Golden Spring (New York) Ltd ("Golden Spring")**.  Golden Spring is a
        Delaware entity that pays the Debtor's expenses so the Debtor can live in
        luxury while claiming to own no assets and earn no income.

        (1)     Purportedly owned indirectly by the Debtor's Son,[4] Golden
                Spring was established and funded by the Debtor through a

---

[3] *See, e.g.*, Friedman, Dan. "A Fugitive Chinese Tycoon Met Steve Bannon. Misinformation Mayhem Ensued."
*Mother Jones*, March – April 2022, https://www.motherjones.com/politics/2022/02/guo-wengui-miles-guo-gettr-
steve-bannon/; Whalen, Jeanne, et al. "Chinese Businessman with Links to Steve Bannon Is Driving Force for a
Sprawling Disinformation Network, Researchers Say." *The Washington Post*, 17 May 2021,
https://www.washingtonpost.com/technology/2021/05/17/guo-wengui-disinformation-steve-bannon/; Hui, Echo, and
Hagar Cohen. "After John Left a Conspiracy-Sharing Group, the Billionaire Founder Told Followers He 'Deserved
to Die'." *ABC News*, 1 Nov. 2020, https://www.abc.net.au/news/2020-11-01/behind-the-scenes-of-the-guo-and-
bannon-led-propaganda-machine/12830824/.

[4] *See, e.g.*, Ex. 2, Wang Dep. Tr. at 18:17-18 (testimony that Golden Spring 100% owned by China Golden Spring
(Hong Kong)); 17:3-4 (describing the Debtor's Son as owner of "Golden Spring").

9

transfer of funds from one of his accounts in Hong Kong to the account of Golden Spring in New York in 2015.[5]

(2)    A court order issued in Hong Kong on October 18, 2018, the Restraint Order Prohibiting Disposal of Assets In Hong Kong and Elsewhere (the "Hong Kong Restraint Order), identified Golden Spring's parent company, China Golden Spring Group (Hong Kong) Limited, as one of a number of entities whose bank accounts were "subject to the effective control of the Debtor."[6]

(3)    The Debtor has testified that Golden Spring has been paying his living expenses since 2015.[7] Golden Spring has also been paying the fees of the Debtor's counsel and millions of dollars of maintenance fees associated with the Sherry Netherland Apartment, among other payments.

(4)    Golden Spring's president, Yan Ping ("Yvette") Wang ("Ms. Wang") has testified that Golden Spring is the Debtor's "family office."[8] She has also testified that in her capacity as president of Golden Spring she "serve[d] as an administrator for *the interests of [the Debtor]* and his family."[9]

(5)    At the same deposition, Ms. Wang could not identify a single person who worked at Golden Spring prior to February 2018, except for the Debtor's personal chauffeur, nor could she identify any business purpose of Golden

---

[5] In a 2016 affidavit filed in the New York Supreme Court in connection with Ace Decade's litigation against UBS, the Debtor stated that Golden Spring was established "by transferring funds from one of my accounts at UBS to Golden Spring New York's JPMorgan Chase bank account in New York." Ex. 3, Affidavit of Kwok Ho Wan, dated February 5, 2016, in *Ace Decade Holdings Limited vs. UBS AG*, Index No. 653316/2015 (N.Y. Sup. Ct.) at ¶ 36.

[6] Ex. 93, Hong Kong Restraint Order ¶ 3, Respondent 22.

[7] *See* Ex. 4, Tr. of Telephonic 341 Meeting of Creditors, dated April 6, 2022 at 85:17-19. *See also* Ex. 5, Letter from Melissa M. Carvalho, dated February 1, 2021 at ¶ 8. ("Mr. Kwok responds that his expenses during the relevant time period have been paid for by Golden Spring (New York) Ltd.").

[8] Ex. 6, Wang Dep. Tr. at 20:10-16 (Q: "What business is Golden Spring Hong Kong in? A: Family office. Q: Whose family? A: The Guo family. Q: Mr. Kwok's family? A: Yes.).

[9] *Id.* at 46:20-23 ("Q: I'm asking you whether or not you serve as an administrator for Mr. Kwok's interests? A: Yes.") (emphasis added). *See also* Ex. 7, May 15, 2018 Affidavit of Yan Ping Wang in *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.) (ECF 182) at ¶ 1. ("I am the President of Golden Spring (New York) Ltd., and in that capacity serve as an administrator for the interests of [the Debtor] and his family.").

Spring other than that of serving as the Debtor's "family office" and starting the Debtor's social media platform.[10]

(6)     During the State Court Action, Golden Spring's counsel appeared at depositions for the Debtor, and the Debtor's counsel represented Ms. Wang, president of Golden Spring, in connection with her deposition.[11]

(7)     Golden Spring's address at 162 East 64th Street, New York, New York 10065 has been used as the address of the Debtor and numerous affiliated entities, including HK USA and Greenwich Land LLC.[12]

(8)     Ms. Wang, president of Golden Spring, is the authorized signatory on official documents filed with courts and administrative agencies by multiple shell companies.[13]

b)     **Lamp Capital LLC ("Lamp Capital").** Lamp Capital is a Delaware entity,[14] purportedly owned by the Debtor's son,[15] that also contributes to the payment of the Debtor's expenses so that he can maintain his lifestyle while claiming to own no assets and earn no income.

(1)     Lamp Capital's sole member is Infinity Treasury Management, Inc.,[16] of which the Debtor's Son is the purported sole shareholder, the Debtor's associate Max Krasner is director and officer,[17] and the Debtor's associate Daniel Podhaskie is a former director and officer.[18]

---

[10] *See* Ex. 6, Wang Dep. Tr. at 39:20–40:8.

[11] *See* Ex. 8, Kwok Dep. Tr. at 8:8-9 ("Karin Maistrello, Golden Spring, for Defendant"); Ex. 6, Wang Dep. Tr. At 6:9-10 (Jillian Searles identified by Ms. Wang as her attorney after entering an appearance "for defendant Kwok Ho Wan").

[12] *See, e.g.*, Ex. 20, Limited Liability Company Agreement of HK International Funds Investments (USA) Limited, LLC, dated April 1, 2019; Ex. 54, Greenwich Land LLC Real Property Tax Assessor Record, dated July 15, 2021.

[13] *See e.g.*, Ex. 9, Verified Complaint, *Genever Holdings, LLC v. Sherry-Netherland, Inc.*, 16-cv-06246 (S.D.N.Y. Aug. 5, 2016), ECF No. 1; Ex. 10, Saraca Media Group Certificates of Assumed Name, dated May 14, 2020.

[14] *See* Ex. 17, Certificate of Incorporation of Lamp Capital LLC, dated Sept. 4, 2020.

[15] Ex. 4, Tr. of Telephonic 341 Meeting of Creditor, at 50:6-7.

[16] Ex. 92, Limited Liability Company Agreement of Lamp Capital, LLC, dated September 8, 2020.

[17] *See* Ex. 55. Mr. Krasner's other roles have included, among others, serving as representative of Greenwich Land in connection with certain property transactions, as incorporator of GTV Media Group, Inc. (a subsidiary of Saraca), and as president, treasurer, and director of the Rule of Law Foundation III Inc., a purported nonprofit entity linked to the Debtor. *See* Ex. 11, Greenwich Land Warranty Deed, dated April 26, 2022; Ex. 12, GTV Media Group

(2)     Mr. Podhaskie is or was an authorized signatory for Lamp Capital.[19]

(3)     Corporate filings related to Lamp Capital LLC were handled by Hodgson Russ LLP, counsel to the Debtor in the State Court Action.[20]

(4)     Lamp Capital purportedly "loaned" the Debtor $1 million, which was then remitted directly to Brown Rudnick LLP ("Brown Rudnick"), the Debtor's former bankruptcy counsel, as a retainer.[21]

c)     **Greenwich Land LLC ("Greenwich Land").**  Greenwich Land, a Delaware entity purportedly owned by the Debtor's wife, owns the Debtor's residence on Taconic Road (the "Taconic Road Residence") in Greenwich, Connecticut.

(1)     Greenwich Land was organized in 2019 by a partner at the law firm of Hodgson Russ, which at the time represented the Debtor in the State Court Action.[22]

(2)     In February 18, 2020, $2 million was transferred from Saraca Media Group Inc. ("Saraca") (an entity purportedly

---

Certificate of Incorporation, dated April 17, 2020; Ex. 13, Rule of Law Foundation III Inc. Certificate of Incorporation, dated January 11, 2019.

[18] *See* Ex. 55. Mr. Podhaskie's other roles have included, among others, serving as the Debtor's personal attorney, general counsel to Golden Spring, and corporate representative for purposes of Rule 30(b)(6) with respect to Genever US and Genever BVI.  *See e.g.*, Ex. 4, Tr. of Telephonic 341 Meeting of Creditors, dated April 6, 2022 at 79:2-3 (debtor stating that Podhaskie "used to be Golden Spring attorney and my personal attorney."); *see* Ex. 14, Podhaskie Dep. Tr. at 8:8-9:1 (Podhaskie appearing as corporate representative of Genever US and Genever BVI (each defined below)).

[19] *See, e.g.*, Ex. 15, Application for Authority of Lamp Capital LLC, dated Sept. 11, 2020 filed with the State of New York (signed by Podhaskie).

[20] *Id.*

[21] *See* Application of the Debtor for Entry of an Order Authorizing the Employment and Retention of Brown Rudnick LLP as Counsel for the Debtor, Docket No. 86, at ¶ 17;  Ex. 4, Tr. of Telephonic 341 Meeting of Creditors, dated April 6, 2022 at 49: 22-24.  At his April 6, 2022 Section 341 meeting, the Debtor testified that this loan was not in writing and that he did not know the terms of the loan, why the money had been lent, or what the source of the money was.  *Id.* at 49-51.

[22] Hodgson Russ attorneys also assisted the Debtor with, among other things, the formations of Saraca and Lamp Capital, as well as other corporate filings on behalf of Golden Spring.  *See* Ex. 16, Saraca Media Group Inc. Certificate of Incorporation, dated May 31, 2018 (signed by Courtney Scanlon); Ex. 17, Certificate of Incorporation of Lamp Capital LLC, dated September 4, 2020 (signed by Valerie E. Stevens); Ex. 18, Biennial Statement of Golden Spring, filed October 16, 2018 (signed by Courtney Scanlon).

owned by the Debtor's Son[23]) to Greenwich Land in connection with the purchase the Taconic Road Residence.

(3)    On or about April 26, 2022, in a transfer that was never disclosed to this Court, Greenwich Land sold a second property, on Ferncliff Road in Cos Cob, Connecticut, which it had previously owned. [24] The authorized signatory for Greenwich Land on the warranty deed in connection with the transfer is Max Krasner, who, as noted above, is an associate of the Debtor with a number of roles at Debtor-affiliated entities.[25]

(4)    Greenwich Land's address at 162 East 64th Street, New York, New York 10065 has been used as the address of the Debtor and numerous affiliated entities, including Golden Spring and HK USA.[26]

d)    **Genever Holdings Corporation ("Genever BVI") and Genever Holdings LLC ("Genever US").**  Genever BVI is a BVI corporation of which the Debtor was the sole registered shareholder (prior to the Trustee obtaining control over such shares), and Genever BVI is the sole member of Genever US.  Genever US holds title to the Debtor's apartment in the Sherry-Netherland Hotel (the "Sherry Netherland Apartment").

(1)    The Debtor has described Genever BVI and Genever US (the "Genever Entities") as special purpose vehicles.[27]

(2)    In the State Court Action, PAX asserted that Genever BVI and Genever US were alter egos of the Debtor.[28]

---

[23] Ex. 4, Tr. of Telephonic 341 Meeting of Creditors, dated April 6, 2022 at 108:12-13 ("Who owns Saraca? A. My Son.").

[24] Ex. 11, Greenwich Land Warranty Deed, dated April 26, 2022.

[25] *Id.  See* FN 18. At the Debtor's first 341 meeting, counsel for the United States Trustee, Holley Claiborne, asked the Debtor twice who Mr. Krasner was, and the Debtor first said he did not know, then failed to respond.  Ex. 19, Tr. of Telephonic 341 Meeting of Creditors, dated March 21, 2022 at 51:7-12.  When Ms. Claiborne asked the Debtor to answer the question, the Debtor's counsel Mr. Baldiga conferred with the Debtor despite Ms. Claiborne stating that she "would rather he would answer the question before you make a confer." *Id.* at 13:18. The Debtor then said he had difficulty with English names and that he did know a "Max" at Golden Spring though not his last name.  *Id.* at 51-52.

[26] *See, e.g.*, Initial Petition (defined below); Ex. 20, Limited Liability Company Agreement of HK International Funds Investments (USA) Limited, LLC, dated April 1, 2019.

[27] *See* Global Notes and Statements of Limitations, Methodology, and Disclaimers Regarding the Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs, (March 9, 2022) ECF No. 77 ("SOFA") at 4.

13

    (3)    On October 24, 2020, Genever US commenced its chapter 11 case in the U.S Bankruptcy Court for the Southern District of New York in front of Judge Garrity, with a petition signed by Ms. Wang (president of Golden Spring).[29]

    (4)    The Debtor listed himself as the "Applicant" on his Sherry-Netherland purchase application,[30] he submitted letters that recommended himself personally to the Board,[31] and he represented that he had an "ownership interest" in the Sherry Netherland Apartment.[32]

e)    **Bravo Luck Limited ("<u>Bravo Luck</u>").**  Bravo Luck is a BVI entity purportedly owned by the Debtor's Son.[33]  Bravo Luck has asserted that it is the beneficial owner of the Genever Entities, and/or the Sherry Netherland Apartment.  The Debtor has used Bravo Luck and its beneficial ownership claim not only to provide himself a penthouse apartment he can claim is not his own, but also to contest and delay pre-petition efforts of PAX to enforce its pre-petition judgment against the Sherry Netherland Apartment, as well as to challenge the Trustee's recent efforts to seek corporate control over Genever BVI.

    (1)    Upon information and belief, the Debtor used Bravo Luck's UBS AG bank account (Account #371236) (the "<u>Bravo Luck UBS Account</u>") to fund the purchases of the Lady May and Sherry Netherland Apartment in 2015, processed pursuant to wire transfer forms signed by the Debtor.[34]

    (2)    The Hong Kong Restraint Order identified the Bravo Luck UBS Account as a bank account that, while purportedly held by Bravo Luck, was "subject to the effective control"

---

[28] Ex. 56, August 2, 2021 Reply Memorandum Of Law In Support Of Plaintiff Pacific Alliance Asia Opportunity Fund L.P.'S Motion For A Turnover Order Against Defendant Miles Kwok And Appointment Of A Receiver, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 899 at 2.

[29] Ex. 57, Petition, *In re Genever Holdings LLC*, Case No. 20-12411-jlg (Bankr. S.D.N.Y.), ECF No. 1, at 4.

[30] *See* Ex. 53, Sherry Netherlands Purchase Application, at 19.

[31] *Id.* at 23, 25-26.

[32] Ex. 7, Affidavit of Yan Ping Wang in *PAX v. Kwok*, at ¶ 2.

[33] *See, e.g.,* Ex. 21, BVI Affidavit of Qiang Guo, dated December 29, 2021.

[34] Escobar, Pepe, et al. "Exclusive: The Fugitive Who Tried to Spark a US-China War." The Unz Review, 5 Aug. 2022, https://www.unz.com/pescobar/exclusive-the-fugitive-who-tried-to-spark-a-us-china-war/.

of the Debtor.[35]  Indeed, the Debtor could access the
account by himself.[36]

(3)     The Debtor held 50% of the equity of Bravo Luck between
January and May 2015, an ownership interest the Debtor
allegedly obtained and then returned to the Debtor's Son
for no consideration.[37]

(4)     Bravo Luck's assertions of beneficial ownership of
Genever BVI, Genever US, and the Sherry Netherland
Apartment are based on a purported trust agreement dated
February 17, 2015 (the "Purported Trust Agreement"), the
validity and enforceability of which are highly questionable
for numerous reasons.

(5)     Among other things, the Purported Trust Agreement was
responsive to numerous document requests served by PAX
during the State Court Action, yet was not disclosed to
PAX during that discovery process, which ended in
September 2018, seven months prior to the Debtor's
disclosure of the Purported Trust Agreement to PAX for
the first time in April 2019.[38]

(6)     The Purported Trust Agreement purports to place the
Sherry Netherland Apartment in trust, but is dated February
17, 2015, before the submission of the application to
purchase the Sherry Netherland Apartment or the purchase
of the apartment.[39]

(7)     In a 2016 lawsuit in the SDNY, Kwok stated that he is the
sole shareholder of Genever NY and a resident in the
Sherry Netherland Apartment, and he further alleged that

---

[35] Ex. 93, Hong Kong Restraint Order ¶ 3, Respondent 21.

[36] Ex. 58, Stevenson Wong Letter, at 2 (Bravo Luck UBS Account, "is operated by either the [the Debtor] or [the
Debtor's Son] signing solely and . . . is able to be accessed by either of them signing solely.")

[37] See id. at 2.

[38] Ex. 22, Email from Jillian Searles of Hodgson Russ LLP disclosing Purported Trust Agreement, dated April 22,
2019.

[39] See Ex. 22, Email disclosing Purported Trust Agreement; Ex. 53, Sherry Netherlands Closing Documents and
Purchase Application, at 1-8, 19-21.

he personally suffered damages as a result of the actions of the Sherry Netherland cooperative with respect thereto.[40]

    f)    **Eastern Profit Corporation ("Eastern").** Eastern is a Hong Kong entity, purportedly owned by the Debtor's daughter,[41] that Judge Liman of the U.S. District Court of the Southern District of New York, in his 2021 decision in the case of *Eastern Profit Corp. v. Strategic Vision US LLC* (the "Liman Decision"), found to be, "in essence, a shell corporation" for the Debtor[42] allegedly used to "protect his confidentiality and anonymity."[43]

    (1)    Judge Liman observed that, at the time Eastern entered into its January 2018 agreement with Strategic Vision US LLC (the agreement which was the subject of the Liman Decision), Eastern was "essentially a defunct entity" with "no assets other than . . . $80,000 frozen in a Hong Kong bank account," and "no operations and no employees." Further, analogously to HK USA and other shell companies, Eastern's location "was in the offices of [the Debtor's] family company in Hong Kong and its sole director was Guo's daughter."[44]

    (2)    The subject of the Liman Decision was a January 2018 agreement, purportedly between Eastern and Strategic Vision US LLC (the "Strategic Vision Agreement"), that was signed on behalf of Eastern by Yvette Wang (president of Golden Spring). But Ms. Wang did not sign her own name, instead she forged the signature of another associate of the Debtor's, Han Changhui, who had purportedly owned Eastern prior to transferring purported ownership of Eastern to the Debtor's Daughter for no apparent consideration in 2017.[45]

---

[40] *See* Ex. 9, Verified Complaint at ¶¶ 123-143, *Genever Holdings, LLC v. Sherry-Netherland, Inc.*, 16-cv-06246 (S.D.N.Y. Aug. 5, 2016), ECF No. 1.

[41] *Eastern Profit Corp. Ltd. v. Strategic Vision US LLC*, No. 18-CV-2185 (LJL), 2021 WL 2554631 at *1.

[42] *Id.*

[43] *Id.* at *7 ("During negotiations, Guo requested that, to protect his confidentiality and anonymity, he would not sign or be a party to the Agreement but that a separate entity would sign and be a party.").

[44] *Id.*

[45] *Id.* at *7 ("Although . . . Han [the Debtor's associate] was the ostensible owner of Eastern, it has now been transferred to [the Debtor's Daughter] but Han could not testify that he received anything in exchange. Eastern is a shell for [the Debtor] and his family.") (internal citations omitted). *Id.* at *1 ("Prior to 2017, the owner and sole

(3)     Judge Liman also found that testimony from Ms. Wang and Mr. Han with respect to Mr. Han's role in connection with the Strategic Agreement was "an after-the-fact creation to make it appear that Eastern was an entity, separate from Guo."[46]

(4)     Judge Liman inferred, with respect to the Strategic Agreement, that "[the Debtor] told Wang to provide the name Eastern to Strategic and to sign Han's name to the Agreement.  If there was any conversation between Wang and Han, it was perfunctory, to confirm the arrangement that *the Debtor] had already made and directed*."[47]

(5)     According to testimony elicited at the hearing held in connection with the Liman Decision, the Debtor introduced Mr. Han (the purported owner of Eastern) as his cook, referring to him as "Little Han,"[48] and introduced Ms. Wang as his servant and assistant.[49]  There was also testimony that Ms. Wang described the Debtor as her "boss."[50]

---

director of Eastern was an individual named Han Changhui ('Han'). In 2017, Han transferred ownership and control to Guo's daughter, Guo Mei, who was a friend of Han's and who is now the owner and sole director of Eastern.").

[46] Liman Decision at *7.

[47] *Id.* (emphasis added).

[48] Ex. 27, Trial Tr. at 768:4-12, *Eastern Profit Corp. Ltd. v. Strategic Vision US LLC*, No. 18-CV-2185 (LJL) (S.D.N.Y) ECF No. 368 (April 22, 2021).

[49] Ex. 28, Trial Tr. at 142:12-19, *Eastern Profit Corp. Ltd. v. Strategic Vision US LLC*, No. 18-CV-2185 (LJL) (S.D.N.Y) ECF No. 362 (April, 19, 2021) ("Q. Did he introduce [Ms. Wang] in any way -- let me ask you this. What did he introduce her as? A. Well, originally as his assistant. Q. Did he say anything else about what she did for him? A. He said that she did, you know, what personal assistants do and -- but he sent her from the room."). Ex. 29, Trial Tr. at 248-249, *Eastern Profit Corp. Ltd. v. Strategic Vision US LLC*, No. 18-CV-2185 (LJL) (S.D.N.Y) ECF No. 362 (April, 19, 2021) ("Q. Did [the Debtor] come to introduce [Ms. Wang] at a particular meeting at some point? A. At the first meeting, he just referred to her as like a servant. In the second meeting, he introduced her as his assistant.").

[50] Ex. 28, Trial Tr. 142-143 ("Okay. Now, I'm going to ask you what Yvette Wang told you about her role. So what did Yvette Wang tell you was her role with respect to this contract? A. Well, first of all, she said: Guo is my boss. I am project manager, and I will be handling this project moving forward."); *id.* ("Did she have any name for Guo or any term she used to describe him?  Yes. She called him chief. She gave him some military ranks. She called the boss.").

     (6)     The Hong Kong Restraint Order identified Eastern Profit as the purported holder of a bank account that was "subject to the effective control" of the Debtor.[51]

    g)    **Saraca Media Group, Inc. ("Saraca")**.  Saraca is a Delaware entity, purportedly owned by the Debtor's Son,[52] that the Debtor has used to engage in, among other things, the sale of purported cryptocurrencies.

     (1)     Saraca shares the same address as Golden Spring,[53] and Golden Spring's president, Ms. Wang, is an authorized signatory on Saraca official documents.[54]

     (2)     Saraca transferred funds to Greenwich Land immediately prior to Greenwich Land's purchase of the Debtor's residence on Taconic Road;

     (3)     Saraca is the registered owner with the United States Patent and Trademarks Office of the marks "Miles Kwok," "Miles Guo," and "Guo Wengui."[55]

     (4)     In September 2021, the Securities and Exchange Commission ("SEC") issued a cease and desist order ordering that Saraca and its subsidiary GTV Media Group, Inc. ("GTV") cease violations of the securities laws in connection with purported sales of GTV stock and G-Coin and G-Dollar cryptocurrencies, which had "raised approximately $487 million from more than 5,000 individuals."[56] The Office of the Attorney General of the

---

[51] Ex. 93, Hong Kong Restraint Order ¶ 3, Respondent 16.

[52] Ex. 4, Tr. of Telephonic 341 Meeting of Creditors, dated April 6, 2022 at 108:12-13 ("Q: Who owns Saraca? A: My son.").

[53] *See* Ex. 10, Saraca Media Group Inc. OpenGovNY New York State corporate registry search results.

[54] *See, e.g.*, Ex. 25, Himalaya Coin Certificate of Assumed Name, dated March 14, 2020 and Ex. 26, Himalaya Dollar Certificate of Assumed Name, dated March 14, 2020.

[55] Ex. 23, United States Patent and Trademark Office Registry Pages for Miles Guo, Miles Kwok, Guo Wengui, and Guo Media.

[56] *See In the Matter of Gtv Media Group, Inc., Saraca Media Group, Inc., and Voice of Guo Media, Inc., Respondents*, Release No. 10979, 2021 WL 4149064, at ¶ 1, 5 (Sept. 13, 2021) (finding that companies that GTV, Saraca, and Voice of Guo Media, Inc. violated the Securities Act in connection with "solicit[ing] thousands of individuals to invest in an offering of GTV common stock" and "solicit[ing] individuals to invest in their offering of a digital asset security that was referred to as either G-Coins or G-Dollars," thus allowing these companies to "collectively raise[] approximately $487 million from more than 5,000 investors, including individuals in the United States, through approximately July 2020").

State of New York took similar action against Saraca and GTV.[57]

(5)     Saraca is also involved in the Debtor's more recent cryptocurrency scheme of promoting and selling "Himalaya Coin" and "Himalaya Dollar" (also known as "H-Coin" or "H-Dollar").

(6)     Saraca registered "Himalaya Coin" and "Himalaya Dollar" as its assumed names in the State of New York, using filings signed by Ms. Wang, ***president of Golden Spring.***[58] Upon information and belief, revenues from the sale of Himalaya cryptocurrency are transferred from customers to Saraca.

h)     **Ace Decade Holdings Limited ("Ace Decade").**  Ace Decade is a BVI entity the Debtor acquired to use as an intermediary entity in connection with the failed 2015 securities transaction that generated the Debtor's lawsuits against UBS.  The Debtor used Ace Decade to avoid disclosure requirements that would have arisen had the Debtor purchased the securities directly.[59]

(1)     The Debtor acquired Ace Decade in November 10, 2014 and on the same day appointed one of his employees, Yu Yong ("Ms. Yu") as the sole director and nominee shareholder.[60]

(2)     The Debtor allegedly appointed Ms. Yu to these roles based on the alleged advice of his banker at UBS, who suggested the use of an intermediary entity to avoid disclosure requirements.[61]

---

[57] Ex. 24, Assurance of Discontinuance, Assurance No. 21-062, *In the Matter of Investigation by Letitia James, Attorney General of the State of New York*, *of GTV Media Group, Inc., and Saraca Media Group, Inc*.

[58] *See* Ex. 25, Himalaya Coin Certificate of Assumed Name; Ex. 26, Himalaya Dollar Certificate of Assumed Name.

[59] Ex. 3, Affidavit of Kwok Ho Wan at ¶¶ 13-14 ("UBS advised that . . . if I invested through Ace Decade directly, applicable disclosure requirements would require certain filings [and] advised that if I invested through an intermediary entity, with the intermediary entity holding legal title to the Shares, no such disclosure would be required.").

[60] Ex. 30, Particular of Claims, *Kwok Ho Wan & Ors. v. UBS*, Cl-2020-000345, ¶ 24, High Court of Justice of England and Wales Queen's Bench Division Commercial Court, dated September 23, 2020 ("UK Complaint").

[61] *Id.* at ¶ 24 ("Ace Decade was acquired on 10 November 2014 by Mr Kwok for the purpose of acting as the said investment vehicle. On the same day, on the advice of Mr Wong, an employee of Mr Kwok, Ms Yu Yong ("Ms Yu") became its nominee shareholder and director.").

        (3)     The Hong Kong Restraint Order identified Ace Decade as the purported holder of a bank account that was "subject to the effective control" of the Debtor.[62]

i)    **Well Origin Limited ("Well Origin").**  Well Origin is a BVI entity owned by the Debtor that was formed as a "special purpose vehicle" to own a private jet, an Airbus 319 (the "Aircraft").[63]

        (1)     In 2014, Well Origin entered into a $50 million loan agreement with UBS AG ("UBS") to "refinance the Aircraft purchase price" as well as a related aircraft mortgage agreement.[64]  In addition, the Debtor entered into a related guarantee agreement with UBS.  UBS was also granted a security interest in Well Origin's shares.[65]

        (2)     Subsequently, UBS foreclosed on its security interest in the shares of Well Origin, took control of Well Origin, and notified the Debtor that it was going to sell the Aircraft.[66]

        (3)     In an action filed in February of 2019, the Debtor sought to enjoin the sale, asserting that he was the "***Aircraft's true beneficial owner,***"[67] and that the Aircraft was "unique," "personal," and "specific to him.[68]  The court rejected the

---

[62] Ex. 93, Hong Kong Restraint Order ¶ 3, Respondent 18.

[63] Ex. 31, Petition at ¶ 7, *Kwok How Wan v. UBS AG, et al.*, Index No. 152025/2019 (N.Y. Sup. Ct.) Doc. No. 1. The capacity of a normal airline A319 is approximately 150 passengers.

[64] *Id.* ¶¶ 14-16.

[65] *Id.* ¶ 15.

[66] *Id.* ¶¶ 22-24.

[67] Ex. 39, Memorandum Of Law In Support Of His Request For A Temporary Restraining Order And Preliminary Injunction at 2, *Kwok v. USB AG et al*, Index No. 152025/2019 (N.Y. Sup. Ct.), NYSCEF Doc. No. 15 (February 25, 2019) ("Moreover, *the Aircraft's true beneficial owner – Kwok* – has been an outspoken critic of the Chinese government and Chinese Communist Party ("CCP") and Kwok has personally exposed massive corruption within the CCP that has resulted in the Chinese government and CCP stopping at no expense to seize any property and asset either directly or indirectly related to Kwok."). *See also id.* at 1 ("UBS, in blatant contravention of the terms of the mortgage, is wrongfully trying to sell the Aircraft without properly notifying *Kwok -- the Aircraft's beneficial owner*, and guarantor on a loan related to the Aircraft -- of the potential sale.').

[68] *Id.* at 2 ("Kwok will suffer irreparable harm if the preliminary injunction is not granted to stay the sale of the aircraft as *the Aircraft is unique to Kwok* -- he personally worked with the designer on the outfitting of the Aircraft and was comprehensively involved in the Aircraft's particular design and specification"); *Id.* at 6-7 ("If UBS is permitted to move forward with the sale despite their defective notice and without providing Kwok an accounting, Kwok will permanently lose the Aircraft that *is personal and specific to him*, for which money damages cannot and will not suffice.").

> Debtor's request for an injunction, pointing out that the
> Debtor was asserting rights under an aircraft mortgage
> agreement that he had not signed.[69]

(4)    With respect to Well Origin, the Debtor looked past the
corporate form and asserted he was the true beneficial
owner of the Aircraft because it suited him to do so (given
that UBS had taken control of Well Origin).

j)    **Numerous Other Shell Companies**: It is likely that the entities discussed
in these counterclaims comprise only a small part of what are reportedly
hundreds of shell companies controlled by the Debtor.[70] The reported
existence of such a large number of shell companies is supported by the
fact that in the Hong Kong Restraint Order the Debtor was determined to
effectively control financial accounts purportedly held by over two dozen
entities and individuals, including certain of the entities already mentioned
herein.[71]

11.    In sum, while these Counterclaims are designed to focus on HK USA and the
Lady May, and the Trustee does not at this time seek relief against other entities, the Trustee
believes that context regarding the Debtor's wide-ranging strategy of using shell companies to
shelter assets from creditors will assist the Court in understanding the Trustee's position.

**B.    Debtor's Formation, Ownership, and Purported Transfer of HK
International Prior to Acquisition of Lady May**

12.    On October 3, 2006, the Debtor incorporated a Hong Kong entity called Hong
Kong International Funds Investments Limited ("HK International").[72]

---

[69] Ex. 32, Order at 3, *Kwok v. USB AG et al*, Index No. 152025/2019 (N.Y. Sup. Ct.), NYSCEF Doc. No. 17
(February 26, 2019) ("Petitioner's sole contractual connection to the aircraft is vis-à-vis a written guarantee of the
non-party mortgagor's obligations which are collateralized via the aircraft.").

[70] Escobar, Pepe, et al. "Exclusive: The Fugitive Who Tried to Spark a US-China War." The Unz Review, 5 Aug.
2022, https://www.unz.com/pescobar/exclusive-the-fugitive-who-tried-to-spark-a-us-china-war/ ("[The Debtor] set
up more than 100 companies in Hong Kong, China, the United Kingdom, the United States, the British Virgin
Islands, and the Cayman Islands.").

[71] Ex. 93, Hong Kong Restraint Order ¶ 3.

[72] Ex. 34, HK Intl. Funds Investments Ltd. Memorandum and Articles of Association, dated October 3, 2006.

13.     The Debtor was HK International's sole shareholder and director through October 10, 2014.[73]

14.     On October 10, 2014, the Debtor transferred his interest in HK International to an individual named Qu Guo Jiao (a/k/a Natasha Qu) ("Ms. Qu").[74]

15.     As found by Justice Ostrager, "Ms. Qu was a trusted business associate of the Kwok family."[75]  In fact, the Hong Kong Restraint Order listed Ms. Qu as one of several individuals whose bank accounts were "subject to the effective control of" the Debtor.[76]

16.     Upon information and belief, on October 10, 2014, in connection with the October 10, 2014 transfer, Ms. Qu signed an undisclosed Declaration of Trust (the "HK International Declaration of Trust") that identified Ms. Qu as the "Trustee" and the Debtor as the "Beneficiary."[77]

17.     Upon information and belief, the undisclosed HK International Declaration of Trust stated, among other things, that the Debtor "authorized and requested" Ms. Qu to "hold in the name of [the Debtor] shares in [HK International]," that such shares "now standing in the books of the Company registered in the name of [Ms. Qu] do not belong to [Ms. Qu] but to [the

---

[73] *See* Ex. 35, HK Intl. Funds Investments Ltd. Annual Return, dated November 26, 2007.

[74] Ex. 1, Final Contempt Decision at 4 (Justice Ostrager stating, in reference to this transaction, that testimony before him "established that in 2014 Kwok transferred a 100% interest in HK International to [Ms. Qu] for no consideration.").

[75] *Id.*

[76] Ex. 93, Hong Kong Restraint Order ¶ 3, Respondent 3.

[77] Escobar, Pepe, et al. "Exclusive: The Fugitive Who Tried to Spark a US-China War." The Unz Review, 5 Aug. 2022, https://www.unz.com/pescobar/exclusive-the-fugitive-who-tried-to-spark-a-us-china-war/.

Debtor],"[78] that Ms. Qu would hold the shares as nominee and in trust for the Debtor, and that

Ms. Qu would exercise rights in connection with the shares at the Debtor's direction.[79]

18.    Accordingly, after October 10, 2014, the Debtor continued to beneficially own

HK International pursuant to the undisclosed Declaration of Trust.

19.    The Hong Kong Restraint Order lists HK International as one of the entities

whose bank accounts were "subject to the effective control" of the Debtor.[80]

### C.    Purchase of Lady May in February 2015

20.    On February 23, 2015, HK International purchased the Lady May for €28,000,000

(or approximately $32,000,000[81]) from Apsley Yachts Limited (the "Seller").[82]

21.    Upon information and belief, on February 23, 2015, Bravo Luck, the Debtor's

shell company, transferred from the Bravo Luck UBS Account no less than €25,200,000 of the

funds used to purchase the Lady May to a representative of the Seller, pursuant to a wire transfer

form signed by the Debtor.[83]   Upon information and belief, the funds held by Bravo Luck

Limited in the Bravo Luck UBS Account (and used to purchase, among other things, the Lady

May) were transferred to Bravo Luck, directly or indirectly, by the Debtor.

---

[78] *Id.*

[79] *Id.*

[80] Ex. 93, Hong Kong Restraint Order ¶ 3, Respondent 19.

[81] The Lady May's Bill of Sale, dated February 23, 2015, lists a purchase of price of €28,000,000.00, which, multiplied by the applicable exchange rate on February 23, 2015 (of 1.1333 dollars per euro), equals $31,732,400.00.

[82] Ex. 36, Sale documents in connection with the sale of the Lady May, at 1; *see also* Ex. 37, February 2, 2022 Evidentiary Hr. Tr. at 45:22–25, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 1179.

[83]  Escobar, Pepe, et al. "Exclusive: The Fugitive Who Tried to Spark a US-China War." The Unz Review, 5 Aug. 2022, https://www.unz.com/pescobar/exclusive-the-fugitive-who-tried-to-spark-a-us-china-war/.

22.     On the same day on which the Lady May was purchased, Tommy Cheung and

Stephen Wong, Managing Directors at the UBS AG Hong Kong Branch, wrote in a letter in

support of the Debtor's application to purchase the Sherry Netherland Apartment that the Debtor,

"has been a client of ours through a personal investment company since July 2012 and during

this time [the Debtor] has had a satisfactory banking relationship with us.  At 18 Feb. 2015, the

funds involved in this banking relationship is not less than USD $400,000,000.[84]  Upon

information and belief, the "personal investment company" of the Debtor referenced in this letter

is Bravo Luck.

23.     The Bravo Luck UBS Account held approximately $490 million as of March 3,

2022, shortly after the purchase of the Lady May.[85]

24.     As of February 23, 2015, 50% of the equity of Bravo Luck Limited was held by

the Debtor, and the remaining 50% was held by the Debtor's son, Qiang Guo (the "Debtor's

Son").[86]  As explained in a March 4, 2015 letter written by the Debtor's counsel in Hong Kong,

Stevenson, Wong & Co., at that time, Bravo Luck was "legally and beneficially owned as to

50%" by the Debtor and the Debtor's Son respectively and the Bravo Luck UBS Account, "is

operated by either the [the Debtor] or [the Debtor's Son] signing solely and . . . is able to be

accessed by either of them signing solely."[87]

---

[84] Ex. 78, Letter from USB AG HK, dated Feb 23, 2015, *In re Genever Holdings LLC*, Case No. 20-12411-jlg (Bankr. S.D.N.Y.), ECF No. 14-64 ("the funds involved in this banking relationship is not less than USD400, 000,000").

[85] Ex. 82, UBS Special Report, dated March 2015, at 3-5.

[86] Ex. 38, Instrument of Transfer, dated May 12, 2015, PAX v. Kwok, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 758; Ex. 33, Bravo Luck Limited Register of Members, *In re Genever Holdings LLC*, Case No. 20-12411-jlg (Bankr. S.D.N.Y.), ECF No. 14-58.  *See* Ex. 21, BVI Affidavit of Qiang Guo at ¶ 31 ("The legal ownership of Bravo Luck was changed for a limited period of approximately four months between 26 January 2015 and 12 May 2015, whereby I transferred 50% legal ownership of Bravo Luck to the [Debtor]").

[87] Ex. 58, Stevenson Wong Letter, at 2.

25. As stated in the Final Contempt Decision, "there is no evidence that [the Debtor's Son] was involved with the corporate transactions leading to" HK International's acquisition of the Lady May.[88] Accordingly, upon information and belief, the Debtor, not his son, used his shell company Bravo Luck to substantially fund the purchase price of the Lady May.

26. That the Debtor caused Bravo Luck, a shell company he controlled, to fund the purchase of the Lady May is consistent with his testimony to this Court that, as of December of 2014, he had $1 billion at his disposal.[89]

**D.    2017 Transfer of Ownership of HK International from Ms. Qu to Debtor's Daughter for HK$1.00**

27. On June 27, 2017, Ms. Qu and the Debtor's Daughter executed an instrument of transfer pursuant to which Ms. Qu purportedly transferred the ownership of HK International to the Debtor's Daughter for consideration of HK$1.00 (the "2017 Transfer").[90] At the time of the transfer, the Lady May, HK International's asset, was worth far more than $1.00—at least tens of millions of dollars.

28. Upon information and belief, the 2017 Transfer occurred at the Debtor's direction while the undisclosed HK International Declaration of Trust was effective—meaning that the Debtor continued to beneficially own HK International at the time of the transfer.[91]

---

[88] Ex. 1, Final Contempt Decision at 5 (noting that Debtor's Daughter's acknowledged in her testimony "that her bother was not involved in any of the transfers that occurred before she acquired the yacht [through HK International]").

[89] Ex. 66, Tr. of Proceedings, dated April 27, 2022 at 173: 1-3  ("Q: Mr. Kwok, isn't it true that in November or December of 2014, you had $1 billion at your disposal? A: Yes.").

[90] See Ex. 36, Sale documents in connection with the sale of the Lady May, at 4 (Instrument of Transfer).

[91] Escobar, Pepe, et al. "Exclusive: The Fugitive Who Tried to Spark a US-China War." The Unz Review, 27 Aug. 2022, https://www.unz.com/pescobar/exclusive-the-fugitive-who-tried-to-spark-a-us-china-war/.

29.     Upon information and belief, at the time of the 2017 Transfer, both the Debtor

and the Debtor's Daughter were residents of New York, the Debtor having moved to New York

on January 9, 2015,[92] and the Debtor's Daughter having moved to the United States on May 16,

2017.[93]  Upon information and belief, the Debtor's Daughter has been a resident of the state of

New York since arriving to the United States.

### E.     Transfer of Lady May to HK USA

30.     On April 1, 2019, HK USA, a Delaware entity, was formed with the Debtor's

Daughter as "the sole member of the company."[94]

31.     HK USA's LLC agreement lists the Debtor's Daughter's address as 781 5th

Avenue, the Sherry Netherland Apartment.[95]  HK USA's LLC agreement also lists the principal

office of HK USA as 162 East 64th Street, New York, New York 10065.[96]  This is an address

that has been used by the Debtor himself (including on his original chapter 11 petition filed on

February 15, 2022),[97] as well as by a number of Debtor-related entities, including Greenwich

Land, Golden Spring, GTV Media Group Inc., and Saraca Media Group Inc.[98]  It was also, for a

---

[92] Ex. 3, Affidavit of Kwok Ho Wan at ¶ 30 ("On January 9, 2015 . . . I moved to New York.").  *See also* Ex. 19, Tr. of Telephonic 341 Meeting of Creditors at 27:3-5 ("Q: Mr. Kwok, how long have you lived in the United States? A: Nearly seven years.").

[93] Complaint, *HK Int'l Funds Investments (USA) Ltd., LLC  v. Kwok, et al.* (Adv. Proceeding No. 22-05003) at ¶ 20 ("On May 16, 2017, Ms. Guo departed for the United States. . . . She has remained in the United States ever since and is currently seeking political asylum here.").

[94] Ex. 20, Limited Liability Company Agreement of HK International Funds Investments (USA) Limited, LLC, dated April 1, 2019.

[95] *Id.*

[96] *Id.*

[97] Voluntary Petition, Docket No. 1, at 2; Ex. 40, Casper Law Firm invoices (addressed to Kwok at 162 East 64th Street Address).

[98] *See* Ex. 54, Real Property Tax Assessor Record of Greenwich Land LLC, dated July 15, 2021; Affidavit of Service, Docket No. 767; Ex. 67, OpenGovNY New York State corporate registry search results registration search results for GTV Media Group Inc.; Ex. 10, Saraca Media Group Inc. OpenGovNY results.

time, the address of the Debtor's counsel, Lawall & Mitchell, LLC.[99]

32.     In April 2020, the Lady May was transferred from HK International to HK USA

for no apparent consideration.[100]

33.     Upon information and belief, neither the Debtor's Son nor the Debtor's Daughter

have ever held gainful employment outside of the Debtor's shell companies.

### F.     Alter Ego Characteristics of HK USA

34.     HK USA is the alter ego of the Debtor, as evidenced by the following

characteristics (applicable during the entire time period relevant to the Counterclaims), among

others:

a)     HK USA had no source of income, and all of HK USA's expenses were paid for by shell companies Golden Spring and Lamp Capital.[101]

b)     HK USA had no directors, officers, or employees.[102]

c)     HK USA did not file tax returns.[103]

d)     HK USA had no bank account and was not otherwise capitalized.[104]

e)     HK USA kept no documents.[105]

---

[99] See Ex. 68, Consent to Change Attorney, PAX v. Kwok, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 338.

[100] Ex. 41, Mei Guo Affidavit at ¶ 11, PAX v. Kwok, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 1162 ("On or about April 17, 2020, I transferred ownership of the Lady May from HK International to HK [USA].").

[101] See, e.g., Complaint ¶ 24, Adv. Proc. Docket No. 1 ("The Lady May's expenses were previously funded through [Golden Spring]. Now they are funded by Lamp Capital."); Ex. 69, Letter from L. Vartan, dated May 4, 2021 ("In connection with its representation [of HK USA], the firm has received payments from Golden Spring (New York) Ltd. and Lamp Capital LLC."); Ex. 42, Letter from L Vartan, dated June 7, 2021 ("I can confirm that all expenses for the Lady May yacht, including staff, crew, and maintenance, are paid by Golden Spring New York.").

[102] Ex. 42, Letter from L. Vartan ("HK International has no directors, officers, or employees; has no dedicated e-mail server or e-mail suffix; does not file tax returns; and has no bank account and is not otherwise 'capitalized.'").

[103] Id.

[104] Id. See also, e.g., Complaint ¶ 24, Adv. Proc. Docket No. 1 ("At no time since [the Debtor's Daughter] owned the Lady May through HK International and/or HK USA has either entity ever held a bank account.").

      f)      HK USA's only purported asset was the Lady May, which, as discussed below, was preclusively found to be beneficially owned and controlled by the Debtor.[106]

35.     The Debtor has wrongfully and unjustly used its alter ego relationship with HK USA to, among other things, cause HK USA to hold assets for the Debtor's use and benefit, while purporting to keep such assets outside the reach of the Debtor's creditors.

### G.     PAX's Claim and Litigation Against Debtor

36.     As determined by the State Court,[107] during the entire time period relevant to the Counterclaims, the Debtor was personally indebted to Pacific Alliance Asia Opportunity Fund L.P. ("PAX") pursuant to a 2011 personal guarantee (the "2011 Personal Guarantee") with respect to amounts owing in connection with a loan made by PAX to one of the Debtor's business entities in 2008 (the "PAX Claim").[108]  Between April 2013 and June 2015, the Debtor and PAX were parties to a Deed of Settlement under which it was contemplated that the PAX Claim would no longer be due and owing if certain conditions occurred.  These conditions did not occur, and the PAX Deed of Settlement was terminated in June of 2015.[109]

---

[105] Ex. 43, Tr. at 9, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 898 (PAX's counsel stating that "what Mr. Vartan did tell us is that HK [USA] has no employees, no officers, no directors, no bank account, no documents, no nothing. It's not a real company. I said, 'Mr. Vartan, where are the documents?' You know what he told me, Judge? 'Golden Spring has them'")  In this transcript, the term "HK International" was used to refer to HK USA.

[106] *See, e.g.*, Ex. 42, Letter from L. Vartan (HK USA's "sole asset is the Lady May Yacht").

[107] Ex. 44, Decision and Order, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 549 ("the Court finds Kwok liable for breach of the 2011 Personal Guarantee.").

[108] *Id.*

[109] *Id.* at 7.

37.     On April 18, 2017, PAX filed a complaint in the State Court asserting the
Debtor's liability in connection with the PAX Claim under a theory of breach of contract related
to the 2011 Personal Guarantee.[110]

38.     On April 18, 2019, PAX amended its complaint to include Genever US and
Genever BVI as defendants and to assert that such entities' corporate veils should be pierced and
that they should be held jointly and severally liable for the Debtor's breach of contract.

39.     On September 15, 2020, PAX prevailed on its motion seeking summary judgment
on its breach of contract claim against the Debtor.[111]  PAX's veil-piercing claims against
Genever US and Genever BVI remained pending.  On February 3, 2021, the State Court entered
an order awarding PAX a judgment in connection with its breach of contract claim in the amount
of $116,402,019.57 (the "PAX Judgment").[112]

40.     On September 25, 2020, PAX filed a motion in the State Court seeking a
restraining order pursuant to New York Civil Practice Law & Rule ("CPLR") 5229, alleging,
among other things, that the Debtor would "take steps to dissipate his assets or otherwise
frustrate the judgment in this case" (the "CPLR Motion").[113]

41.     On September 30, 2020, the State Court entered a temporary restraining order
restraining the Debtor from, among other things, "making or causing any sale, assignment,
transfer, or interference with any property in which he has an interest."[114]

---

[110] See Ex. 45, Complaint, PAX v. Kwok, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 2.

[111] See Ex. 44, Decision and Order. An appeal of this decision is pending.

[112] Ex. 46, Judgment, PAX v. Kwok, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 716.

[113] Ex. 47, Memorandum of Law in Support of PAX's CPLR 5229 Motion and Request for TRO at 5, PAX v. Kwok, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 576.

[114] Ex. 48, Decision and Order on Motion, PAX v. Kwok, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 591.

42.     On October 15, 2020, the State Court held a hearing with respect to PAX's CPLR

Motion and the Debtor's opposition thereto.  At the hearing, Justice Ostrager stated, among other

things, in comments directed at the Debtor and his counsel:

a)      "The Court believes . . .  that Mr. Kwok has attempted to mislead the
Court.  The Court believes that Mr. Kwok is, as the plaintiff contends,
playing a shell game with his assets, and has violated if not the letter of
court orders, the spirit of court orders."[115]

b)      "[W]e are not going to have any more shell games. Wherever these assets
are held, they are going to remain held where they presently reside, and if
it's determined that the entities that are presently listed as the owners of
the assets are the alter ego of Mr. Kwok or are wholly dominated and
controlled by Mr. Kwok, those assets will be made available to satisfy any
judgment that the plaintiff recovers."[116]

c)      "The intent here which is very clear and specific is that in this 2017 case
in which there's been a great deal of gamesmanship, a great deal of
dissembling, and some flagrant disregard of court orders, I want to know if
any transaction is going to take place in which Mr. Kwok is the guiding
hand that's something other than an ordinary course of business
transaction."[117]

d)      "[O]rders of the Court are either flaunted or exceedingly liberally
interpreted, and . . .  intentional or unintentional misstatements that have
misled the Court have been made to the Court."[118]

43.     On the same day, October 15, 2020, the State Court entered an order  (the

"October 2020 Restraining Order") providing that the Debtor "*and/or the registered owners* of

(1) the Residence at the Sherry Netherland Hotel and (2) the yacht, 'the Lady May' are restrained

from making or causing any sale, assignment, transfer, or interference with those assets."[119]

---

[115] Ex. 49, Tr. at 21:13-16, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 647.

[116] *Id.* at. 22:7-14.

[117] *Id.* at 24: 8-14.

[118] *Id.* at 26.

[119] Ex. 50, Decision and Order at 1, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 630
(emphasis added).

44.     The October 2020 Restraining Order applied to HK USA because it was the registered owner of the Lady May.

### H.  Violation of State Court Restraining Order and Contempt Order

45.     The October 2020 Restraining Order was violated almost immediately upon its entry.  As the State Court would later find, arrangements were made for "the Lady May to sail to Florida in early October 2020 and, thereafter, to the Bahamas."[120]  The Lady May was then moved to Europe in October 2021,[121] where it would remain until its return to the United States pursuant to the Lady May Stipulation (defined below) entered in this Court.[122]

46.     During a State Court hearing held on November 12, 2020 before the State Court, counsel to the Debtor, John Siegal, stated that due to the Lady May being registered in the British Virgin Islands,[123] it would have to return there for licensing purposes.[124]  Justice Ostrager responded by stating that any such voyage would require relief from the October 2020 Restraining Order: "You will have to make that application on papers. I don't know anything about the requirement that an asset that has been restrained in the United States should be allowed to go to the British Virgin Islands" where it could "become[] potentially unavailable for [PAX] to levy upon."[125]  Following Justice Ostrager's rejection of a further intervention by

---

[120] Ex. 1, Final Contempt Decision at 2.

[121] Ex. 1, Final Contempt Decision at 5 ("[I]n October 2020 the Lady May was sent to Florida and then the Bahamas for repairs and was subsequently dispatched to Italy in October 2021").

[122] *See Stipulated Order Compelling Hk International Funds Investments (USA) Limited, LLC To Transport And Deliver That Certain Yacht, The "Lady May" Docket No. 299.*

[123] Here, Mr. Siegal confused the British Virgin Islands with the Lady May's correct place of registration in the Cayman Islands.

[124] Ex. 52, Tr. at 13:9-18, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No.  691.

[125] *Id.* at 13:19-24, 14:4-8.

Aaron Mitchell, at the time acting as counsel to the Genever Entities,[126] Mr. Siegel then

acknowledged that "[w]e understand the Court's directive."[127]

47.     On November 18, 2020, in a letter filed with the State Court, counsel to PAX

reported the following information with respect to the Lady May:

> Based on publicly available information, which we accessed at
> MarineTraffic.com . . . we understand that the yacht departed Fort
> Lauderdale, Florida, on November 1, 2020, and, as of today, is located in the
> Bahamas at or near Old Fort Bay, Nassau. In fact, it appears that the yacht
> was already out of the jurisdiction on November 12, 2020, when Mr. Siegal
> (presumably carrying out Mr. Kwok's instructions) asked Justice Ostrager if
> Mr. Kwok could send the yacht out of the jurisdiction. This is particularly
> concerning given Mr. Kwok's history of making misrepresentations
> throughout this litigation.[128]

48.     On December 24, 2020, PAX filed a motion seeking that the Debtor be held in

contempt based on the Lady May having left the jurisdiction.[129]

49.     On March 17, 2021, the State Court issued a decision and order holding the

Debtor in contempt (the "March 2021 Contempt Order") and stating, among other things, the

following:

> The Court has reviewed the extensive submissions of the parties in connection
> with PAX's motion to hold Kwok in contempt. ***Passing the issue of whether any
> of Mr. Kwok's attorneys have violated the Code of Professional Conduct, it is
> clear that there has been an intolerable amount of gamesmanship, dissembling,
> and deceit in proceedings before this Court relating to the whereabouts and
> ownership of the yacht "Lady May."***

---

[126] *Id.* at 14:9-14 (Mr. Mitchell has appeared in other capacities in relation to the Debtor, including filing a letter before this Court as the Debtor's personal counsel. *See* Objection to the appointment of the Mr. Despins as Trustee, Docket No. 531).

[127] *Id.* at 15:5-6. Later, at the State Court hearing held on July 21, 2022, Mr. Siegel stated that during this colloquy at the November 21, 2020 hearing, "unbeknownst to me, . . . the vessel was no longer in the United States." Ex. 43, July 21, 2021 Tr. at 18:21-23. Justice Ostrager responded by stating: "If you choose to -- if you, counsel, choose to be an instrumentality of gamesmanship and defiance of Court orders, that's your decision." *Id.* at 19: 2-4.

[128] Ex. 59, Letter from Melissa M. Carvalho of Baker & Hostetler LLP, dated November 18, 2020, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 692 (internal citations omitted).

[129] Ex. 60, December 24, 2020 Notice of Motion for Order of Contempt Against Defendant Kwok, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 688.

The defendant claims that the yacht was removed from the jurisdiction of this Court for "ordinary course" "winter maintenance" ***notwithstanding restraints imposed on the movement of the yacht by the Court. Rather than catalogue the many "shell games" defendant Kwok has engaged in with the assistance of counsel who should know better, the Court grants the motion for contempt to the following extent: For every day that the yacht is outside the jurisdiction of this Court after May 15, 2021, defendant Kwok will be fined $500,000.*** The other restraints relating to the ownership and control of the yacht remain in place.[130]

## I.  Failure to Return Lady May and Subsequent Contempt Fines

50.     Though the March 2021 Contempt Order provided for the accrual of contempt fines of $500,000 per day after May 15, 2021, that date came and went and the Lady May remained outside of the United States.  In fact, the Lady May would not return to the United States until early July 2022.

51.     On May 27, 2021, the State Court held a hearing in connection with PAX's efforts to obtain documents in discovery from Golden Spring.  At that hearing, Justice Ostrager made the following comments with respect to the Debtor and his related entities.

    a)    "Mr. Kwok is incurring $500,000 per day in contempt penalties.  I understand that Mr. Kwok believes that these court proceedings are a game of evasion -- that he wants to play."[131]

    b)    "Mr. Kwok has exhausted the Court's patience with his antics."[132]

    c)    "Mr. Kwok leads a rather extravagant lifestyle, [yet] purports to have zero assets whatsoever."[133]

---

[130] Ex. 61, Decision and Order on Motion at 2, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 728 (emphasis added).

[131] Ex. 62, May 27, 2021 Tr. at 9:1-3, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 833.

[132] *Id.* at 9:23-24.

[133] *Id.* at 10:2-3.

d) "Mr. Kwok flaunts the Court's orders at will."[134]

e) "Mr. Kwok has apparently no concern for the $500,000 a day sanction for flagrantly violating prior orders of the Court with respect to the boat that [Golden Spring] is paying to maintain and transport."[135]

f) "[PAX's counsel] has been pursuing enforcement of a judgment for years now, and it's been my misfortune to have to have presided over these many, many, many motions and hearings, none of which are producing the results that the Court has ordered because Mr. Kwok directly or indirectly through his companies ignores Court orders."[136]

52.　　On July 8, 2021, PAX filed a motion (the "Final Contempt Motion") in the State Court seeking a final contempt order against the Debtor in connection with the ongoing violation of the March 2021 Contempt Order.[137]

53.　　On July 19, 2021, together with the filing of the Debtor's opposition to the Final Contempt Motion (which opposed the motion on the basis that the Debtor did not own the Lady May and sought a stay pending the appeal of the March 2021 Contempt Order), counsel to HK USA, attorney Lee Vartan, filed an "Affirmation" in opposition to the Final Contempt Motion (the "Vartan Affirmation"). [138]　The Vartan Affirmation asserted, among other things, that HK USA was the owner of the Lady May and that HK USA's "property interests are being affected by" the Final Contempt Motion.[139]

---

[134] *Id.* at 16:8-9.

[135] *Id.* at 17:1-5.

[136] Ex. 62, May 27, 2021 Tr. at 18:1-6.

[137] Ex. 63, Memorandum of Law in Support of PAX's Motion for a Final Order of Civil Contempt, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 857.

[138] *See* Ex. 90, Vartan Affirmation , dated July 19, 2021, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 867.

[139] *Id.* ¶ 4.

54. On July 21, 2021, the State Court held a preliminary hearing on the Final

Contempt Motion, at which hearing Mr. Vartan appeared as counsel for HK USA, purportedly

for the purpose of protecting HK USA's alleged property interest in the Lady May.[140]  At the

hearing, Justice Ostrager made the following comments, among others:

a)  "I don't believe that [PAX's counsel] has met -- met his burden on the
record that's presently before the Court for a final court order of civil
contempt, because there is an issue about the ownership of the ship,
although it would seem that [PAX's counsel] has made more than a prima
facie showing that all of these entities that allegedly control the ship are
controlled by Mr. Kwok."[141]

b)  "Mr. Kwok is proceeding at his own peril by orchestrating the voyages of
this ship to everywhere and anywhere other than the territorial waters of
the United States."[142]

c)  "Let's be clear about – Let's be clear about one thing: The Court issued an
order directing that the boat not be removed from the territorial waters of
the United States, upon an application from representatives of Mr. Kwok,
or entities that he controlled, to remove the boat from the territorial waters
of the United States. That order was disregarded by Mr. Kwok and/or the
entities that he controls. That is a contempt of the Court."[143]

d)  "If this wasn't gamesmanship and this wasn't flaunting of the Court's
orders, and if this wasn't a transparent shell game that Mr. Kwok is
engaged in, the boat would be in the territorial waters of the United States
and we would resolve the issue of the boat's ownership."[144]

e)  "[PAX's counsel] has made more than a prima facie showing that Mr.
Kwok controls all of these entities, over the course of multiple hearings,
and that Mr. Kwok is in contempt, and his entities are in contempt of prior
orders of the Court."[145]

---

[140] Ex. 43, July 21, 2021 Tr. at 3:19-20.

[141] *Id.* at 13:15-23.

[142] *Id.* at 14:1-4.

[143] *Id.* at 16:25-17:10.

[144] *Id.* at 17:15-20.

[145] Ex. 43, July 21, 2021 Tr. at 17:21-25.

    f)    "There can't be any dispute that Mr. Kwok and the entities he controlled were restrained from moving that boat from the territorial waters of the United States. And, in defiance of those orders and subsequent orders, the boat remains outside the territorial waters of the United States. And sooner or later the wheels of justice, which grind exceedingly slowly, will resolve the issue."[146]

55.    On November 9, 2021, the Supreme Court of the State of New York Appellate Division, First Judicial Department (the "Appellate Division"), issued an order on the Debtor's appeal of the March 2021 Contempt Order.  The Appellate Division stated as follows:

> The motion court acted within its discretion in holding defendant in civil contempt, **as plaintiff established by clear and convincing evidence that defendant violated a lawful, clear mandate of the court, of which he had knowledge, and that such violation resulted in prejudice to plaintiffs rights** (see El-Dehdan v El-Dehdan, 26 NY3d 19, 29 [2015]; Judiciary Law S 753).

> Contrary to defendant's argument, the court did not commit a procedural defect under Judiciary Law 9 770 because it did not issue a final order of contempt. Further, the evidence shows that the daily fine of $500,000 was intended to strongly encourage defendant to purge himself of the contempt, which, despite being permitted two months to accomplish, he has shown no interest in doing (see e.g. Ruesch v Ruesch, 106 AD3d 976, 977 [2d Dept 2013]). The motion court is instructed to proceed with an evidentiary hearing to resolve a dispute as to ownership and control of the yacht, and to assess appropriate penalties.[147]

**J.  Final Contempt Hearing and Participation by HK USA**

56.    On February 2, 2022, the State Court held its final evidentiary hearing with respect to the Final Contempt Motion (the "Final Contempt Hearing").  Mr. Vartan again appeared at the Final Contempt Hearing as counsel to HK USA and also for the Debtor's Daughter.[148]

---

[146] *Id.* at 19:8-15.

[147] Ex. 75, *Pac. All. Asia Opportunity Fund L.P. v. Wan*, 199 A.D.3d 423, 423 (1st Dep't 2021) (emphasis added).

[148] Ex. 37, February 2, 2022 Evidentiary Hr. Tr. at 37:7-9 ("The first several witnesses are witnesses for [HK USA], the owner of the vessel. And Lee Vartan will be presenting those witnesses for cross-examination."); *Id.* at 37:25-38:1 ("Lee Vartan on behalf of Mei Guo').  *See also* Ex. 64, Joint Appearance Sheet for February 2, 2022 Hearing at 3, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 1119 (listing Mr. Vartan as "counsel for HK International.").

57.  At the beginning of the Final Contempt Hearing, Mr. Siegal, counsel for the

Debtor, informed the court that "[t]he first several witnesses are witnesses for [HK USA], the

owner of the vessel. And Lee Vartan will be presenting those witnesses for cross-

examination."[149]  Consistent with that explanation, Mr. Vartan proceeded to present four

witnesses[150] (all but one of the witnesses offered on behalf of the defense[151]) and make

evidentiary objections[152] in defending these witnesses before "turn[ing] things back over to Mr.

Siegal" shortly before the conclusion of the hearing.[153]

58.  In connection with the Final Contempt Hearing, the Debtor's Daughter testified

that "she directed the Lady May's itinerary"[154] and that "it was [her] decision for the boat to

travel from New York to Florida in October 2020, not [her] father's decision."[155]  According to

the Debtor's Daughter: "I was aware . . . of the [March 2021 Contempt Order] requiring the Lady

May to return to New York in May 2021.  However, . . . I did not want the boat to travel to New

York, and, after consulting with counsel, directed instead that it proceed to Europe . . . . that

decision was mine alone, not my father's."[156]

---

[149] Ex. 37, February 2, 2022 Evidentiary Hr. Tr. at 37:7-9.

[150] These witnesses were: (1) the Debtor's Daughter; (2) Momchil Ivanov, current captain of the Lady May, (3) Craig Heaslop, former captain of the Lady May, and (4) Russell Stockil, yacht management director for Yachtzoo (the yacht management company for the Lady May).

[151] The sole witness offered by the Debtor was Aaron Mitchell, his attorney.  Ex. 37, February 2, 2022 Evidentiary Hr. Tr. at 96:15-18.

[152] See, e.g., id. at 45:9-12; 58:7-11; 60:18-20.

[153] Id. at 96:13-16.

[154] Ex. 1, Final Contempt Decision at 5.

[155] See Ex. 41, January 28, 2022 Mei Guo Affidavit at ¶ 19 ("It was my decision for the boat to travel from New York to Florida in October 2020, not my father's decision.").

[156] Id. ¶ 20 ("I was aware, through my counsel, of the Court's Order requiring the Lady May to return to New York in May 2021. However, given that I am the owner of the Lady May, and that neither HK USA nor I is a party to this action, I did not want the boat to travel to New York, and, after consulting with counsel, directed instead that it

59.     The Debtor himself did not testify in connection with the Final Contempt

Hearing.  On multiple occasions previously, the Debtor had asserted the Fifth Amendment in

response to PAX's discovery requests.[157]  In the Final Contempt Decision, Justice Ostrager ruled

that the Debtor's invocation of his Fifth Amendment right against self-incrimination "in response

to PAX's post-judgment discovery, including in response to requests specifically about the Lady

May," entitled PAX to an adverse inference against the Debtor.[158]

60.     On February 9, 2022, Justice Ostrager issued his Final Contempt Decision

imposing a contempt fine against the Debtor of $134 million[159] and noting that the State Court

was prepared to enforce timely payment through the "exercise its full authority" under New

York's Judiciary Law § 753, which, among other things, provided the State Court with the power

to imprison the Debtor for failure to pay the fine.[160]

61.     The Final Contempt Decision contained numerous findings of the State Court,

including, among others, the following:

    a)      The Debtor had made "efforts to avoid and deceive his creditors by
            parking his substantial personal assets with a series of corporations,
            trusted confidants, and family members."[161]

---

proceed to Europe as had been long-planned at significant expense. Again, that decision was mine alone, not my father's.").

[157] Ex. 65, Letter from Melissa M. Carvalho of Baker & Hostetler LLP, dated March 11, 2021; Ex. 70, Email from Stuart Sarnoff to Melissa Carvalho, dated Nov. 10, 2021.

[158] Ex. 1, Final Contempt Decision at 9.

[159] The Trustee reserves his rights with respect to the plan treatment of PAX's claims.

[160] See Judiciary Law § 753A ("court of record has power to punish, by fine and imprisonment, or either, a neglect or violation of duty, or other misconduct, by which a right or remedy of a party to a civil action or special proceeding, pending in the court may be defeated, impaired, impeded, or prejudiced").

[161] Ex. 1, Final Contempt Decision at 1.

b)      The Debtor, "who is a self-declared multi-billionaire, had secreted his assets in a maze of corporate entities and with family members."[162]

c)      The Debtor's use of corporate entities to shield assets from creditors was a "scheme" that had "enabled Kwok to assert that he has no assets despite his lavish lifestyle."[163]

d)      The Debtor "exercised dominion and control over" the Lady May.[164]

e)      "The testimony adduced at the hearing out of the mouths of defendants' witnesses clearly and convincingly demonstrated that Kwok beneficially owns and controls the Lady May and has utter contempt for this Court and the judicial process."[165]

f)      Based on the evidence in connection with the purchase of the Lady May "a reasonable inference is that Kwok provided the funds which were used to purchase the yacht."[166]

g)      "Subsequent to this Court's September 30, 2020 restraining Order, in October 2020 the Lady May was sent to Florida and then the Bahamas for repairs and was subsequently dispatched to Italy in October 2021, purportedly at the direction of Golden Spring. Ms. Guo acknowledged that she was aware of both this Court's September 30, 2020 restraining Order and this Court's subsequent March 16, 2021 Order directing that the Lady May be returned to the Court's jurisdiction."[167]

h)      Testimony of the Debtor's Daughter "that she owns and controls the Lady May cannot be credited in any respect."[168]

i)      The Debtor's Daughter "introduced no evidence that she exercised dominion and control of the Lady May, and provided no confirmation that she came into possession of the Lady May, other than as a ruse to shield the Lady May from being levied upon by her father's creditors."[169]

---

[162] *Id.*

[163] *Id.*

[164] *Id.* at 2.

[165] *Id.* at 7.

[166] Ex. 1, Final Contempt Decision at 4.

[167] *Id.* at 5.

[168] *Id.* at 6-7.

[169] *Id.* at 7.

j)      "The machinations associated with the shell game Kwok has orchestrated with respect to the Lady May are of a piece with every other evasive and contemptuous act Kwok has taken during the five years this litigation has been pending, which is why there are 1,180 docket entries in this case."[170]

k)      "Kwok has much more than a beneficial interest in the Lady May. Not only does Kwok control the yacht, it appears he provided the funds to purchase it and he is the person who principally enjoys the use of the yacht."[171]

l)      "The evidence clearly and convincingly demonstrates that Kwok holds a beneficial interest in and controls the Lady May."[172]

62.     In concluding his decision, Justice Ostrager commented that "if billionaire litigants can simultaneously seek to use Court process in New York and elsewhere in the United States while knowingly and intentionally violating Court orders, there is no rule of law."[173]

### K.    Debtor Continues His Shell Game in This Chapter 11 Case

63.     In response to the issuance of the Final Contempt Decision, [174] on February 15, 2022 (the "Petition Date"), the Debtor commenced this Chapter 11 Case by filing his chapter 11 petition [Main Case Docket No. 1] (the "Initial Petition") and Official Form 104, titled "For Individual Chapter 11 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims Against You *and Are Not Insiders*" [Main Case Docket No. 4] (the "Top 20 Creditors List") (emphasis added).

---

[170] *Id.*

[171] Ex. 1, Final Contempt Decision at 8.

[172] *Id.* at 8.

[173] *Id.* at 9.

[174] *See, e.g.,* Ex. 19, Tr. of Telephonic 341 Meeting of Creditors at 15:21-16:1 ("[I]n mid-February in my second trial . . . I was given a fine of $120 million and I was ordered to pay it off within five days. So without any choices -- so I filed bankruptcy application at Connecticut state and Chapter 11."). The Debtor has appealed the Final Contempt Decision.

64.     Throughout the chapter 11 case, the Debtor has continued his shell game of using shell companies and family members to plead poverty while living in the lap of luxury.

65.     In the Debtor's Initial Petition, his amended chapter 11 petition filed on February 23, 2022 [Main Case Docket No. 19] (the "<u>Amended Petition</u>" and, together with the Initial Petition, the ("<u>Petitions</u>")), the Debtor, among other things, failed to disclose that his affiliate, Genever US, was the debtor in a pending chapter 11 case in the Southern District of New York that had been commenced on October 12, 2020. [175]  In response to the Petitions' instruction to disclose, "Where you live," the Debtor stated "c/o Golden Spring (New York) Ltd" and inserted Golden Spring's address.[176] The Debtor also listed shell companies Golden Spring and Lamp Capital as the only holders of undisputed claims on his Top 20 Creditors List and amended versions thereof [Docket Nos. 10, 20].

> **i.     Debtor Denies Holding Assets or Earning Income**

66.     On March 9, 2022, the Debtor filed his schedules [Main Case Docket No. 78] (the "<u>Schedules</u>") and statement of financial affairs [Main Case Docket No. 77] ("<u>SOFA</u>").  These documents in particular, along with their associated global notes (the "<u>Global Notes</u>") attached to the SOFA, help encapsulate how the Debtor has played his shell game in this Chapter 11 Case.  Among other things:

---

[175] Initial Petition at 3 (Petition Item 10).

[176] *Id.* at 2 (Petition Item 5).

a)      Despite voluminous public evidence of the Debtor's wealth, including court documents signed by the Debtor under penalty of perjury,[177] the Schedules reported that the total value of the Debtor's property was ***$3,850.00***, as compared with scheduled unsecured claims of $373,803,498.09, over $250 million of which consisted of the claims of PAX, with the remainder including numerous claims by plaintiffs in litigation relating to accusations of securities fraud, defamation, and sexual assault.

b)      The Debtor scheduled $0.00 of income, stating that: "the Debtor does receive support funded by family and companies controlled by family for housing, household and living expenses. None of the funding related to housing, household or living expenses is subject to any claim by the funding source and all housing, household and living expense funding is without any agreement or expectation to be repaid."

c)      The Debtor scheduled $0.00 of expenses, stating that: "all expenses of any kind including housing, household and living, are funded by third party family members or by companies they control. The Debtor has no expenses for which he is personally liable."

d)      The Debtor scheduled Golden Spring (his "family office") as holder of ***secured claims*** against the Debtor of an unknown value based on certain litigation funding agreements.  As noted above, the Debtor had previously listed Golden Spring as holder of ***unsecured claims*** on his Top 20 Creditors List.

---

[177] *See* Ex. 30, Particular of Claims at ¶ 1 (describing Debtor as "high net worth individual").  *See also* Rolfoundation Rule of Law Fund Live 2020/07/22 Mr. Guo Wengui live." YouTube, July 22, 2020, https://www.youtube.com/watch?v=6d-Jcq0wr7U ("Everyone knows that a while ago, I advised to my family fund and our collaboration fund, and based on my decision, (we) purchased oil futures. Everyone knows that (we) made almost less than a little less than $30 billion. At the time I told them, if money is made, 90% (of the profits) belong to you; if money is lost, all belongs to me. Then all went in and 1 billion barrels (of oil futures) were bought. Now the 1 billion barrels made a profit of $30 billion, and I made at least $3 billion, right?") (based on informal translation from Chinse audio); *See* VICE News, "Exiled Chinese Billionaire Uses YouTube to Wage a War on Corruption, YouTube" (original air date on HBO, Nov. 15, 2017), https://www.youtube.com/watch?v=LkOsgh5kcgQ (In this video, the Debtor describes various of his assets, including the Sherry Netherland Apartment ("I buy the apartment"), the Lady May ("my yacht"), the "most luxurious apartment in London," "two private jets," and "hundreds of race cars".  The Debtor also comments on his great wealth generally, stating, "I have the wealthy life that everyone in the world dreams about," and "I don't have any material needs anymore.").

e)     In his SOFA, the Debtor listed a number of parties as creditors who had received transfers within the ninety days preceding the Petition Date, ***thus admitting that the Debtor, and not another party, had paid these creditors***.[178]  It appears, however, that at least some of these payments were made by Golden Spring and/or Lamp Capital, thereby confirming that the Debtor uses these entities as part of his shell game.

f)     The Debtor stated he had "use and occupancy" of the Taconic Road Residence that was owned by Greenwich Land, an LLC whose sole member is the Debtor's spouse.  The Debtor stated that "related costs and expenses associated with the Residence are paid directly by family and family-controlled enterprises."  Relatedly, the Debtor denied holding legal title to any household goods and furnishings, electronics, or collectibles.

g)     The Debtor stated he had "access to" the Sherry Netherland Apartment and disclosed his ownership of Genever BVI, Genever BVI's ownership of Genever US, and Genever US's ownership of the apartment.  However, the Debtor took the position that he held his equity in Genever BVI in trust for Bravo Luck, owned by the Debtor's Son, and asserted that Bravo Luck funded the purchase of the apartment using funds that "came from entities owned or controlled by the Debtor's son and not from the Debtor."

h)     The Debtor stated he "has use of automobiles, including luxury automobiles and motorcycles" but that he "has no legal title to any vehicle of any type," and that "costs and expenses associated with such vehicles are provided for directly by family and family-controlled enterprises."

i)     The Debtor continued to assert that the Lady May was owned by HK USA and refused to schedule the Lady May as an asset on the grounds that he had appealed the Final Contempt Decision.

j)     The Debtor stated that the Hong Kong Restraint Order had frozen "HK\$3.7 million of funds alleged to belong to the Debtor" and "[a]s much as billions more of funds and property, including real estate in Hong Kong, of individuals and entities purportedly subject to the Debtor's 'effective control.'"  The Debtor stated that "[d]ue to the freezing/seizure of these assets, the Debtor does not include them in his estate," despite the fact that the Hong Kong Restraint Order does not necessarily divest the Debtor of ownership of these assets.

67.    Elaborating on the story of the Debtor's alleged individual poverty amidst family opulence, the Debtor stated in his declaration filed on March 20, 2022 that:

---

[178] *See* SOFA, at 21 (response to question 6 "[d]uring the 90 days before you filed for bankruptcy, did **you** pay any creditor a total of \$600 or more").

> My family, and particularly my son, provides for my needs. Prior to the
> Petition Date, my son's family office [Golden Spring] purchased, among
> many other things, my clothing, food, and sundries. I do not have access to
> a Golden Spring credit card or to a Golden Spring bank account. My
> family retains ownership of nearly everything I use, aside from my
> clothing and mobile phones.[179]

68.     According to the Debtor, "Justice Ostrager, PAX, and perhaps others believe I
have greater financial wherewithal than is reflected here and in my Schedules and Statements of
Financial Affairs.  The wealth they believe is mine, however, actually belongs to my son,
daughter, wife, and extended family, not me."[180]

###     ii.     Shell Game Funds Chapter 11 Case and Lifestyle

69.     Throughout the Chapter 11 Case, the Debtor has continued to play his shell game
to ensure that, despite his condition as a chapter 11 debtor claiming no assets or income, he can
continue to live a luxurious lifestyle and benefit from expensive legal representation.

70.     For example, Lamp Capital paid the $1 million retainer of the Debtor's initial
bankruptcy counsel, Brown Rudnick.[181]  The Debtor's Son then paid the $100,000 retainer of the
Debtor's subsequent bankruptcy counsel, Zeisler & Zeisler, **which simultaneously serves as
counsel to the Debtor's Daughter and HK USA.**

71.     Meanwhile, Golden Spring, Lamp Capital, and Greenwich Land have funded the
Debtor's extravagant lifestyle.  These expenses from the beginning of the Chapter 11 Case are

---

[179] Declaration of Mr. Ho Wan Kwok in Support of the Chapter 11 Case and Certain Motions, Docket No. 107 at ¶ 17.

[180] *Id.*

[181] This payment was made using the proceeds of a purported $1 million loan from Lamp Capital to the Debtor that were remitted directly from Lamp Capital to Brown Rudnick. *See* Application of the Debtor for Entry of an Order Authorizing the Employment and Retention of Brown Rudnick LLP as Counsel for the Debtor, Docket No. 86, at ¶ 17; Ex. 4, Tr. of Telephonic 341 Meeting of Creditors, dated April 6, 2022 at 49: 22-24.  At his April 6, 2022 Section 341 meeting, the Debtor testified that this loan was not in writing and that he did not know the terms of the loan, why the money had been lent, or what the source of the money was.  *Id.* at 49-51.

reflected in the monthly operating reports filed by the Debtor for February 2022 [Main Case

Docket No. 120], March 2022 [Main Case Docket No. 242], and April 2022 [Main Case Docket

No. 423], which report an aggregate amount of **$351,081** paid by a "third party for the benefit of

the estate."

72.     Similarly, the Debtor relied on Golden Spring as lender in connection with an $8

million DIP loan proposed in the Debtor's motion filed on March 22, 2022 [Main Case Docket

No. 117].   This loan would have been made to the estate on an unsecured basis, subordinated to

the claims of the Debtor's pre-petition creditors, and without any administrative or priority

repayment rights.  *Id.*  Nevertheless, the record makes clear that the Debtor intended to use a

significant amount of the funds to pay the professional fees of Brown Rudnick, counsel to the

official committee of unsecured creditors (the "Committee"), and numerous proposed "ordinary

course" professionals that included, among others, the law firm of Melissa Francis, ***Golden

Spring's general counsel***.[182]

73.     The Debtor used HK USA's only asset, the Lady May, as a bargaining chip to

offer to his creditors in exchange for broad plan releases.  On April 10, 2022, the Debtor filed a

proposed chapter 11 plan [Main Case Docket No. 197] (the "Proposed Plan").  Among other

things, the Proposed Plan contemplated that HK USA would donate the Lady May (for no

apparent consideration) to a creditor's trust for the benefit of holders of allowed claims, and that

broad releases would be extended to the Debtor, Golden Spring and HK USA (together referred

---

[182]  *See* Annex 1 to *Motion of Debtor for Entry of an Order Authorizing (I) Employment and Payment of
Professionals Utilized in the Ordinary Course, (II) Payment of Prepetition Claims, and (III) Granting Related Relief*
[Main Case Docket No. 119].

to as the "Plan Funders"), and "all individuals and entities affiliated with the Plan Funders" (i.e.,
the Debtor's entire network of shell companies and individual family members).[183]

74.     The Debtor's counsel would emphasize the Debtor's role in arranging for DIP
financing and the donation of the Lady May as contemplated in the Proposed Plan, stating to the
Court that the Debtor "arranged" the DIP loan and "obtained a commitment as set forth . . . in the
proposed plan, to have a boat costing $37 million contributed to creditors as set forth therein."[184]

### iii.     HK USA Agrees to Return Lady May and Pay $37 Million Into Escrow

75.     On March 1, 2022, PAX filed a motion seeking an order confirming the
inapplicability of the automatic stay or, in the alternative, relief from stay, in connection with the
contempt fine awarded to PAX under the Final Contempt Decision [Main Case Docket No. 57]
(the "PAX Stay Motion").  The Debtor's objection to the PAX Stay Motion argued that the
Debtor did not own or control the Lady May.

76.     On April 11, 2022, the day after the filing of the Proposed Plan, HK USA filed a
statement [Main Case Docket No. 203] (the "HK USA Statement") asserting that it consented to
the entry of a proposed order compelling HK USA to transport and deliver the Lady May back to
Connecticut from Europe, thus, according to HK USA, mooting the PAX Stay Motion.  Also on
April 11, 2022, HK USA commenced this Adversary Proceeding in which it seeks a declaration
that HK USA, and not the Debtor's estate, is the owner of the Lady May.

77.     At the April 13, 2022 hearing (the "April 13 Hearing") in connection with the
PAX Stay Motion, the Court asked HK USA's counsel, Mr. Kindseth, a number of pointed

---

[183] Proposed Plan Art I.A.74 (defining "Plan Funders" as Golden Spring and HK USA); Art I.A.75 (defining "Plan
Funder Related Parties" as ":all individuals and entities affiliated with the Plan Funder"); Art I.A.90 (defining
"Released Parties" to include, among others "collectively, the Debtor, the Plan Funders, the Plan Funder Related
Parties").

[184] Ex. 66, April 27, 2022 Tr. at 218:12, 18-20.

questions regarding HK USA's proposal, including "why don't you just post a bond?"[185]  Mr.
Kindseth responded by stating that he did not "know if my client has the funds available to post
the bond" and that "my client's sole asset is the boat."[186]

78.     The Court also addressed this Adversary Proceeding, stating, "I'm not going to
make a finding over who owns the boat. *Justice Ostrager already did that.* If you don't like that,
then you go fight that back in New York court."[187]  The Court's statement was also highly
relevant to the PAX Stay Motion, because the Debtor's objection thereto was based completely
on the notion that the Debtor did not own or control the Lady May.

79.     Shortly after the Court's comment, Mr. Baldiga of Brown Rudnick, the Debtor's
then-counsel, asked the Court for a 15-minute recess to discuss with the Debtor "the solution [the
Court] did posit . . . the possibility of a bond."[188]  Following this recess, Mr. Kindseth, counsel to
HK USA (and not, at that time, counsel to the Debtor) reported to the Court that his client
"intends and is committed then instead to post cash equal to the cost of the boat, about $37
million."[189]

80.     In sum, shortly after the Court's comments suggesting that ownership of the Lady
May would not be re-litigated and that consequently PAX's Stay Motion would likely be granted
and HK USA's claims to ownership of the Lady May rejected, *the Debtor* proposed the payment
of a bond in connection with *HK USA's* proposed return of the Lady May to Connecticut.  Soon

---

[185] Ex. 76, April 13, 2022 Hr. Tr. at 51:8.

[186] *Id.* at 51:10-11.

[187] *Id.* at 55:19-22.

[188] *Id.* at 62:22-23.

[189] *Id.* at 86:21-23.

thereafter, HK USA, which had shortly before claimed to hold no assets other than the Lady

May, had $37 million in cash at its disposal.

81.     Based on HK USA's offer of a $37 million bond, the Court adjourned the hearing

on the PAX Stay Motion.  Following a subsequent hearing on April 18, 2022 at which the parties

discussed the nature of the contemplated $37 million payment, the Debtor, PAX, the Committee,

and creditors Rui Ma and Zheng Wu reached an agreement to settle the PAX Stay Motion.

Under the agreement, HK USA would be required to return the Lady May to Connecticut, with

the performance of this obligation to be secured by the deposit of $37 million into escrow by HK

USA, to be released back to HK USA only upon the return of the Lady May and the satisfaction

of certain other conditions.[190]  The agreement was announced to the Court at the April 27, 2022

hearing and memorialized in a stipulated order that was submitted to the Court on April 29, 2022

and entered the same day [Main Case Docket No. 299] (the "Lady May Stipulation").[191]

82.     The Lady May Stipulation constitutes a settlement under Federal Rule of

Bankruptcy Procedure 9019, with respect to which creditors were not given notice with an

opportunity to object.  As this Court has noted, the Trustee is not a party to the Lady May

Stipulation.[192]  Although the Lady May Stipulation was entered into while both (a) the UST's

motion seeking appointment of an examiner or chapter 11 trustee and (b) PAX's motion to

dismiss the Chapter 11 Case (each discussed in more detail below) were pending, the Lady May

---

[190]  Lady May Stipulation ¶5(i)("in the event this Court determines that HK USA satisfied the Certification
Conditions then HK USA may provide a copy of the HK USA Certification to the Escrow Agent in accordance with
the Escrow Agreement whereupon the Escrow Agent shall immediately release and transfer the Escrow Funds to
HK USA in accordance with the Escrow Agreement").

[191] *See* Docket No. 294.

[192]*See, e.g.*, Ex. 89, Aug. 30, 2022 Tr. at 18:6-9 ("[O]bviously the trustee -- the trustee was not a party to any of this.
He was not in the case when the parties agreed to forego a hearing on relief from stay and a ruling on relief from
stay.").

Stipulation only contemplated the possibility that the Chapter 11 Case would be dismissed, and did not address the eventuality that a chapter 11 trustee would be appointed.[193]

### iv.    HK USA Obtains $37 Million From Another Debtor-Linked Company

83.     Though not disclosed prior to the approval of the Lady May Stipulation, in subsequent court pleadings, HK USA revealed that the source of the $37 million HK USA paid into escrow was a loan extended to HK USA by BVI-registered entity called Himalaya International Financial Group Ltd. ("Himalaya Financial").

84.     Based on HK USA's document production to the Trustee, Himalaya Financial's April 19, 2022 loan agreement with HK USA (the "Himalaya Loan Agreement") was only executed by the Debtor's Daughter for HK USA, but not executed by any representative of Himalaya Financial.[194]  Notably, the Himalaya Loan Agreement purports to grant to Himalaya Financial a security interest in the Lady May,[195] though a separate side letter agreement (the "Himalaya Side Letter"), also dated April 19, 2022, provides that the Himalaya Loan Agreement "will no longer be deemed to be secured against the Yacht" and that HK USA "will instead provide a personal guarantee."[196]  Based on HK USA's document production to the Trustee, the Himalaya Side Letter was only signed by the Debtor's Daughter, not by Himalaya Financial. The personal guarantee from HK USA required by the Himalaya Side Letter was in fact supplied by the Debtor's Daughter herself (not HK USA) and is also dated April 19, 2022.[197]

---

[193] See Lady May Stipulation ¶ 9 (discussing effectiveness of Lady May Stipulation "[i]n the event this Court enters an order dismissing this bankruptcy case").

[194] See Ex. 79, Himalaya Loan Agreement, dated April 19, 2022, at 13.

[195] Id. at 4.3 ("The Total Facility Amount shall be secured against the Yacht and all other asset of the Company, directly or indirectly, and shall take priority agaist [sic] all other liabilities or debts claimed against the Borrower.").

[196] Ex. 80, Side Letter agreement to Himalaya Loan Agreement, dated April 19, 2022, at 1.3 (a)-(b).

[197] See Ex. 81, Guaranty Agreement, dated April 19, 2022, at 1, 4 (signed by the Debtor's Daughter).

85.     The Himalaya Loan Agreement provides, among other things, that "[s]ubject to the provisions of this agreement, [HK USA] shall repay the Loan in full on demand and in any case upon the return of the yacht to the U.S. or within six months of the date of this Agreement, whichever is sooner."[198]

86.     While the Trustee is currently seeking additional discovery regarding Himalaya Financial, the facts of which the Trustee is aware at the time of the filing of these Counterclaims demonstrate that Himalaya Financial is owned and/or controlled by the Debtor.  For example:

a)    The proposal to post a bond in connection with the return of the Lady May to the United States came from *the Debtor's counsel*, and was arranged by the Debtor in an amount of $37 million very soon after HK USA had announced that its only asset was the Lady May, meaning that HK USA could not have posted a bond in any amount without an immediate infusion of funds.

b)    Based on HK USA's document production, the Himalaya Loan Agreement and Himalaya Side Letter were not signed by Himalaya Financial.  Upon information and belief, Himalaya Financial has not declared a default under the Himalaya Loan Agreement despite payment being due upon the return of the Lady May to the United States, which occurred in early July 2022.

c)    According to documents in the possession of the Trustee, Himalaya Financial was represented in connection with its loan to HK USA by the law firm of Berkeley Rowe, which was previously used by the Debtor's Son as his address on the proof of claim filed by the Debtor's Son in the Genever US chapter 11 case.[199]

d)    According to documents in the possession of the Trustee, Himalaya Financial was not originally slated to be the lender of the $37,000,000, but was a replacement, at the last moment, for ACA Capital Group Limited ("ACA"), a Hong Kong entity with numerous links to the Debtor.  Hong Kong public corporate filings (of the kind that are not publicly available for a BVI company like Himalaya Financial) establish that ACA's sole

---

[198] Ex. 79, Himalaya Loan Agreement, dated April 19, 2022, at 13.

[199] *See* Ex. 71, Proof of Claim 3-1, *In re Genever Holdings LLC*, Case No. 20-12411-JLG (Bankr. S.D.N.Y.).

purported shareholder, William Je,[200] and at least a number of its directors and officers, are well-known associates of the Debtor.[201]

e)  ACA has a history of gifting funds to the Debtor under the guise of purported loans.  In the Liman Decision, Judge Liman found that ACA had given a gift of $1 million to Eastern Profit Corporation, despite the contention that these funds were provided as a loan and the existence of a document that purported to be a loan agreement.[202]  During the related litigation, Strategic Vision US LLC had suggested that the Debtor was the source of the funds gifted to Eastern, however Judge Liman did not make a finding on that issue.[203]

f)  ACA Capital contributed to the payment of the Debtor's legal fees in connection with the State Court Action.[204]

g)  Himalaya Financial plays a key role in the Debtor's latest cryptocurrency venture as the purported issuer of "Himalaya Coin," which, along with the related "Himalaya Dollar," purportedly issued by Himalaya Financial Reserves Limited, has been heavily promoted by the Debtor and the

---

[200] *See* Ex. 72, ACA Capital Group Limited Articles of Association, dated December 30, 2014 at 3 (identifying Je Kin Ming (alias as William Je) as sole shareholder).  Documents filed in the Genever chapter 11 case further provide an address for William Je that is identical to the address on South Bay Road in Hong Kong used by the Debtor and the Debtor's Son in corporate documents related to Genever BVI.  *See* Ex. 74, *In re Genever Holdings LLC*, Case No. 20-12411-jlg (Bankr. S.D.N.Y.), ECF No. 14-62, at p. 6 of 23; Ex. 33, Bravo Luck Limited Register of Members.  At the trial related to the Liman Decision in *Eastern Profit Corp. Ltd.*, a witness named Sasha Gong testified at trial on April 22, 2021 that the Debtor had introduced her to Mr. Je and described Mr. Je as "my money man." Ex. 27, Tr. at 774:24-775:1 ("Was he formally introduced to you? A. Yes. Mr. Guo introduced him to me that -- jokingly, that "He's my money man. Anything ask him about money."").  In addition, at this trial the Debtor invoked the Fifth Amendment multiple times when questioned regarding William Je.  *See id.* at Tr. 691: 24-25 ("Q. Who is William Je? A. The Fifth Amendment."); *Id.* at 692:24-693:1 (Q: "And [Mr. Je] sends money to places when you ask him to do so, doesn't he? A: The Fifth Amendment. I'm invoking the Fifth Amendment."); *Id.* at 695: 5-7 ("And you introduced William Je to close associates as your money man, haven't you? A. The Fifth Amendment.").

[201] *See* Ex. 72, ACA Capital Group Limited Articles of Association, at 3 (identifying Je Kin Ming (alias of William Je) as sole shareholder); Ex. 77, ACA Capital Group Ltd. Change in Particulars of Company Secretary and Director, dated April 1, 2017, at 3 (signed by Fiona Yu); Ex. 51, ACA Capital Group Ltd. Annual Return, dated Jan. 6, 2019, at 4 (listing Karin Maistrello as director).

[202] *Eastern Profit Corp. Ltd.*, 2021 WL 2554631, at *41 ("The source of the funds sent by ACA is unknown to the Court and was not the subject of testimony. But regardless of whether those funds are ultimately traceable to Guo as Strategic suggested or are independent from him, the Court finds that they were a gift on behalf of Eastern (and Guo) and not provided out of any obligation.").

[203] *Id.*

[204] Ex. 73, Letter from Kevin M. Kearney of Hodgson Russ LLP, dated April 7, 2021 at 2, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 766 (Noting that payments to Hodgson Russ were made by Golden Spring as well as ACA Capital and a third Debtor-linked entity, Ziba Limited).

Debtor's various websites and social media accounts.[205] Both cryptocurrencies are sold on the "Himalaya Exchange" website.[206] The Debtor's Himalaya cryptocurrency operation and his other online schemes have resulted in numerous allegations of fraud against the Debtor and his associates.

h)  Numerous entities and organizations reportedly controlled by the Debtor are named "Himalaya." These include, the Himalaya Embassy, Himalaya Federal Reserve, and Himalaya Supervisory Organization, as well as many others.[207]

i)  "Himalaya Coin," the name of the cryptocurrency issued by Himalaya Financial, as well as the name of the related "Himalaya Dollar" cryptocurrency, are assumed names registered in the state of New York by Saraca Media Group, Inc., the shell company used by the Debtor for, among other things, his cryptocurrency ventures.

j)  Saraca's certificates of assumed name for "Himalaya Coin" and "Himalaya Dollar" filed with the State of New York were signed by Yvette Wang,[208] who is also **the president of Golden Spring**.[209]

---

[205] *See* "Whitepaper Himalaya Coin" Himalaya Exchange, Apr. 2021, https://himalaya.exchange/images/hweb/hcn_whitepaper_eng.pdf, at 2 (describing Himalaya Coin as "issued and managed by Himalaya Financial Group Limited" and Himalaya Dollar as "issued and managed by Himalaya International Reserves Limited"); Song, Zijia. "Himalaya Coin Loved by Exiled Billionaire and Steve Bannon Soars." *Bloomberg.com*, Bloomberg, 12 Nov. 2021, https://www.bloomberg.com/news/articles/2021-11-12/a-27-billion-token-loved-by-exiled-billionaire-and-steve-bannon; "Miles Guo - Hcoin to the Moon (Official Video)." *YouTube*, 10 Dec. 2021, https://www.youtube.com/watch?v=foVjKjgyN4Q; "*Our Trillion Currency Empire EP3-1 Professional Interpretation of Himalaya Coin White Paper by Industry Investors*.", G-News Taiwan, 27 May 2021, https://gnews.org/post/p1262067; Guo, Miles. "The Himalaya Coin Is Fully Involved in the Establishment of the New Quantum Computing Standards…" *GETTR*, June 8, 2022, https://gettr.com/post/p1dbt3hd9b5. ("The Himalaya Dollar is the only real stablecoin, and the Himalaya Coin is the best volatile digital coin."); Guo, Miles. "The Himalaya Coin Is and Will Always Be the Most Stable Digital Currency in the World..." *GETTR*, April 3, 2022, https://gettr.com/post/p13hcxj36ea. ("The Himalaya Coin is and will always be the most stable digital currency in the world").

[206] *See* "Himalaya Exchange," Himalaya Exchange, Sept. 22, 2022, https://himalaya.exchange/.

[207] *See, e.g.*, Friedman, Dan. "A Fugitive Chinese Tycoon Met Steve Bannon. Misinformation Mayhem Ensued." *Mother Jones*, March – April 2022, https://www.motherjones.com/politics/2022/02/guo-wengui-miles-guo-gettr-steve-bannon/ ("The [New Federal State of China] has what Guo calls the **Himalaya Embassy**, located in a leased building on Manhattan's Upper East Side that houses other Guo concerns. Navarro, a veteran China hawk, has signed on as a supposed 'international ambassador.' Guo has even created a monetary system, based on a cryptocurrency dubbed GCoin; it's issued through an entity called the **Himalaya Federal Reserve**.").

[208] Ex. 25, Himalaya Coin Certificate of Assumed Name at 1 and Ex. 26, Himalaya Dollar Certificate of Assumed Name at 1.

[209] Ex. 2, Wang Dep. Tr. at 42:20-23.

k)  Documents in the Trustee's possession suggest that funds used to purchase Himalaya Coin and/or Himalaya Dollar cryptocurrency are paid directly to Saraca doing business as Himalaya Coin and/or Himalaya Dollar.

87.     As of the date of the filing of these Counterclaims, the $37 million paid into escrow by HK USA pursuant to the Lady May Stipulation remains deposited in an escrow account at U.S. Bank, a financial institution with branches in Connecticut, pursuant to an escrow agreement between HK USA, the official committee of unsecured creditors, and U.S. Bank (the "Escrow Agreement").

88.     The funds deposited pursuant to the Escrow Agreement and/or rights thereto under the Escrow Agreement (collectively, the "Escrowed Funds"), are property of HK USA.

89.     The Lady May arrived in the waters of Connecticut in early July 2022 and remains there as of the date of the filing of these Counterclaims.

### v.     Debtor Seeks Dismissal of Chapter 11 Case

90.     On March 19, 2022, the UST filed a motion for the appointment of an examiner or chapter 11 trustee [Main Case Docket No. 102] (the "Trustee Motion"), arguing, among other things, that it was "in the best interests of creditors and the estate to appoint an examiner or a trustee because the Debtor, a public figure and self-proclaimed billionaire . . . claims that he has no regular income and virtually no assets yet seemingly has access to significant funds."[210]

91.     On April 6, 2022, PAX Filed a motion to dismiss the Debtor's case, or, in the alternative, a partial joinder to the Trustee Motion [Main Case Docket No. 183] (the "Motion to Dismiss") in which it pointed out, among other things, that the Debtor's *modus operandi* is to part, shield and secrete his assets through family members and shell companies."[211]

---

[210] *UST's Motion for an Order Directing the Appointment of an Examiner or, In the Alternative, Motion for Order Directing the Appointment of a Chapter 11 Trustee*, Docket No. 102, at 1.

[211] *PAX's Motion to Dismiss Chapter 11 Case Or, In The Alternative, Partial Joinder To United States Trustee's Motion For An Order Directing The Appointment Of A Chapter 11 Trustee*, Docket No. 183, ¶ 2.

92.     On May 11, 2022, the Debtor filed notice of his consent to the dismissal of the

Chapter 11 Case [Main Case Docket No. 344] (the "Consent to Dismissal") and withdrew his

DIP motion, which at the time was still pending.  In his Consent to Dismissal, the Debtor stated

that, while he had "obtained the commitment of" Golden Spring to provide DIP financing and

had "arranged for a very substantial asset owned by his daughter, the Lady May yacht with a

likely value in excess of $30 million" to be made available for liquidation for the benefit of

creditors, due to litigation by PAX and the UST, the Debtor was "buckling under the weight" of

professional fees and Golden Spring "had withdrawn its commitment to fund" the Chapter 11

case.[212]

### vi.     HK USA Acts In Concert with Debtor and Golden Spring

93.     Fittingly given its status as the Debtor's alter ego, HK USA's actions in this

Chapter 11 Case have been taken in concert with those of the Debtor and the Debtor's "family

office," Golden Spring.  For example, as demonstrated by email records in the possession of the

Trustee:

   a)     Retention of Zeisler & Zeisler to represent HK USA and the Debtor's
          Daughter was arranged by the Debtor and/or his counsels, Aaron Mitchell
          (Lawall & Mitchell) and William Baldiga (Brown Rudnick), with Stephen
          Kindseth of Zeisler & Zeisler submitting his retention agreement to Mr.
          Mitchell for his review and for signature by the Debtor's Daughter.[213]

   b)     When concerned about the delayed payment of his retainer, Mr. Kindseth
          inquired with the Debtor's counsel, Robert Stark, of Brown Rudnick.[214]

---

[212] *Debtor's Consent to Dismissal of Case*, Docket No. 344, ¶¶ 4, 6.

[213] *See* Ex. 83, Email from Stephen Kindseth, dated April 1, 2022.

[214] *See* Ex. 84, Email from Stephen Kindseth, dated April 4, 2022 ("Robert, just following up about the retainer since you offered. I did not receive it today which is slightly disconcerting. If you could find out about its status that would be great. I have put a lot of time in this already with my partner and there's some obviously critical timing issues this week.").

c)      Email correspondence related to the preparation of the April 11, 2022 HK USA Statement typically included the Debtor's personal attorney, Aaron Mitchell and Golden Spring representative Max Krasner.[215]

d)      Email correspondence between Mr. Kindseth and Craig Jalbert (of the Debtor's proposed financial advisor, Verdolino & Lowey), and between Jeffrey Jonas of Brown Rudnick and Mr. Kindseth and Mr. Jalbert, regarding arrangements to escrow the $37 million paid pursuant to the Lady May Stipulation included Melissa Francis, Golden Spring's general counsel.[216]

e)      The Debtor's attorney Mr. Mitchell responded to inquiries from the Debtor's Brown Rudnick attorneys regarding the status of the wire of the $37 million that was to be deposited into escrow.[217]

### vii.     Debtor Fails to Respond to HK USA's Complaint

94.      May 13, 2022 was the deadline for the Debtor to file an answer in this Adversary Proceeding. The Debtor failed to file an answer or request an extension of this deadline.

95.      Subsequently, the Debtor's counsel Mr. Henzy has clarified that in connection with this Adversary Proceeding:

> "[The Debtor's] position is that HK [USA] owns the boat so [the Debtor and HK USA] are not adverse. He does not believe that he owns the boat. He does not believe that it's property of the bankruptcy estate. I'll say that unequivocally on the record. So I don't see how they can be adverse if they take the same position."[218]

---

[215] *See, e.g.*, Ex. 85, Email from Russell Stockil to Stephen Kindseth, CCing Max Krasner, dated April 6, 2022, providing information regarding the Lady May "further to request from Family Office [i.e., Golden Spring]"); Ex. 86, Email from Stephen Kinseth to Russell Stockil, CCing Max Krasner and Aaron Mitchell, dated April 9, 2022.

[216] *See, e.g.*, Ex. 87, Email from Stephen Kindseth to Craig Jalbert, CCing Melissa Francis, dated April 17, 2022; email from Jeffrey Jonas to Stephen Kindseth and Craig Jalbert, CCing Melissa Francis, dated April 18, 2022.

[217] Ex. 88, Email from Aaron Mitchell, dated April 18, 2022 ("There is a $37M wire that was sent last week. It should clear by now, or soon. Getting wire confirmation.").

[218] *See* Ex. 91, August 1, 2022 Hr. Tr. at 39:3-8.

### viii. Court Orders Appointment of Chapter 11 Trustee

96.     On May 24, 2022, the Court held an evidentiary hearing on the issue of whether

to dismiss the Chapter 11 Case or appoint a chapter 11 Trustee, and on June 15, 2022, the Court

issued its decision ordering the appointment of a chapter 11 trustee [Main Case Docket No. 465]

(the "Trustee Appointment Decision").

97.     In the Trustee Appointment Decision the Court found, among other things, that

the "Debtor has demonstrated he can obtain millions of dollars in funds, including the

$8,000,000.00 that was the subject of the DIP Motion," and that the Debtor's Proposed Plan had

provided for "the transfer of title to the Lady May to a creditor trustee for the benefit of all

creditors."[219]

98.     The Court also noted the arguments of creditors that the Debtor had "engaged in

multilayer transactions involving complicated corporate structures like Golden Spring, Genever

Holdings, Lamp Funding, and HK [USA] that make it difficult to identify and locate the

Debtor's assets."[220]  This "complexity of the Debtor's financial affairs and lack of independent

managerial oversight in this case warrants the appointment of a Chapter 11 trustee who can

investigate, identify, and locate the Debtor's assets for the benefit of creditors and the estate."[221]

### ix.     Debtor Attempts to Frustrate Trustee's Investigation and Administration of Estate to Protect Shell Game From Scrutiny

99.     Since the appointment of the Trustee on July 8, 2022, the Debtor has, despite his

duty to cooperate with the Trustee under section 521(a)(3) of the Bankruptcy Code, engaged in a

---

[219] Memorandum of Decision and Order Denying Motion to Dismiss Without Prejudice and Granting Joinder to Motion for Appointment of Chapter 11 Trustee (June 15, 2022), Docket No. 465, at 13.

[220] *Id.* at 15.

[221] *Id.* at 16.

tireless effort to stymie the Trustee's administration of the Debtor's chapter 11 estate and

investigation of the Debtor's assets and financial condition. Among other things, the Debtor has:

   a)   Sought relief from the order appointing the Trustee;

   b)   Opposed the retention of the Trustee's counsel;

   c)   Opposed the Trustee's corporate governance motion;

   d)   Opposed the Trustee's discovery efforts; and

   e)   Appealed the Court's rulings that denied the Debtor's motion for relief
        from the order appointing the trustee and granted the Trustee's corporate
        governance motion.

100.   In sum, since the Trustee's appointment, hundreds of hours have been devoted to

dealing with the Debtor's "obstruct[ion] [of] the administration of this estate."[222]

101.   In conjunction with the Debtor's filings before this Court that opposed the

appointment of the Trustee and the retention of the Paul Hastings based on alleged influence of

the Chinese government or Chinese Communist Party ("CCP") over Paul Hastings, the Debtor

also launched a stream of online diatribes against the Trustee, his counsel, PAX, PAX's counsel,

the UST, the Department of Justice, and the entire chapter 11 process.[223]

102.   Relatedly, the Debtor has stated that he "firmly believe[s] the CCP is

orchestrating the PAX case."[224]  Indeed, in a 2018 deposition undertaken by counsel to PAX in

connection with the attachment of assets and veil piercing issues, the Debtor accused PAX's

---

[222] Ex. 89, Aug. 30, 2022 Tr.at 94:19-95:2 ("[A]ll the arguments that you have made has been to stop the trustee from trying to do what the trustee is going to do. If you don't like what the trustee does, then you can sue him. You can do that. There's a remedy. You have a remedy. You can sue him. But you are now obstructing the administration of this estate that all the other creditors have been waiting to have administered.").

[223] *See* PAX's Statement to Debtor's Rule 60(b) Motion & Retention Application, Docket No. 618, at ¶ 10.

[224] Docket 107.

attorneys of being agents of the CCP, [225] and, when presented with to an audio recording

evidencing his ownership of the Lady May, the Debtor ***covered his ears*** and refused to listen,

alleging that "[t]his is all communist" and threatening suicide.[226]

103.    Thus, in addition to the Debtor's pattern of using the shell game to defraud

creditors, the Debtor also has a pattern of accusing parties attempting to investigate his assets of

collusion of with the CCP.  In this respect, the Debtor uses his reputation as an anti-CCP activist

to protect his shell game from scrutiny and maintain his lifestyle while creditors go unpaid.

### L.    <u>Claim of IRS</u>

104.    On August 10, 2022, the IRS filed a proof of claim [POC 12-1] against the

Debtor.

### FIRST COUNTERCLAIM

### (Lady May Is Property of the Debtor)

105.    The Trustee repeats and realleges the allegations contained in paragraphs 7-104.

106.    In the Final Contempt Decision, Justice Ostrager found that the Debtor

"beneficially owns and controls the Lady May."[227]

107.    Justice Ostrager's finding with respect to the Debtor's ownership of the Lady May

was preclusive in effect and HK USA is collaterally estopped from contesting that issue.

---

[225] Ex. 8, Kwok Dep. Tr. at 21:8-13 ("I think you guys [PAX's counsel] are a bunch of thugs. I think you are just mafia. You're working for the communists. You're doing threats and racketeering. The whole world knows what you're doing. You're helping the mafia. You're destroying a good person. I don't need to pay any attention to you at all.").

[226] *Id.* at 60:20-61:2 ("THE WITNESS: I refuse to listen. I'm not going to listen.  Q: Sorry, Mr. Kwok, were you covering your ears? A: This is all communist. Everything here is all communist. Unless you prove this is not communist, then I will listen."); 61:14-20 ("I have a sensation of committing suicide if you're going play that. This is communist. Very simple. There is like a number of place that the communist that have been proven by the FBI to be fake. So you want me to commit suicide? Are you here to kill me?").

[227] Ex. 1, Final Contempt Decision at 7.

108.    New York issue preclusion law is applicable here given that the findings in the
Final Contempt Decision were made by a New York Court.

109.    Under New York law, collateral estoppel bars relitigation of an issue when:
(a) the identical issue necessarily was decided in the prior action and is decisive of the present
action, and (b) the party to be precluded from relitigating the issue had a full and fair opportunity
to litigate the issue in the prior action.  *Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*,
988 F.3d 634, 642 (2d Cir. 2021) (applying New York law).

110.    Both of these conditions apply here.  The issue of the Debtor's ownership and
control of the Lady May was necessarily decided by Justice Ostrager.  In fact, the Appellate
Division expressly asked Justice Ostrager to resolve it, leading to the Final Contempt Hearing
and the issuance of the Final Contempt Decision shortly thereafter.[228]  Moreover, HK USA had a
full and fair opportunity to litigate the ownership issue before Justice Ostrager, even though HK
USA was not a named party to the State Court Action.  This is because HK USA was in privity
with the Debtor, who was a party to the State Court Action.  HK USA and the Debtor were (and
are) completely aligned on the ownership issue:  both took the position that HK USA, and not the
Debtor, was the true owner of the Lady May.  In addition, HK USA was an active participant at
the Final Contempt hearing; its counsel introduced and defended the testimony of four out of the
five witnesses called on behalf of the Debtor.

111.    Based on the above, the Trustee seeks a ruling pursuant to sections 541 and 542 of
the Bankruptcy Code (1) declaring that the Lady May is property of the Debtor's chapter 11

---

[228] Ex. 1, Final Contempt Decision (quoting *Pac. All. Asia Opportunity Fund L.P. v. Wan*, 153 N.Y.S.3d 862, 863
(App. Div. 2021)) ("The motion court is instructed to proceed with an evidentiary hearing to resolve a dispute as to
ownership and control of the yacht, and to assess appropriate penalties.").

estate to be administered by the Trustee and (2) ordering the surrender of the Lady May to the Trustee.

## SECOND COUNTERCLAIM

### (Alter Ego)

112.     The Trustee repeats and realleges the allegations contained in paragraphs 7-104.

113.     Because HK USA is a Delaware entity, Delaware law applies to the alter ego/veil piercing claim.[229]

114.     Under Delaware's two-pronged test for piercing the corporate veil, a court applying Delaware's alter ego analysis to the Debtor's relationship with HK USA will focus on (1) whether the Debtor and HK USA operated as a single economic unit and (2) whether there was an overall element of injustice or unfairness.  With regard to the former, a court applying Delaware law would consider a number of factors, including, among others, whether HK USA was adequately capitalized, observed corporate formalities, and was a facade for the Debtor.[230] This "list of factors is not exhaustive and no single factor is dispositive."[231]  However, the common theme, which "must always be present," is an "an overall element of fraud, injustice, or unfairness."[232]  To that end, a number of courts have explained that control over, and/or ownership of, the property or assets of the allegedly separate entity is evidence that the entity is

---

[229] *See e.g. Universitas Education, LLC v. Benistar*, 2021 WL 965794, at *7 (D. Conn. Mar. 15, 2021) ("[B]ecause [defendant] is incorporated in Delaware, I must apply Delaware law to decide if it may be subject to an alter ego claim for reverse veil piercing liability.").

[230] *Blair v. Infineon Tech., AG*, 720 F. Supp.2d 462, 470-71 (D. Del. 2010) (Noting the factors that the Third Circuit considers in determining whether a corporation operated as a single economic entity, which notably would not include whether the relevant individual is a shareholder of the entity, but would include "gross undercapitalization; failure to observe corporate formalities . . . [and] whether the corporation is merely a facade.").

[231] *Blair v. Infineon Tech.*, 720 F. Supp.2d at 471.

[232] *Id.*

60

really the alter ego of the controlling party.[233]

115.    The facts alleged herein establish that HK USA is an alter ego of the Debtor.
Critically, as Justice Ostrager found, HK USA's only purported asset, the Lady May, was
beneficially owned and controlled by the Debtor.  This finding by Justice Ostrager is binding on
HK USA, which was present during, participated in, and was in privity with the Debtor during
the State Court Action, under the doctrines of collateral estoppel and/or *res judicata*.

116.    Moreover, both Justice Ostrager's decision and the overall record of documents
and testimony in prepetition litigation and in this Chapter 11 Case demonstrate conclusively that
HK USA was one of the Debtor's shell companies used as part of a comprehensive effort to
shield assets from creditors and plead poverty while living in the lap of luxury.  The Debtor even
used HK USA as the potential funder of his chapter 11 plan, through the contemplated donation
of the Lady May to a creditor's trust in exchange for broad releases for the Debtor and his shell
companies and family members.

117.    HK USA also has all the classic hallmarks of an alter ego shell company: among
other things, at all relevant times it had no source of income, did not pay its own expenses
(which were funded by Golden Spring), had no directors, officers, or employees, did not file tax

---

[233] *See ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 320 (S.D. Tex. 2008) (debtor and its subsidiary
operated as a single economic unit in part because the "dividends from [subsidiary's] only asset went directly to
[debtor], its dominant shareholder, which had total control of the funds"); *Crystallex Int'l Corp. v. Bolivarian
Republic of Venezuela*, 333 F. Supp. 3d 380, 396 (D. Del. 2018), *aff'd and remanded*, 932 F.3d 126 (3d Cir. 2019)
(allegedly separate instrumentality would be considered an alter ego if the controlling entity had extensive control of
the instrumentality, including if it "uses the instrumentality's property as it its own").  *See also Ashley v. Ashley,* 393
A.2d 637, 641 (Pa. 1978*)* ("We have said that whenever one in control of a corporation uses that control, or uses the
corporate assets, to further his or her own personal interests, the fiction of the separate corporate identity may
properly be disregarded.") (emphasis added); *In re B.L. Jennings, Inc.*, 373 B.R. 742, 759 n. 10 (Bankr. M.D. Fla.
Jun. 12, 2007) ("partnerships and other business entities may also be found to be the 'alter egos' of those in control
or dominion over their assets") (emphasis added); *Freeman v. Complex Computing Co., Inc.,* 119 F.3d 1044, 1051
(2d Cir. 1997) (defendant that "exercised considerable authority over [the corporation] ... to the point of completely
disregarding the corporate form and acting as though [its] assets were his alone to manage and distribute" was
"appropriately viewed as [an] equitable owner for veil-piercing purposes") (internal citation omitted) (as modified)
(emphasis added).

returns, had no bank accounts and was not otherwise capitalized, and kept no documents. HK USA's address was used by the Debtor's other shell companies and the Debtor himself.

118.    At all relevant times, the Debtor was indebted to one or more creditors. Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

119.    Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that HK USA's property, including the Lady May and the Escrowed Funds, is property of the Debtor's chapter 11 estate to be administered by the Trustee and (2) ordering the surrender of the Lady May and the Escrowed Funds to the Trustee.

## THIRD COUNTERCLAIM

### (Declaration that Debtor Is Equitable Owner of HK USA and Ordering Turnover of Ownership of HK USA to Trustee)

120.    The Trustee repeats and realleges the allegations contained in paragraphs 7-104.

121.    The same facts, discussed above, establishing that HK USA is an alter ego of the Debtor also support the conclusion that the Debtor is the equitable owner of HK USA.[234]

122.    At all relevant times, the Debtor was indebted to one or more creditors. Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

123.    Accordingly, the Trustee seeks a ruling, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the membership interest in HK USA purportedly held by the Debtor's Daughter is property of the Debtor's chapter 11 estate and (2) ordering the surrender of such membership interest and all related rights of corporate control, to the Trustee.

---

[234] *Freeman v. Complex Computing Co., Inc.*, 119 F.3d 1044, 1051 (2d Cir. 1997) (defendant that "exercised considerable authority over [the corporation] . . . to the point of completely disregarding the corporate form and ***acting as though [its] assets were his alone to manage.***") (emphasis added).

## FOURTH COUNTERCLAIM

**(Avoidance of Actual Fraudulent Transfer)**
**(Asserted in the alternative to the First, Second, and Third Counterclaims)**

124.    The Trustee repeats and realleges the allegations contained in paragraphs 7-104.

125.    As described in the First, Second, and Third Counterclaims, the Trustee seeks a judgment in this Adversary Proceeding that the Lady May is property of the estate and that HK USA is the alter ego of or equitably owned by the Debtor and, thus, all of HK USA's property or HK USA itself is property of the estate.  In the alternative, in the event that the Lady May is not property of the estate or that HK USA is not the alter ego of or beneficially owned by the Debtor, the Trustee asserts a claim of actual fraudulent transfer against HK USA pursuant to (1) Section 276 of the New York Debtor and Creditor Law,[235] made applicable by section 544 of the Bankruptcy Code; and (2) section 548(a)(1)(A) of the Bankruptcy Code.

126.    A claim of actual intent to defraud under section 548(a)(1)(A) of the Bankruptcy Code requires allegations that the debtor-transferor made a transfer or incurred an obligation with "actual intent" to "hinder, delay or defraud" a past or future creditor.[236]  "The analysis of the debtor's intent to hinder, delay, or defraud under [section] 548 of the Bankruptcy Code and under New York law is identical."[237]

127.    "Because of the difficulty in proving actual intent to hinder, delay, or defraud in making its case, a party can rely on the 'badges of fraud,' which are 'circumstances so

---

[235] This was the New York statute effective on the date of the 2017 Transfer.

[236] *In re Integrity Graphics, Inc.*, 623 B.R. 21, 29-30 (Bankr. D. Conn. 2020).

[237] *In re Combes*, 382 B.R. 186, 193-94 (Bankr. E.D.N.Y. 2008); The debtor-transferor's intent is at issue in such claims, not the transferee's.  *In re LXEng LLC*, 607 B.R. 67, 91 (Bankr. D. Conn. 2019).[237]

commonly associated with fraudulent transfers that their presence gives rise to an inference of intent.'"[238]

128.     Examples of 'badges of fraud' include, *inter alia*: (1) concealing facts and false pretenses; (2) an unconscionable discrepancy in consideration received in exchange for the value of the property transferred; (3) creating a closely-held corporation for property receipt; (4) closeness in relationship between the parties; (5) retaining the property in question for benefit or use; (6) the financial condition of the transferor and transferee both before and after the transfer(s); (7) repeated patterns or cumulative effect of courses of conduct post-insolvency or financial troubles; and (8) the timeline of events. . . The transfer of property to a spouse is a 'classic' badge of fraud. . . . Asset shifting to different corporate entities wholly owned or 'so closely assimilated' by the debtor is an additional badge of fraud."[239]

129.     The facts discussed herein establish the following sequence of events

a)     Between October 2014 and June 27, 2017, ownership of HK International was held by one of the Debtor's associates, Qu Guo Jiao ("Ms. Qu") through the undisclosed HK International Declaration of Trust for the benefit of the Debtor, who remained beneficial owner of HK International.

b)     On February 23, 2015, HK International became owner of the *Lady May*.

c)     The funds used to purchase the Lady May were transferred by the Debtor to Bravo Luck Limited, an entity registered in the British Virgin Islands and in which the Debtor, at the time, held a 50% ownership interest, with the remaining 50% held by the Debtor's son, and then by Bravo Luck Limited to the seller (the "2015 Transfer").

d)     On June 27, 2017, ownership of HK International was transferred to the Debtor's daughter ***for no consideration*** (the "2017 Transfer").

e)     In 2019, HK USA was formed.

---

[238] *Jie Xiao*, 608 B.R. 126, 157 (Bankr. D. Conn. 2019).

[239] *In re Jie Xiao*, 608 B.R. at 157.

      f)    In April 2020, the *Lady May* was transferred from HK International to HK USA ***for no consideration*** (the "2020 Transfer").

130.    This sequence of events, established both by the voluminous record set forth in the Counterclaims and by the preclusive findings made by Justice Ostrager in his Final Contempt Decision, shows that, from the moment he first sought to purchase the Lady May, the Debtor engaged in a series of intentional transactions as part of his comprehensive efforts to judgment-proof himself by placing his valuable assets with shell companies or family members.

131.    First, in 2015, the Debtor used his shell company Bravo Luck Limited, an entity he controlled and shared with his son, to fund the purchase of the Lady May on behalf of HK International, an entity that one of the Debtor's associates (Ms. Qu) held in trust, through the undisclosed HK International Declaration of Trust, for the Debtor's benefit.  That the funds used to purchase the Lady May came from the Debtor is supported by Justice Ostrager's finding that "there is no evidence that [the Debtor's Son] was involved with the corporate transactions leading to" HK International's acquisition of the Lady May,"[240] and that the facts presented supported the "reasonable inference [] that Kwok provided the funds to HK International] which were used to purchase the yacht."[241]  Second, in 2017 the Debtor, for no consideration, transferred HK International itself to his daughter.  Third, and finally, in 2020, the Debtor caused HK International—again for no consideration—to transfer the Lady May to HK USA.  All three of these transactions were clearly part of the Debtor's comprehensive effort to judgment-proof himself by placing his valuable assets with shell companies or family members.

132.    On these facts, there are two separate fraudulent transfers by the Debtor.  The most obvious is the 2017 Transfer, pursuant to which the Debtor caused HK International—

---

[240]   Ex. 1, Final Contempt Decision at 5.

[241]   Ex. 1, Final Contempt Decision at 4.

which he beneficially owned at the time pursuant to the undisclosed HK International
Declaration of Trust—to be transferred to his daughter for no consideration. Given the lack of
any consideration, as well as the extensive evidence and findings by Justice Ostrager that the
Debtor has repeatedly engaged in efforts to shelter his assets from creditors, the 2017 Transfer is
avoidable as an actual fraudulent transfer. *See In re Jie Xiao*, 608 B.R. 126, 157–58 (Bankr. D.
Conn. 2019) (finding actual fraud where "[t]he Debtor had one paramount goal: to leave himself
and LXEng judgment-proof while channeling their assets to his wife, children, and extended
family. His willingness to channel, transfer, and distribute those monies reveals his conscious
intention and design.").

133.    In the alternative, in the event the Court were to determine (despite the clear
evidence to the contrary) that the Debtor did not hold a beneficial interest in HK International at
the time of the 2017 Transfer, then the 2015 Transfer is avoidable as an actual fraudulent
transfer. As noted above, the funds that allowed HK International to purchase the Lady May in
2015 came from the Debtor, using his shell company Bravo Luck. Assuming for the sake of
argument that the Debtor did not own HK International at that time, then he effectively gifted the
funds necessary to purchase the Lady May to HK International for no consideration. Such a
transfer fits neatly into the Debtor's fraudulent shell game and is avoidable for that reason

134.    Because at least one of these transfers is avoidable, the Trustee may recover the
Lady May or its value from HK USA, either because HK USA is a subsequent transferee liable
under section 550(a) of the Bankruptcy Code, or because the transactions in 2015, 2017, and
2020 can be collapsed into one transaction under the collapsing doctrine.

135.    At all relevant times, the Debtor was indebted to one or more creditors. Such
creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors'

rights.

136.     Accordingly, assuming that the relief requested in first or second counterclaim is
not granted, the Trustee seeks a ruling, pursuant to the Section 276 of the New York Debtor and
Creditor Law and sections 544, 548 and 550 of the Bankruptcy Code, that the Lady May or the
value of the Lady May be surrendered to the Trustee.

## FIFTH COUNTERCLAIM

### (Negligence)
### (Asserted in the alternative to the Second and Third Counterclaims)

137.     The Trustee repeats and realleges the allegations contained in paragraphs 7-104.

138.     As described in the Second and Third Counterclaims, the Trustee seeks a
judgment in this Adversary Proceeding that HK USA is the alter ego of or equitably owned by
the Debtor and, thus, all of HK USA's property or HK USA itself is property of the estate.  In the
alternative, in the event HK USA is not the alter ego of or beneficially owned by the Debtor, the
Trustee holds a negligence claim against HK USA.

139.     The elements of a negligence claim under New York law are: "(i) a duty owed to
the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that
breach."[242]  Moreover, "all persons have a common-law duty to exercise ordinary care and skill
to refrain from injuring others."[243]

140.     Here, in the event HK USA is not an alter ego of the Debtor, HK USA owed a
duty to the Debtor to exercise ordinary care and skill to refrain from injuring him.  Nevertheless,
despite the fact that HK USA's sole member, the Debtor's daughter, was aware of Justice

---

[242] *Lombard v. Booz–Allen & Hamilton, Inc.,* 280 F.3d 209, 215 (2d Cir.2002) (citing *Merino v. New York City Transit Auth.,* 218 A.D.2d 451, 639 N.Y.S.2d 784 (1st Dep't 1996)).

[243] *Guido v. 1114 6th Ave. Co.,* 2015 WL 1055074, at *15 (N.Y. Sup. Ct. Mar. 10, 2015).

Ostrager's orders, applicable to HK USA, restraining the movement of the Lady May and imposing daily penalties for the failure to return the Lady May to the United States, HK USA nevertheless moved the Lady May Overseas and kept it there until July 2022.  This was a violation of HK USA's duty of care and caused the Debtor to incur a contempt fine of $134 million pursuant to the Final Contempt Decision.

141.    Thus, the Debtor as of the Petition Date held a negligence claim against HK USA which became property of the Debtor's chapter 11 estate pursuant to section 541 of the Bankruptcy Code and which the Trustee now asserts against HK USA.

## **PRAYER FOR RELIEF**

WHEREFORE, for the foregoing reasons, the Trustee respectfully requests that judgment be entered as follows:

1.    On the First Counterclaim, an order (1) declaring that the Lady May is property of the Debtor's chapter 11 estate to be administered by the Trustee and (2) ordering the surrender of the Lady May to the Trustee;

2.    On the Second Counterclaim, an order (1) declaring that HK USA's property, including the Lady May and the Escrowed Funds, is property of the Debtor's chapter 11 estate to be administered by the Trustee and (2) ordering the surrender of the Lady May and the Escrowed Funds to the Trustee;

3.    On the Third Counterclaim, an order (1) declaring that the membership interest in HK USA purportedly held by the Debtor's Daughter is property of the Debtor's chapter 11 estate and (2) ordering the surrender of such membership interest and all related rights of corporate control, to the Trustee;

4.    On the Fourth Counterclaim, an order ruling, pursuant to the Section 276 of the

New York Debtor and Creditor Law and sections 544, 548 and 550 of the Bankruptcy Code, that the Lady May or the value of the Lady May be surrendered to the Trustee;

5.      On the Fifth Counterclaim, damages in the amount of no less than $134 million;

6.      Reasonable attorneys' fees, costs, and expenses incurred in this action; and

7.      Such other and further relief as the Court may deem just, proper, or equitable under the circumstances.

*[Remainder of Page Intentionally Left Blank]*

Dated:    September 23, 2022         LUC A. DESPINS,
         New Haven, Connecticut     CHAPTER 11 TRUSTEE

By: */s/ Patrick R. Linsey*
    Patrick R. Linsey (ct29437)
    NEUBERT, PEPE & MONTEITH, P.C.
    195 Church Street, 13th Floor
    New Haven, Connecticut 06510
    (203) 781-2847
    plinsey@npmlaw.com

       *and*

    Nicholas A. Bassett (*pro hac vice*)
    PAUL HASTINGS LLP
    2050 M Street NW
    Washington, D.C., 20036
    (202) 551-1902
    nicholasbassett@paulhastings.com

       *and*

    Avram E. Luft (*pro hac vice*)
    Douglass Barron (*pro hac vice*)
    PAUL HASTINGS LLP
    200 Park Avenue
    New York, New York 10166
    (212) 318-6079
    aviluft@paulhastings.com

    *Counsel for the Chapter 11 Trustee*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

```
-------------------------------------------------x
                                                 :
In re:                                           :        Chapter 11
                                                 :
HO WAN KWOK,                                     :        Case No. 22-50073 (JAM)
                                                 :
              Debtor.                            :
-------------------------------------------------x
HK International Funds Investments               :
(USA) Limited, LLC                              :
                          Plaintiff              :        Adv. Proceeding No. 22-05003
v.                                               :
Ho Wan Kwok                                      :
                          Defendant              :        September 23, 2022
                                                 :
-------------------------------------------------x
                                                 :
Chapter 11 Trustee Luc A. Despins                :
                          Counter-Plaintiff      :
                                                 :
v.                                               :
HK International Funds Investments               :
(USA) Limited, LLC, and Mei Guo                  :
                          Counter-Defendants.    :
-------------------------------------------------x
```

### CHAPTER 11 TRUSTEE'S ANSWER AND COUNTERCLAIMS

Mr. Luc A. Despins, in his capacity as the chapter 11 trustee (the "Trustee") appointed in

the chapter 11 case (the "Chapter 11 Case") of Ho Wan Kwok (the "Debtor"), files this answer

(the "Answer") to the complaint (the "Complaint") filed by HK International Funds Investments

(USA) Limited, LLC ("HK USA") [Adv. Proc. Docket No. 1] and asserts the counterclaims set

forth herein (the "Counterclaims").

**ANSWER AND AFFIRMATIVE DEFENSES**

## I.  SPECIFIC ADMISSIONS AND DENIALS

To the extent a response is required to the statements and allegations contained in the first three unnumbered paragraphs of the Complaint under the heading entitled "Summary of HK USA's Cause of Action," the Trustee denies those statements and allegations except to the extent they are admitted in response to the Complaint's numbered allegations, as follows.

1.      The Trustee is without knowledge or information sufficient to admit or deny the allegations in paragraph 1 of the Complaint.  To the extent paragraph 1 of the Complaint implies that HK USA is an independent legal entity, the Trustee denies that allegation because HK USA is the alter ego of the Debtor, for the reasons discussed in the Trustee's Counterclaims.

2.      The Trustee admits that HK USA is nominally the registered owner of the Lady May; however, the Trustee denies that such registered ownership status means that the Lady May is not property of the Debtor's chapter 11 estate.

3.      The Trustee admits that Ms. Mei Guo (the "Debtor's Daughter") is the Debtor's daughter and that she lives in the United States.  The Trustee is without knowledge or information sufficient to admit or deny HK USA's allegations regarding the Debtor's Daughter's immigration proceedings or issues with the Chinese government or CCP, and on that basis denies such allegations.  The Trustee denies the remaining allegations in paragraph 3 of the Complaint.

4.      The Trustee is without knowledge or information sufficient to admit or deny the allegations in paragraph 4 of the Complaint, and on that basis denies such allegations.

5.      The Trustee is without knowledge or information sufficient to admit or deny the allegations in paragraph 5 of the Complaint, and on that basis denies such allegations.

6.      The Trustee admits the allegation contained in paragraph 6 of the Complaint.

7.      The Trustee admits that the Complaint purports to seek the relief described in paragraph 7 of the Complaint but denies that Plaintiff is entitled to such relief.

8.      The Trustee admits that the Court has jurisdiction over this adversary proceeding.

9.      The Trustee admits that the Court has jurisdiction to determine what property constitutes property of the estate.

10.     The Trustee admits that this is a core proceeding.

11.     The Trustee admits that venue is proper in this Court.

12.     The Trustee is without knowledge or information sufficient to admit or deny the allegation in paragraph 12 of the Complaint, and on that basis denies such allegation.

13.     The Trustee is without knowledge or information sufficient to know whether "Ms. Qu was a trusted business partner of Ms. Guo's older brother, Qiang, Guo," and on that basis denies such allegation.  The Trustee further denies the remaining allegations in paragraph 13 of the Complaint.

14.     The Trustee denies the allegations in paragraph 14 of the Complaint.

15.     The Trustee is without knowledge or information sufficient to admit or deny the allegations in paragraph 15 of the Complaint, and on that basis denies such allegations.

16.     The Trustee denies the allegations in paragraph 16 of the Complaint.

17.     The Trustee denies the allegations in paragraph 17 of the Complaint.

18.     The Trustee is without knowledge or information sufficient to admit or deny the allegations in paragraph 18 of the Complaint, and on that basis denies such allegations.

19.     The Trustee is without knowledge or information sufficient to admit or deny the allegations in paragraph 19 of the Complaint, and on that basis denies such allegations.

20.     The Trustee is without knowledge or information sufficient to admit or deny the allegations in paragraph 20 of the Complaint, and on that basis denies such allegations.

21.     The Trustee admits that ownership of HK International was transferred to the Debtor's Daughter on June 27, 2017.  The Trustee denies that it was Ms. Qu who transferred such ownership and also denies the remaining allegations in paragraph 21 of the Complaint.

22.     The Trustee is without knowledge or information sufficient to admit or deny that HK International's only asset when it was transferred to the Debtor's daughter was the Lady May, and on that basis denies such allegation.  The Trustee denies the remaining allegations in paragraph 22 of the Complaint.

23.     The Trustee admits the allegations in paragraph 23 of the Complaint.

24.     The Trustee admits that Golden Spring and Lamp Capital paid expenses associated with the Lady May and that HK USA has never held a bank account.  The Trustee denies the remaining allegations in paragraph 24 of the Complaint.

25.     The Trustee denies the allegations in paragraph 25 of the Complaint.

26.     The Trustee is without knowledge or information sufficient to admit or deny the allegations in paragraph 26 with respect to the Lady May's traditional or typical movements, and on that basis denies such allegations.  The Trustee further denies the allegations in the last two sentences of paragraph 26 asserting that HK USA's representatives directed the Lady May's movements and that the Debtor lacked authority to give such directions.

27.     The Trustee is without knowledge or information sufficient to admit or deny that the Lady May often hosts guests, and on that basis denies such allegation.  The Trustee denies the allegations in the second sentence of paragraph 27 of the Complaint.

28.     The Trustee denies the allegations in paragraph 28 of the Complaint.

4

29.     The Trustee admits that PAX obtained summary judgment against the Debtor on September 15, 2020, and the State Court's decision speaks for itself.   The Trustee admits that neither HK USA nor Ms. Guo is a named party to the litigation in front of Justice Ostrager (the "State Court Action").

30.     The Trustee admits that PAX obtained the order referenced in paragraph 30 of the Complaint, and such order speaks for itself.

31.     The Trustee admits that NY CPLR § 5229 states that "[i]n any court, before a judgment is entered, upon motion of the party in whose favor a verdict or decision has been rendered, the trial judge may order examination of the adverse party and order him restrained with the same effect as if a restraining notice had been served upon him after judgment."  The Trustee denies the remaining allegations in paragraph 31 of the Complaint.

32.     The Trustee admits that the State Court issued a contempt order on March 16, 2021, and such order speaks for itself.  The Trustee denies the remaining allegations in paragraph 32 of the Complaint.

33.     The Trustee admits that the State Court entered a final order of contempt against the Debtor on February 9, 2022, and such order speaks for itself.

34.     The Trustee admits the Debtor's Daughter testified as a witness before the State Court and that she was not a named party to the litigation.  The Trustee denies the remaining allegations in paragraph 34 of the Complaint.

35.     The Trustee admits that PAX filed the referenced motion on March 1, 2022, and such motion speaks for itself.

36.     The Trustee admits that PAX has commenced certain legal proceedings that relate to the Lady May.  The Trustee denies the remaining allegations in paragraph 36 of the Complaint.

37.     The Trustee admits that PAX contended in the State Court that the Lady May is a critical asset of the Debtor's estate.  The Trustee denies the remaining allegations in paragraph 37 of the Complaint.

38.     The Trustee admits that there is a dispute between HK USA, the Trustee, and other parties concerning the Debtor's and HK USA's interest in the Lady May and that the resolution of such dispute will impact the administration of this case.

39.     The Trustee incorporates by reference its responses to paragraphs 1-38 of the Complaint.

40.     The Trustee denies the allegations in paragraph 40 of the Complaint.

41.     The Trustee denies the allegations in paragraph 41 of the Complaint.

42.     The Trustee denies the allegations in paragraph 42 of the Complaint.

## II.     <u>AFFIRMATIVE DEFENSE</u>

1.     HK USA's claims are barred, in whole or in part, by the doctrines of collateral estoppel and/or res judicata.

2.     HK USA's claims are barred, in whole or in part, by the doctrine of unclean hands or *in pari delicto*.

3.     HK USA's claims are barred, in whole or in part, by the doctrines of setoff and recoupment.

## <u>COUNTERCLAIMS</u>

## III.     <u>NATURE OF COUNTERCLAIMS</u>

1.     The issues relevant to this action extend well beyond the narrow question of

6

whether HK USA should be held to be the owner of the Lady May, which the Trustee contests

based on, among other things, the preclusive effect of rulings made by Justice Ostrager of the

New York Supreme Court (the "State Court") in his decision of February 9, 2022 (the "Final

Contempt Decision").[1]

2.      Beyond the Trustee's defenses to the Complaint, the Trustee holds a series of

affirmative claims against HK USA based on HK USA's well-documented role as one of a large

number of shell companies used by the Debtor to protect his assets from creditors.

3.      First, HK USA is an alter ego of the Debtor, and this Court should issue a

declaratory judgment to that effect. Justice Ostrager already found that HK USA is a shell

company the Debtor used to protect assets from his creditors and that the Debtor "beneficially

owns and controls"[2] HK USA's only asset: the Lady May. Justice Ostrager's conclusions are

supported by voluminous evidence in the record showing that HK USA is a mere instrumentality

of the Debtor, with no independent existence. Among other things, HK USA has no income,

bank account, directors, officers, or employees, and, upon information and belief, it has never

observed corporate formalities. At all relevant times, HK USA was under-capitalized, and its

expenses (including its legal fees) have been paid for by Golden Spring (New York) Ltd. and

Lamp Capital LLC, entities purportedly owned by the Debtor's son that also pay for the Debtor's

attorneys' fees and living expenses (enabling him to claim that he has no assets of his own while

living a life of extreme luxury). HK USA has also shared an address with the Debtor and other

Debtor-linked entities. Based on these and the other facts discussed herein, the Trustee seeks an

order declaring that HK USA is the Debtor's alter ego pursuant to sections 541 and 544 of the

---

[1] Ex. 1, February 9, 2022 Decision and Order, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 1181.

[2] Final Contempt Decision at 4.

Bankruptcy Code and that, therefore, all of the property of HK USA, including the $37 million deposited into escrow and/or rights related thereto under the applicable escrow agreement, is property of the Debtor's chapter 11 estate.

4.      <u>Second</u>, for the same reasons that HK USA is the Debtor's alter ego, the Debtor, and not the Debtor's Daughter, is the equitable owner of HK USA.  Therefore, HK USA is property of the Debtor's chapter 11 estate pursuant to section 541 of the Bankruptcy Code.

5.      <u>Third</u>, assuming the Court does not rule that HK USA is an alter ego of or equitably owned by the Debtor, the Trustee asserts that HK USA was the recipient of an actual fraudulent transfer by the Debtor consisting of the value of the Lady May and/or the funds used to purchase the Lady May.  Therefore, the Trustee seeks, as alternative relief, the return of the Lady May or its value to the Debtor's chapter 11 estate pursuant to New York's fraudulent conveyance statute and sections 544, 548, and 550 of the Bankruptcy Code.

6.      <u>Finally</u>, again assuming the Court does not rule that HK USA is an alter ego of or equitably owned by the Debtor, the Trustee asserts a negligence claim against HK USA based on HK USA having taken and kept the Lady May overseas in violation of court orders, causing the Debtor to incur a $134 million contempt fine.

## IV.     <u>FACTS</u>

### A.     <u>Debtor's Shell Game</u>

7.      As established in the State Court Action, the Debtor's *modus operandi* for years has been to use family members and shell companies to shield his assets from creditors.   Justice Ostrager accurately referred to the Debtor's asset protection strategy as a "shell game" numerous times in hearings and written decisions and orders in the State Court Action.

8.      The Debtor's shell game has allowed him to continue, up to this day, to (1) refuse to pay his debts; (2) enjoy all the benefits of massive wealth, such as yachts, private planes, and

luxury cars and lodging; (3) spend millions of dollars on the attorneys' fees necessary to litigate

against PAX, the Trustee, and numerous other parties; and (4) engage in his daily business of

peddling disinformation, conspiracy theories, and cryptocurrency schemes.[3]

9.     The aspect of the Debtor's shell game most critical to this adversary proceeding

(i.e., the Debtor's use of HK USA to shield the Lady May from creditors), ***is only one example***

of the Debtor's massive abuse of the corporate form to judgment-proof himself and keep

creditors at bay.  The Debtor has, upon information and belief, established numerous, potentially

hundreds, of entities (including many in off-shore jurisdictions such as the British Virgin Islands

("BVI")), that he uses to hold or transfer property so that he can avoid liability and protect assets

from creditors.  The Debtor's use of these shell companies makes it impossible to believe he is

truly a pauper dependent on family charity, a position that is insulting to the intelligence of the

Court and all parties in interest.

10.     Certain of the Debtor's important shell companies include, in addition to HK

USA:

a)     **Golden Spring (New York) Ltd ("Golden Spring")**.  Golden Spring is a
Delaware entity that pays the Debtor's expenses so the Debtor can live in
luxury while claiming to own no assets and earn no income.

(1)     Purportedly owned indirectly by the Debtor's Son,[4] Golden
Spring was established and funded by the Debtor through a

---

[3] *See, e.g.*, Friedman, Dan. "A Fugitive Chinese Tycoon Met Steve Bannon. Misinformation Mayhem Ensued."
*Mother Jones*, March – April 2022, https://www.motherjones.com/politics/2022/02/guo-wengui-miles-guo-gettr-steve-bannon/; Whalen, Jeanne, et al. "Chinese Businessman with Links to Steve Bannon Is Driving Force for a
Sprawling Disinformation Network, Researchers Say." *The Washington Post*, 17 May 2021,
https://www.washingtonpost.com/technology/2021/05/17/guo-wengui-disinformation-steve-bannon/; Hui, Echo, and
Hagar Cohen. "After John Left a Conspiracy-Sharing Group, the Billionaire Founder Told Followers He 'Deserved
to Die'." *ABC News*, 1 Nov. 2020, https://www.abc.net.au/news/2020-11-01/behind-the-scenes-of-the-guo-and-bannon-led-propaganda-machine/12830824/.

[4] *See, e.g.*, Ex. 2, Wang Dep. Tr. at 18:17-18 (testimony that Golden Spring 100% owned by China Golden Spring
(Hong Kong)); 17:3-4 (describing the Debtor's Son as owner of "Golden Spring").

9

transfer of funds from one of his accounts in Hong Kong to the account of Golden Spring in New York in 2015.[5]

(2)    A court order issued in Hong Kong on October 18, 2018, the Restraint Order Prohibiting Disposal of Assets In Hong Kong and Elsewhere (the "Hong Kong Restraint Order), identified Golden Spring's parent company, China Golden Spring Group (Hong Kong) Limited, as one of a number of entities whose bank accounts were "subject to the effective control of the Debtor."[6]

(3)    The Debtor has testified that Golden Spring has been paying his living expenses since 2015.[7] Golden Spring has also been paying the fees of the Debtor's counsel and millions of dollars of maintenance fees associated with the Sherry Netherland Apartment, among other payments.

(4)    Golden Spring's president, Yan Ping ("Yvette") Wang ("Ms. Wang") has testified that Golden Spring is the Debtor's "family office."[8] She has also testified that in her capacity as president of Golden Spring she "serve[d] as an administrator for *the interests of [the Debtor]* and his family."[9]

(5)    At the same deposition, Ms. Wang could not identify a single person who worked at Golden Spring prior to February 2018, except for the Debtor's personal chauffeur, nor could she identify any business purpose of Golden

---

[5] In a 2016 affidavit filed in the New York Supreme Court in connection with Ace Decade's litigation against UBS, the Debtor stated that Golden Spring was established "by transferring funds from one of my accounts at UBS to Golden Spring New York's JPMorgan Chase bank account in New York." Ex. 3, Affidavit of Kwok Ho Wan, dated February 5, 2016, in *Ace Decade Holdings Limited vs. UBS AG*, Index No. 653316/2015 (N.Y. Sup. Ct.) at ¶ 36.

[6] Ex. 93, Hong Kong Restraint Order ¶ 3, Respondent 22.

[7] *See* Ex. 4, Tr. of Telephonic 341 Meeting of Creditors, dated April 6, 2022 at 85:17-19. *See also* Ex. 5, Letter from Melissa M. Carvalho, dated February 1, 2021 at ¶ 8. ("Mr. Kwok responds that his expenses during the relevant time period have been paid for by Golden Spring (New York) Ltd.").

[8] Ex. 6, Wang Dep. Tr. at 20:10-16 (Q: "What business is Golden Spring Hong Kong in? A: Family office. Q: Whose family? A: The Guo family. Q: Mr. Kwok's family? A: Yes.).

[9] *Id.* at 46:20-23 ("Q: I'm asking you whether or not you serve as an administrator for Mr. Kwok's interests? A: Yes.") (emphasis added). *See also* Ex. 7, May 15, 2018 Affidavit of Yan Ping Wang in *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.) (ECF 182) at ¶ 1. ("I am the President of Golden Spring (New York) Ltd., and in that capacity serve as an administrator for the interests of [the Debtor] and his family.").

Spring other than that of serving as the Debtor's "family office" and starting the Debtor's social media platform.[10]

(6)     During the State Court Action, Golden Spring's counsel appeared at depositions for the Debtor, and the Debtor's counsel represented Ms. Wang, president of Golden Spring, in connection with her deposition.[11]

(7)     Golden Spring's address at 162 East 64th Street, New York, New York 10065 has been used as the address of the Debtor and numerous affiliated entities, including HK USA and Greenwich Land LLC.[12]

(8)     Ms. Wang, president of Golden Spring, is the authorized signatory on official documents filed with courts and administrative agencies by multiple shell companies.[13]

b)     **Lamp Capital LLC ("Lamp Capital").**  Lamp Capital is a Delaware entity,[14] purportedly owned by the Debtor's son,[15] that also contributes to the payment of the Debtor's expenses so that he can maintain his lifestyle while claiming to own no assets and earn no income.

(1)     Lamp Capital's sole member is Infinity Treasury Management, Inc.,[16] of which the Debtor's Son is the purported sole shareholder, the Debtor's associate Max Krasner is director and officer,[17] and the Debtor's associate Daniel Podhaskie is a former director and officer.[18]

---

[10] *See* Ex. 6, Wang Dep. Tr. at 39:20–40:8.

[11] *See* Ex. 8, Kwok Dep. Tr. at 8:8-9 ("Karin Maistrello, Golden Spring, for Defendant"); Ex. 6, Wang Dep. Tr. At 6:9-10 (Jillian Searles identified by Ms. Wang as her attorney after entering an appearance "for defendant Kwok Ho Wan").

[12] *See, e.g.*, Ex. 20, Limited Liability Company Agreement of HK International Funds Investments (USA) Limited, LLC, dated April 1, 2019; Ex. 54, Greenwich Land LLC Real Property Tax Assessor Record, dated July 15, 2021.

[13] *See e.g.*, Ex. 9, Verified Complaint, *Genever Holdings, LLC v. Sherry-Netherland, Inc.*, 16-cv-06246 (S.D.N.Y. Aug. 5, 2016), ECF No. 1; Ex. 10, Saraca Media Group Certificates of Assumed Name, dated May 14, 2020.

[14] *See* Ex. 17, Certificate of Incorporation of Lamp Capital LLC, dated Sept. 4, 2020.

[15] Ex. 4, Tr. of Telephonic 341 Meeting of Creditor, at 50:6-7.

[16] Ex. 92, Limited Liability Company Agreement of Lamp Capital, LLC, dated September 8, 2020.

[17] *See* Ex. 55. Mr. Krasner's other roles have included, among others, serving as representative of Greenwich Land in connection with certain property transactions, as incorporator of GTV Media Group, Inc. (a subsidiary of Saraca), and as president, treasurer, and director of the Rule of Law Foundation III Inc., a purported nonprofit entity linked to the Debtor.  *See* Ex. 11, Greenwich Land Warranty Deed, dated April 26, 2022; Ex. 12, GTV Media Group

    (2)    Mr. Podhaskie is or was an authorized signatory for Lamp Capital.[19]

    (3)    Corporate filings related to Lamp Capital LLC were handled by Hodgson Russ LLP, counsel to the Debtor in the State Court Action.[20]

    (4)    Lamp Capital purportedly "loaned" the Debtor $1 million, which was then remitted directly to Brown Rudnick LLP ("<u>Brown Rudnick</u>"), the Debtor's former bankruptcy counsel, as a retainer.[21]

c)    **Greenwich Land LLC ("<u>Greenwich Land</u>").**  Greenwich Land, a Delaware entity purportedly owned by the Debtor's wife, owns the Debtor's residence on Taconic Road (the "<u>Taconic Road Residence</u>") in Greenwich, Connecticut.

    (1)    Greenwich Land was organized in 2019 by a partner at the law firm of Hodgson Russ, which at the time represented the Debtor in the State Court Action.[22]

    (2)    In February 18, 2020, $2 million was transferred from Saraca Media Group Inc. ("<u>Saraca</u>") (an entity purportedly

---

Certificate of Incorporation, dated April 17, 2020; Ex. 13, Rule of Law Foundation III Inc. Certificate of Incorporation, dated January 11, 2019.

[18] *See* Ex. 55. Mr. Podhaskie's other roles have included, among others, serving as the Debtor's personal attorney, general counsel to Golden Spring, and corporate representative for purposes of Rule 30(b)(6) with respect to Genever US and Genever BVI.  *See e.g.*, Ex. 4, Tr. of Telephonic 341 Meeting of Creditors, dated April 6, 2022 at 79:2-3 (debtor stating that Podhaskie "used to be Golden Spring attorney and my personal attorney."); *see* Ex. 14, Podhaskie Dep. Tr. at 8:8-9:1 (Podhaskie appearing as corporate representative of Genever US and Genever BVI (each defined below)).

[19] *See, e.g.*, Ex. 15, Application for Authority of Lamp Capital LLC, dated Sept. 11, 2020 filed with the State of New York (signed by Podhaskie).

[20] *Id.*

[21] *See* Application of the Debtor for Entry of an Order Authorizing the Employment and Retention of Brown Rudnick LLP as Counsel for the Debtor, Docket No. 86, at ¶ 17;  Ex. 4, Tr. of Telephonic 341 Meeting of Creditors, dated April 6, 2022 at 49: 22-24.  At his April 6, 2022 Section 341 meeting, the Debtor testified that this loan was not in writing and that he did not know the terms of the loan, why the money had been lent, or what the source of the money was.  *Id.* at 49-51.

[22] Hodgson Russ attorneys also assisted the Debtor with, among other things, the formations of Saraca and Lamp Capital, as well as other corporate filings on behalf of Golden Spring.  *See* Ex. 16, Saraca Media Group Inc. Certificate of Incorporation, dated May 31, 2018 (signed by Courtney Scanlon); Ex. 17, Certificate of Incorporation of Lamp Capital LLC, dated September 4, 2020 (signed by Valerie E. Stevens); Ex. 18, Biennial Statement of Golden Spring, filed October 16, 2018 (signed by Courtney Scanlon).

owned by the Debtor's Son[23]) to Greenwich Land in connection with the purchase the Taconic Road Residence.

(3) On or about April 26, 2022, in a transfer that was never disclosed to this Court, Greenwich Land sold a second property, on Ferncliff Road in Cos Cob, Connecticut, which it had previously owned.[24] The authorized signatory for Greenwich Land on the warranty deed in connection with the transfer is Max Krasner, who, as noted above, is an associate of the Debtor with a number of roles at Debtor-affiliated entities.[25]

(4) Greenwich Land's address at 162 East 64th Street, New York, New York 10065 has been used as the address of the Debtor and numerous affiliated entities, including Golden Spring and HK USA.[26]

d) **Genever Holdings Corporation ("Genever BVI") and Genever Holdings LLC ("Genever US").** Genever BVI is a BVI corporation of which the Debtor was the sole registered shareholder (prior to the Trustee obtaining control over such shares), and Genever BVI is the sole member of Genever US. Genever US holds title to the Debtor's apartment in the Sherry-Netherland Hotel (the "Sherry Netherland Apartment").

(1) The Debtor has described Genever BVI and Genever US (the "Genever Entities") as special purpose vehicles.[27]

(2) In the State Court Action, PAX asserted that Genever BVI and Genever US were alter egos of the Debtor.[28]

---

[23] Ex. 4, Tr. of Telephonic 341 Meeting of Creditors, dated April 6, 2022 at 108:12-13 ("Who owns Saraca? A. My Son.").

[24] Ex. 11, Greenwich Land Warranty Deed, dated April 26, 2022.

[25] *Id. See* FN 18. At the Debtor's first 341 meeting, counsel for the United States Trustee, Holley Claiborne, asked the Debtor twice who Mr. Krasner was, and the Debtor first said he did not know, then failed to respond. Ex. 19, Tr. of Telephonic 341 Meeting of Creditors, dated March 21, 2022 at 51:7-12. When Ms. Claiborne asked the Debtor to answer the question, the Debtor's counsel Mr. Baldiga conferred with the Debtor despite Ms. Claiborne stating that she "would rather he would answer the question before you make a confer." *Id.* at 13:18. The Debtor then said he had difficulty with English names and that he did know a "Max" at Golden Spring though not his last name. *Id.* at 51-52.

[26] *See, e.g.*, Initial Petition (defined below); Ex. 20, Limited Liability Company Agreement of HK International Funds Investments (USA) Limited, LLC, dated April 1, 2019.

[27] *See* Global Notes and Statements of Limitations, Methodology, and Disclaimers Regarding the Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs, (March 9, 2022) ECF No. 77 ("SOFA") at 4.

(3)     On October 24, 2020, Genever US commenced its chapter 11 case in the U.S Bankruptcy Court for the Southern District of New York in front of Judge Garrity, with a petition signed by Ms. Wang (president of Golden Spring).[29]

(4)     The Debtor listed himself as the "Applicant" on his Sherry-Netherland purchase application,[30] he submitted letters that recommended himself personally to the Board,[31] and he represented that he had an "ownership interest" in the Sherry Netherland Apartment.[32]

e)     **Bravo Luck Limited ("<u>Bravo Luck</u>").**  Bravo Luck is a BVI entity purportedly owned by the Debtor's Son.[33]  Bravo Luck has asserted that it is the beneficial owner of the Genever Entities, and/or the Sherry Netherland Apartment.  The Debtor has used Bravo Luck and its beneficial ownership claim not only to provide himself a penthouse apartment he can claim is not his own, but also to contest and delay pre-petition efforts of PAX to enforce its pre-petition judgment against the Sherry Netherland Apartment, as well as to challenge the Trustee's recent efforts to seek corporate control over Genever BVI.

(1)     Upon information and belief, the Debtor used Bravo Luck's UBS AG bank account (Account #371236) (the "<u>Bravo Luck UBS Account</u>") to fund the purchases of the Lady May and Sherry Netherland Apartment in 2015, processed pursuant to wire transfer forms signed by the Debtor.[34]

(2)     The Hong Kong Restraint Order identified the Bravo Luck UBS Account as a bank account that, while purportedly held by Bravo Luck, was "subject to the effective control"

---

[28] Ex. 56, August 2, 2021 Reply Memorandum Of Law In Support Of Plaintiff Pacific Alliance Asia Opportunity Fund L.P.'S Motion For A Turnover Order Against Defendant Miles Kwok And Appointment Of A Receiver, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 899 at 2.

[29] Ex. 57, Petition, *In re Genever Holdings LLC*, Case No. 20-12411-jlg (Bankr. S.D.N.Y.), ECF No. 1, at 4.

[30] *See* Ex. 53, Sherry Netherlands Purchase Application, at 19.

[31] *Id.* at 23, 25-26.

[32] Ex. 7, Affidavit of Yan Ping Wang in *PAX v. Kwok*, at ¶ 2.

[33] *See, e.g.*, Ex. 21, BVI Affidavit of Qiang Guo, dated December 29, 2021.

[34] Escobar, Pepe, et al. "Exclusive: The Fugitive Who Tried to Spark a US-China War." The Unz Review, 5 Aug. 2022, https://www.unz.com/pescobar/exclusive-the-fugitive-who-tried-to-spark-a-us-china-war/.

14

of the Debtor.[35]  Indeed, the Debtor could access the account by himself.[36]

(3)     The Debtor held 50% of the equity of Bravo Luck between January and May 2015, an ownership interest the Debtor allegedly obtained and then returned to the Debtor's Son for no consideration.[37]

(4)     Bravo Luck's assertions of beneficial ownership of Genever BVI, Genever US, and the Sherry Netherland Apartment are based on a purported trust agreement dated February 17, 2015 (the "Purported Trust Agreement"), the validity and enforceability of which are highly questionable for numerous reasons.

(5)     Among other things, the Purported Trust Agreement was responsive to numerous document requests served by PAX during the State Court Action, yet was not disclosed to PAX during that discovery process, which ended in September 2018, seven months prior to the Debtor's disclosure of the Purported Trust Agreement to PAX for the first time in April 2019.[38]

(6)     The Purported Trust Agreement purports to place the Sherry Netherland Apartment in trust, but is dated February 17, 2015, before the submission of the application to purchase the Sherry Netherland Apartment or the purchase of the apartment.[39]

(7)     In a 2016 lawsuit in the SDNY, Kwok stated that he is the sole shareholder of Genever NY and a resident in the Sherry Netherland Apartment, and he further alleged that

---

[35] Ex. 93, Hong Kong Restraint Order ¶ 3, Respondent 21.

[36] Ex. 58, Stevenson Wong Letter, at 2 (Bravo Luck UBS Account, "is operated by either the [the Debtor] or [the Debtor's Son] signing solely and . . . is able to be accessed by either of them signing solely.")

[37] *See id.* at 2.

[38] Ex. 22, Email from Jillian Searles of Hodgson Russ LLP disclosing Purported Trust Agreement, dated April 22, 2019.

[39] *See* Ex. 22, Email disclosing Purported Trust Agreement; Ex. 53, Sherry Netherlands Closing Documents and Purchase Application, at 1-8, 19-21.

he personally suffered damages as a result of the actions of the Sherry Netherland cooperative with respect thereto.[40]

f)  **Eastern Profit Corporation ("Eastern").**  Eastern is a Hong Kong entity, purportedly owned by the Debtor's daughter,[41] that Judge Liman of the U.S. District Court of the Southern District of New York, in his 2021 decision in the case of *Eastern Profit Corp. v. Strategic Vision US LLC* (the "Liman Decision"), found to be, "in essence, a shell corporation" for the Debtor[42] allegedly used to "protect his confidentiality and anonymity."[43]

(1)  Judge Liman observed that, at the time Eastern entered into its January 2018 agreement with Strategic Vision US LLC (the agreement which was the subject of the Liman Decision), Eastern was "essentially a defunct entity" with "no assets other than . . . $80,000 frozen in a Hong Kong bank account," and "no operations and no employees." Further, analogously to HK USA and other shell companies, Eastern's location "was in the offices of [the Debtor's] family company in Hong Kong and its sole director was Guo's daughter."[44]

(2)  The subject of the Liman Decision was a January 2018 agreement, purportedly between Eastern and Strategic Vision US LLC (the "Strategic Vision Agreement"), that was signed on behalf of Eastern by Yvette Wang (president of Golden Spring).  But Ms. Wang did not sign her own name, instead she forged the signature of another associate of the Debtor's, Han Changhui, who had purportedly owned Eastern prior to transferring purported ownership of Eastern to the Debtor's Daughter for no apparent consideration in 2017.[45]

---

[40] *See* Ex. 9, Verified Complaint at ¶¶ 123-143, *Genever Holdings, LLC v. Sherry-Netherland, Inc.*, 16-cv-06246 (S.D.N.Y. Aug. 5, 2016), ECF No. 1.

[41] *Eastern Profit Corp. Ltd. v. Strategic Vision US LLC*, No. 18-CV-2185 (LJL), 2021 WL 2554631 at *1.

[42] *Id.*

[43] *Id.* at *7 ("During negotiations, Guo requested that, to protect his confidentiality and anonymity, he would not sign or be a party to the Agreement but that a separate entity would sign and be a party.").

[44] *Id.*

[45] *Id.* at *7 ("Although . . . Han [the Debtor's associate] was the ostensible owner of Eastern, it has now been transferred to [the Debtor's Daughter] but Han could not testify that he received anything in exchange. Eastern is a shell for [the Debtor] and his family.") (internal citations omitted). *Id.* at *1 ("Prior to 2017, the owner and sole

16

(3)     Judge Liman also found that testimony from Ms. Wang and Mr. Han with respect to Mr. Han's role in connection with the Strategic Agreement was "an after-the-fact creation to make it appear that Eastern was an entity, separate from Guo."[46]

(4)     Judge Liman inferred, with respect to the Strategic Agreement, that "[the Debtor] told Wang to provide the name Eastern to Strategic and to sign Han's name to the Agreement.  If there was any conversation between Wang and Han, it was perfunctory, to confirm the arrangement that *[the Debtor] had already made and directed*."[47]

(5)     According to testimony elicited at the hearing held in connection with the Liman Decision, the Debtor introduced Mr. Han (the purported owner of Eastern) as his cook, referring to him as "Little Han,"[48] and introduced Ms. Wang as his servant and assistant.[49]  There was also testimony that Ms. Wang described the Debtor as her "boss."[50]

---

director of Eastern was an individual named Han Changhui ('Han'). In 2017, Han transferred ownership and control to Guo's daughter, Guo Mei, who was a friend of Han's and who is now the owner and sole director of Eastern.").

[46] Liman Decision at *7.

[47] *Id.* (emphasis added).

[48] Ex. 27, Trial Tr. at 768:4-12, *Eastern Profit Corp. Ltd. v. Strategic Vision US LLC*, No. 18-CV-2185 (LJL) (S.D.N.Y) ECF No. 368 (April 22, 2021).

[49] Ex. 28, Trial Tr. at 142:12-19, *Eastern Profit Corp. Ltd. v. Strategic Vision US LLC*, No. 18-CV-2185 (LJL) (S.D.N.Y) ECF No. 362 (April, 19, 2021) ("Q. Did he introduce [Ms. Wang] in any way -- let me ask you this. What did he introduce her as? A. Well, originally as his assistant. Q. Did he say anything else about what she did for him? A. He said that she did, you know, what personal assistants do and -- but he sent her from the room."). Ex. 29, Trial Tr. at 248-249, *Eastern Profit Corp. Ltd. v. Strategic Vision US LLC*, No. 18-CV-2185 (LJL) (S.D.N.Y) ECF No. 362 (April, 19, 2021) ("Q. Did [the Debtor] come to introduce [Ms. Wang] at a particular meeting at some point? A. At the first meeting, he just referred to her as like a servant. In the second meeting, he introduced her as his assistant.").

[50] Ex. 28, Trial Tr. 142-143 ("Okay. Now, I'm going to ask you what Yvette Wang told you about her role. So what did Yvette Wang tell you was her role with respect to this contract?  A. Well, first of all, she said: Guo is my boss. I am project manager, and I will be handling this project moving forward."); *id.* ("Did she have any name for Guo or any term she used to describe him?  Yes. She called him chief. She gave him some military ranks. She called him the boss.").

  (6)  The Hong Kong Restraint Order identified Eastern Profit as the purported holder of a bank account that was "subject to the effective control" of the Debtor.[51]

 g) **Saraca Media Group, Inc. ("<u>Saraca</u>")**.  Saraca is a Delaware entity, purportedly owned by the Debtor's Son,[52] that the Debtor has used to engage in, among other things, the sale of purported cryptocurrencies.

  (1)  Saraca shares the same address as Golden Spring,[53] and Golden Spring's president, Ms. Wang, is an authorized signatory on Saraca official documents.[54]

  (2)  Saraca transferred funds to Greenwich Land immediately prior to Greenwich Land's purchase of the Debtor's residence on Taconic Road;

  (3)  Saraca is the registered owner with the United States Patent and Trademarks Office of the marks "Miles Kwok," "Miles Guo," and "Guo Wengui."[55]

  (4)  In September 2021, the Securities and Exchange Commission ("<u>SEC</u>") issued a cease and desist order ordering that Saraca and its subsidiary GTV Media Group, Inc. ("<u>GTV</u>") cease violations of the securities laws in connection with purported sales of GTV stock and G-Coin and G-Dollar cryptocurrencies, which had "raised approximately $487 million from more than 5,000 individuals."[56]  The Office of the Attorney General of the

---

[51] Ex. 93, Hong Kong Restraint Order ¶ 3, Respondent 16.

[52] Ex. 4, Tr. of Telephonic 341 Meeting of Creditors, dated April 6, 2022 at 108:12-13 ("Q: Who owns Saraca? A: My son.").

[53] *See* Ex. 10, Saraca Media Group Inc. OpenGovNY New York State corporate registry search results.

[54] *See, e.g.*, Ex. 25, Himalaya Coin Certificate of Assumed Name, dated March 14, 2020 and Ex. 26, Himalaya Dollar Certificate of Assumed Name, dated March 14, 2020.

[55] Ex. 23, United States Patent and Trademark Office Registry Pages for Miles Guo, Miles Kwok, Guo Wengui, and Guo Media.

[56] *See In the Matter of Gtv Media Group, Inc., Saraca Media Group, Inc., and Voice of Guo Media, Inc., Respondents*, Release No. 10979, 2021 WL 4149064, at ¶ 1, 5 (Sept. 13, 2021) (finding that companies that GTV, Saraca, and Voice of Guo Media, Inc. violated the Securities Act in connection with "solicit[ing] thousands of individuals to invest in an offering of GTV common stock" and "solicit[ing] individuals to invest in their offering of a digital asset security that was referred to as either G-Coins or G-Dollars," thus allowing these companies to "collectively raise[] approximately $487 million from more than 5,000 investors, including individuals in the United States, through approximately July 2020").

State of New York took similar action against Saraca and GTV.[57]

    (5)    Saraca is also involved in the Debtor's more recent cryptocurrency scheme of promoting and selling "Himalaya Coin" and "Himalaya Dollar" (also known as "H-Coin" or "H-Dollar").

    (6)    Saraca registered "Himalaya Coin" and "Himalaya Dollar" as its assumed names in the State of New York, using filings signed by Ms. Wang, ***president of Golden Spring.***[58] Upon information and belief, revenues from the sale of Himalaya cryptocurrency are transferred from customers to Saraca.

    h)    **Ace Decade Holdings Limited ("Ace Decade").**  Ace Decade is a BVI entity the Debtor acquired to use as an intermediary entity in connection with the failed 2015 securities transaction that generated the Debtor's lawsuits against UBS.  The Debtor used Ace Decade to avoid disclosure requirements that would have arisen had the Debtor purchased the securities directly.[59]

    (1)    The Debtor acquired Ace Decade in November 10, 2014 and on the same day appointed one of his employees, Yu Yong ("Ms. Yu") as the sole director and nominee shareholder.[60]

    (2)    The Debtor allegedly appointed Ms. Yu to these roles based on the alleged advice of his banker at UBS, who suggested the use of an intermediary entity to avoid disclosure requirements.[61]

---

[57] Ex. 24, Assurance of Discontinuance, Assurance No. 21-062, *In the Matter of Investigation by Letitia James, Attorney General of the State of New York*, *of GTV Media Group, Inc., and Saraca Media Group, Inc*.

[58] *See* Ex. 25, Himalaya Coin Certificate of Assumed Name; Ex. 26, Himalaya Dollar Certificate of Assumed Name.

[59] Ex. 3, Affidavit of Kwok Ho Wan at ¶¶ 13-14 ("UBS advised that . . . if I invested through Ace Decade directly, applicable disclosure requirements would require certain filings [and] advised that if I invested through an intermediary entity, with the intermediary entity holding legal title to the Shares, no such disclosure would be required.").

[60] Ex. 30, Particular of Claims, *Kwok Ho Wan & Ors. v. UBS*, CI-2020-000345, ¶ 24, High Court of Justice of England and Wales Queen's Bench Division Commercial Court, dated September 23, 2020 ("UK Complaint").

[61] *Id.* at ¶ 24 ("Ace Decade was acquired on 10 November 2014 by Mr Kwok for the purpose of acting as the said investment vehicle. On the same day, on the advice of Mr Wong, an employee of Mr Kwok, Ms Yu Yong ("Ms Yu") became its nominee shareholder and director.").

      (3)     The Hong Kong Restraint Order identified Ace Decade as
the purported holder of a bank account that was "subject to
the effective control" of the Debtor.[62]

i)    **Well Origin Limited ("Well Origin").**  Well Origin is a BVI entity
owned by the Debtor that was formed as a "special purpose vehicle" to
own a private jet, an Airbus 319 (the "Aircraft").[63]

      (1)     In 2014, Well Origin entered into a $50 million loan
agreement with UBS AG ("UBS") to "refinance the
Aircraft purchase price" as well as a related aircraft
mortgage agreement.[64]  In addition, the Debtor entered into
a related guarantee agreement with UBS.  UBS was also
granted a security interest in Well Origin's shares.[65]

      (2)     Subsequently, UBS foreclosed on its security interest in the
shares of Well Origin, took control of Well Origin, and
notified the Debtor that it was going to sell the Aircraft.[66]

      (3)     In an action filed in February of 2019, the Debtor sought to
enjoin the sale, asserting that he was the "***Aircraft's true
beneficial owner,***"[67] and that the Aircraft was "unique,"
"personal," and "specific to him.[68]  The court rejected the

---

[62] Ex. 93, Hong Kong Restraint Order ¶ 3, Respondent 18.

[63] Ex. 31, Petition at ¶ 7, *Kwok How Wan v. UBS AG, et al.*, Index No. 152025/2019 (N.Y. Sup. Ct.) Doc. No. 1.
The capacity of a normal airline A319 is approximately 150 passengers.

[64] *Id.* ¶¶ 14-16.

[65] *Id.* ¶ 15.

[66] *Id.* ¶¶ 22-24.

[67] Ex. 39, Memorandum Of Law In Support Of His Request For A Temporary Restraining Order And Preliminary
Injunction at 2, *Kwok v. USB AG et al*, Index No. 152025/2019 (N.Y. Sup. Ct.), NYSCEF Doc. No. 15 (February 25,
2019) ("Moreover, *the Aircraft's true beneficial owner – Kwok* – has been an outspoken critic of the Chinese
government and Chinese Communist Party ("CCP") and Kwok has personally exposed massive corruption within
the CCP that has resulted in the Chinese government and CCP stopping at no expense to seize any property and
asset either directly or indirectly related to Kwok."). *See also id.* at 1 ("UBS, in blatant contravention of the terms of
the mortgage, is wrongfully trying to sell the Aircraft without properly notifying *Kwok -- the Aircraft's beneficial
owner*, and guarantor on a loan related to the Aircraft -- of the potential sale.').

[68] *Id.* at 2 ("Kwok will suffer irreparable harm if the preliminary injunction is not granted to stay the sale of the
aircraft as *the Aircraft is unique to Kwok* -- he personally worked with the designer on the outfitting of the Aircraft
and was comprehensively involved in the Aircraft's particular design and specification"); *Id.* at 6-7 ("If UBS is
permitted to move forward with the sale despite their defective notice and without providing Kwok an accounting,
Kwok will permanently lose the Aircraft that *is personal and specific to him*, for which money damages cannot and
will not suffice.").

Debtor's request for an injunction, pointing out that the Debtor was asserting rights under an aircraft mortgage agreement that he had not signed.[69]

(4)   With respect to Well Origin, the Debtor looked past the corporate form and asserted he was the true beneficial owner of the Aircraft because it suited him to do so (given that UBS had taken control of Well Origin).

j)   **Numerous Other Shell Companies**: It is likely that the entities discussed in these counterclaims comprise only a small part of what are reportedly hundreds of shell companies controlled by the Debtor.[70]  The reported existence of such a large number of shell companies is supported by the fact that in the Hong Kong Restraint Order the Debtor was determined to effectively control financial accounts purportedly held by over two dozen entities and individuals, including certain of the entities already mentioned herein.[71]

11.   In sum, while these Counterclaims are designed to focus on HK USA and the Lady May, and the Trustee does not at this time seek relief against other entities, the Trustee believes that context regarding the Debtor's wide-ranging strategy of using shell companies to shelter assets from creditors will assist the Court in understanding the Trustee's position.

B.   **Debtor's Formation, Ownership, and Purported Transfer of HK International Prior to Acquisition of Lady May**

12.   On October 3, 2006, the Debtor incorporated a Hong Kong entity called Hong Kong International Funds Investments Limited ("HK International").[72]

---

[69] Ex. 32, Order at 3, *Kwok v. USB AG et al*, Index No. 152025/2019 (N.Y. Sup. Ct.), NYSCEF Doc. No. 17 (February 26, 2019) ("Petitioner's sole contractual connection to the aircraft is vis-à-vis a written guarantee of the non-party mortgagor's obligations which are collateralized via the aircraft.").

[70] Escobar, Pepe, et al. "Exclusive: The Fugitive Who Tried to Spark a US-China War." The Unz Review, 5 Aug. 2022, https://www.unz.com/pescobar/exclusive-the-fugitive-who-tried-to-spark-a-us-china-war/ ("[The Debtor] set up more than 100 companies in Hong Kong, China, the United Kingdom, the United States, the British Virgin Islands, and the Cayman Islands.").

[71] Ex. 93, Hong Kong Restraint Order ¶ 3.

[72] Ex. 34, HK Intl. Funds Investments Ltd. Memorandum and Articles of Association, dated October 3, 2006.

13. The Debtor was HK International's sole shareholder and director through October 10, 2014.[73]

14. On October 10, 2014, the Debtor transferred his interest in HK International to an individual named Qu Guo Jiao (a/k/a Natasha Qu) ("Ms. Qu").[74]

15. As found by Justice Ostrager, "Ms. Qu was a trusted business associate of the Kwok family."[75]  In fact, the Hong Kong Restraint Order listed Ms. Qu as one of several individuals whose bank accounts were "subject to the effective control of" the Debtor.[76]

16. Upon information and belief, on October 10, 2014, in connection with the October 10, 2014 transfer, Ms. Qu signed an undisclosed Declaration of Trust (the "HK International Declaration of Trust") that identified Ms. Qu as the "Trustee" and the Debtor as the "Beneficiary."[77]

17. Upon information and belief, the undisclosed HK International Declaration of Trust stated, among other things, that the Debtor "authorized and requested" Ms. Qu to "hold in the name of [the Debtor] shares in [HK International]," that such shares "now standing in the books of the Company registered in the name of [Ms. Qu] do not belong to [Ms. Qu] but to [the

---

[73] *See* Ex. 35, HK Intl. Funds Investments Ltd. Annual Return, dated November 26, 2007.

[74] Ex. 1, Final Contempt Decision at 4 (Justice Ostrager stating, in reference to this transaction, that testimony before him "established that in 2014 Kwok transferred a 100% interest in HK International to [Ms. Qu] for no consideration.").

[75] *Id.*

[76] Ex. 93, Hong Kong Restraint Order ¶ 3, Respondent 3.

[77] Escobar, Pepe, et al. "Exclusive: The Fugitive Who Tried to Spark a US-China War." The Unz Review, 5 Aug. 2022, https://www.unz.com/pescobar/exclusive-the-fugitive-who-tried-to-spark-a-us-china-war/.

Debtor],"[78] that Ms. Qu would hold the shares as nominee and in trust for the Debtor, and that

Ms. Qu would exercise rights in connection with the shares at the Debtor's direction.[79]

18.     Accordingly, after October 10, 2014, the Debtor continued to beneficially own

HK International pursuant to the undisclosed Declaration of Trust.

19.     The Hong Kong Restraint Order lists HK International as one of the entities

whose bank accounts were "subject to the effective control" of the Debtor.[80]

### C.     Purchase of Lady May in February 2015

20.     On February 23, 2015, HK International purchased the Lady May for €28,000,000

(or approximately $32,000,000[81]) from Apsley Yachts Limited (the "Seller").[82]

21.     Upon information and belief, on February 23, 2015, Bravo Luck, the Debtor's

shell company, transferred from the Bravo Luck UBS Account no less than €25,200,000 of the

funds used to purchase the Lady May to a representative of the Seller, pursuant to a wire transfer

form signed by the Debtor.[83]  Upon information and belief, the funds held by Bravo Luck

Limited in the Bravo Luck UBS Account (and used to purchase, among other things, the Lady

May) were transferred to Bravo Luck, directly or indirectly, by the Debtor.

---

[78] *Id.*

[79] *Id.*

[80] Ex. 93, Hong Kong Restraint Order ¶ 3, Respondent 19.

[81] The Lady May's Bill of Sale, dated February 23, 2015, lists a purchase of price of €28,000,000.00, which, multiplied by the applicable exchange rate on February 23, 2015 (of 1.1333 dollars per euro), equals $31,732,400.00.

[82] Ex. 36, Sale documents in connection with the sale of the Lady May, at 1; *see also* Ex. 37, February 2, 2022 Evidentiary Hr. Tr. at 45:22–25, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 1179.

[83]  Escobar, Pepe, et al. "Exclusive: The Fugitive Who Tried to Spark a US-China War." The Unz Review, 5 Aug. 2022, https://www.unz.com/pescobar/exclusive-the-fugitive-who-tried-to-spark-a-us-china-war/.

22.     On the same day on which the Lady May was purchased, Tommy Cheung and

Stephen Wong, Managing Directors at the UBS AG Hong Kong Branch, wrote in a letter in

support of the Debtor's application to purchase the Sherry Netherland Apartment that the Debtor,

"has been a client of ours through a personal investment company since July 2012 and during

this time [the Debtor] has had a satisfactory banking relationship with us.  At 18 Feb. 2015, the

funds involved in this banking relationship is not less than USD $400,000,000.[84]  Upon

information and belief, the "personal investment company" of the Debtor referenced in this letter

is Bravo Luck.

23.     The Bravo Luck UBS Account held approximately $490 million as of March 3,

2022, shortly after the purchase of the Lady May.[85]

24.     As of February 23, 2015, 50% of the equity of Bravo Luck Limited was held by

the Debtor, and the remaining 50% was held by the Debtor's son, Qiang Guo (the "Debtor's

Son").[86]  As explained in a March 4, 2015 letter written by the Debtor's counsel in Hong Kong,

Stevenson, Wong & Co., at that time, Bravo Luck was "legally and beneficially owned as to

50%" by the Debtor and the Debtor's Son respectively and the Bravo Luck UBS Account, "is

operated by either the [the Debtor] or [the Debtor's Son] signing solely and . . . is able to be

accessed by either of them signing solely."[87]

---

[84] Ex. 78, Letter from USB AG HK, dated Feb 23, 2015, *In re Genever Holdings LLC*, Case No. 20-12411-jlg
(Bankr. S.D.N.Y.), ECF No. 14-64 ("the funds involved in this banking relationship is not less than USD400,
000,000").

[85] Ex. 82, UBS Special Report, dated March 2015, at 3-5.

[86] Ex. 38, Instrument of Transfer, dated May 12, 2015, PAX v. Kwok, Index No. 652077/2017 (N.Y. Sup. Ct.),
NYSCEF Doc. No. 758; Ex. 33, Bravo Luck Limited Register of Members, *In re Genever Holdings LLC*, Case No.
20-12411-jlg (Bankr. S.D.N.Y.), ECF No. 14-58.  *See* Ex. 21, BVI Affidavit of Qiang Guo at ¶ 31 ("The legal
ownership of Bravo Luck was changed for a limited period of approximately four months between 26 January 2015
and 12 May 2015, whereby I transferred 50% legal ownership of Bravo Luck to the [Debtor]").

[87] Ex. 58, Stevenson Wong Letter, at 2.

25.     As stated in the Final Contempt Decision, "there is no evidence that [the Debtor's Son] was involved with the corporate transactions leading to" HK International's acquisition of the Lady May.[88]  Accordingly, upon information and belief, the Debtor, not his son, used his shell company Bravo Luck to substantially fund the purchase price of the Lady May.

26.     That the Debtor caused Bravo Luck, a shell company he controlled, to fund the purchase of the Lady May is consistent with his testimony to this Court that, as of December of 2014, he had $1 billion at his disposal.[89]

**D.     2017 Transfer of Ownership of HK International from Ms. Qu to Debtor's Daughter for HK$1.00**

27.     On June 27, 2017, Ms. Qu and the Debtor's Daughter executed an instrument of transfer pursuant to which Ms. Qu purportedly transferred the ownership of HK International to the Debtor's Daughter for consideration of HK$1.00 (the "2017 Transfer").[90]  At the time of the transfer, the Lady May, HK International's asset, was worth far more than $1.00—at least tens of millions of dollars.

28.     Upon information and belief, the 2017 Transfer occurred at the Debtor's direction while the undisclosed HK International Declaration of Trust was effective—meaning that the Debtor continued to beneficially own HK International at the time of the transfer.[91]

---

[88] Ex. 1, Final Contempt Decision at 5 (noting that Debtor's Daughter's acknowledged in her testimony "that her bother was not involved in any of the transfers that occurred before she acquired the yacht [through HK International]").

[89] Ex. 66, Tr. of Proceedings, dated April 27, 2022 at 173: 1-3  ("Q: Mr. Kwok, isn't it true that in November or December of 2014, you had $1 billion at your disposal? A: Yes.").

[90] See Ex. 36, Sale documents in connection with the sale of the Lady May, at 4 (Instrument of Transfer).

[91] Escobar, Pepe, et al. "Exclusive: The Fugitive Who Tried to Spark a US-China War." The Unz Review, 27 Aug. 2022, https://www.unz.com/pescobar/exclusive-the-fugitive-who-tried-to-spark-a-us-china-war/.

29.     Upon information and belief, at the time of the 2017 Transfer, both the Debtor

and the Debtor's Daughter were residents of New York, the Debtor having moved to New York

on January 9, 2015,[92] and the Debtor's Daughter having moved to the United States on May 16,

2017.[93]  Upon information and belief, the Debtor's Daughter has been a resident of the state of

New York since arriving to the United States.

### E.     Transfer of Lady May to HK USA

30.     On April 1, 2019, HK USA, a Delaware entity, was formed with the Debtor's

Daughter as "the sole member of the company."[94]

31.     HK USA's LLC agreement lists the Debtor's Daughter's address as 781 5th

Avenue, the Sherry Netherland Apartment.[95]  HK USA's LLC agreement also lists the principal

office of HK USA as 162 East 64th Street, New York, New York 10065.[96] This is an address

that has been used by the Debtor himself (including on his original chapter 11 petition filed on

February 15, 2022),[97] as well as by a number of Debtor-related entities, including Greenwich

Land, Golden Spring, GTV Media Group Inc., and Saraca Media Group Inc.[98]  It was also, for a

---

[92] Ex. 3, Affidavit of Kwok Ho Wan at ¶ 30 ("On January 9, 2015 . . . I moved to New York."). *See also* Ex. 19, Tr. of Telephonic 341 Meeting of Creditors at 27:3-5 ("Q: Mr. Kwok, how long have you lived in the United States? A: Nearly seven years.").

[93] Complaint, *HK Int'l Funds Investments (USA) Ltd., LLC  v. Kwok, et al.* (Adv. Proceeding No. 22-05003) at ¶ 20 ("On May 16, 2017, Ms. Guo departed for the United States. . . . She has remained in the United States ever since and is currently seeking political asylum here.").

[94] Ex. 20, Limited Liability Company Agreement of HK International Funds Investments (USA) Limited, LLC, dated April 1, 2019.

[95] *Id.*

[96] *Id.*

[97] Voluntary Petition, Docket No. 1, at 2; Ex. 40, Casper Law Firm invoices (addressed to Kwok at 162 East 64th Street Address).

[98] *See* Ex. 54, Real Property Tax Assessor Record of Greenwich Land LLC, dated July 15, 2021; Affidavit of Service, Docket No. 767; Ex. 67, OpenGovNY New York State corporate registry search results registration search results for GTV Media Group Inc.; Ex. 10, Saraca Media Group Inc. OpenGovNY results.

time, the address of the Debtor's counsel, Lawall & Mitchell, LLC.[99]

32.     In April 2020, the Lady May was transferred from HK International to HK USA for no apparent consideration.[100]

33.     Upon information and belief, neither the Debtor's Son nor the Debtor's Daughter have ever held gainful employment outside of the Debtor's shell companies.

**F.     Alter Ego Characteristics of HK USA**

34.     HK USA is the alter ego of the Debtor, as evidenced by the following characteristics (applicable during the entire time period relevant to the Counterclaims), among others:

a)     HK USA had no source of income, and all of HK USA's expenses were paid for by shell companies Golden Spring and Lamp Capital.[101]

b)     HK USA had no directors, officers, or employees.[102]

c)     HK USA did not file tax returns.[103]

d)     HK USA had no bank account and was not otherwise capitalized.[104]

e)     HK USA kept no documents.[105]

---

[99] See Ex. 68, Consent to Change Attorney, PAX v. Kwok, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 338.

[100] Ex. 41, Mei Guo Affidavit at ¶ 11, PAX v. Kwok, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 1162 ("On or about April 17, 2020, I transferred ownership of the Lady May from HK International to HK [USA].").

[101] See, e.g., Complaint ¶ 24, Adv. Proc. Docket No. 1 ("The Lady May's expenses were previously funded through [Golden Spring]. Now they are funded by Lamp Capital."); Ex. 69, Letter from L. Vartan, dated May 4, 2021 ("In connection with its representation [of HK USA], the firm has received payments from Golden Spring (New York) Ltd. and Lamp Capital LLC."); Ex. 42, Letter from L Vartan, dated June 7, 2021 ("I can confirm that all expenses for the Lady May yacht, including staff, crew, and maintenance, are paid by Golden Spring New York.").

[102] Ex. 42, Letter from L. Vartan ("HK International has no directors, officers, or employees; has no dedicated e-mail server or e-mail suffix; does not file tax returns; and has no bank account and is not otherwise 'capitalized.'").

[103] Id.

[104] Id. See also, e.g., Complaint ¶ 24, Adv. Proc. Docket No. 1 ("At no time since [the Debtor's Daughter] owned the Lady May through HK International and/or HK USA has either entity ever held a bank account.").

     f)      HK USA's only purported asset was the Lady May, which, as discussed below, was preclusively found to be beneficially owned and controlled by the Debtor.[106]

35.     The Debtor has wrongfully and unjustly used its alter ego relationship with HK USA to, among other things, cause HK USA to hold assets for the Debtor's use and benefit, while purporting to keep such assets outside the reach of the Debtor's creditors.

### G.    PAX's Claim and Litigation Against Debtor

36.     As determined by the State Court,[107] during the entire time period relevant to the Counterclaims, the Debtor was personally indebted to Pacific Alliance Asia Opportunity Fund L.P. ("PAX") pursuant to a 2011 personal guarantee (the "2011 Personal Guarantee") with respect to amounts owing in connection with a loan made by PAX to one of the Debtor's business entities in 2008 (the "PAX Claim").[108]  Between April 2013 and June 2015, the Debtor and PAX were parties to a Deed of Settlement under which it was contemplated that the PAX Claim would no longer be due and owing if certain conditions occurred.  These conditions did not occur, and the PAX Deed of Settlement was terminated in June of 2015.[109]

---

[105] Ex. 43, Tr. at 9, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 898 (PAX's counsel stating that "what Mr. Vartan did tell us is that HK [USA] has no employees, no officers, no directors, no bank account, no documents, no nothing. It's not a real company. I said, 'Mr. Vartan, where are the documents?' You know what he told me, Judge? 'Golden Spring has them'")  In this transcript, the term "HK International" was used to refer to HK USA.

[106] *See, e.g.*, Ex. 42, Letter from L. Vartan (HK USA's "sole asset is the Lady May Yacht").

[107] Ex. 44, Decision and Order, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 549 ("the Court finds Kwok liable for breach of the 2011 Personal Guarantee.").

[108] *Id.*

[109] *Id.* at 7.

37.     On April 18, 2017, PAX filed a complaint in the State Court asserting the Debtor's liability in connection with the PAX Claim under a theory of breach of contract related to the 2011 Personal Guarantee.[110]

38.     On April 18, 2019, PAX amended its complaint to include Genever US and Genever BVI as defendants and to assert that such entities' corporate veils should be pierced and that they should be held jointly and severally liable for the Debtor's breach of contract.

39.     On September 15, 2020, PAX prevailed on its motion seeking summary judgment on its breach of contract claim against the Debtor.[111]  PAX's veil-piercing claims against Genever US and Genever BVI remained pending.  On February 3, 2021, the State Court entered an order awarding PAX a judgment in connection with its breach of contract claim in the amount of $116,402,019.57 (the "PAX Judgment").[112]

40.     On September 25, 2020, PAX filed a motion in the State Court seeking a restraining order pursuant to New York Civil Practice Law & Rule ("CPLR") 5229, alleging, among other things, that the Debtor would "take steps to dissipate his assets or otherwise frustrate the judgment in this case" (the "CPLR Motion").[113]

41.     On September 30, 2020, the State Court entered a temporary restraining order restraining the Debtor from, among other things, "making or causing any sale, assignment, transfer, or interference with any property in which he has an interest."[114]

---

[110] See Ex. 45, Complaint, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 2.

[111] See Ex. 44, Decision and Order. An appeal of this decision is pending.

[112] Ex. 46, Judgment, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 716.

[113] Ex. 47, Memorandum of Law in Support of PAX's CPLR 5229 Motion and Request for TRO at 5, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 576.

[114] Ex. 48, Decision and Order on Motion, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 591.

42.     On October 15, 2020, the State Court held a hearing with respect to PAX's CPLR

Motion and the Debtor's opposition thereto.  At the hearing, Justice Ostrager stated, among other

things, in comments directed at the Debtor and his counsel:

a)      "The Court believes . . . that Mr. Kwok has attempted to mislead the
Court.  The Court believes that Mr. Kwok is, as the plaintiff contends,
playing a shell game with his assets, and has violated if not the letter of
court orders, the spirit of court orders."[115]

b)      "[W]e are not going to have any more shell games. Wherever these assets
are held, they are going to remain held where they presently reside, and if
it's determined that the entities that are presently listed as the owners of
the assets are the alter ego of Mr. Kwok or are wholly dominated and
controlled by Mr. Kwok, those assets will be made available to satisfy any
judgment that the plaintiff recovers."[116]

c)      "The intent here which is very clear and specific is that in this 2017 case
in which there's been a great deal of gamesmanship, a great deal of
dissembling, and some flagrant disregard of court orders, I want to know if
any transaction is going to take place in which Mr. Kwok is the guiding
hand that's something other than an ordinary course of business
transaction."[117]

d)      "[O]rders of the Court are either flaunted or exceedingly liberally
interpreted, and . . . intentional or unintentional misstatements that have
misled the Court have been made to the Court."[118]

43.     On the same day, October 15, 2020, the State Court entered an order  (the

"October 2020 Restraining Order") providing that the Debtor "*and/or the registered owners* of

(1) the Residence at the Sherry Netherland Hotel and (2) the yacht, 'the Lady May' are restrained

from making or causing any sale, assignment, transfer, or interference with those assets."[119]

---

[115] Ex. 49, Tr. at 21:13-16, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 647.

[116] *Id.* at 22:7-14.

[117] *Id.* at 24: 8-14.

[118] *Id.* at 26.

[119] Ex. 50, Decision and Order at 1, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 630
(emphasis added).

44.     The October 2020 Restraining Order applied to HK USA because it was the registered owner of the Lady May.

**H.  Violation of State Court Restraining Order and Contempt Order**

45.     The October 2020 Restraining Order was violated almost immediately upon its entry.  As the State Court would later find, arrangements were made for "the Lady May to sail to Florida in early October 2020 and, thereafter, to the Bahamas."[120]  The Lady May was then moved to Europe in October 2021,[121] where it would remain until its return to the United States pursuant to the Lady May Stipulation (defined below) entered in this Court.[122]

46.     During a State Court hearing held on November 12, 2020 before the State Court, counsel to the Debtor, John Siegal, stated that due to the Lady May being registered in the British Virgin Islands,[123] it would have to return there for licensing purposes.[124]  Justice Ostrager responded by stating that any such voyage would require relief from the October 2020 Restraining Order: "You will have to make that application on papers. I don't know anything about the requirement that an asset that has been restrained in the United States should be allowed to go to the British Virgin Islands" where it could "become[] potentially unavailable for [PAX] to levy upon."[125]  Following Justice Ostrager's rejection of a further intervention by

---

[120] Ex. 1, Final Contempt Decision at 2.

[121] Ex. 1, Final Contempt Decision at 5 ("[I]n October 2020 the Lady May was sent to Florida and then the Bahamas for repairs and was subsequently dispatched to Italy in October 2021").

[122] *See Stipulated Order Compelling Hk International Funds Investments (USA) Limited, LLC To Transport And Deliver That Certain Yacht, The "Lady May" Docket No. 299.*

[123] Here, Mr. Siegal confused the British Virgin Islands with the Lady May's correct place of registration in the Cayman Islands.

[124] Ex. 52, Tr. at 13:9-18, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No.  691.

[125] *Id.* at 13:19-24, 14:4-8.

Aaron Mitchell, at the time acting as counsel to the Genever Entities,[126] Mr. Siegel then

acknowledged that "[w]e understand the Court's directive."[127]

47. On November 18, 2020, in a letter filed with the State Court, counsel to PAX

reported the following information with respect to the Lady May:

> Based on publicly available information, which we accessed at
> MarineTraffic.com . . . we understand that the yacht departed Fort Lauderdale,
> Florida, on November 1, 2020, and, as of today, is located in the Bahamas at or
> near Old Fort Bay, Nassau. In fact, it appears that the yacht was already out of the
> jurisdiction on November 12, 2020, when Mr. Siegal (presumably carrying out
> Mr. Kwok's instructions) asked Justice Ostrager if Mr. Kwok could send the
> yacht out of the jurisdiction. This is particularly concerning given Mr. Kwok's
> history of making misrepresentations throughout this litigation.[128]

48. On December 24, 2020, PAX filed a motion seeking that the Debtor be held in

contempt based on the Lady May having left the jurisdiction.[129]

49. On March 17, 2021, the State Court issued a decision and order holding the

Debtor in contempt (the "March 2021 Contempt Order") and stating, among other things, the

following:

> The Court has reviewed the extensive submissions of the parties in connection
> with PAX's motion to hold Kwok in contempt. ***Passing the issue of whether any
> of Mr. Kwok's attorneys have violated the Code of Professional Conduct, it is
> clear that there has been an intolerable amount of gamesmanship, dissembling,
> and deceit in proceedings before this Court relating to the whereabouts and
> ownership of the yacht "Lady May."***

---

[126] *Id.* at 14:9-14 (Mr. Mitchell has appeared in other capacities in relation to the Debtor, including filing a letter before this Court as the Debtor's personal counsel. *See* Objection to the appointment of the Mr. Despins as Trustee, Docket No. 531).

[127] *Id.* at 15:5-6. Later, at the State Court hearing held on July 21, 2022, Mr. Siegel stated that during this colloquy at the November 21, 2020 hearing, "unbeknownst to me, . . . the vessel was no longer in the United States." Ex. 43, July 21, 2021 Tr. at 18:21-23. Justice Ostrager responded by stating: "If you choose to -- if you, counsel, choose to be an instrumentality of gamesmanship and defiance of Court orders, that's your decision." *Id.* at 19: 2-4.

[128] Ex. 59, Letter from Melissa M. Carvalho of Baker & Hostetler LLP, dated November 18, 2020, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 692 (internal citations omitted).

[129] Ex. 60, December 24, 2020 Notice of Motion for Order of Contempt Against Defendant Kwok, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 688.

The defendant claims that the yacht was removed from the jurisdiction of this Court for "ordinary course" "winter maintenance" ***notwithstanding restraints imposed on the movement of the yacht by the Court. Rather than catalogue the many "shell games" defendant Kwok has engaged in with the assistance of counsel who should know better, the Court grants the motion for contempt to the following extent: For every day that the yacht is outside the jurisdiction of this Court after May 15, 2021, defendant Kwok will be fined $500,000.*** The other restraints relating to the ownership and control of the yacht remain in place.[130]

## I. Failure to Return Lady May and Subsequent Contempt Fines

50.　　Though the March 2021 Contempt Order provided for the accrual of contempt fines of $500,000 per day after May 15, 2021, that date came and went and the Lady May remained outside of the United States.  In fact, the Lady May would not return to the United States until early July 2022.

51.　　On May 27, 2021, the State Court held a hearing in connection with PAX's efforts to obtain documents in discovery from Golden Spring.  At that hearing, Justice Ostrager made the following comments with respect to the Debtor and his related entities.

　　　　a)　　"Mr. Kwok is incurring $500,000 per day in contempt penalties.  I understand that Mr. Kwok believes that these court proceedings are a game of evasion -- that he wants to play."[131]

　　　　b)　　"Mr. Kwok has exhausted the Court's patience with his antics."[132]

　　　　c)　　"Mr. Kwok leads a rather extravagant lifestyle, [yet] purports to have zero assets whatsoever."[133]

---

[130] Ex. 61, Decision and Order on Motion at 2, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 728 (emphasis added).

[131] Ex. 62, May 27, 2021 Tr. at 9:1-3, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 833.

[132] *Id.* at 9:23-24.

[133] *Id.* at 10:2-3.

<ol type="a" start="4">
<li>"Mr. Kwok flaunts the Court's orders at will."[134]</li>
<li>"Mr. Kwok has apparently no concern for the $500,000 a day sanction for flagrantly violating prior orders of the Court with respect to the boat that [Golden Spring] is paying to maintain and transport."[135]</li>
<li>"[PAX's counsel] has been pursuing enforcement of a judgment for years now, and it's been my misfortune to have to have presided over these many, many, many motions and hearings, none of which are producing the results that the Court has ordered because Mr. Kwok directly or indirectly through his companies ignores Court orders."[136]</li>
</ol>

52.     On July 8, 2021, PAX filed a motion (the "Final Contempt Motion") in the State Court seeking a final contempt order against the Debtor in connection with the ongoing violation of the March 2021 Contempt Order.[137]

53.     On July 19, 2021, together with the filing of the Debtor's opposition to the Final Contempt Motion (which opposed the motion on the basis that the Debtor did not own the Lady May and sought a stay pending the appeal of the March 2021 Contempt Order), counsel to HK USA, attorney Lee Vartan, filed an "Affirmation" in opposition to the Final Contempt Motion (the "Vartan Affirmation"). [138]  The Vartan Affirmation asserted, among other things, that HK USA was the owner of the Lady May and that HK USA's "property interests are being affected by" the Final Contempt Motion.[139]

---

[134] *Id.* at 16:8-9.

[135] *Id.* at 17:1-5.

[136] Ex. 62, May 27, 2021 Tr. at 18:1-6.

[137] Ex. 63, Memorandum of Law in Support of PAX's Motion for a Final Order of Civil Contempt, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 857.

[138] *See* Ex. 90, Vartan Affirmation , dated July 19, 2021, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 867.

[139] *Id.* ¶ 4.

54. On July 21, 2021, the State Court held a preliminary hearing on the Final

Contempt Motion, at which hearing Mr. Vartan appeared as counsel for HK USA, purportedly

for the purpose of protecting HK USA's alleged property interest in the Lady May.[140]  At the

hearing, Justice Ostrager made the following comments, among others:

a) "I don't believe that [PAX's counsel] has met -- met his burden on the record that's presently before the Court for a final court order of civil contempt, because there is an issue about the ownership of the ship, although it would seem that [PAX's counsel] has made more than a prima facie showing that all of these entities that allegedly control the ship are controlled by Mr. Kwok."[141]

b) "Mr. Kwok is proceeding at his own peril by orchestrating the voyages of this ship to everywhere and anywhere other than the territorial waters of the United States."[142]

c) "Let's be clear about – Let's be clear about one thing: The Court issued an order directing that the boat not be removed from the territorial waters of the United States, upon an application from representatives of Mr. Kwok, or entities that he controlled, to remove the boat from the territorial waters of the United States. That order was disregarded by Mr. Kwok and/or the entities that he controls. That is a contempt of the Court."[143]

d) "If this wasn't gamesmanship and this wasn't flaunting of the Court's orders, and if this wasn't a transparent shell game that Mr. Kwok is engaged in, the boat would be in the territorial waters of the United States and we would resolve the issue of the boat's ownership."[144]

e) "[PAX's counsel] has made more than a prima facie showing that Mr. Kwok controls all of these entities, over the course of multiple hearings, and that Mr. Kwok is in contempt, and his entities are in contempt of prior orders of the Court."[145]

---

[140] Ex. 43, July 21, 2021 Tr. at 3:19-20.

[141] *Id.* at 13:15-23.

[142] *Id.* at 14:1-4.

[143] *Id.* at 16:25-17:10.

[144] *Id.* at 17:15-20.

[145] Ex. 43, July 21, 2021 Tr. at 17:21-25.

      f)      "There can't be any dispute that Mr. Kwok and the entities he controlled were restrained from moving that boat from the territorial waters of the United States. And, in defiance of those orders and subsequent orders, the boat remains outside the territorial waters of the United States. And sooner or later the wheels of justice, which grind exceedingly slowly, will resolve the issue."[146]

55.      On November 9, 2021, the Supreme Court of the State of New York Appellate Division, First Judicial Department (the "Appellate Division"), issued an order on the Debtor's appeal of the March 2021 Contempt Order. The Appellate Division stated as follows:

> The motion court acted within its discretion in holding defendant in civil contempt, **as plaintiff established by clear and convincing evidence that defendant violated a lawful, clear mandate of the court, of which he had knowledge, and that such violation resulted in prejudice to plaintiffs rights** (see El-Dehdan v El-Dehdan, 26 NY3d 19, 29 [2015]; Judiciary Law S 753).
>
> Contrary to defendant's argument, the court did not commit a procedural defect under Judiciary Law 9 770 because it did not issue a final order of contempt. Further, the evidence shows that the daily fine of $500,000 was intended to strongly encourage defendant to purge himself of the contempt, which, despite being permitted two months to accomplish, he has shown no interest in doing (see e.g. Ruesch v Ruesch, 106 AD3d 976, 977 [2d Dept 2013]). The motion court is instructed to proceed with an evidentiary hearing to resolve a dispute as to ownership and control of the yacht, and to assess appropriate penalties.[147]

## J.  Final Contempt Hearing and Participation by HK USA

56.      On February 2, 2022, the State Court held its final evidentiary hearing with respect to the Final Contempt Motion (the "Final Contempt Hearing"). Mr. Vartan again appeared at the Final Contempt Hearing as counsel to HK USA and also for the Debtor's Daughter.[148]

---

[146] Id. at 19:8-15.

[147] Ex. 75, *Pac. All. Asia Opportunity Fund L.P. v. Wan*, 199 A.D.3d 423, 423 (1st Dep't 2021) (emphasis added).

[148] Ex. 37, February 2, 2022 Evidentiary Hr. Tr. at 37:7-9 ("The first several witnesses are witnesses for [HK USA], the owner of the vessel. And Lee Vartan will be presenting those witnesses for cross-examination."); Id. at 37:25-38:1 ("Lee Vartan on behalf of Mei Guo'). *See also* Ex. 64, Joint Appearance Sheet for February 2, 2022 Hearing at 3, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 1119 (listing Mr. Vartan as "counsel for HK International.").

57.     At the beginning of the Final Contempt Hearing, Mr. Siegal, counsel for the

Debtor, informed the court that "[t]he first several witnesses are witnesses for [HK USA], the

owner of the vessel. And Lee Vartan will be presenting those witnesses for cross-

examination."[149]  Consistent with that explanation, Mr. Vartan proceeded to present four

witnesses[150] (all but one of the witnesses offered on behalf of the defense[151]) and make

evidentiary objections[152] in defending these witnesses before "turn[ing] things back over to Mr.

Siegal" shortly before the conclusion of the hearing.[153]

58.     In connection with the Final Contempt Hearing, the Debtor's Daughter testified

that "she directed the Lady May's itinerary"[154] and that "it was [her] decision for the boat to

travel from New York to Florida in October 2020, not [her] father's decision."[155]  According to

the Debtor's Daughter: "I was aware . . . of the [March 2021 Contempt Order] requiring the Lady

May to return to New York in May 2021.  However, . . . I did not want the boat to travel to New

York, and, after consulting with counsel, directed instead that it proceed to Europe . . . . that

decision was mine alone, not my father's."[156]

---

[149] Ex. 37, February 2, 2022 Evidentiary Hr. Tr. at 37:7-9.

[150] These witnesses were: (1) the Debtor's Daughter; (2) Momchil Ivanov, current captain of the Lady May, (3) Craig Heaslop, former captain of the Lady May, and (4) Russell Stockil, yacht management director for Yachtzoo (the yacht management company for the Lady May).

[151] The sole witness offered by the Debtor was Aaron Mitchell, his attorney.  Ex. 37, February 2, 2022 Evidentiary Hr. Tr. at 96:15-18.

[152] *See, e.g.*, *id.* at 45:9-12; 58:7-11; 60:18-20.

[153] *Id.* at 96:13-16.

[154] Ex. 1, Final Contempt Decision at 5.

[155] *See* Ex. 41, January 28, 2022 Mei Guo Affidavit at ¶ 19 ("It was my decision for the boat to travel from New York to Florida in October 2020, not my father's decision.").

[156] *Id.* ¶ 20 ("I was aware, through my counsel, of the Court's Order requiring the Lady May to return to New York in May 2021. However, given that I am the owner of the Lady May, and that neither HK USA nor I is a party to this action, I did not want the boat to travel to New York, and, after consulting with counsel, directed instead that it

59.     The Debtor himself did not testify in connection with the Final Contempt Hearing.  On multiple occasions previously, the Debtor had asserted the Fifth Amendment in response to PAX's discovery requests.[157]  In the Final Contempt Decision, Justice Ostrager ruled that the Debtor's invocation of his Fifth Amendment right against self-incrimination "in response to PAX's post-judgment discovery, including in response to requests specifically about the Lady May," entitled PAX to an adverse inference against the Debtor.[158]

60.     On February 9, 2022, Justice Ostrager issued his Final Contempt Decision imposing a contempt fine against the Debtor of $134 million[159] and noting that the State Court was prepared to enforce timely payment through the "exercise its full authority" under New York's Judiciary Law § 753, which, among other things, provided the State Court with the power to imprison the Debtor for failure to pay the fine.[160]

61.     The Final Contempt Decision contained numerous findings of the State Court, including, among others, the following:

    a)      The Debtor had made "efforts to avoid and deceive his creditors by parking his substantial personal assets with a series of corporations, trusted confidants, and family members."[161]

---

proceed to Europe as had been long-planned at significant expense. Again, that decision was mine alone, not my father's.").

[157] Ex. 65, Letter from Melissa M. Carvalho of Baker & Hostetler LLP, dated March 11, 2021; Ex. 70, Email from Stuart Sarnoff to Melissa Carvalho, dated Nov. 10, 2021.

[158] Ex. 1, Final Contempt Decision at 9.

[159] The Trustee reserves his rights with respect to the plan treatment of PAX's claims.

[160] *See* Judiciary Law § 753A ("court of record has power to punish, by fine and imprisonment, or either, a neglect or violation of duty, or other misconduct, by which a right or remedy of a party to a civil action or special proceeding, pending in the court may be defeated, impaired, impeded, or prejudiced").

[161] Ex. 1, Final Contempt Decision at 1.

b) The Debtor, "who is a self-declared multi-billionaire, had secreted his assets in a maze of corporate entities and with family members."[162]

c) The Debtor's use of corporate entities to shield assets from creditors was a "scheme" that had "enabled Kwok to assert that he has no assets despite his lavish lifestyle."[163]

d) The Debtor "exercised dominion and control over" the Lady May.[164]

e) "The testimony adduced at the hearing out of the mouths of defendants' witnesses clearly and convincingly demonstrated that Kwok beneficially owns and controls the Lady May and has utter contempt for this Court and the judicial process."[165]

f) Based on the evidence in connection with the purchase of the Lady May "a reasonable inference is that Kwok provided the funds which were used to purchase the yacht."[166]

g) "Subsequent to this Court's September 30, 2020 restraining Order, in October 2020 the Lady May was sent to Florida and then the Bahamas for repairs and was subsequently dispatched to Italy in October 2021, purportedly at the direction of Golden Spring. Ms. Guo acknowledged that she was aware of both this Court's September 30, 2020 restraining Order and this Court's subsequent March 16, 2021 Order directing that the Lady May be returned to the Court's jurisdiction."[167]

h) Testimony of the Debtor's Daughter "that she owns and controls the Lady May cannot be credited in any respect."[168]

i) The Debtor's Daughter "introduced no evidence that she exercised dominion and control of the Lady May, and provided no confirmation that she came into possession of the Lady May, other than as a ruse to shield the Lady May from being levied upon by her father's creditors."[169]

---

[162] *Id.*

[163] *Id.*

[164] *Id.* at 2.

[165] *Id.* at 7.

[166] Ex. 1, Final Contempt Decision at 4.

[167] *Id.* at 5.

[168] *Id.* at 6-7.

[169] *Id.* at 7.

j)   "The machinations associated with the shell game Kwok has orchestrated with respect to the Lady May are of a piece with every other evasive and contemptuous act Kwok has taken during the five years this litigation has been pending, which is why there are 1,180 docket entries in this case."[170]

k)   "Kwok has much more than a beneficial interest in the Lady May. Not only does Kwok control the yacht, it appears he provided the funds to purchase it and he is the person who principally enjoys the use of the yacht."[171]

l)   "The evidence clearly and convincingly demonstrates that Kwok holds a beneficial interest in and controls the Lady May."[172]

62.   In concluding his decision, Justice Ostrager commented that "if billionaire litigants can simultaneously seek to use Court process in New York and elsewhere in the United States while knowingly and intentionally violating Court orders, there is no rule of law."[173]

## K.   Debtor Continues His Shell Game in This Chapter 11 Case

63.   In response to the issuance of the Final Contempt Decision, [174] on February 15, 2022 (the "Petition Date"), the Debtor commenced this Chapter 11 Case by filing his chapter 11 petition [Main Case Docket No. 1] (the "Initial Petition") and Official Form 104, titled "For Individual Chapter 11 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims Against You *and Are Not Insiders*" [Main Case Docket No. 4] (the "Top 20 Creditors List") (emphasis added).

---

[170] *Id.*

[171] Ex. 1, Final Contempt Decision at 8.

[172] *Id.* at 8.

[173] *Id.* at 9.

[174] *See, e.g.*, Ex. 19, Tr. of Telephonic 341 Meeting of Creditors at 15:21-16:1 ("[I]n mid-February in my second trial . . . I was given a fine of $120 million and I was ordered to pay it off within five days. So without any choices -- so I filed bankruptcy application at Connecticut state and Chapter 11."). The Debtor has appealed the Final Contempt Decision.

64.     Throughout the chapter 11 case, the Debtor has continued his shell game of using shell companies and family members to plead poverty while living in the lap of luxury.

65.     In the Debtor's Initial Petition, his amended chapter 11 petition filed on February 23, 2022 [Main Case Docket No. 19] (the "Amended Petition" and, together with the Initial Petition, the ("Petitions")), the Debtor, among other things, failed to disclose that his affiliate, Genever US, was the debtor in a pending chapter 11 case in the Southern District of New York that had been commenced on October 12, 2020.[175]  In response to the Petitions' instruction to disclose, "Where you live," the Debtor stated "c/o Golden Spring (New York) Ltd" and inserted Golden Spring's address.[176] The Debtor also listed shell companies Golden Spring and Lamp Capital as the only holders of undisputed claims on his Top 20 Creditors List and amended versions thereof [Docket Nos. 10, 20].

### i.     Debtor Denies Holding Assets or Earning Income

66.     On March 9, 2022, the Debtor filed his schedules [Main Case Docket No. 78] (the "Schedules") and statement of financial affairs [Main Case Docket No. 77] ("SOFA").  These documents in particular, along with their associated global notes (the "Global Notes") attached to the SOFA, help encapsulate how the Debtor has played his shell game in this Chapter 11 Case. Among other things:

---

[175] Initial Petition at 3 (Petition Item 10).

[176] *Id.* at 2 (Petition Item 5).

a)      Despite voluminous public evidence of the Debtor's wealth, including court documents signed by the Debtor under penalty of perjury,[177] the Schedules reported that the total value of the Debtor's property was ***$3,850.00***, as compared with scheduled unsecured claims of $373,803,498.09, over $250 million of which consisted of the claims of PAX, with the remainder including numerous claims by plaintiffs in litigation relating to accusations of securities fraud, defamation, and sexual assault.

b)      The Debtor scheduled $0.00 of income, stating that: "the Debtor does receive support funded by family and companies controlled by family for housing, household and living expenses. None of the funding related to housing, household or living expenses is subject to any claim by the funding source and all housing, household and living expense funding is without any agreement or expectation to be repaid."

c)      The Debtor scheduled $0.00 of expenses, stating that: "all expenses of any kind including housing, household and living, are funded by third party family members or by companies they control. The Debtor has no expenses for which he is personally liable."

d)      The Debtor scheduled Golden Spring (his "family office") as holder of ***secured claims*** against the Debtor of an unknown value based on certain litigation funding agreements.  As noted above, the Debtor had previously listed Golden Spring as holder of ***unsecured claims*** on his Top 20 Creditors List.

---

[177] *See* Ex. 30, Particular of Claims at ¶ 1 (describing Debtor as "high net worth individual").  *See also* Rolfoundation Rule of Law Fund Live 2020/07/22 Mr. Guo Wengui live." YouTube, July 22, 2020, https://www.youtube.com/watch?v=6d-Jcq0wr7U ("Everyone knows that a while ago, I advised to my family fund and our collaboration fund, and based on my decision, (we) purchased oil futures. Everyone knows that (we) made almost less than a little less than $30 billion. At the time I told them, if money is made, 90% (of the profits) belong to you; if money is lost, all belongs to me. Then all went in and 1 billion barrels (of oil futures) were bought. Now the 1 billion barrels made a profit of $30 billion, and I made at least $3 billion, right?") (based on informal translation from Chinse audio); *See* VICE News, "Exiled Chinese Billionaire Uses YouTube to Wage a War on Corruption, YouTube" (original air date on HBO, Nov. 15, 2017), https://www.youtube.com/watch?v=LkOsgh5kcgQ (In this video, the Debtor describes various of his assets, including the Sherry Netherland Apartment ("I buy the apartment"), the Lady May ("my yacht"), the "most luxurious apartment in London," "two private jets," and "hundreds of race cars".  The Debtor also comments on his great wealth generally, stating, "I have the wealthy life that everyone in the world dreams about," and "I don't have any material needs anymore.").

e)  In his SOFA, the Debtor listed a number of parties as creditors who had received transfers within the ninety days preceding the Petition Date, ***thus admitting that the Debtor, and not another party, had paid these creditors***.[178]  It appears, however, that at least some of these payments were made by Golden Spring and/or Lamp Capital, thereby confirming that the Debtor uses these entities as part of his shell game.

f)  The Debtor stated he had "use and occupancy" of the Taconic Road Residence that was owned by Greenwich Land, an LLC whose sole member is the Debtor's spouse.  The Debtor stated that "related costs and expenses associated with the Residence are paid directly by family and family-controlled enterprises."  Relatedly, the Debtor denied holding legal title to any household goods and furnishings, electronics, or collectibles.

g)  The Debtor stated he had "access to" the Sherry Netherland Apartment and disclosed his ownership of Genever BVI, Genever BVI's ownership of Genever US, and Genever US's ownership of the apartment.  However, the Debtor took the position that he held his equity in Genever BVI in trust for Bravo Luck, owned by the Debtor's Son, and asserted that Bravo Luck funded the purchase of the apartment using funds that "came from entities owned or controlled by the Debtor's son and not from the Debtor."

h)  The Debtor stated he "has use of automobiles, including luxury automobiles and motorcycles" but that he "has no legal title to any vehicle of any type," and that "costs and expenses associated with such vehicles are provided for directly by family and family-controlled enterprises."

i)  The Debtor continued to assert that the Lady May was owned by HK USA and refused to schedule the Lady May as an asset on the grounds that he had appealed the Final Contempt Decision.

j)  The Debtor stated that the Hong Kong Restraint Order had frozen "HK$3.7 million of funds alleged to belong to the Debtor" and "[a]s much as billions more of funds and property, including real estate in Hong Kong, of individuals and entities purportedly subject to the Debtor's 'effective control.'"  The Debtor stated that "[d]ue to the freezing/seizure of these assets, the Debtor does not include them in his estate," despite the fact that the Hong Kong Restraint Order does not necessarily divest the Debtor of ownership of these assets.

67.  Elaborating on the story of the Debtor's alleged individual poverty amidst family opulence, the Debtor stated in his declaration filed on March 20, 2022 that:

---

[178] *See* SOFA, at 21 (response to question 6 "[d]uring the 90 days before you filed for bankruptcy, did **you** pay any creditor a total of $600 or more").

My family, and particularly my son, provides for my needs. Prior to the
Petition Date, my son's family office [Golden Spring] purchased, among
many other things, my clothing, food, and sundries. I do not have access to
a Golden Spring credit card or to a Golden Spring bank account. My
family retains ownership of nearly everything I use, aside from my
clothing and mobile phones.[179]

68.     According to the Debtor, "Justice Ostrager, PAX, and perhaps others believe I

have greater financial wherewithal than is reflected here and in my Schedules and Statements of

Financial Affairs. The wealth they believe is mine, however, actually belongs to my son,

daughter, wife, and extended family, not me."[180]

### ii. Shell Game Funds Chapter 11 Case and Lifestyle

69.     Throughout the Chapter 11 Case, the Debtor has continued to play his shell game

to ensure that, despite his condition as a chapter 11 debtor claiming no assets or income, he can

continue to live a luxurious lifestyle and benefit from expensive legal representation.

70.     For example, Lamp Capital paid the $1 million retainer of the Debtor's initial

bankruptcy counsel, Brown Rudnick.[181]  The Debtor's Son then paid the $100,000 retainer of the

Debtor's subsequent bankruptcy counsel, Zeisler & Zeisler, *which simultaneously serves as

counsel to the Debtor's Daughter and HK USA.*

71.     Meanwhile, Golden Spring, Lamp Capital, and Greenwich Land have funded the

Debtor's extravagant lifestyle.  These expenses from the beginning of the Chapter 11 Case are

---

[179] Declaration of Mr. Ho Wan Kwok in Support of the Chapter 11 Case and Certain Motions, Docket No. 107 at ¶
17.

[180] *Id.*

[181] This payment was made using the proceeds of a purported $1 million loan from Lamp Capital to the Debtor that
were remitted directly from Lamp Capital to Brown Rudnick. *See* Application of the Debtor for Entry of an Order
Authorizing the Employment and Retention of Brown Rudnick LLP as Counsel for the Debtor, Docket No. 86, at ¶
17; Ex. 4, Tr. of Telephonic 341 Meeting of Creditors, dated April 6, 2022 at 49: 22-24.  At his April 6, 2022
Section 341 meeting, the Debtor testified that this loan was not in writing and that he did not know the terms of the
loan, why the money had been lent, or what the source of the money was. *Id.* at 49-51.

reflected in the monthly operating reports filed by the Debtor for February 2022 [Main Case

Docket No. 120], March 2022 [Main Case Docket No. 242], and April 2022 [Main Case Docket

No. 423], which report an aggregate amount of **$351,081** paid by a "third party for the benefit of

the estate."

72.     Similarly, the Debtor relied on Golden Spring as lender in connection with an $8

million DIP loan proposed in the Debtor's motion filed on March 22, 2022 [Main Case Docket

No. 117].   This loan would have been made to the estate on an unsecured basis, subordinated to

the claims of the Debtor's pre-petition creditors, and without any administrative or priority

repayment rights.  *Id.*  Nevertheless, the record makes clear that the Debtor intended to use a

significant amount of the funds to pay the professional fees of Brown Rudnick, counsel to the

official committee of unsecured creditors (the "Committee"), and numerous proposed "ordinary

course" professionals that included, among others, the law firm of Melissa Francis, ***Golden***

***Spring's general counsel***.[182]

73.     The Debtor used HK USA's only asset, the Lady May, as a bargaining chip to

offer to his creditors in exchange for broad plan releases.  On April 10, 2022, the Debtor filed a

proposed chapter 11 plan [Main Case Docket No. 197] (the "Proposed Plan").  Among other

things, the Proposed Plan contemplated that HK USA would donate the Lady May (for no

apparent consideration) to a creditor's trust for the benefit of holders of allowed claims, and that

broad releases would be extended to the Debtor, Golden Spring and HK USA (together referred

---

[182] *See* Annex 1 to *Motion of Debtor for Entry of an Order Authorizing (I) Employment and Payment of Professionals Utilized in the Ordinary Course, (II) Payment of Prepetition Claims, and (III) Granting Related Relief* [Main Case Docket No. 119].

to as the "Plan Funders"), and "all individuals and entities affiliated with the Plan Funders" (i.e.,

the Debtor's entire network of shell companies and individual family members).[183]

74.     The Debtor's counsel would emphasize the Debtor's role in arranging for DIP

financing and the donation of the Lady May as contemplated in the Proposed Plan, stating to the

Court that the Debtor "arranged" the DIP loan and "obtained a commitment as set forth . . . in the

proposed plan, to have a boat costing $37 million contributed to creditors as set forth therein."[184]

### iii.     HK USA Agrees to Return Lady May and Pay $37 Million Into Escrow

75.     On March 1, 2022, PAX filed a motion seeking an order confirming the

inapplicability of the automatic stay or, in the alternative, relief from stay, in connection with the

contempt fine awarded to PAX under the Final Contempt Decision [Main Case Docket No. 57]

(the "PAX Stay Motion").  The Debtor's objection to the PAX Stay Motion argued that the

Debtor did not own or control the Lady May.

76.     On April 11, 2022, the day after the filing of the Proposed Plan, HK USA filed a

statement [Main Case Docket No. 203] (the "HK USA Statement") asserting that it consented to

the entry of a proposed order compelling HK USA to transport and deliver the Lady May back to

Connecticut from Europe, thus, according to HK USA, mooting the PAX Stay Motion.  Also on

April 11, 2022, HK USA commenced this Adversary Proceeding in which it seeks a declaration

that HK USA, and not the Debtor's estate, is the owner of the Lady May.

77.     At the April 13, 2022 hearing (the "April 13 Hearing") in connection with the

PAX Stay Motion, the Court asked HK USA's counsel, Mr. Kindseth, a number of pointed

---

[183] Proposed Plan Art I.A.74 (defining "Plan Funders" as Golden Spring and HK USA); Art I.A.75 (defining "Plan
Funder Related Parties" as ":all individuals and entities affiliated with the Plan Funder"); Art I.A.90 (defining
"Released Parties" to include, among others "collectively, the Debtor, the Plan Funders, the Plan Funder Related
Parties").

[184] Ex. 66, April 27, 2022 Tr. at 218:12, 18-20.

questions regarding HK USA's proposal, including "why don't you just post a bond?"[185]  Mr.

Kindseth responded by stating that he did not "know if my client has the funds available to post

the bond" and that "my client's sole asset is the boat."[186]

78.     The Court also addressed this Adversary Proceeding, stating, "I'm not going to

make a finding over who owns the boat. *Justice Ostrager already did that.* If you don't like that,

then you go fight that back in New York court."[187]  The Court's statement was also highly

relevant to the PAX Stay Motion, because the Debtor's objection thereto was based completely

on the notion that the Debtor did not own or control the Lady May.

79.     Shortly after the Court's comment, Mr. Baldiga of Brown Rudnick, the Debtor's

then-counsel, asked the Court for a 15-minute recess to discuss with the Debtor "the solution [the

Court] did posit . . . the possibility of a bond."[188]  Following this recess, Mr. Kindseth, counsel to

HK USA (and not, at that time, counsel to the Debtor) reported to the Court that his client

"intends and is committed then instead to post cash equal to the cost of the boat, about $37

million."[189]

80.     In sum, shortly after the Court's comments suggesting that ownership of the Lady

May would not be re-litigated and that consequently PAX's Stay Motion would likely be granted

and HK USA's claims to ownership of the Lady May rejected, *the Debtor* proposed the payment

of a bond in connection with *HK USA's* proposed return of the Lady May to Connecticut.  Soon

---

[185] Ex. 76, April 13, 2022 Hr. Tr. at 51:8.

[186] *Id.* at 51:10-11.

[187] *Id.* at 55:19-22.

[188] *Id.* at 62:22-23.

[189] *Id.* at 86:21-23.

thereafter, HK USA, which had shortly before claimed to hold no assets other than the Lady

May, had $37 million in cash at its disposal.

81.     Based on HK USA's offer of a $37 million bond, the Court adjourned the hearing

on the PAX Stay Motion.  Following a subsequent hearing on April 18, 2022 at which the parties

discussed the nature of the contemplated $37 million payment, the Debtor, PAX, the Committee,

and creditors Rui Ma and Zheng Wu reached an agreement to settle the PAX Stay Motion.

Under the agreement, HK USA would be required to return the Lady May to Connecticut, with

the performance of this obligation to be secured by the deposit of $37 million into escrow by HK

USA, to be released back to HK USA only upon the return of the Lady May and the satisfaction

of certain other conditions.[190]  The agreement was announced to the Court at the April 27, 2022

hearing and memorialized in a stipulated order that was submitted to the Court on April 29, 2022

and entered the same day [Main Case Docket No. 299] (the "Lady May Stipulation").[191]

82.     The Lady May Stipulation constitutes a settlement under Federal Rule of

Bankruptcy Procedure 9019, with respect to which creditors were not given notice with an

opportunity to object.  As this Court has noted, the Trustee is not a party to the Lady May

Stipulation.[192]  Although the Lady May Stipulation was entered into while both (a) the UST's

motion seeking appointment of an examiner or chapter 11 trustee and (b) PAX's motion to

dismiss the Chapter 11 Case (each discussed in more detail below) were pending, the Lady May

---

[190]  Lady May Stipulation ¶5(i)("in the event this Court determines that HK USA satisfied the Certification
Conditions then HK USA may provide a copy of the HK USA Certification to the Escrow Agent in accordance with
the Escrow Agreement whereupon the Escrow Agent shall immediately release and transfer the Escrow Funds to
HK USA in accordance with the Escrow Agreement").

[191] *See* Docket No. 294.

[192]*See, e.g.*, Ex. 89, Aug. 30, 2022 Tr. at 18:6-9 ("[O]bviously the trustee -- the trustee was not a party to any of this.
He was not in the case when the parties agreed to forego a hearing on relief from stay and a ruling on relief from
stay.").

Stipulation only contemplated the possibility that the Chapter 11 Case would be dismissed, and did not address the eventuality that a chapter 11 trustee would be appointed.[193]

### iv. HK USA Obtains $37 Million From Another Debtor-Linked Company

83. Though not disclosed prior to the approval of the Lady May Stipulation, in subsequent court pleadings, HK USA revealed that the source of the $37 million HK USA paid into escrow was a loan extended to HK USA by BVI-registered entity called Himalaya International Financial Group Ltd. ("Himalaya Financial").

84. Based on HK USA's document production to the Trustee, Himalaya Financial's April 19, 2022 loan agreement with HK USA (the "Himalaya Loan Agreement") was only executed by the Debtor's Daughter for HK USA, but not executed by any representative of Himalaya Financial.[194] Notably, the Himalaya Loan Agreement purports to grant to Himalaya Financial a security interest in the Lady May,[195] though a separate side letter agreement (the "Himalaya Side Letter"), also dated April 19, 2022, provides that the Himalaya Loan Agreement "will no longer be deemed to be secured against the Yacht" and that HK USA "will instead provide a personal guarantee."[196] Based on HK USA's document production to the Trustee, the Himalaya Side Letter was only signed by the Debtor's Daughter, not by Himalaya Financial. The personal guarantee from HK USA required by the Himalaya Side Letter was in fact supplied by the Debtor's Daughter herself (not HK USA) and is also dated April 19, 2022.[197]

---

[193] See Lady May Stipulation ¶ 9 (discussing effectiveness of Lady May Stipulation "[i]n the event this Court enters an order dismissing this bankruptcy case").

[194] See Ex. 79, Himalaya Loan Agreement, dated April 19, 2022, at 13.

[195] Id. at 4.3 ("The Total Facility Amount shall be secured against the Yacht and all other asset of the Company, directly or indirectly, and shall take priority agaist [sic] all other liabilities or debts claimed against the Borrower.").

[196] Ex. 80, Side Letter agreement to Himalaya Loan Agreement, dated April 19, 2022, at 1.3 (a)-(b).

[197] See Ex. 81, Guaranty Agreement, dated April 19, 2022, at 1, 4 (signed by the Debtor's Daughter).

49

85. The Himalaya Loan Agreement provides, among other things, that "[s]ubject to the provisions of this agreement, [HK USA] shall repay the Loan in full on demand and in any case upon the return of the yacht to the U.S. or within six months of the date of this Agreement, whichever is sooner."[198]

86. While the Trustee is currently seeking additional discovery regarding Himalaya Financial, the facts of which the Trustee is aware at the time of the filing of these Counterclaims demonstrate that Himalaya Financial is owned and/or controlled by the Debtor. For example:

a) The proposal to post a bond in connection with the return of the Lady May to the United States came from **the Debtor's counsel**, and was arranged by the Debtor in an amount of $37 million very soon after HK USA had announced that its only asset was the Lady May, meaning that HK USA could not have posted a bond in any amount without an immediate infusion of funds.

b) Based on HK USA's document production, the Himalaya Loan Agreement and Himalaya Side Letter were not signed by Himalaya Financial. Upon information and belief, Himalaya Financial has not declared a default under the Himalaya Loan Agreement despite payment being due upon the return of the Lady May to the United States, which occurred in early July 2022.

c) According to documents in the possession of the Trustee, Himalaya Financial was represented in connection with its loan to HK USA by the law firm of Berkeley Rowe, which was previously used by the Debtor's Son as his address on the proof of claim filed by the Debtor's Son in the Genever US chapter 11 case.[199]

d) According to documents in the possession of the Trustee, Himalaya Financial was not originally slated to be the lender of the $37,000,000, but was a replacement, at the last moment, for ACA Capital Group Limited ("ACA"), a Hong Kong entity with numerous links to the Debtor. Hong Kong public corporate filings (of the kind that are not publicly available for a BVI company like Himalaya Financial) establish that ACA's sole

---

[198] Ex. 79, Himalaya Loan Agreement, dated April 19, 2022, at 13.

[199] *See* Ex. 71, Proof of Claim 3-1, *In re Genever Holdings LLC*, Case No. 20-12411-JLG (Bankr. S.D.N.Y.).

purported shareholder, William Je,[200] and at least a number of its directors and officers, are well-known associates of the Debtor.[201]

e) ACA has a history of gifting funds to the Debtor under the guise of purported loans. In the Liman Decision, Judge Liman found that ACA had given a gift of $1 million to Eastern Profit Corporation, despite the contention that these funds were provided as a loan and the existence of a document that purported to be a loan agreement.[202] During the related litigation, Strategic Vision US LLC had suggested that the Debtor was the source of the funds gifted to Eastern, however Judge Liman did not make a finding on that issue.[203]

f) ACA Capital contributed to the payment of the Debtor's legal fees in connection with the State Court Action.[204]

g) Himalaya Financial plays a key role in the Debtor's latest cryptocurrency venture as the purported issuer of "Himalaya Coin," which, along with the related "Himalaya Dollar," purportedly issued by Himalaya Financial Reserves Limited, has been heavily promoted by the Debtor and the

---

[200] See Ex. 72, ACA Capital Group Limited Articles of Association, dated December 30, 2014 at 3 (identifying Je Kin Ming (alias as William Je) as sole shareholder). Documents filed in the Genever chapter 11 case further provide an address for William Je that is identical to the address on South Bay Road in Hong Kong used by the Debtor and the Debtor's Son in corporate documents related to Genever BVI. See Ex. 74, In re Genever Holdings LLC, Case No. 20-12411-jlg (Bankr. S.D.N.Y.), ECF No. 14-62, at p. 6 of 23; Ex. 33, Bravo Luck Limited Register of Members. At the trial related to the Liman Decision in Eastern Profit Corp. Ltd., a witness named Sasha Gong testified at trial on April 22, 2021 that the Debtor had introduced her to Mr. Je and described Mr. Je as "my money man." Ex. 27, Tr. at 774:24-775:1 ("Was he formally introduced to you? A. Yes. Mr. Guo introduced him to me that -- jokingly, that "He's my money man. Anything ask him about money."). In addition, at this trial the Debtor invoked the Fifth Amendment multiple times when questioned regarding William Je. See id. at Tr. 691: 24-25 ("Q. Who is William Je? A. The Fifth Amendment."); Id. at 692:24-693:1 (Q: "And [Mr. Je] sends money to places when you ask him to do so, doesn't he? A: The Fifth Amendment. I'm invoking the Fifth Amendment."); Id. at 695: 5-7 ("And you introduced William Je to close associates as your money man, haven't you? A. The Fifth Amendment.").

[201] See Ex. 72, ACA Capital Group Limited Articles of Association, at 3 (identifying Je Kin Ming (alias of William Je) as sole shareholder); Ex. 77, ACA Capital Group Ltd. Change in Particulars of Company Secretary and Director, dated April 1, 2017, at 3 (signed by Fiona Yu); Ex. 51, ACA Capital Group Ltd. Annual Return, dated Jan. 6, 2019, at 4 (listing Karin Maistrello as director).

[202] Eastern Profit Corp. Ltd., 2021 WL 2554631, at *41 ("The source of the funds sent by ACA is unknown to the Court and was not the subject of testimony. But regardless of whether those funds are ultimately traceable to Guo as Strategic suggested or are independent from him, the Court finds that they were a gift on behalf of Eastern (and Guo) and not provided out of any obligation.").

[203] Id.

[204] Ex. 73, Letter from Kevin M. Kearney of Hodgson Russ LLP, dated April 7, 2021 at 2, PAX v. Kwok, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 766 (Noting that payments to Hodgson Russ were made by Golden Spring as well as ACA Capital and a third Debtor-linked entity, Ziba Limited).

Debtor's various websites and social media accounts.[205] Both cryptocurrencies are sold on the "Himalaya Exchange" website.[206] The Debtor's Himalaya cryptocurrency operation and his other online schemes have resulted in numerous allegations of fraud against the Debtor and his associates.

h)      Numerous entities and organizations reportedly controlled by the Debtor are named "Himalaya." These include, the Himalaya Embassy, Himalaya Federal Reserve, and Himalaya Supervisory Organization, as well as many others.[207]

i)      "Himalaya Coin," the name of the cryptocurrency issued by Himalaya Financial, as well as the name of the related "Himalaya Dollar" cryptocurrency, are assumed names registered in the state of New York by Saraca Media Group, Inc., the shell company used by the Debtor for, among other things, his cryptocurrency ventures.

j)      Saraca's certificates of assumed name for "Himalaya Coin" and "Himalaya Dollar" filed with the State of New York were signed by Yvette Wang,[208] who is also **the president of Golden Spring**.[209]

---

[205] *See* "Whitepaper Himalaya Coin" Himalaya Exchange, Apr. 2021, https://himalaya.exchange/images/hweb/hcn_whitepaper_eng.pdf, at 2 (describing Himalaya Coin as "issued and managed by Himalaya Financial Group Limited" and Himalaya Dollar as "issued and managed by Himalaya International Reserves Limited"); Song, Zijia. "Himalaya Coin Loved by Exiled Billionaire and Steve Bannon Soars." *Bloomberg.com*, Bloomberg, 12 Nov. 2021, https://www.bloomberg.com/news/articles/2021-11-12/a-27-billion-token-loved-by-exiled-billionaire-and-steve-bannon; "Miles Guo - Hcoin to the Moon (Official Video)." *YouTube*, 10 Dec. 2021, https://www.youtube.com/watch?v=foVjKjgyN4Q; "*Our Trillion Currency Empire EP3-1 Professional Interpretation of Himalaya Coin White Paper by Industry Investors*.", G-News Taiwan, 27 May 2021, https://gnews.org/post/p1262067; Guo, Miles. "The Himalaya Coin Is Fully Involved in the Establishment of the New Quantum Computing Standards…" *GETTR*, June 8, 2022, https://gettr.com/post/p1dbt3hd9b5. ("The Himalaya Dollar is the only real stablecoin, and the Himalaya Coin is the best volatile digital coin."); Guo, Miles. "The Himalaya Coin Is and Will Always Be the Most Stable Digital Currency in the World..." *GETTR*, April 3, 2022, https://gettr.com/post/p13hcxj36ea. ("The Himalaya Coin is and will always be the most stable digital currency in the world").

[206] *See* "Himalaya Exchange," Himalaya Exchange, Sept. 22, 2022, https://himalaya.exchange/.

[207] *See, e.g.*, Friedman, Dan. "A Fugitive Chinese Tycoon Met Steve Bannon. Misinformation Mayhem Ensued." *Mother Jones*, March – April 2022, https://www.motherjones.com/politics/2022/02/guo-wengui-miles-guo-gettr-steve-bannon/ ("The [New Federal State of China] has what Guo calls the *Himalaya Embassy*, located in a leased building on Manhattan's Upper East Side that houses other Guo concerns. Navarro, a veteran China hawk, has signed on as a supposed 'international ambassador.' Guo has even created a monetary system, based on a cryptocurrency dubbed GCoin; it's issued through an entity called the *Himalaya Federal Reserve*.").

[208] Ex. 25, Himalaya Coin Certificate of Assumed Name at 1 and Ex. 26, Himalaya Dollar Certificate of Assumed Name at 1.

[209] Ex. 2, Wang Dep. Tr. at 42:20-23.

k)      Documents in the Trustee's possession suggest that funds used to purchase Himalaya Coin and/or Himalaya Dollar cryptocurrency are paid directly to Saraca doing business as Himalaya Coin and/or Himalaya Dollar.

87.     As of the date of the filing of these Counterclaims, the $37 million paid into escrow by HK USA pursuant to the Lady May Stipulation remains deposited in an escrow account at U.S. Bank, a financial institution with branches in Connecticut, pursuant to an escrow agreement between HK USA, the official committee of unsecured creditors, and U.S. Bank (the "Escrow Agreement").

88.     The funds deposited pursuant to the Escrow Agreement and/or rights thereto under the Escrow Agreement (collectively, the "Escrowed Funds"), are property of HK USA.

89.     The Lady May arrived in the waters of Connecticut in early July 2022 and remains there as of the date of the filing of these Counterclaims.

**v.      Debtor Seeks Dismissal of Chapter 11 Case**

90.     On March 19, 2022, the UST filed a motion for the appointment of an examiner or chapter 11 trustee [Main Case Docket No. 102] (the "Trustee Motion"), arguing, among other things, that it was "in the best interests of creditors and the estate to appoint an examiner or a trustee because the Debtor, a public figure and self-proclaimed billionaire . . . claims that he has no regular income and virtually no assets yet seemingly has access to significant funds."[210]

91.     On April 6, 2022, PAX Filed a motion to dismiss the Debtor's case, or, in the alternative, a partial joinder to the Trustee Motion [Main Case Docket No. 183] (the "Motion to Dismiss") in which it pointed out, among other things, that the Debtor's *modus operandi* is to part, shield and secrete his assets through family members and shell companies."[211]

---

[210] *UST's Motion for an Order Directing the Appointment of an Examiner or, In the Alternative, Motion for Order Directing the Appointment of a Chapter 11 Trustee*, Docket No. 102, at 1.

[211] *PAX's Motion to Dismiss Chapter 11 Case Or, In The Alternative, Partial Joinder To United States Trustee's Motion For An Order Directing The Appointment Of A Chapter 11 Trustee*, Docket No. 183, ¶ 2.

92.     On May 11, 2022, the Debtor filed notice of his consent to the dismissal of the

Chapter 11 Case [Main Case Docket No. 344] (the "Consent to Dismissal") and withdrew his

DIP motion, which at the time was still pending.  In his Consent to Dismissal, the Debtor stated

that, while he had "obtained the commitment of" Golden Spring to provide DIP financing and

had "arranged for a very substantial asset owned by his daughter, the Lady May yacht with a

likely value in excess of $30 million" to be made available for liquidation for the benefit of

creditors, due to litigation by PAX and the UST, the Debtor was "buckling under the weight" of

professional fees and Golden Spring "had withdrawn its commitment to fund" the Chapter 11

case.[212]

### vi.     HK USA Acts In Concert with Debtor and Golden Spring

93.     Fittingly given its status as the Debtor's alter ego, HK USA's actions in this

Chapter 11 Case have been taken in concert with those of the Debtor and the Debtor's "family

office," Golden Spring.  For example, as demonstrated by email records in the possession of the

Trustee:

a)      Retention of Zeisler & Zeisler to represent HK USA and the Debtor's
        Daughter was arranged by the Debtor and/or his counsels, Aaron Mitchell
        (Lawall & Mitchell) and William Baldiga (Brown Rudnick), with Stephen
        Kindseth of Zeisler & Zeisler submitting his retention agreement to Mr.
        Mitchell for his review and for signature by the Debtor's Daughter.[213]

b)      When concerned about the delayed payment of his retainer, Mr. Kindseth
        inquired with the Debtor's counsel, Robert Stark, of Brown Rudnick.[214]

---

[212] *Debtor's Consent to Dismissal of Case*, Docket No. 344, ¶¶ 4, 6.

[213] *See* Ex. 83, Email from Stephen Kindseth, dated April 1, 2022.

[214] *See* Ex. 84, Email from Stephen Kindseth, dated April 4, 2022 ("Robert, just following up about the retainer since you offered. I did not receive it today which is slightly disconcerting. If you could find out about its status that would be great. I have put a lot of time in this already with my partner and there's some obviously critical timing issues this week.").

c)    Email correspondence related to the preparation of the April 11, 2022 HK USA Statement typically included the Debtor's personal attorney, Aaron Mitchell and Golden Spring representative Max Krasner.[215]

d)    Email correspondence between Mr. Kindseth and Craig Jalbert (of the Debtor's proposed financial advisor, Verdolino & Lowey), and between Jeffrey Jonas of Brown Rudnick and Mr. Kindseth and Mr. Jalbert, regarding arrangements to escrow the $37 million paid pursuant to the Lady May Stipulation included Melissa Francis, Golden Spring's general counsel.[216]

e)    The Debtor's attorney Mr. Mitchell responded to inquiries from the Debtor's Brown Rudnick attorneys regarding the status of the wire of the $37 million that was to be deposited into escrow.[217]

### vii.    Debtor Fails to Respond to HK USA's Complaint

94.    May 13, 2022 was the deadline for the Debtor to file an answer in this Adversary Proceeding. The Debtor failed to file an answer or request an extension of this deadline.

95.    Subsequently, the Debtor's counsel Mr. Henzy has clarified that in connection with this Adversary Proceeding:

> "[The Debtor's] position is that HK [USA] owns the boat so [the Debtor and HK USA] are not adverse. He does not believe that he owns the boat. He does not believe that it's property of the bankruptcy estate. I'll say that unequivocally on the record. So I don't see how they can be adverse if they take the same position."[218]

---

[215] *See, e.g.*, Ex. 85, Email from Russell Stockil to Stephen Kindseth, CCing Max Krasner, dated April 6, 2022, providing information regarding the Lady May "further to request from Family Office [i.e., Golden Spring]"); Ex. 86, Email from Stephen Kinseth to Russell Stockil, CCing Max Krasner and Aaron Mitchell, dated April 9, 2022.

[216] *See, e.g.*, Ex. 87, Email from Stephen Kindseth to Craig Jalbert, CCing Melissa Francis, dated April 17, 2022; email from Jeffrey Jonas to Stephen Kindseth and Craig Jalbert, CCing Melissa Francis, dated April 18, 2022.

[217] Ex. 88, Email from Aaron Mitchell, dated April 18, 2022 ("There is a $37M wire that was sent last week. It should clear by now, or soon. Getting wire confirmation.").

[218] *See* Ex. 91, August 1, 2022 Hr. Tr. at 39:3-8.

### viii. Court Orders Appointment of Chapter 11 Trustee

96.     On May 24, 2022, the Court held an evidentiary hearing on the issue of whether

to dismiss the Chapter 11 Case or appoint a chapter 11 Trustee, and on June 15, 2022, the Court

issued its decision ordering the appointment of a chapter 11 trustee [Main Case Docket No. 465]

(the "Trustee Appointment Decision").

97.     In the Trustee Appointment Decision the Court found, among other things, that

the "Debtor has demonstrated he can obtain millions of dollars in funds, including the

$8,000,000.00 that was the subject of the DIP Motion," and that the Debtor's Proposed Plan had

provided for "the transfer of title to the Lady May to a creditor trustee for the benefit of all

creditors."[219]

98.     The Court also noted the arguments of creditors that the Debtor had "engaged in

multilayer transactions involving complicated corporate structures like Golden Spring, Genever

Holdings, Lamp Funding, and HK [USA] that make it difficult to identify and locate the

Debtor's assets."[220]  This "complexity of the Debtor's financial affairs and lack of independent

managerial oversight in this case warrants the appointment of a Chapter 11 trustee who can

investigate, identify, and locate the Debtor's assets for the benefit of creditors and the estate."[221]

### ix. Debtor Attempts to Frustrate Trustee's Investigation and Administration of Estate to Protect Shell Game From Scrutiny

99.     Since the appointment of the Trustee on July 8, 2022, the Debtor has, despite his

duty to cooperate with the Trustee under section 521(a)(3) of the Bankruptcy Code, engaged in a

---

[219] Memorandum of Decision and Order Denying Motion to Dismiss Without Prejudice and Granting Joinder to Motion for Appointment of Chapter 11 Trustee (June 15, 2022), Docket No. 465, at 13.

[220] *Id.* at 15.

[221] *Id.* at 16.

tireless effort to stymie the Trustee's administration of the Debtor's chapter 11 estate and

investigation of the Debtor's assets and financial condition.  Among other things, the Debtor has:

a)      Sought relief from the order appointing the Trustee;

b)      Opposed the retention of the Trustee's counsel;

c)      Opposed the Trustee's corporate governance motion;

d)      Opposed the Trustee's discovery efforts; and

e)      Appealed the Court's rulings that denied the Debtor's motion for relief
from the order appointing the trustee and granted the Trustee's corporate
governance motion.

100.    In sum, since the Trustee's appointment, hundreds of hours have been devoted to

dealing with the Debtor's "obstruct[ion] [of] the administration of this estate."[222]

101.    In conjunction with the Debtor's filings before this Court that opposed the

appointment of the Trustee and the retention of the Paul Hastings based on alleged influence of

the Chinese government or Chinese Communist Party ("CCP") over Paul Hastings, the Debtor

also launched a stream of online diatribes against the Trustee, his counsel, PAX, PAX's counsel,

the UST, the Department of Justice, and the entire chapter 11 process.[223]

102.    Relatedly, the Debtor has stated that he "firmly believe[s] the CCP is

orchestrating the PAX case."[224]  Indeed, in a 2018 deposition undertaken by counsel to PAX in

connection with the attachment of assets and veil piercing issues, the Debtor accused PAX's

---

[222] Ex. 89, Aug. 30, 2022 Tr.at 94:19-95:2 ("[A]ll the arguments that you have made has been to stop the trustee from trying to do what the trustee is going to do. If you don't like what the trustee does, then you can sue him. You can do that. There's a remedy. You have a remedy. You can sue him. But you are now obstructing the administration of this estate that all the other creditors have been waiting to have administered.").

[223] *See* PAX's Statement to Debtor's Rule 60(b) Motion & Retention Application, Docket No. 618, at ¶ 10.

[224] Docket 107.

attorneys of being agents of the CCP,[225] and, when presented with to an audio recording

evidencing his ownership of the Lady May, the Debtor **covered his ears** and refused to listen,

alleging that "[t]his is all communist" and threatening suicide.[226]

103.     Thus, in addition to the Debtor's pattern of using the shell game to defraud

creditors, the Debtor also has a pattern of accusing parties attempting to investigate his assets of

collusion of with the CCP.  In this respect, the Debtor uses his reputation as an anti-CCP activist

to protect his shell game from scrutiny and maintain his lifestyle while creditors go unpaid.

### L.     Claim of IRS

104.     On August 10, 2022, the IRS filed a proof of claim [POC 12-1] against the

Debtor.

### FIRST COUNTERCLAIM

### (Lady May Is Property of the Debtor)

105.     The Trustee repeats and realleges the allegations contained in paragraphs 7-104.

106.     In the Final Contempt Decision, Justice Ostrager found that the Debtor

"beneficially owns and controls the Lady May."[227]

107.     Justice Ostrager's finding with respect to the Debtor's ownership of the Lady May

was preclusive in effect and HK USA is collaterally estopped from contesting that issue.

---

[225] Ex. 8, Kwok Dep. Tr. at 21:8-13 ("I think you guys [PAX's counsel] are a bunch of thugs. I think you are just mafia. You're working for the communists. You're doing threats and racketeering. The whole world knows what you're doing. You're helping the mafia. You're destroying a good person. I don't need to pay any attention to you at all.").

[226] *Id.* at 60:20-61:2 ("THE WITNESS: I refuse to listen. I'm not going to listen.  Q: Sorry, Mr. Kwok, were you covering your ears? A: This is all communist. Everything here is all communist. Unless you prove this is not communist, then I will listen."); 61:14-20 ("I have a sensation of committing suicide if you're going play that. This is communist. Very simple. There is like a number of place that the communist that have been proven by the FBI to be fake. So you want me to commit suicide? Are you here to kill me?").

[227] Ex. 1, Final Contempt Decision at 7.

108.    New York issue preclusion law is applicable here given that the findings in the
Final Contempt Decision were made by a New York Court.

109.    Under New York law, collateral estoppel bars relitigation of an issue when:
(a) the identical issue necessarily was decided in the prior action and is decisive of the present
action, and (b) the party to be precluded from relitigating the issue had a full and fair opportunity
to litigate the issue in the prior action.  *Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*,
988 F.3d 634, 642 (2d Cir. 2021) (applying New York law).

110.    Both of these conditions apply here.  The issue of the Debtor's ownership and
control of the Lady May was necessarily decided by Justice Ostrager.  In fact, the Appellate
Division expressly asked Justice Ostrager to resolve it, leading to the Final Contempt Hearing
and the issuance of the Final Contempt Decision shortly thereafter.[228]  Moreover, HK USA had a
full and fair opportunity to litigate the ownership issue before Justice Ostrager, even though HK
USA was not a named party to the State Court Action.  This is because HK USA was in privity
with the Debtor, who was a party to the State Court Action.  HK USA and the Debtor were (and
are) completely aligned on the ownership issue:  both took the position that HK USA, and not the
Debtor, was the true owner of the Lady May.  In addition, HK USA was an active participant at
the Final Contempt hearing; its counsel introduced and defended the testimony of four out of the
five witnesses called on behalf of the Debtor.

111.    Based on the above, the Trustee seeks a ruling pursuant to sections 541 and 542 of
the Bankruptcy Code (1) declaring that the Lady May is property of the Debtor's chapter 11

---

[228] Ex. 1, Final Contempt Decision (quoting *Pac. All. Asia Opportunity Fund L.P. v. Wan*, 153 N.Y.S.3d 862, 863
(App. Div. 2021)) ("The motion court is instructed to proceed with an evidentiary hearing to resolve a dispute as to
ownership and control of the yacht, and to assess appropriate penalties.").

estate to be administered by the Trustee and (2) ordering the surrender of the Lady May to the
Trustee.

## SECOND COUNTERCLAIM

### (Alter Ego)

112.    The Trustee repeats and realleges the allegations contained in paragraphs 7-104.

113.    Because HK USA is a Delaware entity, Delaware law applies to the alter ego/veil
piercing claim.[229]

114.    Under Delaware's two-pronged test for piercing the corporate veil, a court
applying Delaware's alter ego analysis to the Debtor's relationship with HK USA will focus on
(1) whether the Debtor and HK USA operated as a single economic unit and (2) whether there
was an overall element of injustice or unfairness.  With regard to the former, a court applying
Delaware law would consider a number of factors, including, among others, whether HK USA
was adequately capitalized, observed corporate formalities, and was a facade for the Debtor.[230]
This "list of factors is not exhaustive and no single factor is dispositive."[231]  However, the
common theme, which "must always be present," is an "an overall element of fraud, injustice, or
unfairness."[232]  To that end, a number of courts have explained that control over, and/or
ownership of, the property or assets of the allegedly separate entity is evidence that the entity is

---

[229] *See e.g. Universitas Education, LLC v. Benistar*, 2021 WL 965794, at *7 (D. Conn. Mar. 15, 2021) ("[B]ecause [defendant] is incorporated in Delaware, I must apply Delaware law to decide if it may be subject to an alter ego claim for reverse veil piercing liability.").

[230] *Blair v. Infineon Tech., AG*, 720 F. Supp.2d 462, 470-71 (D. Del. 2010) (Noting the factors that the Third Circuit considers in determining whether a corporation operated as a single economic entity, which notably would not include whether the relevant individual is a shareholder of the entity, but would include "gross undercapitalization; failure to observe corporate formalities . . . [and] whether the corporation is merely a facade.").

[231] *Blair v. Infineon Tech.*, 720 F. Supp.2d at 471.

[232] *Id.*

60

really the alter ego of the controlling party.[233]

115.    The facts alleged herein establish that HK USA is an alter ego of the Debtor.
Critically, as Justice Ostrager found, HK USA's only purported asset, the Lady May, was
beneficially owned and controlled by the Debtor.  This finding by Justice Ostrager is binding on
HK USA, which was present during, participated in, and was in privity with the Debtor during
the State Court Action, under the doctrines of collateral estoppel and/or *res judicata*.

116.    Moreover, both Justice Ostrager's decision and the overall record of documents
and testimony in prepetition litigation and in this Chapter 11 Case demonstrate conclusively that
HK USA was one of the Debtor's shell companies used as part of a comprehensive effort to
shield assets from creditors and plead poverty while living in the lap of luxury.  The Debtor even
used HK USA as the potential funder of his chapter 11 plan, through the contemplated donation
of the Lady May to a creditor's trust in exchange for broad releases for the Debtor and his shell
companies and family members.

117.    HK USA also has all the classic hallmarks of an alter ego shell company: among
other things, at all relevant times it had no source of income, did not pay its own expenses
(which were funded by Golden Spring), had no directors, officers, or employees, did not file tax

---

[233] *See ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 320 (S.D. Tex. 2008) (debtor and its subsidiary
operated as a single economic unit in part because the "dividends from [subsidiary's] only asset went directly to
[debtor], its dominant shareholder, which had total control of the funds"); *Crystallex Int'l Corp. v. Bolivarian
Republic of Venezuela*, 333 F. Supp. 3d 380, 396 (D. Del. 2018), *aff'd and remanded*, 932 F.3d 126 (3d Cir. 2019)
(allegedly separate instrumentality would be considered an alter ego if the controlling entity had extensive control of
the instrumentality, including if it "uses the instrumentality's property as it its own").  *See also Ashley v. Ashley*, 393
A.2d 637, 641 (Pa. 1978) ("We have said that whenever one in control of a corporation uses that control, or uses the
corporate assets, to further his or her own personal interests, the fiction of the separate corporate identity may
properly be disregarded.") (emphasis added); *In re B.L. Jennings, Inc*., 373 B.R. 742, 759 n. 10 (Bankr. M.D. Fla.
Jun. 12, 2007) ("partnerships and other business entities may also be found to be the 'alter egos' of those in control
or dominion over their assets") (emphasis added); *Freeman v. Complex Computing Co., Inc.,* 119 F.3d 1044, 1051
(2d Cir. 1997) (defendant that "exercised considerable authority over [the corporation] ... to the point of completely
disregarding the corporate form and acting as though [its] assets were his alone to manage and distribute" was
"appropriately viewed as [an] equitable owner for veil-piercing purposes") (internal citation omitted) (as modified)
(emphasis added).

returns, had no bank accounts and was not otherwise capitalized, and kept no documents. HK

USA's address was used by the Debtor's other shell companies and the Debtor himself.

118.    At all relevant times, the Debtor was indebted to one or more creditors. Such

creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors'

rights.

119.    Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of

the Bankruptcy Code, (1) declaring that HK USA's property, including the Lady May and the

Escrowed Funds, is property of the Debtor's chapter 11 estate to be administered by the Trustee

and (2) ordering the surrender of the Lady May and the Escrowed Funds to the Trustee.

## **THIRD COUNTERCLAIM**

### **(Declaration that Debtor Is Equitable Owner of HK USA and Ordering Turnover of Ownership of HK USA to Trustee)**

120.    The Trustee repeats and realleges the allegations contained in paragraphs 7-104.

121.    The same facts, discussed above, establishing that HK USA is an alter ego of the

Debtor also support the conclusion that the Debtor is the equitable owner of HK USA.[234]

122.    At all relevant times, the Debtor was indebted to one or more creditors. Such

creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors'

rights.

123.    Accordingly, the Trustee seeks a ruling, pursuant to sections 541, 542, and 544 of

the Bankruptcy Code, (1) declaring that the membership interest in HK USA purportedly held by

the Debtor's Daughter is property of the Debtor's chapter 11 estate and (2) ordering the

surrender of such membership interest and all related rights of corporate control, to the Trustee.

---

[234] *Freeman v. Complex Computing Co., Inc.*, 119 F.3d 1044, 1051 (2d Cir. 1997) (defendant that "exercised considerable authority over [the corporation] . . . to the point of completely disregarding the corporate form and ***acting as though [its] assets were his alone to manage.***") (emphasis added).

## FOURTH COUNTERCLAIM

### (Avoidance of Actual Fraudulent Transfer)
### (Asserted in the alternative to the First, Second, and Third Counterclaims)

124.     The Trustee repeats and realleges the allegations contained in paragraphs 7-104.

125.     As described in the First, Second, and Third Counterclaims, the Trustee seeks a judgment in this Adversary Proceeding that the Lady May is property of the estate and that HK USA is the alter ego of or equitably owned by the Debtor and, thus, all of HK USA's property or HK USA itself is property of the estate.  In the alternative, in the event that the Lady May is not property of the estate or that HK USA is not the alter ego of or beneficially owned by the Debtor, the Trustee asserts a claim of actual fraudulent transfer against HK USA pursuant to (1) Section 276 of the New York Debtor and Creditor Law,[235] made applicable by section 544 of the Bankruptcy Code; and (2) section 548(a)(1)(A) of the Bankruptcy Code.

126.     A claim of actual intent to defraud under section 548(a)(1)(A) of the Bankruptcy Code requires allegations that the debtor-transferor made a transfer or incurred an obligation with "actual intent" to "hinder, delay or defraud" a past or future creditor.[236]  "The analysis of the debtor's intent to hinder, delay, or defraud under [section] 548 of the Bankruptcy Code and under New York law is identical."[237]

127.     "Because of the difficulty in proving actual intent to hinder, delay, or defraud in making its case, a party can rely on the 'badges of fraud,' which are 'circumstances so

---

[235] This was the New York statute effective on the date of the 2017 Transfer.

[236] *In re Integrity Graphics, Inc.*, 623 B.R. 21, 29-30 (Bankr. D. Conn. 2020).

[237] *In re Combes*, 382 B.R. 186, 193-94 (Bankr. E.D.N.Y. 2008); The debtor-transferor's intent is at issue in such claims, not the transferee's.  *In re LXEng LLC*, 607 B.R. 67, 91 (Bankr. D. Conn. 2019).[237]

63

commonly associated with fraudulent transfers that their presence gives rise to an inference of intent.'"[238]

128.     Examples of 'badges of fraud' include, *inter alia*: (1) concealing facts and false pretenses; (2) an unconscionable discrepancy in consideration received in exchange for the value of the property transferred; (3) creating a closely-held corporation for property receipt; (4) closeness in relationship between the parties; (5) retaining the property in question for benefit or use; (6) the financial condition of the transferor and transferee both before and after the transfer(s); (7) repeated patterns or cumulative effect of courses of conduct post-insolvency or financial troubles; and (8) the timeline of events. . . The transfer of property to a spouse is a 'classic' badge of fraud. . . . Asset shifting to different corporate entities wholly owned or 'so closely assimilated' by the debtor is an additional badge of fraud."[239]

129.     The facts discussed herein establish the following sequence of events

a)     Between October 2014 and June 27, 2017, ownership of HK International was held by one of the Debtor's associates, Qu Guo Jiao ("Ms. Qu") through the undisclosed HK International Declaration of Trust for the benefit of the Debtor, who remained beneficial owner of HK International.

b)     On February 23, 2015, HK International became owner of the *Lady May*.

c)     The funds used to purchase the Lady May were transferred by the Debtor to Bravo Luck Limited, an entity registered in the British Virgin Islands and in which the Debtor, at the time, held a 50% ownership interest, with the remaining 50% held by the Debtor's son, and then by Bravo Luck Limited to the seller (the "2015 Transfer").

d)     On June 27, 2017, ownership of HK International was transferred to the Debtor's daughter *for no consideration* (the "2017 Transfer").

e)     In 2019, HK USA was formed.

---

[238] *Jie Xiao*, 608 B.R. 126, 157 (Bankr. D. Conn. 2019).

[239] *In re Jie Xiao*, 608 B.R. at 157.

64

f)     In April 2020, the *Lady May* was transferred from HK International to HK USA ***for no consideration*** (the "2020 Transfer").

130.     This sequence of events, established both by the voluminous record set forth in the Counterclaims and by the preclusive findings made by Justice Ostrager in his Final Contempt Decision, shows that, from the moment he first sought to purchase the Lady May, the Debtor engaged in a series of intentional transactions as part of his comprehensive efforts to judgment-proof himself by placing his valuable assets with shell companies or family members.

131.     First, in 2015, the Debtor used his shell company Bravo Luck Limited, an entity he controlled and shared with his son, to fund the purchase of the Lady May on behalf of HK International, an entity that one of the Debtor's associates (Ms. Qu) held in trust, through the undisclosed HK International Declaration of Trust, for the Debtor's benefit.  That the funds used to purchase the Lady May came from the Debtor is supported by Justice Ostrager's finding that "there is no evidence that [the Debtor's Son] was involved with the corporate transactions leading to" HK International's acquisition of the Lady May,"[240] and that the facts presented supported the "reasonable inference [] that Kwok provided the funds to HK International] which were used to purchase the yacht."[241]  Second, in 2017 the Debtor, for no consideration, transferred HK International itself to his daughter.  Third, and finally, in 2020, the Debtor caused HK International—again for no consideration—to transfer the Lady May to HK USA.  All three of these transactions were clearly part of the Debtor's comprehensive effort to judgment-proof himself by placing his valuable assets with shell companies or family members.

132.     On these facts, there are two separate fraudulent transfers by the Debtor.  The most obvious is the 2017 Transfer, pursuant to which the Debtor caused HK International—

---

[240]   Ex. 1, Final Contempt Decision at 5.

[241]   Ex. 1, Final Contempt Decision at 4.

which he beneficially owned at the time pursuant to the undisclosed HK International Declaration of Trust—to be transferred to his daughter for no consideration. Given the lack of any consideration, as well as the extensive evidence and findings by Justice Ostrager that the Debtor has repeatedly engaged in efforts to shelter his assets from creditors, the 2017 Transfer is avoidable as an actual fraudulent transfer. *See In re Jie Xiao*, 608 B.R. 126, 157–58 (Bankr. D. Conn. 2019) (finding actual fraud where "[t]he Debtor had one paramount goal: to leave himself and LXEng judgment-proof while channeling their assets to his wife, children, and extended family. His willingness to channel, transfer, and distribute those monies reveals his conscious intention and design.").

133.    In the alternative, in the event the Court were to determine (despite the clear evidence to the contrary) that the Debtor did not hold a beneficial interest in HK International at the time of the 2017 Transfer, then the 2015 Transfer is avoidable as an actual fraudulent transfer. As noted above, the funds that allowed HK International to purchase the Lady May in 2015 came from the Debtor, using his shell company Bravo Luck. Assuming for the sake of argument that the Debtor did not own HK International at that time, then he effectively gifted the funds necessary to purchase the Lady May to HK International for no consideration. Such a transfer fits neatly into the Debtor's fraudulent shell game and is avoidable for that reason

134.    Because at least one of these transfers is avoidable, the Trustee may recover the Lady May or its value from HK USA, either because HK USA is a subsequent transferee liable under section 550(a) of the Bankruptcy Code, or because the transactions in 2015, 2017, and 2020 can be collapsed into one transaction under the collapsing doctrine.

135.    At all relevant times, the Debtor was indebted to one or more creditors. Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors'

rights.

136.     Accordingly, assuming that the relief requested in first or second counterclaim is not granted, the Trustee seeks a ruling, pursuant to the Section 276 of the New York Debtor and Creditor Law and sections 544, 548 and 550 of the Bankruptcy Code, that the Lady May or the value of the Lady May be surrendered to the Trustee.

## FIFTH COUNTERCLAIM

### (Negligence)
### (Asserted in the alternative to the Second and Third Counterclaims)

137.     The Trustee repeats and realleges the allegations contained in paragraphs 7-104.

138.     As described in the Second and Third Counterclaims, the Trustee seeks a judgment in this Adversary Proceeding that HK USA is the alter ego of or equitably owned by the Debtor and, thus, all of HK USA's property or HK USA itself is property of the estate.  In the alternative, in the event HK USA is not the alter ego of or beneficially owned by the Debtor, the Trustee holds a negligence claim against HK USA.

139.     The elements of a negligence claim under New York law are: "(i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach."[242]  Moreover, "all persons have a common-law duty to exercise ordinary care and skill to refrain from injuring others."[243]

140.     Here, in the event HK USA is not an alter ego of the Debtor, HK USA owed a duty to the Debtor to exercise ordinary care and skill to refrain from injuring him.  Nevertheless, despite the fact that HK USA's sole member, the Debtor's daughter, was aware of Justice

---

[242] *Lombard v. Booz–Allen & Hamilton, Inc.,* 280 F.3d 209, 215 (2d Cir.2002) (citing *Merino v. New York City Transit Auth.,* 218 A.D.2d 451, 639 N.Y.S.2d 784 (1st Dep't 1996)).

[243] *Guido v. 1114 6th Ave. Co.,* 2015 WL 1055074, at *15 (N.Y. Sup. Ct. Mar. 10, 2015).

Ostrager's orders, applicable to HK USA, restraining the movement of the Lady May and imposing daily penalties for the failure to return the Lady May to the United States, HK USA nevertheless moved the Lady May Overseas and kept it there until July 2022. This was a violation of HK USA's duty of care and caused the Debtor to incur a contempt fine of $134 million pursuant to the Final Contempt Decision.

141. Thus, the Debtor as of the Petition Date held a negligence claim against HK USA which became property of the Debtor's chapter 11 estate pursuant to section 541 of the Bankruptcy Code and which the Trustee now asserts against HK USA.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, the Trustee respectfully requests that judgment be entered as follows:

1. On the First Counterclaim, an order (1) declaring that the Lady May is property of the Debtor's chapter 11 estate to be administered by the Trustee and (2) ordering the surrender of the Lady May to the Trustee;

2. On the Second Counterclaim, an order (1) declaring that HK USA's property, including the Lady May and the Escrowed Funds, is property of the Debtor's chapter 11 estate to be administered by the Trustee and (2) ordering the surrender of the Lady May and the Escrowed Funds to the Trustee;

3. On the Third Counterclaim, an order (1) declaring that the membership interest in HK USA purportedly held by the Debtor's Daughter is property of the Debtor's chapter 11 estate and (2) ordering the surrender of such membership interest and all related rights of corporate control, to the Trustee;

4. On the Fourth Counterclaim, an order ruling, pursuant to the Section 276 of the

New York Debtor and Creditor Law and sections 544, 548 and 550 of the Bankruptcy Code, that the Lady May or the value of the Lady May be surrendered to the Trustee;

5.      On the Fifth Counterclaim, damages in the amount of no less than $134 million;

6.      Reasonable attorneys' fees, costs, and expenses incurred in this action; and

7.      Such other and further relief as the Court may deem just, proper, or equitable under the circumstances.

[*Remainder of Page Intentionally Left Blank*]

Dated:    September 23, 2022          LUC A. DESPINS,
          New Haven, Connecticut      CHAPTER 11 TRUSTEE

By: */s/ Patrick R. Linsey*
    Patrick R. Linsey (ct29437)
    NEUBERT, PEPE & MONTEITH, P.C.
    195 Church Street, 13th Floor
    New Haven, Connecticut 06510
    (203) 781-2847
    plinsey@npmlaw.com

      *and*

    Nicholas A. Bassett *(pro hac vice)*
    PAUL HASTINGS LLP
    2050 M Street NW
    Washington, D.C., 20036
    (202) 551-1902
    nicholasbassett@paulhastings.com

      *and*

    Avram E. Luft *(pro hac vice)*
    Douglass Barron *(pro hac vice)*
    PAUL HASTINGS LLP
    200 Park Avenue
    New York, New York 10166
    (212) 318-6079
    aviluft@paulhastings.com

    *Counsel for the Chapter 11 Trustee*